David W. Sanford (DC Bar No. 457933, admitted *pro hac vice*)
dsanford@sanfordheisler.com
Aimee Krause Stewart (DC Bar No. 1047933, admitted *pro hac vice*)
astewart@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5200
Facsimile: (202) 499-5199

Deborah K. Marcuse (DC Bar No. 99538, admitted *pro hac vice*)
dmarcuse@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, MD 21202
Telephone: (410) 834-7420
Facsimile: (410) 834-7425

Ed Chapin (CA Bar No. 53287)
echapin2@sanfordheisler.com
Jill Sullivan Sanford (CA Bar No. 185757)
jsanford@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
655 W. Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 577-4253
Facsimile: (619) 677-4250

*Attorneys for Plaintiffs, the Proposed Classes, and the Proposed Collective*
*[Additional Attorneys Listed After Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, and JANE DOE 6, on behalf of themselves and all others similarly situated,<br><br>                                        Plaintiffs,<br><br>v.<br><br>MORRISON & FOERSTER LLP<br><br>                                        Defendant. | **Case No.: 18-CV-2542 (JSC)**<br><br>**AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, and Jane Doe 6 ("Plaintiffs" or "Class Representatives"), by and through their attorneys, Sanford Heisler Sharp, LLP, bring this action on behalf of themselves and all similarly situated female attorneys against Defendant Morrison & Foerster LLP. Plaintiffs allege, upon knowledge as to themselves and otherwise upon information and belief, that Defendant engages in systemic discrimination based on gender, pregnancy, and maternity, as follows:

## I.    **INTRODUCTION**

1.      Defendant Morrison & Foerster LLP ("Defendant," "MoFo," or "the Firm"), is one of the largest law firms in the nation, employing nearly 800 attorneys across the country, with 16 offices globally. MoFo specializes in a wide range of practice areas, including defense-side labor and employment law, in which the Firm defends clients against individual and class action employment lawsuits, including discrimination actions. The Firm markets itself as a progressive firm with policies and initiatives that champion the advancement of its female employees.[1] However, this is far from the truth.

2.      At MoFo, female attorneys who become pregnant, have children, and take or prepare to take maternity leave are denied opportunities for advancement and higher pay. MoFo's standard operating procedure is to hold back women who take maternity leave, regardless of their performance before or after leave. Continuing to bill out these attorneys at the same higher rate as their peers, until and unless the practice is contested, MoFo fails to pay these women on par with their actual seniority. By holding them back, MoFo further creates a lasting stain on their careers, impeding not only their opportunities for advancement internally but also their marketability at other firms.

3.      Left to work their way back from what is effectively a demotion, attorneys who are mothers are forced to prove their commitment to the Firm in a way no one else is. They risk isolation, work droughts, and even being pushed out of their practice groups if they do not meet the new, and impossibly high, standards that are set for them after they return from leave.

*//*

---

[1]    See    Morrison    &    Foerster,    *MoFo    Women*    (rev.    Dec.    6,    2018), https://media2.mofo.com/documents/181113-mofo-women.pdf.

4.      MoFo's policies, practices, and procedures are one manifestation of the "old boys' club" that has long permeated law firms, suppressing female advancement by treating female lawyers in ways that accord with stereotyped expectations rather than objective performance. When female attorneys become mothers, their place in a firm culture built on gender stereotypes becomes even more tenuous.

5.      Persistent stereotypes about working mothers have serious financial and social consequences for women. Women in law who have children and take maternity leave return (if they return at all) to face a lower volume of work, reduced exposure to interesting projects, and fewer opportunities for advancement.[2] More often than not, the law firms in question are acting based on stereotypes they place on working mothers as uncommitted to their jobs, overwhelmed, or no longer competent. When working mothers are viewed through the warped lens of employer stereotypes, their actual commitment or output becomes irrelevant. Consigned to the "mommy track," pregnant women and mothers are steered away from the opportunities for professional development that would permit them to reach the same levels of pay and promotion as their male peers.

6.      At MoFo, the mommy track is a dead end. Not only are pregnant attorneys and mothers routinely prevented from advancing with their class years, but the Firm forces women who are or could be mothers to work harder to prove that they are dedicated to their positions and to the Firm, setting unreasonably high expectations for them. Those who avail themselves of the Firm's maternity leave or flexible work schedule policy (voluntarily or involuntarily)—which permits attorneys to work part-time to care for their newborn children, purportedly without fear of repercussions for their career—are particularly vulnerable. Adding insult to injury, women are often denied even the chance to meet these expectations when they return from maternity leave and find themselves without sufficient work to meet the billable hour expectations set by the Firm.

7.      Women in the law already face significant challenges based on their gender. Women are regularly excluded from the upper echelons of law firms country-wide and continue to encounter the "glass

---

[2] See, e.g., Marc Tracy, *What Happens to Pregnant Women at a Big Law Firm*, New Republic (Jul. 25, 2013), https://newrepublic.com/article/114026/why-big-law-firms-lag-behind-parental-leave.

ceiling" at large law firms. A recent American Bar Association study found that at law firms nationwide, female attorneys comprise about 45% of law firm associates, but only 22.7% of partners and 19% of equity partners.[3] Men also far outpace women in their representation on firm-wide decision-making bodies.[4] Female attorneys across the board are paid significantly less than their male counterparts. A 2017 survey by the National Association for Women Lawyers found that the typical female attorney earns less than a typical male attorney at the same level, from lower ranks of associates all the way up to equity partners.[5] Even for associates, the median man makes on average $10,000 more per year than the median woman.[6]

8.      Women in the legal profession also disproportionately shoulder the costs of bearing children and child-rearing. Because of this, female lawyers are forced to delay their decisions to have a child until after they attain partnership, or face the negative consequences associated with motherhood.[7]

9.      At MoFo, pregnancy and maternity only amplify the costs of doing business as a woman. MoFo subjects its female attorneys to discrimination based on their gender, pregnancy, and maternity. The Firm has subjected Plaintiffs and other similarly situated employees to (a) unwarranted suppression of pay, professional development, and promotions after taking federal and state protected leave; (b) disparate treatment based on pregnancy and/or maternity; (c) discriminatory career and development opportunities and promotion denials; (d) discriminatory policies, practices, and procedures implemented by a male-dominated leadership that have a disparate impact on female attorneys, especially pregnant women and

---

[3] Comm'n on Women in the Profession, Am. Bar Ass'n, *A Current Glance at Women in the Law 2018* (January 2018), http://www.americanbar.org/groups/women/resources/statistics.html

[4] Nat'l Ass'n of Women Lawyers, *Annual Survey on Promotion and Retention of Women in Law Firms* (2017), http://www.nawl.org/p/cm/ld/fid=1163.

[5] *Id.;* see also Young Lawyer Ed. Bd., *The Real Women's Issue*, The Am. Lawyer, Aug. 2018, at 18.

[6] See Nat'l Ass'n of Women Lawyers, *supra* n.4.

[7] See Kyung Park & Nayoung Rim, *The Gendered Effects of Career Concerns on Fertility* (June 1, 2017), *available at* https://ssrn.com/abstract=3107374.

mothers; (e) lower pay for substantially equal work requiring equal skill, effort, and responsibility; and (f) other adverse terms and conditions of employment.

10.     Upon information and belief, MoFo has long been aware of these problems but has failed to take remedial measures to prevent or correct them.

11.     To remedy the gender and pregnancy discrimination and retaliation they witnessed and experienced at the Firm, Plaintiffs and the class are seeking all legal and equitable relief available under state and federal anti-discrimination, equal pay, and retaliation statutes, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, as amended; the Family and Medical Leave Act, ("FMLA"), 29 U.S.C § 2601 *et seq.*; and the Equal Pay Act of 1963, ("EPA"), 29 U.S.C. § 201 *et seq.*. Plaintiffs Jane Does 1-4 also seek all legal and equitable relief under the California Equal Pay Act, Cal. Lab. Code § 1197.5; the California Fair Employment and Housing Act, ("FEHA"), Cal. Gov. Code § 12940 *et seq.*; and the California Family Rights Act, ("CFRA"), Cal. Gov. Code § 12945.2. Plaintiff Jane Doe 5 also seeks all legal and equitable relief under the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1402-11 *et seq.*, and the District of Columbia Family & Medical Leave Act ("DCFMLA"), D.C. Code § 32–501 *et seq*. Plaintiff Jane Doe 6 also seeks all legal and equitable relief under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107, and New York Equal Pay Law, N.Y. Lab. Law § 194. Plaintiffs seek monetary and injunctive relief to rectify the Firm's discriminatory policies, practices, and procedures and to ensure that, going forward, the Firm abides by the law.

## II.    **THE PARTIES**

12.     **Plaintiff Jane Doe 1** is a woman who, at all times relevant to this action, lived and worked in California. At present, Jane Doe 1 is an attorney employed in one of Defendant's California offices.

13.     **Plaintiff Jane Doe 2** is a woman who, at all times relevant to this action, lived and worked in California. At present, Jane Doe 2 is an attorney employed in one of Defendant's California offices.

14.     **Plaintiff Jane Doe 3** is a woman who, at all times relevant to this action, lived and worked in California. At present, Jane Doe 3 is an attorney employed in one of Defendant's California offices.

15.     **Plaintiff Jane Doe 4** is a woman who, at all times relevant to this action, lived and worked in California. Jane Doe 4 was employed in one of Defendant's California offices through 2018.

16. **Plaintiff Jane Doe 5** is a woman who, at all times relevant to this action, lived in Maryland. Jane Doe 5 was employed in Defendant's Washington, D.C. office until August 2017.

17. **Plaintiff Jane Doe 6** is a woman who, at all times relevant to this action, was a resident of New Jersey and worked in New York. Jane Doe 6 was employed as Of Counsel in Defendant's New York office until 2018.

18. **Defendant Morrison & Foerster** is a law firm with offices worldwide, including four offices in California. The Firm's California offices are located in Los Angeles, Palo Alto, San Diego, and San Francisco. According to its website, Morrison & Foerster employs over 400 attorneys in California. It also has offices in Washington, D.C. During all relevant times, Morrison & Foerster was Plaintiffs' employer within the meaning of all applicable federal and state statutes.

### III. **JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over Plaintiffs' state law claims. The claims constitute the same case and controversy raised in the claims under federal law.

20. The Northern District of California has personal jurisdiction over the Firm because the Firm has headquarters in and transacts significant business in the State of California and in this District.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Defendant conducts substantial business in the Northern District of California, and because, upon information and belief, unlawful employment practices originated in this District.

22. Plaintiffs Jane Does 1-3 duly filed their administrative charges before the California Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC") on April 24, 2018, and received their Notices of Right to Sue from the EEOC June 18, 2018.

23. Plaintiff Jane Doe 4 filed her administrative charge before the DFEH and the EEOC on October 31, 2018. She received her Notice of Right to Sue from the DFEH on November 6, 2018 and is currently perfecting her right to sue before the EEOC; upon receipt of Notice of Case Closure and Right

to Sue she will serve such notice on opposing counsel.[8]

24.     Plaintiff Jane Doe 5 filed her administrative charge before the EEOC on October 31, 2018, and is currently perfecting her right to sue; upon receipt of Notice of Case Closure and Right to Sue she will serve such notice on opposing counsel.

25.     Plaintiff Jane Doe 6 filed her administrative charge before the EEOC on November 20, 2018, and is currently perfecting her right to sue; upon receipt of Notice of Case Closure and Right to Sue she will serve such notice on opposing counsel.

## IV.     FACTUAL ALLEGATIONS

### A.     What Happened When She Became a Mommy: MoFo Routinely Holds Back Women Who Are Pregnant, Have Children, and Take Maternity Leave

26.     Pregnant women and mothers, even those attorneys who are considered the "best," cannot last long at MoFo. Indeed, these women are strikingly absent from the upper ranks of management. To understand what happens to high-performing women at the Firm, one need only refer to the words of one partner: "She became a mommy."

27.     The Firm boasts of its "work-life programs" for employees, including parental and adoption leave, parental transition time upon returning from leave, backup caregiving, flexible work options, and a reduced hours program.[9] Through these benefits, the Firm ostensibly allows, and even encourages, its female employees to take up to six months of maternity leave. Indeed, MoFo recently received recognition for offering the greatest number of weeks for paid primary caregiver leave amongst big law firms.[10]

---

[8] The ability to obtain a Notice of Case Closure and Right to Sue is currently impeded by the government shutdown, which has affected the local EEOC offices in question. To comply with the parties' stipulation, (Dkt. 33), Plaintiffs are filing this Amended Complaint by the stipulated deadline.

[9] See MoFo Women, *supra* n.1, at 15, 18.

[10] Yale Law Women, *The Top Ten Female & Family Friendly Firms Lists of 2018* (2018), http://yalelawwomen.org/wp-content/uploads/2012/11/2018-FFFFI-Report_Final-2.pdf.   Notably,   the survey includes no data on how women are paid as compared to their male peers.

28.     However, MoFo remained absent from Yale Law Women's Top Ten Family-Friendly Firms list in 2018, and rightly so. The reality for female attorneys at MoFo, especially for those who have or wish to have children, is far from the Firm's family-friendly façade. Instead, when women take advantage of the Firm's "generous" maternity leave or notify the Firm that they have children, they are routinely held back and set up to fail.

29.     Morrison & Foerster discriminates against Plaintiffs and other female attorneys, especially pregnant attorneys and women with children, with respect to compensation and promotions through common policies, practices, and procedures. When a female attorney at MoFo is pregnant, has children, or takes maternity leave, the Firm's standard operating procedure is to hold her back from advancement with her peers, denying her opportunities for greater pay and limiting her progression. This Firm practice reinforces stereotypes that mothers are worse at and less committed to their jobs, and sets in motion a chain of events that leads to the dead end of the mommy track: when female attorneys become mothers, the Firm demands they prove their commitment by working more hours; when they seek additional work, they are denied assignments, business opportunities, and client contacts because of stereotype-driven perceptions that they lack commitment to their jobs.

30.     The stereotype becomes self-reinforcing, and women become stuck. They now face a Hobson's choice: pay a motherhood penalty in the form of slower rates of progression and correspondingly lesser compensation, thus accepting lower pay for substantially equal work requiring equal skill, effort, and responsibility to that of their male colleagues; or, in the alternative, resign from their roles altogether.

31.     In some cases, female attorneys are not even given the courtesy of receiving prior notice that they will be held back. Only through checking the Firm's online portal do they learn that, despite solid or even stellar performance, they will not be progressing with their peers.

32.     In one California office alone, Plaintiffs are aware that, since 2013, at least seven female attorneys have been held back upon their return from maternity leave.

33.     Some women who become pregnant and go on leave, including named Plaintiffs Jane Doe 4 and Jane Doe 5, have faced outright termination as a result.

34.     MoFo's policy and practice relating to pregnancy and maternity leave has a disparate impact on the Firm's female attorneys. Specifically, because the Firm does not progress women, especially

pregnant attorneys and women with children, at rates equal to their male counterparts, there is a dwindling proportion of women at each successive level of the Firm's hierarchy. For example, while women represent approximately 50% of the Firm's associates, only 25% of MoFo's partners are women.[11]

35.     Upon information and belief, men who become fathers or take advantage of the Firm's paternity leave policy do not face disqualification from advancement and higher pay as do their female counterparts.

**B.     The Firm's Male-Dominated Hierarchy Sets Policies that Disparately Impact Female Attorneys, in Particular Pregnant Women and Women with Children**

36.     Men dominate MoFo's leadership and management. Out of the six attorneys on MoFo's leadership team, only one woman holds a seat as a Managing Partner. As noted above, while women represent approximately 46% of the Firm's associates, only 22% of MoFo's 248 partners are female. MoFo's own website acknowledges that only 31% of the Partner Compensation Committee and 36% of the Board of Directors are women. The disproportionately large representation of men in leadership roles at MoFo facilitates discrimination against women, especially pregnant women and women with children, throughout the Firm.

37.     Upon information and belief, the overrepresentation of men and employees who are not pregnant or mothers in Firm leadership reproduces a pattern of systemic discrimination against female attorneys at MoFo, especially those who are pregnant or have children.

38.     Promotion and compensation decisions at Morrison & Foerster are controlled by a practice group's chair or head partner. As of August 2018, in the Firm's San Francisco office alone, less than one third of the partners are female. Similarly, in the Los Angeles office, there are only nine female partners out of a total of 24. In the Palo Alto office, there are eight female partners out of 25; in San Diego, there are only three female partners out of 12.

39.     The predominantly male leadership at MoFo favors men and/or women who are not pregnant or have no children in promotions and other opportunities, regardless of their qualifications. In

---

[11] *Why MoFo*, Morrison Foerster, https://careers.mofo.com/why-mofo/ (last visited Jan. 25, 2019).

some offices, it is not uncommon to see an entire practice group consisting primarily of female attorneys with a male chair or head who controls all compensation and promotion decisions for his team.

40.     MoFo discriminates against women by permitting its predominantly male leadership to favor men overtly in pay, promotions, and other opportunities, regardless of their qualifications, and to otherwise discriminate against women, pregnant women, and mothers. MoFo leadership fosters or condones a Firm culture that marginalizes, demeans, and undervalues women and mothers.

41.     One example of this arose at a MoFo partners meeting, where a film was presented that showed the "men behind" women partners (i.e., those men who had supported women to make partner). It was the subject of later Women's Strategy Committee calls, because it brought to light that at MoFo, despite the Firm's veneer of being female-friendly, a truly important requirement for women to make partner is having a powerful man supporting her.

42.     Upon information and belief, MoFo's standard operating procedure is to terminate or push out working mothers in a manner that makes it clear that their motherhood, not the quality or quantity of their work, is the decisive factor. Thus, on the one hand, female attorneys who return from leave on a flexible or part-time schedule are penalized for not committing to work full-time hours. At the same time, those who return full-time are steered toward part-time schedules and correspondingly lower compensation. Even if their salaries are leveled up to reflect that they are, in fact, working full-time hours, female attorneys who are nominally part-time still receive lower bonuses than their counterparts who work the same hours without the part-time label.

43.     Upon information and belief, Morrison & Foerster's leadership is aware of the Firm's inequitable promotion, pay, job assignment, and other practices, but has taken no steps to address the root causes of the disparity. Defendant is aware of the demographics of its workforce, including the underrepresentation of women in different levels and functions. Despite several initiatives the Firm has taken in the recent past, purportedly with the goal of reducing or eliminating this underrepresentation, the problem persists, maintained and magnified by Firm policies, practices, and procedures and a culture that stereotypes and undervalues female attorneys who choose to have children.

44.     Upon information and belief, Defendant is aware of its own misconduct, but it has failed to rectify the discrimination.

C.     **The Firm's Common Business Development and Job Assignment Practices Disfavor Women, Particularly Pregnant Women and Mothers**

45.     Female attorneys throughout the Firm are given less substantive and less desirable work than their male counterparts. Prominent members of Morrison & Foerster's predominantly male leadership have shown a preference for working with other male attorneys. Thus, male attorneys, non-pregnant women, and women without children are given significantly more access to partners at any given time, allowing them to thrive under a partner's close tutelage and stay on track to attain partnership themselves. This common practice ensures that women are underrepresented in more senior or leadership roles, while perpetuating the "old boys' club" culture at the Firm.

46.     The lack of substantive work, coupled with higher expectations, together make progression and promotion extremely difficult for women. After returning from maternity leave in particular, female attorneys at the Firm are punished and held to a higher standard than their male counterparts.

V.     **PLAINTIFF JANE DOE 1**

47.     Plaintiff Jane Doe 1 currently works in one of Morrison & Foerster's California offices.

48.     Plaintiff Jane Doe 1 has a B.A. and a J.D. and is admitted to the California bar. Jane Doe 1 joined MoFo as a mid-level associate after several years of practicing law elsewhere.

49.     Jane Doe 1 excelled at her duties at the Firm.

A.     **Being a Mommy: Once She Returned From Maternity Leave, MoFo Took Adverse Employment Action Against Plaintiff Jane Doe 1**

50.     Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, after having her second child, Plaintiff Jane Doe 1 went on maternity leave during the statutory period, about two years after she joined the Firm.

51.     On January 9, 2018, Jane Doe 1 discovered through the Firm's online portal for employees that her salary no longer matched up to her class year; she had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion. Jane Doe 1's supervisors had given her no indication or notice that the Firm would not progress her. Jane Doe 1 had no history of performance issues, nor had she ever been held back previously during her time at MoFo.

52.     Although the Firm decided to hold back Plaintiff Jane Doe 1, MoFo increased her external billing rate as if she had been promoted, while not increasing her compensation internally. This was only rectified after Jane Doe 1 raised the issue with upper management.

53.     Upon information and belief, male colleagues, including two male associates in the same office, were advanced with Jane Doe 1's class year and received the corresponding pay increase. Upon information and belief, the only material difference between the class members who progressed and Jane Doe 1 was Jane Doe's status as a woman who had become pregnant and taken leave.

**B.     "Parents Tend Not to Do Well In This Group:" MoFo Discriminated Against Plaintiff Jane Doe 1 Due to Her Pregnancy, Leave-Taking, and Maternity**

54.     The Firm's decision to hold back Jane Doe 1 after she returned from maternity leave was not the first time the Firm discriminated against her due to her gender and pregnancy or her status as a mother.

55.     On Plaintiff Jane Doe 1's first day at the Firm, one of her now supervising partners ("Partner 1") told her: "We didn't realize you were a parent when we extended you the offer," implying that Jane Doe 1 had concealed her motherhood during her interview process with the Firm. In fact, although it was not required as part of the hiring process, Jane Doe 1 had been clear with the Firm's Human Resources department that she was interviewing during her maternity leave, and had told three Partners at the Firm that she had a child. Partner 1's comment made it clear from the start that Jane Doe 1 would face obstacles at the Firm because she was a mother; the same partner later warned that **"parents tend not to do well in this group."** Ironically, Partner 1 was appointed by the Firm to be Jane Doe 1's partner mentor.

56.     Partner 1 continued to show preferential treatment toward attorneys without children and routinely denied Jane Doe 1 opportunities to complete substantive work. For example, Partner 1 transitioned Jane Doe 1 off a deal and replaced her with another female associate who was not pregnant and did not have children, despite Jane Doe 1's excellent performance.

57.     This kind of discriminatory conduct based on Plaintiff Jane Doe 1's gender, pregnancy, and maternity was not limited to Partner 1. During the Firm's holiday party, another supervising partner ("Partner 2") told Plaintiff Jane Doe 1 about a female associate who was "one of the best he had ever

worked with." When Jane Doe 1 asked him what the attorney was doing now, he said that "she became a mommy."

### C. MoFo Unfairly Evaluated Jane Doe 1's Performance Because of Her Gender, Pregnancy, and Maternity

58.    When she returned from maternity leave, Jane Doe 1 repeatedly sought to discuss the ongoing matters and status of her practice group with Partner 1, who refused to discuss this with her.

59.    On January 9, 2018—the day she learned that her salary no longer matched up with her class year—Jane Doe 1 called Partner 1 to seek clarification about her promotion status. Partner 1 told Jane Doe 1 that she would not be progressing; instructed her to speak with Partner 2 during her performance review who "had a plan for her"; and faulted Jane Doe 1 for being on maternity leave when the performance reviews were conducted. Partner 1 ended the call by terminating their mentor-mentee relationship, and also informed Jane Doe 1 that Jane Doe 1 should no longer consider her a sponsoring Partner and should direct all future inquiries to Partner 2.

60.    Jane Doe 1 complained to a representative of the Firm's Attorney Development Group about the Firm's decision to hold her back one year and the unilateral termination of her mentor-mentee relationship.

61.    The next day, Partner 1 told Plaintiff Jane Doe 1 that she was instructed to tell Jane Doe 1 that the decision to hold Jane Doe 1 back was not "performance-based," and referred Jane Doe 1 to Attorney Development for any further questions.

### D. "Ramp Up" Your Efforts: Following Her Maternity Leave, MoFo Encouraged Jane Doe 1 to Leave the Firm

62.    Jane Doe 1 met with Partner 2 in person to conduct her performance review, with Partner 1 in attendance telephonically. In that review, Jane Doe 1 was told that she had been making good headway before her maternity leave, but would now, post-leave, have to "ramp up" her efforts. She was then advised to bill at least 2000 "substantive" hours before the end of 2018—an unrealistic expectation considering that practice group business in their office had been slow.

//
//

63.     In response to this unrealistic expectation, Jane Doe 1 asked for more work to ensure that she would be able to meet her higher billable hours target. Partner 1 then chided Jane Doe 1 for seeking more hours, indicating that she should "think of the team."

64.     Following Jane Doe 1's review, she reached out to the head of Attorney Development, who acknowledged that she was in a difficult position between Partner 1, who unambiguously cut her off from the group, and Partner 2, who requested that she bill 2000 hours without providing a viable means for her to do so. She also spoke with another member of Attorney Development, who told Jane Doe 1 multiple times that, as a senior associate, she needed a plan to advance within the Firm, and acknowledged that the comments from her supervising partners indicated there was no such plan for her.

65.     Over the year that followed, Jane Doe 1 did not receive *any* substantive assignments from *either* of her supervising partners that would allow her to meet her hourly minimum requirements. While Jane Doe 1's supervising partners instructed her to seek work from other partners, they did not make introductions or otherwise help her obtain such assignments. Jane Doe 1 reached out herself to seven different attorneys in five different MoFo offices, only finding work outside of her group and specialty area. For example, Jane Doe 1 took on additional pro bono work, as well as work for another practice group. She also worked to bring in a new matter for the Firm. Without work from her practice group, which is expected to be the primary source of her assignments, Jane Doe 1 was unable to meet her hours requirement.

66.     Jane Doe 1 has sought, but MoFo has failed to provide, any substantive guidance or development plan to meet the hours requirements imposed upon her, in light of the dearth of work opportunities she faces. Indeed, when she discussed her own proposed performance development plan with Partner 2, he gave her no additional feedback beyond what she had been told in her performance review six months prior.

67.     Multiple partners have commented to Jane Doe 1 that her hours are low. Upon information and belief, partners are less willing to give Jane Doe 1 more work because she has low hours, compounding her difficulty finding work outside of her practice group.

68.     At the time of her 2018 performance evaluation, Jane Doe 1 had only billed 21% of the hours requirement, which is significantly less than she billed in the year that she took maternity leave.

Although MoFo recognized that Jane Doe 1 was performing at the level expected and was willing to assist in matters, MoFo faulted her for not having billed more hours and informed her that she is subject to an additional spring review and potential termination.

69.   The lack of work offered to Jane Doe 1 from her practice group cannot be attributed to any lack of work in the group as a whole, which sought to hire new associates of varying seniority levels in 2018, appropriated two associates from the 2018 entering class to join in November, and opened several new engagements. Others in her group were able to attain their hours expectations. Jane Doe 1, however, has not received similar support, and has also been cut off from exposure to client and networking events. Jane Doe 1 has been ostracized from her group and is being pushed out.

## VI.   PLAINTIFF JANE DOE 2

70.   Plaintiff Jane Doe 2 currently works in one of Morrison & Foerster's California offices.

71.   Plaintiff Jane Doe 2 has a B.S. and a J.D. and is admitted to the California bar. Prior to law school, she had experience in the corporate sector and as a legal intern.

72.   After working at MoFo as a summer associate during law school, Jane Doe 2 was offered a permanent position and joined the Firm full-time as an associate.

73.   Since joining the Firm, Jane Doe 2 has excelled in her job duties at MoFo. She has been a committed attorney and has been involved in many Firm initiatives.

### A.   Being a Mommy: Once She Returned From Maternity Leave, MoFo Took Adverse Employment Action Against Plaintiff Jane Doe 2

74.   Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Plaintiff Jane Doe 2 went on maternity leave during the statutory period.

75.   On January 9, 2018, Jane Doe 2 discovered through the Firm's online portal for employees that her salary no longer matched up to her class year; she had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion.

76.   Jane Doe 2's supervisors had given her no indication or notice that the Firm would not progress her. Jane Doe 2 had no history of performance issues, nor had she ever been held back previously during her time at MoFo.

77.     Although the Firm decided to hold back Plaintiff Jane Doe 2, MoFo increased her external billing rate as if she had been promoted, while not increasing her compensation. This discrepancy was only rectified after Jane Doe 2's colleagues, Jane Doe 1 and Jane Doe 3, raised the issue with upper management.

78.     Upon information and belief, within Jane Doe 2's office alone, four male colleagues in the same office were advanced with Jane Doe 2's class year and received the corresponding pay increase. Upon information and belief, the only material difference between the male associates who progressed and Jane Doe 2 was Jane Doe's status as a woman who had become pregnant and taken leave.

**B.      MoFo Unfairly Evaluated Plaintiff Jane Doe 2's Performance Based on Her Gender, Pregnancy, and Maternity**

79.     After learning through the Firm's online portal that she would not be advanced with her peers, Jane Doe 2 spoke to a representative of the Firm's Attorney Development Group about the Firm's decision to hold her back a year and the manner in which she had discovered it.

80.     Jane Doe 2's supervising partner ("Partner 3") stated during her review that there was some debate about "how to deal with [Jane Doe 2's] leave of absence," and indicated that he would have held her back regardless of her performance.

81.     Throughout her tenure at MoFo, Jane Doe 2 has never had problems with her performance. In fact, she had been progressed and had received a bonus every year since starting her employment at the Firm, until she took maternity leave.

**C.      The Firm Discriminated Against Jane Doe 2 Due to Her Gender, Favoring a More Junior Male Associate in Work and Development Opportunities**

82.     The Firm's decision not to progress Jane Doe 2 after she returned from her maternity leave was not the first time it discriminated against her due to her gender.

83.     Earlier in her tenure, Partner 3 encouraged Jane Doe 2 and other attorneys in the practice group to "wine and dine" a young male associate, a practice usually reserved for recruiting more senior attorneys. Once the male associate was hired, Partner 3 began working primarily with him.

84.     Partner 3 prefers to work with male attorneys. This preference has had a discriminatory impact on the women in Jane Doe 2's practice group, who have had fewer opportunities for substantive

work, client contact, and business development opportunities. As an example, male associates in the practice group have been flown to New York to meet and work with prominent partners and clients. By contrast, MoFo has not offered the same experience to female associates in the group, even those more senior than the male associates in question.

## VII.   PLAINTIFF JANE DOE 3

85.     Plaintiff Jane Doe 3 currently works in one of Morrison & Foerster's California offices.

86.     Plaintiff Jane Doe 3 has a B.A. and a J.D. and is admitted to the California bar. Prior to joining the Firm, Jane Doe 3 had consulting experience.

87.     Jane Doe 3 joined MoFo as an associate.

88.     Since joining the Firm, Jane Doe 3 has excelled in her job duties.

**A.     Being a Mommy: Once She Returned from Maternity Leave, MoFo Took Adverse Employment Action Against Plaintiff Jane Doe**

89.     Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Plaintiff Jane Doe 3 went on maternity leave during the statutory period.

90.     On January 9, 2018, Jane Doe 3 discovered through the Firm's online portal for employees that her salary no longer matched up to her class year; she had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion.

91.     Jane Doe 3's supervisors had given her no indication or notice that the Firm would not progress her. Jane Doe 3 had no history of performance issues nor had she ever been held back previously during her time at MoFo.

92.     Although the Firm decided to hold back Plaintiff Jane Doe 3 from progressing, MoFo increased her external billing rate as if she had been promoted, while not increasing her compensation internally. This was only rectified after Jane Doe 3 raised it with upper management.

93.     Upon information and belief, male colleagues, including a male associate in the same office, were advanced with Jane Doe 3's class year and received the corresponding pay increase. Upon information and belief, the only material difference between the male associate who progressed and Jane Doe 3 was Jane Doe's status as a woman who had become pregnant and taken leave.

**B.** **"Work Really Hard to Prove That You Are Committed:" Following Plaintiff Jane Doe 3's Maternity Leave, the Firm Stereotyped Her and Subjected Her to Higher Expectations Due to Her Pregnancy and Maternity**

94. The Firm's decision to hold Jane Doe 3 back was not the first time the Firm discriminated against her due to her gender.

95. Before she returned from maternity leave, Jane Doe 3 sought a flexible work schedule in which she would return to her position full-time but would work from home part of the week. Although the Firm nominally "offers" new mothers flexible schedules for up to a year following their return from maternity leave, Jane Doe 3's proposal was rejected. After discussions with Attorney Development and with her supervising partner, it was made clear to her that she had to choose one of only three options: 1) return to the Firm full-time in the office; 2) work part-time at a fraction of her salary; or 3) quit.

96. Jane Doe 3's supervising partner ("Partner 3") suggested that if Jane Doe 3 chose to go part-time, it would be interpreted as a lack of interest in her career and in becoming partner, especially in combination with "being out," a reference to her taking protected maternity leave. Partner 3 went on to say that she would have to "work really hard to prove that [she was] committed and to get the best, most interesting work." He told her it was "difficult to progress if you are on part-time after being out."

**C.** **You Cannot Progress Because of Your Leave: The Firm Unfairly Evaluated Jane Doe 3's Performance Because of Her Gender, Pregnancy, and Maternity**

97. During her January 11, 2018 performance review, Partner 3 made it clear to Jane Doe 3 that MoFo did not promote her because she had become a mother. Partner 3 noted that Jane Doe 3 had not progressed because she had taken leave.

98. Jane Doe 3 billed nearly 100 hours more than the minimum needed to be considered for progression following maternity leave. Even though Jane Doe 3 took maternity leave, she performed better in every metric than she had the prior year, a year during which she received a promotion.

99. Jane Doe 3's written review contained stellar feedback from other partners and associates with whom she worked throughout 2017.

100. Upon information and belief, male colleagues who have taken leave or have had children have not been held back from progression.

D.     **The Firm Discriminated Against Jane Doe 3 Due to Her Gender, Favoring a Similarly Situated Male Colleague in Work and Development Opportunities**

101.    During Jane Doe 3's tenure at the Firm, even prior to her maternity leave, Partner 3 had showed preferential treatment towards Jane Doe 3's similarly situated male colleague, who is repeatedly assigned more substantive work than Jane Doe 3 or her other female peers. Jane Doe 3 has not had nearly the same degree of access to MoFo senior partners and management as has her male colleague.

102.    The inequitable assignment of substantive work and comparatively limited access to influential partners has negatively impacted Jane Doe 3 and other female attorneys who are pregnant or have children. The Firm's favoritism towards male attorneys has impeded Jane Doe 3's future at the Firm and has diminished her chances of becoming a partner.

VIII.   **PLAINTIFF JANE DOE 4**

103.    Plaintiff Jane Doe 4 was employed in one of Morrison & Foerster's California offices.

104.    Plaintiff Jane Doe 4 has a B.A. and a J.D. and is admitted to the California bar. Prior to joining the Firm, Jane Doe 4 had experience as an associate at another large law firm and a prestigious federal appellate clerkship. Within her practice group, an Of Counsel went on maternity leave in early 2017. During this time, the Of Counsel worked through her maternity leave but entrusted Jane Doe 4 to take over the majority of her matters and her clients due to the high quality of Jane Doe 4's work. She also did this so MoFo would not divert her matters to male attorneys while she was on her leave.

105.    Jane Doe 4 joined MoFo as an associate.

106.    After joining the Firm, Jane Doe 4 excelled in her job duties.

A.     **Being a Mommy: Once She Notified the Firm of Her Maternity Leave, MoFo Terminated Jane Doe 4 because of Her Pregnancy and Maternity**

107.    Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, when Jane Doe 4 became pregnant in 2017, she planned to take maternity leave beginning in 2018.

108.    After she announced her pregnancy and intention to take leave, when Jane Doe 4 was more than eight months pregnant, MoFo informed her that she would not be advancing with her class and terminated her employment.

109.    Some months prior, when Jane Doe 4 disclosed to a working mother in the same practice group ("Of Counsel 1") that she planned to announce her pregnancy, Of Counsel 1 warned Jane Doe 4 to defer announcing her pregnancy for as long as possible due to the negative impact that pregnancy and maternity would have on her career at the Firm. Jane Doe 4 heeded this advice, notifying the practice group of her pregnancy mid-2017; subsequently, a member of the practice group referred to Jane Doe 4's upcoming maternity leave as a "vacation."

110.    In late 2017, less than two months away from her due date, MoFo abruptly terminated Jane Doe 4. The Firm did not—nor could it—cite any specific or current negative feedback about Jane Doe 4's performance, that would have justified its termination of her employment at that time. Instead, MoFo just told her that she was being terminated because she would not be progressing with her class, even though Jane Doe 4 was the highest billing associate in her practice group and a high performer overall who had received positive reviews and positive feedback on her progression from supervising attorneys.

111.    Jane Doe 4 later learned from her peers that, just prior to her termination, a MoFo partner had personally visited the offices of people who worked with her to solicit such negative feedback. Upon information and belief, the only feedback the partner was able to elicit illustrated that none of the people she worked with viewed Jane Doe 4 or her work in a negative light.

112.    Facing the abrupt loss of her job and her anticipated maternity leave, Jane Doe 4 was offered a cruel bargain: She could take her leave as anticipated, in exchange for a full release of claims. She was given less than two weeks to decide.

113.    In that time, Jane Doe 4 had trouble sleeping. Exhausted, fearing for her family, and angry at her unjust termination, Jane Doe 4 reached out to a local employment lawyer, who said he would not to take on MoFo, a Big Law behemoth, in litigation. Under extreme pressure, and feeling that she had no other choice, Jane Doe 4 demanded more time and more money, including the bonus money she had already earned for 2017. MoFo rejected almost all her terms, agreeing only to a slight increase in bonus payout. Out of time and without alternative options, she reluctantly signed the agreement.

114.    Without her salary, Jane Doe 4 and her husband were unable to afford rent on their current home and had to move just weeks before her baby was due.

//

115.    Upon information and belief, MoFo did not terminate or take any adverse employment actions against Jane Doe 4's male colleagues for having children or taking leave. Upon information and belief, the material difference between the male associates who took leave but were not terminated and Jane Doe 4 was Jane Doe 4's status as a woman who had become pregnant and notified the Firm of her intent to take leave.

116.    Two attorneys above the associate level in her practice group advised Jane Doe 4 to speak with an attorney about the termination, and one told her via text message that MoFo's decision to terminate her was "unacceptable."

**B.      MoFo Retaliates Against Jane Doe 4 For Complaining of Gender Discrimination**

117.    When Jane Doe 4's "maternity leave" with MoFo concluded in 2018, she began to apply for lateral associate positions at comparable firms, working with an experienced recruiter.

118.    Three times, Jane Doe 4 went through the full interview process with prominent national firms, at the conclusion of which she was told to expect an offer.

119.    In every case, the promised offer never materialized. When the recruiter contacted the firms seeking feedback about their ultimate decision with regard to Jane Doe 4, she was in every case offered only vague platitudes, for example that they had "decided to go in a different direction."

120.    Jane Doe 4 believes that MoFo was thwarting her job prospects by providing negative references in retaliation for her decision to pursue legal action against the Firm.

**IX.     PLAINTIFF JANE DOE 5**

121.    Plaintiff Jane Doe 5 was employed in Morrison & Forester's Washington, D.C. office until August 2017.

122.    Plaintiff Jane Doe 5 has a B.A. and a J.D., and is admitted to the Washington, D.C. bar. Prior to joining the Firm, Jane Doe 5 worked at another large law firm in Washington, D.C.

123.    Jane Doe 5 joined MoFo as an associate.

124.    After joining the Firm, Jane Doe 5 excelled in her job duties and was named a "Pro Bono All-Star."

//

//

**A.      Being a Mommy: Once She Returned from Maternity Leave, MoFo Took Adverse Employment Action Against Jane Doe 5**

125.      Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Jane Doe 5 went on maternity leave in 2016.

126.      Upon returning from leave, Jane Doe 5 learned that she had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion. Prior to that, Jane Doe 5's supervisors had given her no indication or notice that the Firm would not progress her. Jane Doe 5 had no history of performance issues nor had she ever been held back previously during her time at MoFo.

127.      Upon information and belief, male colleagues, including a male associate in the same office, were advanced with Jane Doe 5's class year and received the corresponding pay increase. Upon information and belief, the only material difference between the male associate who progressed and Jane Doe 5 was Jane Doe 5's status as a woman who had become pregnant and taken leave. In fact, in the one year that Jane Doe 5 received a less-than-glowing performance review, she was told that MoFo "had this exact same review and feedback with" the male associate in question.

**B.      The Same Thing Happened Before: After Jane Doe 5 Took Maternity Leave, She Was Terminated Because of Her Pregnancy and Maternity**

128.      The Firm's decision to hold Jane Doe 5 back was not the first time, or the last time, the Firm discriminated against her due to her gender, pregnancy, or maternity.

129.      Before she had returned from maternity leave, Jane Doe 5 was encouraged to take a part-time schedule, and was told that if she took less than six months of maternity leave, as outlined in MoFo's relevant policy, she could return at a part-time or flexible schedule.

130.      Approximately six months after returning from leave, Jane Doe 5 was notified that she would be terminated effective August 4, 2017. The partners who communicated this decision to her were unable to cite any specific instances in which Jane Doe 5's performance was lacking or called into question. In fact, the CFO at Jane Doe 5's primary client had praised her work and provided positive written feedback, and MoFo had considered little else in cobbling together the evaluation presented to Jane Doe 5 at this meeting: it had not allowed Jane Doe 5 to complete the standard self-evaluation prior

to this conversation, did not refer to her work for other clients, and did not factor in her pro bono recognition. The feedback MoFo did include in her review came from an associate who had complained to Jane Doe 5 about her work schedule at a time when Jane Doe 5 had to periodically leave the office for pregnancy-related medical monitoring.

131.    MoFo all but openly acknowledged that maternity was the cause of Jane Doe 5's termination when, in the course of giving her notice of her termination, one of the partners—unprompted—informed her that MoFo had also already terminated the only other working mother in Jane Doe 5's practice group who had been on a part-time schedule.

132.    Shockingly, the same MoFo partners who informed Jane Doe 5 of her termination had, prior to speaking with her, approached one of her colleagues to inquire whether Jane Doe 5 would be likely to sue the Firm if she were terminated. That colleague herself was later terminated.

133.    Following this conversation, but before her termination date, Jane Doe 5 learned she was pregnant. Jane Doe 5 experienced complications that required consistent medical monitoring and occasional unplanned hospital visits from June 2017 through the birth of her child in January 2018. From June 2017 through approximately September 2017, Jane Doe 5 was not able to work and needed assistance caring for her family. Additionally, following childbirth, Jane Doe 5 was disabled and unable to work or care for her family for approximately three months.

134.    Due to these periods of disability, Jane Doe 5 seeks equitable tolling of the 300-day period in which to file an administrative complaint challenging her termination and other applicable limitations periods.

## C.    The Firm Discriminated Against Jane Doe 5 Due to Her Gender, Favoring a Similarly Situated Male Colleague in Work and Development Opportunities

135.    During Jane Doe 5's tenure at the Firm, even prior to her maternity leave, men in her practice group were shown preferential treatment. New business, training, and development opportunities were re-directed to a male associate who was the same class year as Jane Doe 5, even when Jane Doe 5 specifically requested those opportunities. That associate was given substantial leeway with his work: when he committed a fireable offense, he was not formally disciplined; instead, he continued to receive substantive work assignments over women.

136.     The inequitable assignment of substantive work and access to influential partners has negatively impacted Jane Doe 5 and other female attorneys who are pregnant or have children. The Firm's favoritism towards male attorneys impeded Jane Doe 5's ability to succeed at the Firm.

137.     Additionally, upon information and belief, MoFo paid Jane Doe 5 less than male colleagues who worked the same number of hours as she did.

## X.     PLAINTIFF JANE DOE 6

138.     Plaintiff Jane Doe 6 worked in Morrison & Foerster's New York office until 2018.

139.     Plaintiff Jane Doe 6 has a B.A. and a J.D. and is a member of the New York bar. She was recruited to join the Firm as a well-respected lawyer in her practice area; since then, she has built a stellar reputation in her field.

140.     Because of her success in her foundational practice area and as an inducement to join the Firm, Jane Doe 6 was given a hiring bonus and promised a full bonus for her partial first year. MoFo also indicated to her, including in her offer letter, that she would be considered for partner after two years at the Firm. When she was made Of Counsel after approximately one year at the Firm, she was told that it was a "placeholder" for partnership, and anticipated that she would be considered for partner at the end of her second year. However, despite her achievements and loyalty to the Firm, Jane Doe 6 was never made partner and was never even included on the official list for consideration.

141.     At the Firm, Jane Doe 6 excelled in her job duties while also demonstrating an exceptional willingness to be a team player, make sacrifices for her group, and promote the Firm. Performing partner-level work nearly from the outset, Jane Doe 6 also began to attract significant positive attention and business for MoFo and her colleagues, although she seldom received any billing credit for doing so.

142.     At MoFo, Jane Doe 6 also had a strong history of overwhelmingly positive evaluations and was recognized as a top performer, and she consistently demonstrated creative problem solving, client service, business development, and group leadership. She was active in pro bono work and in diversity and inclusion activities.

143.     Yet for all of Jane Doe 6's patience and dedication to her group and the Firm, her promised consideration for partnership at the Firm—and the pay increases associated with it—never came.

//

**A.    Being a Mommy: Once She Returned from Maternity Leave, MoFo Took Adverse Employment Action Against Jane Doe 6**

144.    Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Jane Doe 6 went on maternity leave during the statutory period.

145.    When Jane Doe 6 took maternity leave at MoFo, MoFo took adverse action against her. It denied her pay raises and promotions to which she was entitled, and ultimately demoted her. After Jane Doe 6 reported her concerns, MoFo deliberately created an intolerable working environment for Jane Doe 6 until she had no choice but to leave the Firm.

146.    While Jane Doe 6 was promoted to Of Counsel after approximately one year at the Firm, in which time Jane Doe 6 had a baby and took an abbreviated maternity leave (working through much of it), Jane Doe 6's salary was not increased at all. By contrast, a male attorney who made Of Counsel a few months before Jane Doe 6 had the opportunity to negotiate an Of Counsel contract with MoFo at the time of his promotion, and obtained higher pay. MoFo instructed Jane Doe 6 to wait until the end of the year for a raise, but by the end of the year, when Jane Doe 6 was visibly pregnant, MoFo Management refused to negotiate an Of Counsel contract with her or raise her compensation to reflect her promotion.

147.    Although Jane Doe 6 was performing partner-level work, MoFo instead kept her pay on par with associates, including some more junior to her. At the same time, while associates were entitled to a market bonus if they met their hourly requirements, MoFo told Jane Doe 6 that her of-counsel bonus would be discretionary and would not exceed the associate bonus. Indeed, MoFo told her that she should be thankful for what she was given, as it could have been substantially lower. On several occasions, partners in Jane Doe 6's practice group observed that she would have been better off financially had she remained an associate.

148.    Jane Doe 6's salary was kept at an 80% equivalent of a senior associate salary for two years. As a result, she was paid less in salary during the course of that second year than the Associates in the class from which she had been "promoted." At the suggestion of a supportive supervising partner ("Partner 4"), Jane Doe 6 repeatedly followed up with MoFo Management about her compensation, and she researched and provided data showing that her compensation was materially under-market. At the end of that second year, her salary was then adjusted slightly.

149.    A few months later, MoFo again made an upward adjustment to Jane Doe 6's salary, which nevertheless remained below the salary that she had indicated to MoFo Management was within the range of market. At approximately the same time, the Firm hired a male Of Counsel who was junior to Jane Doe 6 and had been an associate at his prior firm. Jane Doe 6 later learned that this male Of Counsel in her group was paid a salary above her own full-time equivalent. In fact, he was paid the same salary that Jane Doe 6 had identified as a market offer for a junior Of Counsel, a salary MoFo never offered Jane Doe 6 herself.

150.    MoFo never increased her salary again. She did not receive a raise or market step-up in her last two years at the Firm, despite repeated assurances from MoFo Management that she deserved a raise, and despite two market-wide associate salary increases during that time period. As a result, she ultimately was paid less than male associates, Of Counsel, and partners who were performing work of substantially equal or lesser skill, effort, and responsibility. A male associate reported to her that he was receiving bonuses in excess of associate bonuses and, therefore, in excess of Jane Doe 6's.

151.    When Jane Doe 6 raised her inequitable compensation with Firm leadership on multiple occasions, she was encouraged to "trust the partnership" and look forward to her own elevation to partner. Based on these representations, including that her compensation level was a short-term issue that would be resolved when she made partner, Jane Doe 6 patiently remained with the Firm. MoFo did not make her a partner, however.

152.    MoFo's concrete acts of discrimination against Jane Doe 6 include but are not limited to the following: A male associate from another firm, who had two fewer years of experience than Jane Doe 6, was brought in as Of Counsel in the same group and given higher pay than Jane Doe 6, even though practice group records show that his date of potential promotion to partner was later than Jane Doe 6's. Another male colleague who had similar experience was made Of Counsel at approximately the same time as Jane Doe 6 but was then elevated to the partnership at the end of that same year; he was also paid significantly more than Jane Doe 6 and his compensation was adjusted at the time of his elevation to Of Counsel. A third male colleague who had fewer years of experience was hired after Jane Doe 6 as an equity partner and paid significantly more than Jane Doe 6, even as she was asked by Firm partners to weigh in on certain of his matters (including during her maternity leave) because her expertise and

experience were more trusted. Upon information and belief, none of these male attorneys was a substantial business generator.

153.    Upon information and belief, the only basis for MoFo's decision to compensate and promote these male attorneys over Jane Doe 6 was Jane Doe 6's status as a woman who had become pregnant and taken leave. Indeed, one MoFo partner told Jane Doe 6 outright that MoFo believed it could justify deferring her consideration for partnership because she had taken maternity leave.

154.    Certain female partners with children at MoFo who are held up as exemplars of female success regularly boast of having taken almost no maternity leave.

**B.    The Maternity Double-Bind: MoFo Subjected Jane Doe 6 to Higher Expectations Due to Her Gender, Pregnancy, and Maternity, But Undermined and Penalized Jane Doe 6 Because She Took Maternity Leave**

155.    Instead of rewarding her success and ability, MoFo repeatedly questioned Jane Doe 6's commitment to her job, expecting her to prove herself by sacrificing her own pay and advancement in favor of others, and requiring her to work harder than those around her to "earn" fair treatment. Jane Doe 6 consistently worked more than full-time hours for part-time pay, including by working throughout her maternity leaves, during which she was encouraged by MoFo to continue to generate business and seek out opportunities, maintain her extensive non-billable contributions to the Firm, and continue to provide excellent client service.

156.    But for all Jane Doe 6's effort, it was never enough. She was repeatedly told to wait her turn and made to cede the way to a male attorney ("Attorney 1"). When Jane Doe 6 was pregnant, partners asked if she was "really" planning to return from leave. When she did return, MoFo encouraged Jane Doe 6 to maintain her "part-time" designation, denied her a raise commensurate with her experience and level of work, and again denied her promotion to partnership.

157.    Upon her return from maternity leave, MoFo encouraged Jane Doe 6 to avail herself of MoFo's post-leave reduced hours policy, assuring her it would not have adverse effects on her career at MoFo, and indicating that it could "help" her group by reducing the target hours budget and costs for the group. Jane Doe 6 reduced her formal schedule to 80%, but continued to work more than a full-time schedule, believing that the Firm would recognize her sacrifices by elevating her to partner. Jane Doe 6's

"reduced hours" classification permitted MoFo to reassign portions of her billable time as nonbillable, thereby reducing the number of write-offs and assisting with budget management. At times, Jane Doe 6's billable hours were capped retroactively for matters, or she was asked to reclassify her billable hours as non-billable.

158.    Nevertheless, until her last six months at the Firm, when she experienced escalating retaliation after reporting her concerns about discrimination to HR, Jane Doe 6's client-billable hours for every calendar year significantly exceeded her budgeted goals, in some years exceeding 150% of her target. At all times, her overall recorded hours were vastly higher than the goals set for her by the Firm. She was regularly described as a "tireless" worker.

159.    Jane Doe 6 took these actions in reliance on the Firm's representation that it would recognize her sacrifices by elevating her to partner, and that a reduced-hours schedule would have no negative effect on her progress at the Firm. MoFo's Management and Attorney Development were aware of Jane Doe 6's actions, and she was presented as a model to others for how to be successful with a reduced hours schedule. In fact, however, once she reported discrimination to MoFo, Jane Doe 6 was ultimately told that her billable hours thereafter were too low, a strike against her for partnership.

160.    Upon information and belief, no men were encouraged to take reduced work schedules or reduce their billable hours in a similar way. MoFo encouraged Jane Doe 6 to do so because she was a woman and a mother.

161.    Over the following years, Jane Doe 6 continued to seek and was continually assured by partners that she deserved to join their ranks. At best, Jane Doe 6 was told to wait to the next annual round of promotions. At other times, she was outright ignored.

162.    When Jane Doe 6 announced that she was pregnant and due to give birth, a powerful MoFo Partner ("Partner 5") and Attorney 1 stepped in and began to exclude her from group business, events, and leadership, all the while relying on Jane Doe 6 to continuing pitching for and generating business.

163.    Jane Doe 6 nevertheless continued her tireless commitment to her work. For instance, she billed over 350 client-billable hours in a single month, while approximately eight months pregnant. She led complicated, high-profile, high-pressure matters. She planned successful events for her practice group. Jane Doe 6 even continued working around the clock during her maternity leave.

164.    Jane Doe 6 proved her success again and again, even as MoFo continued to undermine her, cutting her out of presentations she had prepared, failing to acknowledge internally or externally her substantial contributions to the Firm.

165.    During Jane Doe 6's maternity leave, throughout which she was working full-time, MoFo appointed Attorney 1 to Jane Doe 6's role in her practice group without Jane Doe 6's knowledge or consent, effectively demoting her. This was after Jane Doe had already complained to MoFo partners about the discrimination she had been facing. When she complained to senior partners about this latest blow, Jane Doe 6 was advised not to raise the issue, but instead to cede her important position to Attorney 1 and await elevation to partnership. That elevation never came. Even after learning a few months later while she was still on maternity leave that she would not be elevated to partner that year, Jane Doe 6 continued to work tirelessly throughout her leave. Regardless, Partner 5 and Attorney 1 told her that they were excluding her from her practice group matters and events because she was on leave.

166.    After MoFo yet again refused to elevate Jane Doe 6 to partnership, she raised her concerns about discrimination with MoFo's Director of Attorney Development. The Director's advice was that Jane Doe 6 refrain from informing those who had supported her candidacy that MoFo was not making her a partner. She instead suggested that Jane Doe 6 work with a job coach to address alleged concerns from Partner 5 about the length of her emails, despite the fact that she had not worked for Partner 5 during the review period. Moreover, partners in her group with whom she did work assured her that there was nothing wrong with her emails, and she had a long history at MoFo of evaluations praising her written communications. MoFo Management then told her to again look ahead to partnership in the coming year. While Jane Doe 6 followed in good faith these recommendations, the coach acknowledged that the stated concerns about Jane Doe 6 were questionable, both on their face and as justification for MoFo's decision not to promote Jane Doe 6 to partner.

167.    Upon information and belief, Attorney Development expressly solicited from Partner 4 example of an email in which Jane Doe 6 could have included less information. Attorney Development subsequently inserted into Jane Doe 6's evaluation summary, which otherwise praised her writing as clear, concise, and generally exceptional, a reference to potentially reducing the amount of content in certain emails and the provision of a writing coach. Upon information and belief, this negative comment did not

appear in any underlying data from Jane Doe 6's performance reviews, in that year or any other, but rather was added by Attorney Development solely to justify the deferral of Jane Doe 6's promotion to partnership.

168.    The Director also openly criticized Jane Doe 6 for working on maternity leave with her baby present, in one instance claiming that multiple partners had told her that Jane Doe 6 had acted like a "martyr" by explaining that her baby was in her lap and might make noises during internal conference calls.

169.    When, later during her maternity leave, a significant Firm client emailed MoFo Senior Management, without her knowledge, to praise her work and express his surprise that Jane Doe 6 had been passed over for partnership, MoFo Attorney Development reached out to her demanding to know whether she had solicited the client's intervention. Jane Doe 6 later learned that the client had reached out at the suggestion of a MoFo partner from another practice group who had supported her for partnership, after the client had questioned the MoFo partner about why Jane Doe 6 was not already a partner and why she was not being put up again in 2017. She also learned that a key member of MoFo management had described her in his response as being "tireless" and "incredibly passionate about [her practice]."

C.    **MoFo Subjected Jane Doe 6 to Repeated, Demeaning Comments and Appointed a Male Harasser as a Group Head for Jane Doe 6**

170.    In addition to requiring Jane Doe 6 to expend extra effort to prove herself to the Firm and then penalizing her for taking maternity leave, MoFo permitted ongoing, sex-based hostility directed at Jane Doe 6.

171.    Partner 2 subjected Jane Doe 6 to gender-based harassment and mistreatment, questioning whether her significant other had fathered the child she was then pregnant with, and insinuating she was low class, all while supervising her on a deal. Jane Doe 6 reported this information to partners.

172.    MoFo later installed and maintained Partner 2 as a group head for Jane Doe 6, giving him input into decisions about her salary and promotion, even though she had disclosed to appropriate MoFo personnel, including Attorney Development and others, that her prior romantic relationship with Partner 2 had ended after he coerced her into not keeping a pregnancy with him. When she learned that Partner 2 would join the Firm, he expressly discouraged her from letting others at MoFo know that he and Jane Doe

6 had had a prior romantic relationship. Upon information and belief, during Jane Doe's maternity leave, after joining the Firm, Partner 2 falsely indicated to a supervising partner of Jane Doe 6 that he did not know Jane Doe 6 at all prior to joining MoFo. Concerns Jane Doe 6 expressed after Partner 2 was appointed as her group head, including to MoFo Attorney Development and other partners, as well as her requests that Partner 2 recuse himself from her promotion and compensation decisions fell on deaf ears. One partner cautioned Jane Doe 6 about disclosing this information to others, out of concern that she be seen as a "complainer" or that the relationship would reflect poorly on *her*. Partner 2 himself told Jane Doe 6 that it would look bad for her if others knew that he and she had a prior relationship. A male attorney suggested that it could actually be good for her career if Partner 2 "still wanted" her. Although Jane Doe 6 made every effort to deal professionally with Partner 2, as Jane Doe 6's group head, Partner 2 told another partner that there would never be a reason to elevate her to partnership.

173.     Partner 2 was not the only source of gender-based harassment. Other male MoFo partners and attorneys none of whom were in her foundational group, repeatedly subjected Jane Doe 6 to objectifying and demeaning comments: calling her a natural blonde to indicate she was "dumb;" telling her that people would not pay attention during a presentation because they were thinking about "how hot you are;" comparing her to Kim Kardashian; and suggesting she possessed only looks and no substance, despite the fact that her evaluations were across-the-board exemplary and recognized her accomplishments.

174.     Disparaging and gendered remarks were not limited to Jane Doe 6. She heard Partner 5 and Attorney 1 speak negatively about other female attorneys and staff in a dismissive, intimidating, and insulting manner, calling them things like "incompetent," a "bitch," "a disaster," "uncoachable," "unprofessional," and "incapable of running [matters]." In truth, none of these slurs were accurate; indeed, some of these women were among MoFo's top performers.

175.     The imagery of women presented in MoFo's office underscored the objectifying, harassing behavior from Jane Doe 6's colleagues. In a shared working space in MoFo's New York office, pictures of scantily clad cheerleaders adorned the wall.

//

//

1

### D.      MoFo Retaliated Against and Constructively Discharged Jane Doe 6

2      176.    Over her last year at MoFo, Jane Doe 6 repeatedly reported MoFo's unfair treatment by

3 Partner 5 and Attorney 1 to partners, MoFo Attorney Development, and MoFo Human Resources. In

4 response, rather than investigating her concerns, MoFo escalated its campaign against Jane Doe 6 until

5 she had no choice but to leave.

6      177.    Although Jane Doe 6 identified for MoFo numerous witnesses, including partners, to the

7 inequitable treatment she had experienced, upon information and belief, MoFo never spoke with those

8 individuals to investigate her complaints. Not only were Jane Doe 6's requests to be separated from those

9 whom she reported for their discriminatory and retaliatory conduct ignored, MoFo affirmatively forced

10 Jane Doe 6 to interact with them, including outside of the Firm, and, in some cases, to indirectly report to

11 them.

12      178.    Having effectively demoted Jane Doe 6, passed her over for partner one more time, and

13 acknowledged that she deserved but failed to provide a raise when her partnership was again deferred,

14 MoFo now retaliated against Jane Doe 6 in response to her complaints. Upon information and belief, this

15 retaliation was coordinated among multiple MoFo attorneys, including Partner 5. The Firm began

16 funneling more work and responsibility away from Jane Doe 6 to her male colleagues and undermining

17 her reputation inside and outside the Firm, attempted to prevent her from reporting to a supportive

18 supervising partner, attempted to exclude her from events immediately relevant to her practice,

19 unreasonably restricted her ability to onboard and otherwise process matters, sought to limit her ability to

20 work with other supportive partners, and, in certain instances, even physically intimidated her.

21      179.    When Jane Doe 6 highlighted the extensive documentation of her achievements and

22 leadership since joining the Firm, encouraging HR to review her annual performance reviews, historical

23 hours records and other evidence of excellence, the Firm doubled down on its retaliatory campaign against

24 her, attempting to generate a paper trail to mar her exemplary record. By restricting her ability to onboard

25 matters, including for certain prominent clients, MoFo reduced the hours she could credit as billable,

26 thwarted her ability to staff matters, and sometimes frustrated potential clients who wanted to engage the

27 Firm. When Jane Doe 6 asked for the same type of administrative or paralegal support to help on-board

28 and process matters and bills that Partner 5 and Attorney 1 received, she was denied.

---

180.    False statements and gaslighting from MoFo compounded the retaliatory assault.  When Jane Doe 6 learned about planned events or meetings from which Attorney 1 and Partner 5 had excluded her, she was told that such events had not been planned or scheduled, despite evidence to the contrary. When she explained to HR her method for accurately recording time using the history function of the Firm's billing system, the function was permanently disabled for her the next day and never reinstated. Harsh and accusatory emails from certain MoFo partners would be followed immediately by friendly and understanding phone calls directing her to ignore the emails just sent. Oral direction from certain partners to take or refrain from taking certain actions was followed by emailed criticism for having followed the direction. Two partners would give, almost simultaneously, conflicting instructions that could not both be satisfied, such as that two different, purportedly urgent internal MoFo activities be completed at the exact same time. Supportive MoFo partners and others reported to Jane Doe 6 rumors designed to undermine her, including, among other things, that Partner 5 had told others that she would be leaving the Firm, which Jane Doe 6 then had to refute at an internal meeting she was leading. She continued reporting to HR, but the retaliatory campaign only escalated.

181.    From the time of her initial report to HR, MoFo set nearly impossibly-high expectations for Jane Doe 6. In one instance, partners from another group, with whom Jane Doe 6 had not previously worked, required her to travel internationally on their behalf for informational meetings, despite her supervising partner strongly advising them that she was too busy and despite her need to bring her baby (whom she was breastfeeding) with her. To show her dedication, Jane Doe 6 got her baby a passport, took her on the redeye, found childcare abroad, and made every effort to make the trip work, ultimately creating lasting relationships abroad and leading to client referrals.

182.    Even as Jane Doe 6 was scheduled to travel alone and abroad with her infant at the behest of those partners, a partner from another group, with whom Jane Doe 6 had never worked previously, set an informational call for the middle of the night, local time, and requested that she participate, indicating that the time could not be moved. When Jane Doe 6 missed the call—in part because her MoFo phone, email, and calendar were not working properly abroad, a problem to which she alerted both MoFo IT and the partners with whom she was traveling—the partners chastised her harshly, even as her relationship with the client remained positive.

183.    Immediately after she returned from that trip, MoFo acted to separate Jane Doe 6 from a supportive supervising partner, demanding that she report instead to a more senior partner outside her practice group with whom she had never worked or even previously met in person. At the same time, despite her ongoing requests, MoFo never separated her from any of the attorneys whose discriminatory or retaliatory conduct she had reported to HR. To the contrary, in some cases, she was expressly required to report to or be directly supervised by such partners. Among other things, despite discomfort that she expressed in writing, she was forced by MoFo Management and HR to work on a matter for Partner 5 and to enter and bill her time for it, as well as to invite Partner 5 to a small off-site client development meeting that she had arranged, despite her request to, instead, bring Partner 4, who was similarly qualified.

184.    The retaliation Jane Doe 6 faced after making a report of discrimination to HR, while devastating, did not come as a complete surprise, as multiple MoFo partners whom she had consulted in advance had predicted this outcome. One partner had encouraged her to get a lawyer, while Attorney Development had warned her that reporting her concerns could doom her chances at partnership, and suggested that she would be better off simply resigning. Nevertheless, Jane Doe 6 understood that MoFo policy required that she make a report to HR and provide the Firm an opportunity to investigate and remedy the situation.

185.    On many occasions, Partner 4, who was Jane Doe 6's primary supervising partner, recognizing her value to the group and the Firm more broadly, attempted to advocate for her, including for her to be promoted and properly compensated. Not only was he largely unsuccessful, but, on some occasions, he seemed to experience pressure and retaliation (in multiple and intensifying forms) by MoFo in response to his efforts on Jane Doe 6's behalf, particularly after Jane Doe 6 had begun reporting her concerns to HR. Ultimately, MoFo effectively removed Partner 4 from his role supervising Jane Doe 6, excluding him from meetings about Jane Doe 6's future at MoFo and replacing him with partners from outside of Jane Doe 6's practice group. At times, MoFo exploited Jane Doe 6's desire to minimize retaliation against Partner 4 to obtain her compliance with improper or unreasonable demands.

186.    Those whom Jane Doe 6 reported for discrimination and retaliation attempted to justify unreasonably impeding her ability to onboard matters by casting her in a false light and suggesting that

she was attempting to expose MoFo to unwarranted risks. In fact, however, Jane Doe 6 herself had proposed, and subsequently tightened, the Firm's risk management protocol for her practice area.

187.    Despite Jane Doe 6's best efforts to remedy the situation, MoFo's efforts to push her out only intensified. Faced with no other option but to leave, Jane Doe 6 tendered her resignation. Even after tendering her resignation, Jane Doe 6 continued to work with her colleagues on important matters and collaborate with them to help them develop new business, including on her very last day at the Firm.

188.    After Jane Doe 6 notified MoFo of her intention to pursue this lawsuit, it retaliated against her by attempting to undermine her reputation with others in her field. For example, Attorney 1 and Partner 5 refused (including, purportedly, on behalf of MoFo) to participate in certain non-MoFo business networking and similar activities without assurance that Jane Doe 6 was not a participant in those events.

189.    In addition to subjecting her to ongoing retaliation, MoFo elevated Attorney 1 to partner. Upon information and belief, Attorney 1's path to candidacy differed significantly from Jane Doe 6's: for example, while she was subject to unwarranted criticism from Partner 5 (with whom she had not worked during the review period) and never put on the list for consideration, his path was cleared.

## CLASS AND COLLECTIVE ALLEGATIONS

190.    Plaintiffs incorporate allegations from the previous paragraphs of the Amended Complaint (hereinafter "this Complaint") alleging class-based discrimination against female attorneys and mothers.

191.    Plaintiffs represent a class consisting of all female attorneys at the Firm who have or will be employed by MoFo in the United States during the applicable liability period to the date of judgment, as well as a subclass of all female attorneys who have been or will be employed by MoFo in the United States, and who have been or will become pregnant or a mother, and/or take maternity leave during the applicable liability period (the "pregnancy subclass"). Plaintiffs Jane Does 1-4 ("California Class Representatives") seek to represent subclasses of all female attorneys who have been or will be employed by MoFo in California (a) during the applicable liability period to the date of judgment (the "California subclass"); (b) and who have been or will become pregnant or a mother, and/or take maternity leave during the applicable liability period through the date of judgment (the "California pregnancy subclass").

192.    Plaintiffs also seek to represent a collective of female attorneys employed by MoFo during the applicable liability period (a) who were not compensated equally to male attorneys who had

substantially similar job classifications, functions, titles, and/or duties; (b) who were not compensated equally to male attorneys who performed substantially similar work; and/or (c) who were denied equal compensation to similarly situated male attorneys by being held back to lower pay levels than male attorneys who performed substantially similar work and had substantially similar experience.

## XI.    CLASS ALLEGATIONS UNDER RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

193.    MoFo tolerates and cultivates a work environment that discriminates against female attorneys, in particular those who are pregnant or take maternity leave.

194.    Female attorneys, pregnant attorneys, and mothers are subjected to continuing unlawful disparate treatment in pay and promotions. Moreover, the Firm's policies, practices, and procedures have an ongoing disparate impact on female attorneys and mothers.

195.    The Firm maintains policies, practices, and procedures for setting compensation that promote gender-based inequities in compensation, and policies, practices, and procedures for promotion that lead to gender-based inequalities in promotion. The Firm's discriminatory policies, practices, and procedures include a system where women who become pregnant and take maternity leave are denied opportunities for advancement in the Firm's hierarchy, as well as the higher pay afforded to their male colleagues. Specifically, the Firm maintains a pay system that includes a lock-step pay scale, under which women who are pregnant or take maternity leave are routinely held back, resulting in pay differentials between men and women and less frequent promotions for mothers. MoFo circumvents the pay scale by holding mothers back a year, and this results in lower pay for women who continue to do the same work as their male colleagues with similar levels of experience.

196.    The Firm's nationwide policies, practices, and procedures result in lower compensation for female attorneys than similarly situated male attorneys.

197.    In general, the policies, practices, and procedures that govern the pay and promotions of female attorneys lack the sufficient standards, quality controls, implementation metrics, transparency, and oversight to ensure equal opportunity at the Firm.

198.    Because the Firm's management does not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies,

practices, and procedures, female attorneys suffering from discrimination are without recourse. Whatever complaint and compliance policies may exist lack meaningful controls, standards, implementation metrics, and means of redress such that upper management may ignore, disregard, minimize, cover up, mishandle, or otherwise fail to properly respond to evidence of discrimination in the workplace.

199.    The Firm's policies, practices, and procedures are not valid, job-related, or justified by business necessity. Alternative, objective, and more valid procedures are available to the Firm that would avoid such a disparate impact on female attorneys. The Firm has failed or refused to use such alternative procedures.

200.    Upon information and belief, the Firm's discriminatory employment practices, policies, and procedures are centrally established and implemented at the highest levels of the Firm.

201.    Upon information and belief, the Firm's employment policies, practices, and procedures are not unique nor limited to any office or practice group; rather, they apply uniformly and systematically to attorneys throughout the Firm, occurring as a pattern or practice throughout all office locations and practice groups.

202.    Because of the Firm's systemic pattern or practice of gender and pregnancy discrimination, the Plaintiffs and members of the proposed Class have suffered harm including lost compensation, back pay, employment benefits, and emotional distress.

203.    The Plaintiffs and members of the Class have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief. The Plaintiffs and members of the Class have suffered and are now suffering irreparable injury from the Firm's ongoing, unlawful policies, practices, and procedures set forth herein, and they will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

### A.  Rule 23 Class Definition

204.    The proposed Rule 23 Class consists of all female attorneys who are, have been, or will be employed by the Firm in the United States during the applicable liability period until the date of judgment. Upon information and belief, there are more than 40 members of the proposed Class.

205.    Plaintiffs also seek to represent a subclass of female attorneys who are, have been, or will be employed at the Firm in the United States, and who have been or will become pregnant or a mother,

1   and/or take maternity leave between during the applicable liability period through the date of judgment

2   (the "pregnancy subclass").

3       206.    Plaintiffs are each members of the Class and pregnancy subclass.

4       207.    Jane Does 1-4 further seek to represent subclasses of female attorneys in California (a)

5   during the applicable liability period through the date of judgment (the "California subclass"); and (b)

6   who have been or will become pregnant or a mother, and/or take maternity leave during the applicable

7   liability period through the date of judgment (the "California pregnancy subclass").

8       208.    Jane Does 1-4 are each members of the California subclasses.

9       209.    The systemic gender and pregnancy discrimination described in this Complaint has been,

10   and is, continuing in nature.

11       210.    Plaintiffs reserve the right to amend the class definitions based on discovery or legal

12   developments.

13   **B.  Efficiency of Class Prosecution of Class Claims**

14       211.    Certification of the proposed Class and subclasses is the most efficient and economical

15   means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the

16   Class.

17       212.    The individual claims of Plaintiffs, as Class Representatives, require resolution of the

18   common questions concerning whether the Firm has engaged in a pattern and/or practice of gender

19   discrimination against its female attorneys, particularly against women who are pregnant or have children,

20   and whether its policies, practices, and procedures have an adverse effect on the Class. Class

21   Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives,

22   careers, and working conditions and in the lives, careers, and working conditions of the class members,

23   and to prevent the Firm's continued gender discrimination.

24       213.    The Class Representatives have standing to seek such relief because of the adverse effect

25   that such discrimination has on them individually and on female attorneys generally. MoFo caused

26   Plaintiffs' injuries through its discriminatory policies, practices, and procedures and through the disparate

27   impact its policies, practices, and procedures have on female and/or pregnant attorneys. These injuries are

28   redressable through systemic relief, such as equitable and injunctive relief and other remedies sought in

this action. In addition, proper relief for Plaintiffs' individual discrimination claims can include promotion and increased compensation. Plaintiffs have a personal interest in the policies, practices, and procedures implemented at the Firm.

214.    To obtain relief for themselves and the class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

215.    Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the class members, and the Firm.

### C.  Numerosity and Impracticability of Joinder

216.    The Class that the Class Representatives seek to represent is so numerous that joinder of all members is impracticable. In addition, joinder is impractical as the attorneys are physically based in different locations throughout the United States. Fear of retaliation on the part of the Firm's present and former female attorneys is also likely to undermine the possibility of joinder.

### D.  Common Questions of Law and Fact

217.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their individual claims and those of the Class they seek to represent.

218.    The common issues of law include, *inter alia*: (a) whether MoFo has engaged in unlawful, systemic gender discrimination in its work assignment, promotion, and compensation policies, practices, and procedures; (b) whether the failure to institute adequate standards, quality controls, implementation metrics or oversight of those policies, practices, and procedures violates federal and state law, including Title VII, the FMLA, the FEHA, the CEPA, the CFRA and/or other statutes; (c) whether the lack of transparency and opportunities for redress in those systems violates federal and state law, including Title VII, the FMLA, the FEHA, the CEPA, the CFRA, and/or other statutes; (d) a determination of the proper standard for proving whether MoFo's employment policies, practices, and procedures had a disparate impact on the Class and subclasses; (e) a determination of the proper standards for proving a pattern or

1  practice of discrimination by the Firm against its female attorneys, and under the disparate treatment

2  theory of liability for attorneys; (f) whether MoFo's failure to prevent, investigate, or properly respond to

3  evidence and complaints of discrimination in the workplace violates Title VII and other statutes; and (g)

4  whether the Firm is liable for continuing systemic violations of Title VII and other statutes.

5  219.    The common questions of fact include, *inter alia*, whether the Firm has: (a) intentionally

6  held back female attorneys who have children on its pay scale because they took maternity leave; (b) used

7  a compensation system that lacks appropriate standards, implementation metrics, quality controls,

8  transparency, and opportunities for redress; (c) relied on compensation criteria that perpetuate

9  discrimination, such as basing salaries on prior salaries or on whether that person was pregnant or took

10  maternity leave; (d) compensated female attorneys less than similarly situated male attorneys in base

11  salary, bonuses, and/or promotions; (e) allocated Firm resources, including mentoring time, billable

12  assignments, and development opportunities in ways that undermined and/or frustrated the work and the

13  advancement of female attorneys, especially those who are pregnant or have children; (f) minimized,

14  ignored, or covered up evidence of gender and pregnancy discrimination in the workplace and/or

15  otherwise mishandled the investigation of and response to complaints of discrimination; (g) cultivated an

16  indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled,

17  or covered up evidence of or complaints of gender discrimination; and (h) otherwise discriminated against

18  female attorneys, especially those who are pregnant or have children, in the terms and conditions of

19  employment.

20  220.    Upon information and belief, the Firm's employment policies, practices, and procedures

21  are not unique or limited to any office or practice group; rather, they apply uniformly and systematically

22  to attorneys throughout the Firm, occurring as a pattern or practice throughout all office locations and

23  practice groups. They thus affect the Class Representatives and class members in the same ways regardless

24  of the office location or practice group in which they work. Discrimination in compensation occurs as a

25  pattern or practice throughout the Firm's offices and practice groups.

26  **E.  Typicality of Claims and Relief Sought**

27  221.    The Class Representatives' claims are typical of the claims of the proposed Class and

28  subclasses. The Class Representatives possess and assert each of the claims they assert on behalf of the

proposed Class and subclasses. They pursue the same factual and legal theories and seek similar relief.

222.    Like members of the proposed Class and subclasses, the Class Representatives are female attorneys who were employees of the Firm during the liability period and who were pregnant, had children, and took or were preparing to take maternity leave during the liability period.

223.    Differential treatment between male and female attorneys occurs as a pattern or practice throughout all offices and practice groups of the Firm. The Firm discriminates against female attorneys, especially those who are pregnant or have children, in compensation and promotion and subjects them to a work culture predominated by men. This differential treatment has affected the Class Representatives and the class members in the same or similar ways.

224.    The Firm has failed to respond adequately or appropriately to evidence and complaints of discrimination. The Class Representatives and class members have been affected in the same or similar ways by the Firm's failure to implement adequate procedures to detect, monitor, and correct this pattern or practice of discrimination.

225.    The Firm has failed to create adequate procedures to ensure its executive leadership complies with equal employment opportunity laws regarding each of the policies, practices, and procedures referenced in this Complaint, and the Firm has failed to discipline adequately others in Firm leadership when they violate anti-discrimination laws. These failures have affected the Class Representatives and the class members in the same or similar ways.

226.    The relief necessary to remedy the claims of the Class Representatives is the same as that necessary to remedy the claims of the proposed class members.

227.    The Class Representatives seek the following relief for their individual claims and for the claims of the members of the proposed Classes: (a) a declaratory judgment that the Firm has engaged in systemic gender and pregnancy discrimination against female attorneys by (i) denying promotions to female attorneys who are pregnant, have children, or take maternity leave and on the basis of gender, (ii) paying female attorneys and those who are pregnant, have children, or take maternity leave less than their male counterparts in base compensation and/or bonuses, in a way that is not consistent with a legitimate lock-step or seniority system, (iii) failing to investigate or respond to evidence of discrimination in the workplace against female attorneys, especially those who are pregnant or have children, and (iv) otherwise

exposing female attorneys, especially those who are pregnant or have children, to differential treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects a restructuring of the Firm's policies, practices, and procedures for promoting and awarding compensation to female attorneys; (d) equitable relief that effects a restructuring of the Firm compensation system so female attorneys receive the compensation they would have been paid in the absence of the Firm's discrimination; (e) back pay, front pay, reinstatement, and other equitable remedies necessary to make female attorneys whole from the Firm's past discrimination; (f) compensatory damages; (g) punitive damages to deter the Firm from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs, and expenses.

### F. Adequacy of Representation

228.   The Class Representatives' interests are coextensive with those of the members of the proposed Class. The Class Representatives seek to remedy the Firm's discriminatory policies, practices, and procedures so female attorneys, and those who are pregnant, have children, or take maternity leave, will not receive disparate pay and differential treatment.

229.   The Class Representatives are willing and able to represent the proposed Class fairly and vigorously as they pursue their similar individual claims in this action.

230.   The Class Representatives have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G. Requirements of Rule 23(b)(2)

231.   The Firm has acted on grounds generally applicable to the Class Representatives and the proposed Class by adopting and following systemic policies, practices, and procedures that discriminate on the basis of gender, pregnancy, and maternity. Gender discrimination is the Firm's standard operating procedure rather than a sporadic occurrence.

232.   The Firm has also acted or refused to act on grounds generally applicable to the Class

Representatives and the proposed Class by, *inter alia*: (a) using a promotion system that systematically, intentionally, or knowingly disadvantages women, pregnant women, and mothers; (b) systematically, intentionally, or knowingly denying promotions for women, pregnant women, and mothers in favor of similarly situated males; (c) using a compensation system and promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (d) compensating women, pregnant women, and mothers less than similarly situated males in salary and/or bonuses; (e) systematically, intentionally, or knowingly compensating women, pregnant women, and mothers less than similarly situated male attorneys, including less base salary and/or bonus pay; (f) minimizing, ignoring, or covering up evidence of gender, pregnancy, and maternity discrimination in the workplace and/or otherwise mishandling the investigation of and response to complaints of discrimination; (g) cultivating an indifference to evidence of discrimination in the workplace or otherwise minimizing, ignoring, mishandling, or covering up evidence or complaints of gender, pregnancy, and maternity discrimination; and (h) otherwise discriminating against women, pregnant women, and mothers in the terms and conditions of employment as attorneys.

233.   The Firm's policies, practices, and procedures with respect to compensation have led to gender, pregnancy, and maternity discrimination and stratification. The systemic means of accomplishing such gender-based stratification include, but are not limited to, the Firm's policies, practices, and procedures for awarding base compensation, bonus pay, and promotions to female attorneys and those who are pregnant or have children. These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; and opportunities for redress or challenge. As a result, female attorneys and attorneys who are pregnant or who have children are compensated within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably or fairly manage or reward them.

234.   The Firm's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

235.   Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of the Firm's systemic gender discrimination. In turn, entitlement to declaratory, injunctive,

and affirmative relief forms the factual and legal predicate for recovery by the Class Representatives and class members of monetary and non-monetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of compensatory and punitive damages.

### H.  Requirements of Rule 23(b)(3)

236.    The common issues of fact and law affecting the claims of the Class Representatives and proposed class members—including, but not limited to, the common issues identified above—predominate over any issues affecting only individual claims. The common issues include whether the Firm has engaged in gender, pregnancy, and maternity discrimination against female attorneys by paying and promoting female attorneys, particularly those who become mothers or take or prepare to take maternity leave, less than their male counterparts.

237.    A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representatives and members of the proposed Class.

238.    By virtue of the pattern or practice of discrimination at the Firm, the Class Representatives and class members are eligible for monetary remedies for losses caused by the systemic discrimination, including back pay, front pay, reinstatement, compensatory damages, and other relief.

239.    Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rules 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all class members.

### XII.  <u>COLLECTIVE ALLEGATIONS UNDER THE EQUAL PAY ACT</u>

240.    Plaintiffs incorporate all allegations of this Complaint alleging class-based discrimination.

241.    Plaintiffs bring collective claims under the Equal Pay Act pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action. The EPA Action includes female attorneys (a) who were not compensated equally to male attorneys who had substantially similar job classifications, functions, titles, and/or duties, (b) who were not compensated equally to male attorneys who performed substantially similar work, and/or (c) who were denied equal compensation to similarly situated male attorneys by being held back to lesser pay levels than male attorneys who performed substantially equal work and had substantially similar experience.

242.    Plaintiffs and the Collective Action members are similarly situated with respect to their

claims that the Firm paid and promoted them less than their male counterparts.

243.    There is a common nexus of fact and law suggesting that Plaintiffs and the Collective Action members were discriminated against in the same manner. Questions at issue in the case include:

(a)    Whether the Firm unlawfully awarded less in base pay to female attorneys than to similarly-qualified male attorneys for substantially equal work;

(b)    Whether the Firm unlawfully awarded less in bonuses to female attorneys than similarly-qualified male attorneys for substantially equal work;

(c)    Whether the Firm unlawfully assigned and continues to assign female attorneys into positions with lesser pay and other compensation than similarly-qualified male attorneys who perform substantially equal work;

(d) Whether the Firm's resulting failure to compensate female attorneys on a par with comparable male attorneys was willful within the meaning of the EPA.

244.    Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiff are similar to the claims of the EPA Collective Action Class.

245.    Plaintiffs and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles, and/or duties; and (c) are subject to the Firm's common policy and practice of gender discrimination in failing to compensate female attorneys commensurate with compensation given to male attorneys who perform substantially equal work.

## XIII.  COUNTS

### CLASS AND COLLECTIVE COUNTS

### COUNT 1

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(e)** *et seq.*, *as amended by the* **PREGNANCY DISCRIMINATION ACT OF 1978**

**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**

**On Behalf of Class Representatives and all Pregnancy Subclass Members**

246.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

247.    This Count is brought on behalf of the Class Representatives and all members of the Pregnancy subclass.

248.    MoFo has discriminated against Class Representatives and all members of the subclass in violation of Title VII by subjecting them to different treatment on the basis of their gender, including pregnancy and maternity. The members of the Class have been disparately impacted and disparately treated as a result of MoFo's wrongful conduct and its policies, practices, and procedures.

249.    MoFo has discriminated against the subclass members by treating them differently from and less preferably than similarly situated male employees and female employees who are not pregnant and who do not have children, and by subjecting them to differential and substandard terms and conditions of employment including, but not limited to, discriminatory denials of fair compensation, discriminatory denials of promotional opportunities, and discriminatory treatment with respect to leave, work responsibilities, and other terms and conditions of employment in violation of Title VII.

250.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representatives and the members of the proposed subclass, entitling the Class Representatives and the members of the subclass to punitive damages.

251.    As a result of MoFo's conduct alleged in this Complaint, Class Representatives and the members of the subclass have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

252.    By reason of MoFo's discrimination, Class Representatives and members of the subclasses are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

253.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

//

//

//

//

//

## COUNT 2

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

## 42 U.S.C. § 2000(e) *et seq.*

## GENDER DISCRIMINATION

## On Behalf of Class Representatives and all Class Members

254.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

255.    This Count is brought on behalf of the Class Representatives and all members of the Class.

256.    MoFo, an employer of Class Representatives and Class Members within the meaning of Title VII, has discriminated against the Class Representatives and the Class Members in violation of Title VII by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

257.    MoFo has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against Class Representatives and the Class by, among other things: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; discriminating against Class Representatives and class members in pay and promotions; discriminatorily denying development opportunities; and other forms of discrimination.

258.    These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on Class Representatives and the Class with respect to the terms and conditions of their employment.

259.    As a result of this disparate treatment and disparate impact discrimination, MoFo has treated Class Representatives and the Class differently from and less preferentially than similarly situated male employees with respect to pay and promotions.

260.    MoFo has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

261.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and the Class, entitling the Class Representatives and all members of the Class to punitive damages.

262. By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the Class, the Class Representatives and all members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

263. By reason of MoFo's discrimination, the Class Representatives and the Class are entitled to all legal and equitable remedies available for violations of Title VII.

264. As a result of MoFo's conduct alleged in this Complaint, the Class Representatives and the Class have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, including interest.

265. As a further result of MoFo's unlawful conduct, the Class Representatives and the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Class Representatives and the Class are entitled to recover damages for such injuries from MoFo under Title VII.

266. Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 3

### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT,

### 29 U.S.C § 2601 *et seq.*

### DISCRIMINATION, INTERFERENCE AND RETALIATION

### On behalf of Class Representatives and the Pregnancy Subclass

267. Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

268. This Count is brought on behalf of Plaintiffs in their individual and representative capacities, and all members of the Pregnancy subclass.

269. Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of FMLA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. Plaintiffs took or were preparing to take approved FMLA leave for maternity leave.

//

270.     MoFo interfered with the taking of protected maternity leave by Class Representatives and subclass members and retaliated and discriminated against them for the taking of such leave, in violation of the FMLA.

271.     MoFo interfered with the taking of protected maternity leave by Class Representatives and subclass members and retaliated and discriminated against them for taking such leave by using the taking of FMLA leave as a negative factor in employment actions, including, *inter alia*, failing to promote them, denying them career-advancement opportunities and work opportunities, making inaccurate statements harmful to their professional careers, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

272.     MoFo acted willfully, intentionally, and with reckless disregard for Class Representatives' rights under the FMLA.

273.     As a direct and proximate result of MoFo's actions, Class Representatives suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

274.     By reason of MoFo's discrimination, Class Representatives and class members are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

## COUNT 4

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, *as amended by*

### THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 216(b)

### DENIAL OF EQUAL PAY FOR EQUAL WORK

### On Behalf of All Plaintiffs and the EPA Collective Action Plaintiffs

275.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

276.     This Count is brought on behalf of Plaintiffs and the EPA Collective Action, including all EPA Collective Action Plaintiffs who "opt-in" to this action.

277.     MoFo has discriminated against Plaintiffs and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act of 1963 in violation of the Fair Labor Standards Act of 1938, 29 U.S.C.

§§ 206, *et seq.*, as amended by the EPA, by providing them with a lower rate of pay than similarly situated male colleagues on the basis of their gender, female, even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility as their male counterparts.

278.   Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all perform similar job duties and functions. Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all performed jobs that required equal skill, effort, and responsibility.

279.   MoFo discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay in violation of the Equal Pay Act.

280.   The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

281.   MoFo caused, attempted to cause, or contributed to the continuation of pay discrimination based on gender, in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because MoFo has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

282.   As a result of MoFo's conduct as alleged in this Complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

283.   By reason of MoFo's discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

284.   Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## <u>COUNT 5</u>

### VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,

### Cal. Gov. Code § 12940, *et seq*.

### PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION

### On behalf of California Class Representatives and the California Pregnancy Subclass

285.   Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

286.    This Count is brought on behalf of Plaintiffs Jane Does 1-4 (the "California Class Representatives") in their individual and representative capacities, and all members of the California subclass.

287.    MoFo has discriminated against the California Class Representatives and the California subclass in violation of the FEHA by subjecting them to different treatment because and on the basis of their gender, in particular their pregnancy and maternity, including by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

288.    MoFo has engaged in an intentional, firm-wide and system policy, pattern, and/or practice of discrimination against the California Class Representatives and the California subclass by, among other things: maintaining a discriminatory system for promotions, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women who are pregnant or have children, and other forms of discrimination.

289.    These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on the California Class Representatives and the members of the California subclass with respect to the terms and conditions of their employment.

290.    As a result of this disparate treatment and disparate impact discrimination, MoFo has treated the California Class Representatives and California subclass differently from and less preferentially than similarly situated male attorneys and female attorneys who are not pregnant or do not have children, with respect to pay and promotions.

291.    MoFo has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

292.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the California Class Representatives and all members of the California pregnancy subclass, entitling the California Class Representatives and all members of the California pregnancy subclass to punitive damages.

293.    As a result of MoFo's conduct alleged in this Complaint, the California Class Representatives and the California pregnancy subclass have suffered and continue to suffer harm,

including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

294.    By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of the California Class Representatives and the members of the California pregnancy subclass, the continuing violations doctrine applies to all violations alleged herein.

295.    By reason of MoFo's discrimination, the California Class Representatives and the members of the California pregnancy subclass are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

296.    Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

## COUNT 6

## VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,

## Cal. Gov. Code § 12940, *et seq.*

## GENDER DISCRIMINATION

### On behalf of California Class Representatives and the California Subclass

297.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

298.    This Count is brought on behalf of the California Class Representatives in their individual and representative capacities, and all members of the California subclass.

299.    MoFo has discriminated against the California Class Representatives and the California subclass in violation of the California Fair Employment and Housing Act (the "FEHA"), Cal. Gov. Code § 12940, *et seq.*, by subjecting them to different treatment because and on the basis of their gender (including pregnancy), by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

300.    MoFo has engaged in an intentional, firm-wide, and systemic policy, pattern, and/or practice of discrimination against the California Class Representatives and the California subclass by, among other things: maintaining a discriminatory system for compensation, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women, and other forms of discrimination.

//

301.    These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on the California Class Representatives and the members of the California subclass with respect to the terms and conditions of their employment.

302.    As a result of this disparate treatment and disparate impact discrimination, MoFo has treated the California Class Representatives and California subclass differently from and less preferentially than similarly situated male attorneys with respect to pay and promotions.

303.    MoFo has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

304.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the California Class Representatives and all members of the California subclass, entitling the California Class Representatives and all members of the California subclass to punitive damages.

305.    As a result of MoFo's conduct alleged in this Complaint, California Class Representatives and the California subclass have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

306.    By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of the California Class Representatives and the members of the California subclass, the continuing violations doctrine applies to all violations alleged herein.

307.    By reason of MoFo's discrimination, California Class Representatives and the members of the California subclass are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

308.    Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

//

//

//

//

//

1

<u>COUNT 7</u>

**VIOLATION OF THE CALIFORNIA FAMILY RIGHTS ACT,**

**Cal. Gov. Code § 12945.2**

**DISCRIMINATION, INTERFERENCE AND RETALIATION**

**On behalf of California Class Representatives and the California Pregnancy Subclass**

309.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

310.    This Count is brought on behalf of California Class Representatives in their individual and representative capacities, and all members of the California pregnancy subclass.

311.    Under the California Family Rights Act ("CFRA"), an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of CFRA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. California Class Representatives took or were preparing to take approved CFRA leave for maternity leave and bonding leave.

312.    MoFo interfered with the taking of protected maternity and bonding leave by California Class Representatives and subclass members, and retaliated and discriminated against them for taking such leave, in violation of the CFRA.

313.    MoFo interfered with the taking of protected maternity and bonding leave by California Class Representatives and subclass members, and retaliated and discriminated against them for taking such leave, by using the taking of CFRA leave as a negative factor in employment actions, including, *inter alia*, failing to promote them, denying them career-advancement opportunities and work opportunities, making inaccurate statements harmful to their professional careers, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

314.    MoFo acted willfully, intentionally, and with reckless disregard for California Class Representatives' rights under the CFRA.

315.    As a direct and proximate result of MoFo's actions, California Class Representatives suffered injury and monetary damages, including, but not limited to, past and future loss of income,

benefits, promotion and promotional opportunities, expenses, and costs, and are entitled to all legal and equitable remedies available.

316.   By reason of MoFo's discrimination, California Class Representatives and class members are entitled to all legal and equitable remedies available for violations of the CFRA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation.

## COUNT 8

**VIOLATION OF THE CALIFORNIA EQUAL PAY ACT, *as amended by* THE CALIFORNIA FAIR PAY ACT, Cal. Lab. Code § 1197.5, *et seq*.; CALIFORNIA EQUAL PAY ACT, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015)**

**DENIAL OF EQUAL PAY FOR EQUAL & SUBSTANTIALLY SIMILAR WORK**

**On behalf of California Class Representatives and the California Subclass**

317.   Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

318.   This Count is brought on behalf of the California Class Representatives in their individual and representative capacities, and all members of the California subclass.

319.   MoFo has discriminated against the California Class Representatives and all members of the California subclass in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq.* MoFo has paid California Class Representatives and members of the California subclass less than similarly situated male attorneys in the same establishment performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

320.   MoFo has discriminated against the California Class Representatives and the California subclass in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5, *et seq.* MoFo has paid California Class Representatives and members of the subclass less than similarly situated male attorneys performing substantially equal work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

321.   MoFo subjected California Class Representatives and the members of the California subclass to common discriminatory pay policies, practices, and procedures including: maintaining a

1   discriminatory system of determining compensation; maintaining a discriminatory system for promotions;

2   and other forms of discrimination affecting pay.

3   322.   The differential in pay between male and female attorneys was not due to a legitimate

4   seniority system, merit, or the quantity or quality of production, or a bona fide factor other than sex, such

5   as education, training, or experience, but was due to gender. In the alternative, to the extent that MoFo

6   relied upon one or more of these factors, said factor(s) were not reasonably applied and did/do not account

7   for the entire wage differential.

8   323.   The foregoing conduct constitutes a willful violation of the California Equal Pay Act, Cal.

9   Lab. Code §1197.5 *et seq*., as amended by the California Fair Pay Act. Therefore, a three-year statute of

10   limitations applies to such violations, pursuant to California Equal Pay Act, Cal. Lab. Code § 1197.5(h),

11   *et seq*., and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code

12   § 1197.5(h).

13   324.   As a result of MoFo's conduct alleged in this Complaint and/or MoFo's willful, knowing,

14   and intentional discrimination, the California subclass members have suffered and will continue to suffer

15   harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-

16   economic damages.

17   325.   California Class Representatives and the California subclass are therefore entitled to all

18   legal and equitable remedies, including doubled compensatory awards for all willful violations.

19   326.   Attorneys' fees should be awarded under California Labor Code § 1197.5(g).

20   <u>**COUNT 9**</u>

21   **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE,**

22   **Cal. Bus. & Prof. Code § 17200 *et seq*.**

23   **UNFAIR COMPETITION**

24   **On behalf of California Class Representatives and the California Subclass**

25   327.   Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

26   328.   This Count is brought on behalf of California Class Representatives in their individual and

27   representative capacities, and all members of the California subclass.

28   329.   MoFo is a "person" as defined under California Business & Professions Code § 17201.

330.     MoFo's willful failure to pay women equally, to promote women equally, and otherwise to offer women equal employment opportunities as alleged above, constitutes unlawful, unfair and/or fraudulent activity prohibited by California Business and Professions Code § 17200. As a result of its unlawful, unfair and/or fraudulent acts, MoFo reaped and continues to reap unfair benefits and illegal profits at the expense of California Class Representatives and the California subclass. MoFo should be enjoined from this activity.

331.     Accordingly, California Class Representatives and the California subclass members are entitled to restitution with interest and other equitable relief, pursuant to Business & Professions Code § 17203.

### INDIVIDUAL COUNTS

### COUNT 10

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000e-2(a), *et seq.*

### RETALIATION

### On behalf of Jane Does 1 and 4

332.     Jane Does 1 and 4 re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

333.     Jane Does 1 and 4 engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination and participating in, supporting, and pursuing this action.

334.     MoFo retaliated against Jane Doe 1 by depriving her of adequate work, providing her with negative performance reviews, and threatening her with termination. Upon information and belief, MoFo also retaliated against Jane Doe 4 by, *inter alia*, providing negative references and hindering her ability to find new employment.

335.     MoFo's retaliatory acts against Jane Does 1 and 4 were a direct and proximate result of their protected activities.

336.     A reasonable person would find MoFo's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

337.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Jane Does 1 and 4's rights, entitling them to punitive damages.

338.    Defendant's actions and failures to act have caused Jane Does 1 and 4 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

339.    Jane Does 1 and 4 are therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

340.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 11

**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**

**Cal. Gov. Code § 12940, *et seq*.**

**RETALIATION**

**On behalf of Jane Does 1 and 4**

341.    Jane Does 1 and 4 re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

342.    Jane Does 1 and 4 engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination and participating in, supporting, and pursuing this action.

343.    MoFo retaliated against Jane Doe 1 by depriving her of adequate work, providing her with negative performance reviews, and threatening her with termination. Upon information and belief, MoFo also retaliated against Jane Doe 4 by, *inter alia*, providing negative references and hindering her ability to find new employment.

344.    MoFo's retaliatory acts against Jane Does 1 and 4 were a direct and proximate result of their protected activities.

345.    A reasonable person would find MoFo's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

346.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Jane Does 1 and 4's rights, entitling them to punitive damages.

347.    Defendant's actions and failures to act have caused Jane Does 1 and 4 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

348.    Jane Does 1 and 4 are therefore entitled to all legal and equitable remedies available for violations of the FEHA, including an award of punitive damages.

## COUNT 12

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000e-2(a), *et seq.*,

### WRONGFUL TERMINATION

### On behalf of Jane Doe 4

349.    Jane Doe 4 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

350.    MoFo terminated the employment of Jane Doe 4 due to gender and pregnancy discrimination. MoFo's discharge of Jane Doe 4 was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of Title VII.

351.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Jane Doe 4, entitling her to punitive damages.

352.    MoFo's discharge of Jane Doe 4 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

353.    Jane Doe 4 is therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of punitive damages.

354.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

//

//

//

//

//

## COUNT 13

### CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,

### Cal. Gov. Code § 12940, *et seq.*

### WRONGFUL TERMINATION

### On behalf of Jane Doe 4

355.   Jane Doe 4 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

356.   MoFo terminated the employment of Jane Doe 4 due to gender and pregnancy discrimination. MoFo's discharge of Jane Doe 4 was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of the FEHA.

357.   MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Jane Doe 4, entitling her to punitive damages.

358.   MoFo's discharge of Jane Doe 4 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

359.   Jane Doe 4 is therefore entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of punitive damages.

360.   Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

## COUNT 14

### RESCISSION OF CONTRACT,

### Cal. Civil Code § 1688, *et seq.*

### On behalf of Jane Doe 4

361.   Jane Doe 4 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

362.   On or about November 17, 2017, as a result of Defendant's coercion and/or excessive pressure in light of Jane Doe 4's pregnancy, exhaustion, economic vulnerability, emotional anguish, and lack of alternatives for income, Jane Doe 4 signed the severance agreement.

363.   Defendant's wrongful acts caused or induced Jane Doe 4 to endorse the severance

agreement. Defendant thus obtained Jane Doe 4's signature to the severance agreement through duress and/or undue influence in violation of California law.

364.    Jane Doe 4 is therefore entitled to a judgment from this Court declaring that the severance agreement is invalid, void, and rescinded. Pursuant to Cal. Civil Code § 1693, Jane Doe 4 will tender restoration as deemed appropriate by the Court.

**COUNT 15**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**

**42 U.S.C. § 2000e-2(a),** ***et seq.***

**WRONGFUL TERMINATION**

**On behalf of Jane Doe 5**

365.    Jane Doe 5 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

366.    MoFo terminated the employment of Jane Doe 5 due to gender and pregnancy discrimination. MoFo's discharge of Jane Doe 5 was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of Title VII.

367.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Jane Doe 5, entitling her to punitive damages.

368.    MoFo's discharge of Jane Doe 5 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

369.    Jane Doe 5 is therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of punitive damages.

370.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

//
//
//
//
//

## COUNT 16

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**

**D.C. Code §§ 2-1401,** *et seq.*

**DISCRIMINATION AND WRONGFUL TERMINATION**

**On behalf of Jane Doe 5**

371.    Jane Doe 5 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

372.    MoFo, an employer within the meaning of the DCHRA, wrongfully discriminated against and terminated Jane Doe 5's employment due to gender, pregnancy, and maternity discrimination. MoFo's wrongful termination was an adverse employment action that materially and adversely affected Doe 5's employment in violation of the DCHRA.

373.    MoFo's discrimination against and discharge of Jane Doe 5 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

374.    Jane Doe 5 is therefore entitled to all legal and equitable remedies available for violations of the DCHRA, including reinstatement and an award of punitive damages.

375.    Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

## COUNT 17

**VIOLATION OF THE DISTRICT OF COLUMBIA FAMILY AND MEDICAL LEAVE ACT,**

**D.C. CODE § 32-501** *et seq.*

**DISCRIMINATION, INTERFERENCE AND RETALIATION**

**On behalf of Jane Doe 5**

376.    Jane Doe 5 re-alleges and incorporates by reference each and every allegation in the previous paragraphs of this Complaint as though fully set forth herein.

377.    MoFo interfered with the taking of protected maternity leave by Jane Doe 5 and discriminated against her for the taking of such leave, in violation of the DCFMLA.

378.    MoFo interfered with the taking of protected maternity leave by Jane Doe 5 and retaliated and discriminated against her for taking such leave by using the taking of DCFMLA leave as a negative

factor in employment actions, including, *inter alia*, failing to promote her, denying her career-advancement opportunities and work opportunities, making inaccurate statements harmful to her professional career, creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave, and terminating her employment.

379.    MoFo acted willfully, intentionally, and with reckless disregard for Jane Doe 5' rights under the DCFMLA.

380.    As a direct and proximate result of MoFo's actions, Jane Doe 5 suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

381.    By reason of MoFo's actions, Jane Doe 5 is entitled to all legal and equitable remedies available for violations of the DCFMLA, including an award of consequential damages and prejudgment interest.

<u>**COUNT 18**</u>

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**

**42 U.S.C. § 2000e-2(a), *et seq.***

**WRONGFUL CONSTRUCTIVE DISCHARGE**

**On behalf of Plaintiff Jane Doe 6**

382.    Plaintiff Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

383.    MoFo constructively terminated the employment of Jane Doe 6 due to gender and pregnancy discrimination. MoFo's discharge of Jane Doe 6 was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of Title VII.

384.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Jane Doe 6, entitling her to punitive damages.

385.    MoFo's discharge of Jane Doe 6 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

386.     Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of punitive damages.

387.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 19

### VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW,

### N.Y. Exec. Law § 290, *et seq.*

### GENDER AND PREGNANCY DISCRIMINATION

### On behalf of Jane Doe 6

388.     Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

389.     MoFo, an employer within the meaning of the NYSHRL, wrongfully discriminated against and constructively discharged Jane Doe 6 due to gender and pregnancy discrimination. MoFo's discrimination and constructive discharge were adverse employment actions that materially and adversely affected Jane Doe 6's employment in violation of the NYSHRL.

390.     MoFo's discrimination against Jane Doe 6 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

391.     Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of the NYSHRL, including reinstatement and an award of punitive damages.

## COUNT 20

### VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,

### N.Y.C. Admin. Code § 8-101, *et seq.*

### GENDER, PREGNANCY, AND CAREGIVER DISCRIMINATION

### On behalf of Jane Doe 6

392.     Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

393.     MoFo, an employer within the meaning of the NYCHRL, wrongfully discriminated against and constructively discharged Jane Doe 6 due to gender, pregnancy, and caregiver discrimination. MoFo's

discrimination and constructive discharge were adverse employment actions that materially and adversely affected Doe 6's employment in violation of the NYCHRL.

394.    MoFo's discrimination against Jane Doe 6 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

395.    Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including reinstatement and an award of punitive damages.

<u>**COUNT 21**</u>

**VIOLATION OF THE NEW YORK EQUAL PAY LAW,**

**N.Y. Lab. Law § 194**

**UNEQUAL PAY**

**On behalf of Jane Doe 6**

396.    Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

397.    Defendant MoFo, the employer of Jane Doe 6 within the meaning of the New York Equal Pay Law, has discriminated against Jane Doe 6 in violation of New York Labor Law § 194 by subjecting her to unequal pay on the basis of her sex.

398.    Defendant has discriminated against Jane Doe 6 by treating her differently from and less preferably than similarly situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions. Defendant so discriminated by subjecting her to discriminatory pay and other forms of discrimination in violation of the New York Equal Pay Law.

399.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant willfully violated the New York Equal Pay Law by intentionally paying Jane Doe 6 less than similarly situated men.

400.    Jane Doe 6 is therefore entitled to all remedies available for violations of New York Labor Law § 194, including liquidated damages and attorneys' fees and costs for all willful violations.

## COUNT 22

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000e-2(a), *et seq.*

### RETALIATION

### On behalf of Jane Doe 6

401.    Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

402.    Jane Doe 6 engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination in compensation and promotion. She complained to members of the Firm on numerous occasions, including, but not limited to, Partner 4, MoFo Human Resources and MoFo Attorney Development.

403.    MoFo constructively terminated Jane Doe 6's employment in retaliation for her discrimination complaints. MoFo also retaliated against Jane Doe 6 by, *inter alia*, undermining her client relationships, failing to promote her to partner, demoting her, and undermining her reputation in her field. These adverse employment actions materially and adversely changed Jane Doe 6's terms and conditions of employment.

404.    MoFo's retaliatory acts against Jane Doe 6 were a direct and proximate result of her protected activities.

405.    A reasonable employee would find MoFo's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

406.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Jane Doe 6's rights, entitling her to punitive damages.

407.    Defendant's actions and failures to act have caused Jane Doe 6 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

408.    Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

409.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 23

**VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW,**

**N.Y. Exec. Law § 290,** *et seq.*

**RETALIATION**

**On behalf of Jane Doe 6**

410.    Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

411.    Jane Doe 6 engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination in compensation and promotion. She complained to members of the Firm on numerous occasions, including, but not limited to, Partner 4, MoFo Human Resources and MoFo Attorney Development.

412.    By objecting to discrimination based on gender and pregnancy, Jane Doe 6 engaged in an activity protected by the New York State Human Rights Law.

413.    MoFo constructively terminated Jane Doe 6's employment in retaliation for her discrimination complaints. MoFo also retaliated against Jane Doe 6 by, *inter alia*, undermining her client relationships, failing to promote her to partner, demoting her, and undermining her reputation in her field. These adverse employment actions materially and adversely changed Jane Doe 6's terms and conditions of employment.

414.    MoFo's retaliatory acts against Jane Doe 6 were a direct and proximate result of her protected activities. MoFo's retaliatory acts immediately followed Jane Doe 6's complaints for violations of the New York State Human Rights Law and are in direct violation of Jane Doe 6's rights under the law.

415.    Defendant's retaliatory acts would be reasonably likely to deter a person from engaging in protected activity.

416.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Jane Doe 6's rights, entitling her to punitive damages.

417.    Defendant's actions and failures to act have caused Jane Doe 6 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

418.    Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of the NYSHRL, including an award of punitive damages.

## COUNT 24

## VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,

## N.Y.C. Admin. Code § 8-101, *et seq.*

## RETALIATION

## On behalf of Jane Doe 6

419.    Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

420.    Jane Doe 6 engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination in compensation and promotion. She complained to members of the Firm on numerous occasions, including, but not limited to, Partner 4, MoFo Human Resources and MoFo Attorney Development.

421.    By objecting to discrimination based on gender and pregnancy, Jane Doe 6 engaged in an activity protected by the New York City Human Rights Law.

422.    MoFo constructively terminated Jane Doe 6's employment in retaliation for her discrimination complaints. MoFo also retaliated against Jane Doe 6 by, *inter alia*, undermining her client relationships, failing to promote her to partner, demoting her, and undermining her reputation in her field. These adverse employment actions materially and adversely changed Jane Doe 6's terms and conditions of employment.

423.    Defendant's actions and failures to act have caused Jane Doe 6 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

424.    Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including an award of punitive damages.

//

//

//

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on their own behalf and on behalf of the Class, subclasses, and EPA Collective Action, request the following relief:

a.   Acceptance of jurisdiction of this case;

b.   Certification of this case as a class action under Federal Rule of Civil Procedure 23, on behalf of the proposed Plaintiff Class and subclasses, designation of the proposed Class Representatives as representatives of this Class and subclasses, and designation of Plaintiffs' counsel of record as Class Counsel;

c.   Designation of this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and:

   i.   promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

   ii.   tolling the statute of limitations on the claims of all members of the EPA Opt-In Class from the date the original Complaint was filed until the class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

d.   Designation of Plaintiffs as representatives of the EPA Collective Action;

e.   A declaratory judgment that the practices complained of therein are unlawful and violate, among other laws, 42 U.S.C. § 2000(e) *et seq.*, as amended; 29 U.S.C. § 2601, *et seq.*; 29 U.S.C. § 206, *et seq.*; and the applicable state and local laws;

f.   A determination that Jane Doe 4's severance agreement has been rescinded;

g.   A determination that Jane Doe 5 is entitled to equitable tolling of the limitations period for her claims;

h.   A permanent injunction against MoFo and its partners, officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with

them from engaging in any further unlawful practices, policies, customs, and usages set forth therein;

i. An Order requiring the Firm to initiate and implement programs that (i) remedy the hostile work environment at Morrison & Foerster; (ii) ensure prompt, remedial action regarding all claims of gender, pregnancy, and maternity discrimination; and (iii) eliminate the continuing effects of the discrimination and retaliatory practices described therein;

j. An Order requiring MoFo to initiate and implement systems for promoting and compensating female attorneys in a non-discriminatory manner;

k. An Order directing MoFo to adjust the compensation and title for Class Representatives and the class members to the level that they would be enjoying but for MoFo's discriminatory policies, practices, and procedures;

l. An award of back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the Plaintiffs, Members of the Classes, and Members of the EPA Collective Action, in an amount not less than $50,000,000;

m. An award of nominal, liquidated, and compensatory damages to Plaintiffs and Members of the Classes, in an amount not less than $50,000,000;

n. Award punitive damages to Plaintiffs and Members of the Classes, in an amount not less than $100,000,000;

o. An award of penalties available under applicable laws, including waiting time penalties;

p. An award of litigation costs and expenses, including reasonable attorneys' fees to the Plaintiffs;

q. An award of pre-judgment and post-judgment interest; and

r. Such other and further relief as the Court may deem just and proper.

//

//

1

## **DEMAND FOR JURY TRIAL**

2       Plaintiffs demand a trial by jury of all issues triable of right to a jury.

3

4   Dated: January 25, 2019                    Respectfully Submitted,

5                                               /s/ David W. Sanford
                                               David W. Sanford (admitted *pro hac vice*)
6                                              Deborah K. Marcuse (admitted *pro hac vice*)
                                               Ed Chapin (CA Bar No. 53287)
7                                              Jill Sullivan Sanford (CA Bar No. 185757)
                                               Aimee Krause Stewart (admitted *pro hac vice*)
8                                              Danielle Fuschetti (CA Bar No. 294065)
9                                              **SANFORD HEISLER SHARP, LLP**

10                                             *Attorneys for Plaintiffs, the Proposed Classes, and*
11                                             *the Proposed Collective*

12  [*Continued from Caption Page*]

13  Danielle Fuschetti (CA Bar No. 294065)
14  dfuschetti@sanfordheisler.com
    **SANFORD HEISLER SHARP, LLP**
15  111 Sutter Street, Suite 975
    San Francisco, CA 94104
16  Telephone: (415) 795-2020
    Facsimile: (415) 795-2021
17

18  *Attorneys for Plaintiffs, the Proposed Classes,*
    *and the Proposed Collective*
19

20

21

22

23

24

25

26

27

28