1 David W. Sanford (DC Bar No. 457933, admitted *pro hac vice*)
dsanford@sanfordheisler.com
2 Andrew Melzer (NY Bar No. 4270682, *pro hac vice* forthcoming)
amelzer@sanfordheisler.com
3 **SANFORD HEISLER SHARP, LLP**
4 1350 Avenue of the Americas, 31st Floor
New York, New York 10019
5 Telephone: (646) 402-5656
Facsimile: (646) 402-5651
6

7 Deborah K. Marcuse (DC Bar No. 99538, admitted *pro hac vice*)
dmarcuse@sanfordheisler.com
8 **SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
9 Baltimore, MD 21202
Telephone: (410) 834-7420
10 Facsimile: (410) 834-7425

11 Ed Chapin (CA Bar No. 53287)
echapin2@sanfordheisler.com
12 Jill Sullivan Sanford (CA Bar No. 185757)
jsanford@sanfordheisler.com
13 **SANFORD HEISLER SHARP, LLP**
14 655 W. Broadway, Suite 1700
San Diego, CA 92101
15 Telephone: (619) 577-4253
Facsimile: (619) 677-4250
16

17 *Attorneys for Plaintiffs, the Proposed Classes, and the Proposed Collective*
*[Additional Attorneys Listed After Signature Page]*
18

19 UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
20 SAN FRANCISCO DIVISION

21

22 JANE DOE 1, JANE DOE 2, JANE DOE 3, | **Case No.: 18-CV-2542 (JSC)**
JANE DOE 4, JANE DOE 5, JANE DOE 6, and
23 JANE DOE 7, on behalf of themselves and all | **THIRD AMENDED CLASS AND**
others similarly situated, | **COLLECTIVE ACTION**
24 | **COMPLAINT**
Plaintiffs,
25 v. | **DEMAND FOR JURY TRIAL**

26 MORRISON & FOERSTER LLP

27 Defendant.

28

CASE NO. 18-CV-2542 JSC – THIRD AMENDED CLASS AND COLLECTIVE ACTION
COMPLAINT
-1-

Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 6, and Jane Doe 7 ("Plaintiffs"), by and through their attorneys, Sanford Heisler Sharp, LLP, bring this action on behalf of themselves and all similarly situated female attorneys against Defendant Morrison & Foerster LLP. Plaintiffs allege, upon knowledge as to themselves and otherwise upon information and belief, that Defendant engages in systemic discrimination based on gender, pregnancy, and maternity, as follows:

## I.     **INTRODUCTION**

1.     Defendant Morrison & Foerster LLP ("Defendant," "MoFo," or "the Firm"), is one of the largest law firms in the nation, employing nearly 800 attorneys across the country, with 16 offices globally. MoFo specializes in a wide range of practice areas, including defense-side labor and employment law, in which the Firm defends clients against individual and class action employment lawsuits, including discrimination actions. The Firm markets itself as a progressive firm with policies and initiatives that champion the advancement of its female employees.[1] However, this is far from the truth.

2.     At MoFo, female attorneys who become pregnant, have children, and take or prepare to take maternity leave are denied opportunities for advancement and higher pay. MoFo's standard operating procedure is to hold back women who take maternity leave, regardless of their performance before or after leave. Continuing to bill out these attorneys at the same higher rate as their peers, until and unless the practice is contested, MoFo fails to pay these women on par with their actual seniority. By holding them back, MoFo further creates a lasting stain on their careers, impeding not only their opportunities for advancement internally but also their marketability at other firms.

3.     Left to work their way back from what is effectively a demotion, attorneys who are mothers are forced to prove their commitment to the Firm in a way no one else is. They risk isolation, work droughts, and even being pushed out of their practice groups if they do not meet the new, and impossibly high, standards that are set for them after they return from leave.

4.     MoFo's policies, practices, and procedures are one manifestation of the "old boys' club" that has long permeated law firms, suppressing female advancement by treating female lawyers in ways that accord with stereotyped expectations rather than objective performance. When female attorneys

---

[1]  *See* Morrison & Foerster, *MoFo Women* (rev. Dec. 6, 2018), https://media2.mofo.com/documents/181113-mofo-women.pdf.

become mothers, their place in a firm culture built on gender stereotypes becomes even more tenuous.

5.    Persistent stereotypes about working mothers have serious financial and social consequences for women. Women in law who have children and take maternity leave return (if they return at all) to face a lower volume of work, reduced exposure to interesting projects, and fewer opportunities for advancement.[2] More often than not, the law firms in question are acting based on stereotypes they place on working mothers as uncommitted to their jobs, overwhelmed, or no longer competent. When working mothers are viewed through the warped lens of employer stereotypes, their actual commitment or output becomes irrelevant. Consigned to the "mommy track," pregnant women and mothers are steered away from the opportunities for professional development that would permit them to reach the same levels of pay and promotion as their male peers.

6.    At MoFo, the mommy track is a dead end. Not only are pregnant attorneys and mothers routinely prevented from advancing with their class years, but the Firm forces women who are or could be mothers to work harder to prove that they are dedicated to their positions and to the Firm, setting unreasonably high expectations for them. Those who avail themselves of the Firm's maternity leave or flexible work schedule policy (voluntarily or involuntarily)—which permits attorneys to work part-time to care for their newborn children, purportedly without fear of repercussions for their career—are particularly vulnerable. Adding insult to injury, women are often denied even the chance to meet these expectations when they return from maternity leave and find themselves without sufficient work to meet the billable hour expectations set by the Firm.

7.    Women in the law already face significant challenges based on their gender. Women are regularly excluded from the upper echelons of law firms country-wide and continue to encounter the "glass ceiling" at large law firms. A recent ABA study found that at law firms nationwide, female attorneys comprise about 45% of associates, but only 22.7% of partners and 19% of equity partners.[3] Men also far

---

[2] *See, e.g.*, Marc Tracy, *What Happens to Pregnant Women at a Big Law Firm*, New Republic (Jul. 25, 2013), https://newrepublic.com/article/114026/why-big-law-firms-lag-behind-parental-leave.

[3] Comm'n on Women in the Profession, Am. Bar Ass'n, *A Current Glance at Women in the Law 2018* (January 2018), http://www.americanbar.org/groups/women/resources/statistics.html.

outpace women in their representation on firm-wide decision-making bodies.[4] Female attorneys across the board are paid significantly less than their male counterparts. A 2017 survey by the National Association for Women Lawyers found that the typical female attorney earns less than a typical male attorney at the same level, from lower ranks of associates all the way up to equity partners.[5] Even for associates, the median man makes on average $10,000 more per year than the median woman.[6]

8.      Women in the legal profession also disproportionately shoulder the costs of bearing children and child-rearing. Because of this, female lawyers are forced to delay their decisions to have a child until after they attain partnership, or face the negative consequences associated with motherhood.[7]

9.      At MoFo, pregnancy and maternity only amplify the costs of doing business as a woman. MoFo subjects its female attorneys to discrimination based on their gender, pregnancy, and maternity. The Firm has subjected Plaintiffs and other similarly situated employees to (a) unwarranted suppression of pay, professional development, and promotions after taking federal and state protected leave; (b) disparate treatment based on pregnancy and/or maternity; (c) discriminatory career and development opportunities and promotion denials; (d) discriminatory policies, practices, and procedures implemented by a male-dominated leadership that have a disparate impact on female attorneys, especially pregnant women and mothers; (e) lower pay for substantially equal work requiring equal skill, effort, and responsibility; and (f) other adverse terms and conditions of employment.

10.     Upon information and belief, MoFo has long been aware of these problems but has failed to take remedial measures to prevent or correct them.

11.     To remedy the gender and pregnancy discrimination and retaliation they witnessed and experienced at the Firm, Plaintiffs and the class are seeking all legal and equitable relief available under state and federal anti-discrimination, equal pay, and retaliation statutes, including the Family and Medical Leave Act, ("FMLA"), 29 U.S.C § 2601 *et seq.*; and the Equal Pay Act of 1963, ("EPA"), 29 U.S.C. § 201

---

[4] Nat'l Ass'n of Women Lawyers, *Annual Survey on Promotion and Retention of Women in Law Firms* (2017), https://www.nawl.org/p/cm/ld/fid=82#reports.

[5] *Id.*; *see also* Young Lawyer Ed. Bd., *The Real Women's Issue*, The Am. Lawyer, Aug. 2018, at 18.

[6] *See* Nat'l Ass'n of Women Lawyers, *supra* n.8.

[7] *See* Kyung Park & Nayoung Rim, *The Gendered Effects of Career Concerns on Fertility* (June 1, 2017), *available at* https://www.usna.edu/EconDept/RePEc/usn/wp/usnawp59.pdf.

*et seq.*, and, for Plaintiffs Jane Does 1-6, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, as amended. Plaintiffs Jane Does 1-4 also seek all legal and equitable relief on behalf of themselves and subclasses under the California Equal Pay Act ("CEPA"), Cal. Lab. Code § 1197.5; the California Fair Employment and Housing Act, ("FEHA"), Cal. Gov. Code § 12940 *et seq.*; the California Family Rights Act, ("CFRA"), Cal. Gov. Code § 12945.2; and the California Business and Professions Code, Cal. Bus. & Prof. Code § 17200 et seq. Plaintiff Jane Doe 5 also seeks all legal and equitable relief under the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1402-11 *et seq.*, and the District of Columbia Family & Medical Leave Act ("DCFMLA"), D.C. Code § 32–501 *et seq*. Plaintiffs Jane Doe 6 and 7 also seek all legal and equitable relief on behalf of themselves and subclasses under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107, and New York Equal Pay Law, N.Y. Lab. Law § 194. Plaintiffs seek monetary and injunctive relief to rectify the Firm's discriminatory policies, practices, and procedures and to ensure that, going forward, the Firm abides by the law.

**II.   <u>THE PARTIES</u>**

12.   **Plaintiff Jane Doe 1** is a woman who, at all times relevant to this action, lived and worked in California. At present, Jane Doe 1 is an attorney employed in one of Defendant's California offices.

13.   **Plaintiff Jane Doe 2** is a woman who, at all times relevant to this action, lived and worked in California. At present, Jane Doe 2 is an attorney employed in one of Defendant's California offices.

14.   **Plaintiff Jane Doe 3** is a woman who, at all times relevant to this action, lived and worked in California. Jane Doe 3 was an attorney employed in one of Defendant's California offices until recently.

15.   **Plaintiff Jane Doe 4** is a woman who, at all times relevant to this action, lived and worked in California. Jane Doe 4 was employed in one of Defendant's California offices through 2018.

16.   **Plaintiff Jane Doe 5** is a woman who, at all times relevant to this action, lived in Maryland. Jane Doe 5 was employed in Defendant's Washington, D.C. office until August 2017.

17.   **Plaintiff Jane Doe 6** is a woman who, at all times relevant to this action, was a resident of New Jersey and worked in New York. Jane Doe 6 was employed as Of Counsel in Defendant's New York office until 2018.

18.   **Plaintiff Jane Doe 7** is a woman who, at all times relevant to this action, lived and worked in New York City. Jane Doe 7 was employed in Defendant's New York office until 2016.

19.     **Defendant Morrison & Foerster** is a law firm with offices worldwide, including four offices in California. The Firm's California offices are located in Los Angeles, Palo Alto, San Diego, and San Francisco. According to its website, Morrison & Foerster employs over 400 attorneys in California. It also has offices in Washington, D.C. and New York. During all relevant times, Morrison & Foerster was Plaintiffs' employer within the meaning of all applicable federal and state statutes.

## III.    JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over Plaintiffs' state law claims. The claims constitute the same case and controversy raised in the claims under federal law.

21.     The Northern District of California has personal jurisdiction over the Firm because the Firm has headquarters in and transacts significant business in the State of California and in this District.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Defendant conducts substantial business in the Northern District of California, and because, upon information and belief, unlawful employment practices originated in this District.

23.     Plaintiffs Jane Does 1-3 duly filed their administrative charges before the California Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC") on April 24, 2018, and received their Notices of Right to Sue from the EEOC June 18, 2018. Jane Doe 1 filed a second administrative charge before the EEOC and DFEH and received her Notices of Right to Sue dated February 20, 2019 and February 28, 2019, respectively.

24.     Plaintiff Jane Doe 4 filed her administrative charge before the DFEH and the EEOC, marked as received by the EEOC on November 1, 2018. She received her Notice of Right to Sue from the DFEH and EEOC on November 6, 2018 and February 28, 2019, respectively.

25.     Plaintiff Jane Doe 5 filed her administrative charge before the EEOC, marked as received by the EEOC on November 1, 2018, and is currently perfecting her right to sue; upon receipt of Notice of Case Closure and Right to Sue she will serve such notice on opposing counsel.

26.     Plaintiff Jane Doe 6 filed her administrative charge before the EEOC on November 20, 2018, and received her Notice of Right to Sue on March 1, 2019.

\\

## IV.   FACTUAL ALLEGATIONS

### A.   What Happened When She Became a Mommy: MoFo Routinely Holds Back Women Who Are Pregnant, Have Children, and Take Maternity Leave

27.     Pregnant women and mothers, even those attorneys who are considered the "best," cannot last long at MoFo. Indeed, these women are strikingly absent from the upper ranks of management. To understand what happens to high-performing women at the Firm, one need only refer to the words of one partner: "She became a mommy."

28.     The Firm boasts of its "work-life programs" for employees, including parental and adoption leave, parental transition time upon returning from leave, backup caregiving, flexible work options, and a reduced hours program.[8] Through these benefits, the Firm ostensibly allows, and even encourages, its female employees to take up to six months of maternity leave. Indeed, MoFo recently received recognition for offering the greatest number of weeks for paid primary caregiver leave amongst big law firms.[9]

29.     However, MoFo remained absent from Yale Law Women's Top Ten Family-Friendly Firms list in 2018, and rightly so. The reality for female attorneys at MoFo, especially for those who have or wish to have children, is far from the Firm's family-friendly façade. Instead, when women take advantage of the Firm's "generous" maternity leave or notify the Firm that they have children, they are routinely held back and set up to fail.

30.     Morrison & Foerster discriminates against Plaintiffs and other female attorneys, especially pregnant attorneys and women with children, with respect to compensation and promotions through common policies, practices, and procedures. When a female attorney at MoFo is pregnant, has children, or takes maternity leave, the Firm's standard operating procedure is to hold her back from advancement with her peers, denying her opportunities for greater pay and limiting her progression. This Firm practice reinforces stereotypes that mothers are worse at and less committed to their jobs, and sets in motion a chain of events that leads to the dead end of the mommy track: when female attorneys become mothers,

---

[8] *See* MoFo Women, *supra* n.1, at 15, 18.

[9] Yale Law Women, *The Top Ten Female & Family Friendly Firms Lists of 2018* (2018), http://yalelawwomen.org/wp-content/uploads/2012/11/2018-FFFFI-Report_Final-2.pdf. Notably, the survey includes no data on how women are paid as compared to their male peers.

the Firm demands they prove their commitment by working more hours; when they seek additional work, they are denied assignments, business opportunities, and client contacts because of stereotype-driven perceptions that they lack commitment to their jobs.

31.     The stereotype becomes self-reinforcing, and women become stuck. They now face a Hobson's choice: pay a motherhood penalty in the form of slower rates of progression and correspondingly lesser compensation, thus accepting lower pay for substantially equal work requiring equal skill, effort, and responsibility to that of their male colleagues; or, in the alternative, resign from their roles altogether.

32.     In some cases, female attorneys are not even given the courtesy of receiving prior notice that they will be held back. Only through checking the Firm's online portal do they learn that, despite solid or even stellar performance, they will not be progressing with their peers.

33.     In one California office alone, Plaintiffs are aware that, since 2013, at least seven female attorneys have been held back upon their return from maternity leave.

34.     Some women who become pregnant and go on leave, including named Plaintiffs Jane Doe 4 and Jane Doe 5, have faced outright termination as a result.

35.     MoFo's policy and practice relating to pregnancy and maternity leave has a disparate impact on the Firm's female attorneys. Specifically, because the Firm does not progress women, especially pregnant attorneys and women with children, at rates equal to their male counterparts, there is a dwindling proportion of women at each successive level of the Firm's hierarchy. For example, while women represent approximately 50% of the Firm's associates, only 25% of MoFo's partners are women.[10]

36.     Upon information and belief, men who become fathers or take advantage of the Firm's paternity leave policy do not face disqualification from advancement and higher pay as do their female counterparts.

**B.     The Firm's Male-Dominated Hierarchy Sets Policies that Disparately Impact Female Attorneys, in Particular Pregnant Women and Women with Children**

37.     Men dominate MoFo's leadership and management. Out of the six attorneys on MoFo's leadership team, only one woman holds a seat as a Managing Partner. As noted above, while women represent approximately 50% of the Firm's associates, only 25% of MoFo's 248 partners are female.

---

[10] *Why MoFo*, Morrison Foerster, https://careers.mofo.com/why-mofo/ (last visited March 1, 2019).

MoFo's own website acknowledges that only 31% of the Partner Compensation Committee and 36% of the Board of Directors are women. The disproportionately large representation of men in leadership roles at MoFo facilitates discrimination against women, especially pregnant women and women with children, throughout the Firm.

38.     Upon information and belief, the overrepresentation of men and employees who are not pregnant or mothers in Firm leadership reproduces a pattern of systemic discrimination against female attorneys at MoFo, especially those who are pregnant or have children.

39.     Promotion and compensation decisions at Morrison & Foerster are controlled by a practice group's chair or head partner. As of August 2018, in the Firm's San Francisco office alone, less than one third of the partners are female. Similarly, in the Los Angeles office, there are only nine female partners out of a total of 23. In the Palo Alto office, there are eight female partners out of 23; in San Diego, there are only three female partners out of 12.

40.     The predominantly male leadership at MoFo favors men and/or women who are not pregnant or have no children in promotions and other opportunities, regardless of their qualifications. In some offices, it is not uncommon to see an entire practice group consisting primarily of female attorneys with a male chair or head who controls all compensation and promotion decisions for his team.

41.     MoFo discriminates against women by permitting its predominantly male leadership to favor men overtly in pay, promotions, and other opportunities, regardless of their qualifications, and to otherwise discriminate against women, pregnant women, and mothers. MoFo leadership fosters or condones a Firm culture that marginalizes, demeans, and undervalues women and mothers.

42.     One example of this arose at a MoFo partners meeting, where a film was presented that showed the "men behind" women partners (i.e., those men who had supported women to make partner). It was the subject of later Women's Strategy Committee calls, because it brought to light that at MoFo, despite the Firm's veneer of being female-friendly, a truly important requirement for women to make partner is having a powerful man supporting her.

43.     Upon information and belief, MoFo's standard operating procedure is to terminate or push out working mothers in a manner that makes it clear that their motherhood, not the quality or quantity of their work, is the decisive factor. Thus, on the one hand, female attorneys who return from leave on a

flexible or part-time schedule are penalized for not committing to work full-time hours. At the same time, those who return full-time are steered toward part-time schedules and correspondingly lower compensation. Even if their salaries are leveled up to reflect that they are, in fact, working full-time hours, female attorneys who are nominally part-time still receive lower bonuses than their counterparts who work the same hours without the part-time label.

44.     Upon information and belief, Morrison & Foerster's leadership is aware of the Firm's inequitable promotion, pay, job assignment, and other practices, but has taken no steps to address the root causes of the disparity. Defendant is aware of the demographics of its workforce, including the underrepresentation of women in different levels and functions. Despite several initiatives the Firm has taken in the recent past, purportedly with the goal of reducing or eliminating this underrepresentation, the problem persists, maintained and magnified by Firm policies, practices, and procedures and a culture that stereotypes and undervalues female attorneys who choose to have children.

45.     Upon information and belief, Defendant is aware of its own misconduct, but it has failed to rectify the discrimination.

### C.     The Firm's Common Business Development and Job Assignment Practices Disfavor Women, Particularly Pregnant Women and Mothers

46.     Female attorneys throughout the Firm are given less substantive and less desirable work than their male counterparts. Prominent members of Morrison & Foerster's predominantly male leadership have shown a preference for working with other male attorneys. Thus, male attorneys, non-pregnant women, and women without children are given significantly more access to partners at any given time, allowing them to thrive under a partner's close tutelage and stay on track to attain partnership themselves. This common practice ensures that women are underrepresented in more senior or leadership roles, while perpetuating the "old boys' club" culture at the Firm.

47.     The lack of substantive work, coupled with higher expectations, together make progression and promotion extremely difficult for women. After returning from maternity leave in particular, female attorneys at the Firm are punished and held to a higher standard than their male counterparts.

### V.     PLAINTIFF JANE DOE 1

48.     Plaintiff Jane Doe 1 currently works in one of Morrison & Foerster's California offices.

---

CASE NO. 18-CV-2542 JSC – THIRD AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

49.     Plaintiff Jane Doe 1 has a B.A. and a J.D. and is admitted to the California bar. Jane Doe 1 joined MoFo as a mid-level associate after several years of practicing law elsewhere.

50.     Jane Doe 1 excelled at her duties at the Firm and received positive feedback in her evaluations.

**A.      Being a Mommy: Once She Returned From Maternity Leave, MoFo Took Adverse Employment Action Against Plaintiff Jane Doe 1**

51.     Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, after having her second child, Plaintiff Jane Doe 1 went on maternity leave during the statutory period, about two years after she joined the Firm.

52.     On January 9, 2018, Jane Doe 1 discovered through the Firm's online portal for employees that her salary no longer matched up to her class year; she had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion. Jane Doe 1's supervisors had given her no indication or notice that the Firm would not progress her. Jane Doe 1 had no history of performance issues, nor had she ever been held back previously during her time at MoFo.

53.     Although the Firm decided to hold back Plaintiff Jane Doe 1, MoFo increased her external billing rate as if she had been promoted, while not increasing her compensation internally. This was only rectified after Jane Doe 1 raised the issue with upper management.

54.     Upon information and belief, male colleagues, including two male associates in the same office, were advanced with Jane Doe 1's class year and received the corresponding pay increase. Upon information and belief, the only material difference between the class members who progressed and Jane Doe 1 was Jane Doe's status as a woman who had become pregnant and taken leave.

55.     Indeed, a male colleague in the same practice area who is one class year behind Jane Doe 1, who had children and took paternity leave and who joined MoFo at the same time as Jane Doe 1, has been progressed each year and, upon information and belief, is being groomed for partnership.

**B.      "Parents Tend Not to Do Well In This Group:" MoFo Discriminated Against Plaintiff Jane Doe 1 Due to Her Pregnancy, Leave-Taking, and Maternity**

\\

56.     The Firm's decision to hold back Jane Doe 1 after she returned from maternity leave was not the first time the Firm discriminated against her due to her gender and pregnancy or her status as a mother.

57.     On Plaintiff Jane Doe 1's first day at the Firm, one of her now supervising partners ("Partner 1") told her: "We didn't realize you were a parent when we extended you the offer," implying that Jane Doe 1 had concealed her motherhood during her interview process with the Firm. In fact, although it was not required as part of the hiring process, Jane Doe 1 had been clear with the Firm's Human Resources department that she was interviewing during her maternity leave, and had told three Partners at the Firm that she had a child. Partner 1's comment made it clear from the start that Jane Doe 1 would face obstacles at the Firm because she was a mother; the same partner later warned that **"parents tend not to do well in this group."** Ironically, Partner 1 was appointed by the Firm to be Jane Doe 1's partner mentor.

58.     Partner 1 continued to show preferential treatment toward attorneys without children and routinely denied Jane Doe 1 opportunities to complete substantive work. For example, Partner 1 transitioned Jane Doe 1 off a matter and replaced her with another female associate who was not pregnant and did not have children, despite Jane Doe 1's excellent performance.

59.     This kind of discriminatory conduct based on Plaintiff Jane Doe 1's gender, pregnancy, and maternity was not limited to Partner 1. During the Firm's holiday party, another supervising partner ("Partner 2") told Plaintiff Jane Doe 1 about a female associate who was "one of the best he had ever worked with." When Jane Doe 1 asked him what the attorney was doing now, he said that "she became a mommy."

**C.      MoFo Unfairly Evaluated Jane Doe 1's Performance Because of Her Gender, Pregnancy, and Maternity**

60.     When she returned from maternity leave, Jane Doe 1 repeatedly sought to discuss the ongoing matters and status of her practice group with Partner 1, who refused to discuss this with her.

61.     On January 9, 2018—the day she learned that her salary no longer matched up with her class year—Jane Doe 1 called Partner 1 to seek clarification about her promotion status. Partner 1 told Jane Doe 1 that she would not be progressing; instructed her to speak with Partner 2 during her

1   performance review who "had a plan for her"; and faulted Jane Doe 1 for being on maternity leave when

2   the performance reviews were conducted. Partner 1 ended the call by terminating their mentor-mentee

3   relationship, and also informed Jane Doe 1 that Jane Doe 1 should no longer consider her a sponsoring

4   Partner and should direct all future inquiries to Partner 2. Jane Doe 1 was not assigned another formal

5   mentor until July or August 2018.

6       62.    Jane Doe 1 complained to a representative of the Firm's Attorney Development Group

7   about the Firm's decision to hold her back one year and the unilateral termination of her mentor-mentee

8   relationship.

9       63.    The next day, Partner 1 told Plaintiff Jane Doe 1 that she was instructed to tell Jane Doe 1

10  that the decision to hold Jane Doe 1 back was not "performance-based," and referred Jane Doe 1 to

11  Attorney Development for any further questions.

12      **D.     "Ramp Up" Your Efforts: Following Her Maternity Leave, MoFo Encouraged Jane**

13      **Doe 1 to Leave the Firm**

14      64.    Jane Doe 1 met with Partner 2 in person to conduct her performance review, with Partner

15  1 in attendance telephonically. In that review, Jane Doe 1 was told that she had been making good headway

16  before her maternity leave, but that being held back after having taken maternity leave should not come

17  as a surprise. She was told that she would now, post-leave, have to "ramp up" her efforts. She was then

18  advised to bill at least 2000 "substantive" hours before the end of 2018—an unrealistic expectation

19  considering that practice group business in their office had been slow.

20      65.    In response to this unrealistic expectation, Jane Doe 1 asked for more work to ensure that

21  she would be able to meet her higher billable hours target. Partner 1 then chided Jane Doe 1 for seeking

22  more hours, indicating that she should "think of the team."

23      66.    Following Jane Doe 1's review, she reached out to the head of Attorney Development, who

24  acknowledged that she was in a difficult position between Partner 1, who unambiguously cut her off from

25  the group, and Partner 2, who requested that she bill 2000 hours without providing a viable means for her

26  to do so. She also spoke with another member of Attorney Development, who told Jane Doe 1 multiple

27  times that, as a senior associate, she needed a plan to advance within the Firm, and acknowledged that the

28  comments from her supervising partners indicated there was no such plan for her.

67.     Over the year that followed, Jane Doe 1 did not receive *any* substantive assignments from *either* of her supervising partners that would allow her to meet her hourly minimum requirements. While Jane Doe 1's supervising partners instructed her to seek work from other partners, they did not make introductions or otherwise help her obtain such assignments. Jane Doe 1 reached out herself to seven different attorneys in five different MoFo offices, only finding work outside of her group and specialty area. For example, Jane Doe 1 took on additional pro bono work, as well as work for another practice group. She also worked to bring in a new matter for the Firm. Without work from her practice group, which is expected to be the primary source of her assignments, Jane Doe 1 was unable to meet her hours requirement.

68.     Jane Doe 1 has sought, but MoFo has failed to provide, any substantive guidance or development plan to meet the hours requirements imposed upon her, in light of the dearth of work opportunities she faces. Indeed, when she discussed her own proposed performance development plan with Partner 2, he gave her no additional feedback beyond what she had been told in her performance review six months prior.

69.     Multiple partners have commented to Jane Doe 1 that her hours are low. Upon information and belief, partners are less willing to give Jane Doe 1 more work because she has low hours, compounding her difficulty finding work outside of her practice group.

70.     At the time of her 2018 performance evaluation, Jane Doe 1 had only billed 21% of the hours requirement, which is significantly less than she billed in the year that she took maternity leave. Although MoFo recognized that Jane Doe 1 was performing at the level expected and was willing to assist in matters, MoFo faulted her for not having billed more hours and informed her that she is subject to an additional spring review and potential termination.

71.     The lack of work offered to Jane Doe 1 from her practice group cannot be attributed to any lack of work in the group as a whole, which sought to hire new associates of varying seniority levels in 2018, appropriated two associates from the 2018 entering class to join in November, and opened several new engagements. Others in her group were able to attain their hours expectations. Jane Doe 1, however, has not received similar support, and has also been cut off from exposure to client and networking events. Jane Doe 1 has been ostracized from her group and is being pushed out.

72.     For example, despite having instructed her in her performance evaluation, to attend more industry events, her entire group excluded her from just such a conference on or about February 6, 2019. After Jane Doe 1 learned of the conference, she sought permission from Partner 2 to attend. He told her that she could participate in a MoFo-hosted reception, but not the conference itself.

## VI.     PLAINTIFF JANE DOE 2

73.     Plaintiff Jane Doe 2 currently works in one of Morrison & Foerster's California offices.

74.     Plaintiff Jane Doe 2 has a B.S. and a J.D. and is admitted to the California bar. Prior to law school, she had experience in the corporate sector and as a legal intern.

75.     After working at MoFo as a summer associate during law school, Jane Doe 2 was offered a permanent position and joined the Firm full-time as an associate.

76.     Since joining the Firm, Jane Doe 2 has excelled in her job duties at MoFo. She has been a committed attorney and has been involved in many Firm initiatives.

### A.     Being a Mommy: Once She Returned From Maternity Leave, MoFo Took Adverse Employment Action Against Plaintiff Jane Doe 2

77.     Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Plaintiff Jane Doe 2 went on maternity leave during the statutory period.

78.     On January 9, 2018, Jane Doe 2 discovered through the Firm's online portal for employees that her salary no longer matched up to her class year; she had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion.

79.     Jane Doe 2's supervisors had given her no indication or notice that the Firm would not progress her. Jane Doe 2 had no history of performance issues, nor had she ever been held back previously during her time at MoFo.

80.     Although the Firm decided to hold back Plaintiff Jane Doe 2, MoFo increased her external billing rate as if she had been promoted, while not increasing her compensation. This discrepancy was only rectified after Jane Doe 2's colleagues, Jane Doe 1 and Jane Doe 3, raised the issue with upper management.

\\

81.     Upon information and belief, within Jane Doe 2's office alone, four male colleagues in the same office were advanced with Jane Doe 2's class year and received the corresponding pay increase. Upon information and belief, the only material difference between the male associates who progressed and Jane Doe 2 was Jane Doe 2's status as a woman who had become pregnant and taken leave.

**B.      MoFo Unfairly Evaluated Plaintiff Jane Doe 2's Performance Based on Her Gender, Pregnancy, and Maternity**

82.     After learning through the Firm's online portal that she would not be advanced with her peers, Jane Doe 2 spoke to a representative of the Firm's Attorney Development Group about the Firm's decision to hold her back a year and the manner in which she had discovered it.

83.     Jane Doe 2's supervising partner ("Partner 3") stated during her review that there was some debate about "how to deal with [Jane Doe 2's] leave of absence," and indicated that he would have held her back regardless of her performance.

84.     Throughout her tenure at MoFo, Jane Doe 2 has never had problems with her performance. In fact, she had been progressed and had received a bonus every year since starting her employment at the Firm, until she took maternity leave.

**C.      The Firm Discriminated Against Jane Doe 2 Due to Her Gender, Favoring a More Junior Male Associate in Work and Development Opportunities**

85.     The Firm's decision not to progress Jane Doe 2 after she returned from her maternity leave was not the first time it discriminated against her due to her gender.

86.     Earlier in her tenure, Partner 3 encouraged Jane Doe 2 and other attorneys in the practice group to "wine and dine" a young male associate, a practice usually reserved for recruiting more senior attorneys. Once the male associate was hired, Partner 3 began working primarily with him.

87.     Partner 3 prefers to work with male attorneys. This preference has had a discriminatory impact on the women in Jane Doe 2's practice group, who have had fewer opportunities for substantive work, client contact, and business development opportunities. As an example, male associates in the practice group have been flown to New York to meet and work with prominent partners and clients. By contrast, MoFo has not offered the same experience to female associates in the group, even those more senior than the male associates in question.

VII.   **PLAINTIFF JANE DOE 3**

88.   Plaintiff Jane Doe 3 was employed in one of Morrison & Foerster's California offices until recently.

89.   Plaintiff Jane Doe 3 has a B.A. and a J.D. and is admitted to the California bar. Prior to joining the Firm, Jane Doe 3 had consulting experience.

90.   Jane Doe 3 joined MoFo as an associate.

91.   After joining the Firm, Jane Doe 3 excelled in her job duties.

A.   **Being a Mommy: Once She Returned from Maternity Leave, MoFo Took Adverse Employment Action Against Plaintiff Jane Doe 3**

92.   Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Plaintiff Jane Doe 3 went on maternity leave during the statutory period.

93.   On January 9, 2018, Jane Doe 3 discovered through the Firm's online portal for employees that her salary no longer matched up to her class year; she had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion.

94.   Jane Doe 3's supervisors had given her no indication or notice that the Firm would not progress her. Jane Doe 3 had no history of performance issues nor had she ever been held back previously during her time at MoFo.

95.   Although the Firm decided to hold back Plaintiff Jane Doe 3 from progressing, MoFo increased her external billing rate as if she had been promoted, while not increasing her compensation internally. This was only rectified after Jane Doe 3 raised it with upper management.

96.   Upon information and belief, male colleagues, including a male associate in a similar practice the same office, were advanced with Jane Doe 3's class year and received the corresponding pay increase. Upon information and belief, the only material difference between the male associate who progressed and Jane Doe 3 was Jane Doe 3's status as a woman who had become pregnant and taken leave.

\\

\\

B.     **"Work Really Hard to Prove That You Are Committed:" Following Plaintiff Jane Doe 3's Maternity Leave, the Firm Stereotyped Her and Subjected Her to Higher Expectations Due to Her Pregnancy and Maternity**

97.     The Firm's decision to hold Jane Doe 3 back was not the first time the Firm discriminated against her due to her gender.

98.     Before she returned from maternity leave, Jane Doe 3 sought a flexible work schedule in which she would return to her position full-time but would work from home part of the week. Although the Firm nominally "offers" new mothers flexible schedules for up to a year following their return from maternity leave, Jane Doe 3's proposal was rejected. After discussions with Attorney Development and with her supervising partner, it was made clear to her that she had to choose one of only three options: 1) return to the Firm full-time in the office; 2) work part-time at a fraction of her salary; or 3) quit.

99.     Jane Doe 3's supervising partner ("Partner 3") suggested that if Jane Doe 3 chose to go part-time, it would be interpreted as a lack of interest in her career and in becoming partner, especially in combination with "being out," a reference to her taking protected maternity leave. Partner 3 went on to say that she would have to "work really hard to prove that [she was] committed and to get the best, most interesting work." He told her it was "difficult to progress if you are on part-time after being out."

C.     **You Cannot Progress Because of Your Leave: The Firm Unfairly Evaluated Jane Doe 3's Performance Because of Her Gender, Pregnancy, and Maternity**

100.     During her January 11, 2018 performance review, Partner 3 made it clear to Jane Doe 3 that MoFo did not promote her because she had become a mother. Partner 3 noted that Jane Doe 3 had not progressed because she had taken leave.

101.     Jane Doe 3 billed nearly 100 hours more than the minimum needed to be considered for progression following maternity leave. Even though Jane Doe 3 took maternity leave, she performed better in every metric than she had the prior year, a year during which she received a promotion.

102.     Jane Doe 3's written review contained stellar feedback from other partners and associates with whom she worked throughout 2017.

103.     Upon information and belief, male colleagues who have taken leave or have had children have not been held back from progression.

**D.     The Firm Discriminated Against Jane Doe 3 Due to Her Gender, Favoring a Similarly Situated Male Colleague in Work and Development Opportunities**

104.     During Jane Doe 3's tenure at the Firm, even prior to her maternity leave, Partner 3 had showed preferential treatment towards Jane Doe 3's similarly situated male colleague, who is repeatedly assigned more substantive work than Jane Doe 3 or her other female peers. Jane Doe 3 has not had nearly the same degree of access to MoFo senior partners and management as has her male colleague.

105.     The inequitable assignment of substantive work and comparatively limited access to influential partners negatively impacted Jane Doe 3 and other female attorneys who are pregnant or have children. The Firm's favoritism towards male attorneys impeded Jane Doe 3's future at the Firm and diminished her chances of becoming a partner.

**VIII.   <u>PLAINTIFF JANE DOE 4</u>**

106.     Plaintiff Jane Doe 4 was employed in one of Morrison & Foerster's California offices.

107.     Plaintiff Jane Doe 4 has a B.A. and a J.D. and is admitted to the California bar. Prior to joining the Firm, Jane Doe 4 had experience as an associate at another large law firm and a prestigious federal appellate clerkship. Within her practice group, an Of Counsel went on maternity leave in early 2017. During this time, the Of Counsel worked through her maternity leave but entrusted Jane Doe 4 to take over the majority of her matters and her clients due to the high quality of Jane Doe 4's work. She also did this so MoFo would not divert her matters to male attorneys while she was on her leave.

108.     Jane Doe 4 joined MoFo as an associate.

109.     After joining the Firm, Jane Doe 4 excelled in her job duties.

**A.     Being a Mommy: Once She Notified the Firm of Her Maternity Leave, MoFo Terminated Jane Doe 4 because of Her Pregnancy and Maternity**

110.     Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, when Jane Doe 4 became pregnant in 2017, she planned to take maternity leave beginning in 2018.

111.     After she announced her pregnancy and intention to take leave, when Jane Doe 4 was more than eight months pregnant, MoFo informed her that she would not be advancing with her class and terminated her employment.

112.    Some months prior, when Jane Doe 4 disclosed to a working mother in the same practice group ("Of Counsel 1") that she planned to announce her pregnancy, Of Counsel 1 warned Jane Doe 4 to defer announcing her pregnancy for as long as possible due to the negative impact that pregnancy and maternity would have on her career at the Firm. Jane Doe 4 heeded this advice, notifying the practice group of her pregnancy in mid-2017; subsequently, a member of the practice group referred to Jane Doe 4's upcoming maternity leave as a "vacation."

113.    Upon information and belief, a male associate in a similar practice group left the Firm for approximately one year, did not work during that period, and resumed working at the Firm without being held back upon his return.

114.    In late 2017, less than two months away from her due date, MoFo abruptly terminated Jane Doe 4. The Firm did not—nor could it—cite any specific or current negative feedback about Jane Doe 4's performance, that would have justified its termination of her employment at that time. Instead, MoFo just told her that she was being terminated because she would not be progressing with her class, even though Jane Doe 4 was the highest billing associate in her practice group and a high performer overall who had received positive reviews and positive feedback on her progression from supervising attorneys.

115.    Jane Doe 4 later learned from her peers that, just prior to her termination, a MoFo partner had personally visited the offices of people who worked with her to solicit such negative feedback. Upon information and belief, the only feedback the partner was able to elicit illustrated that none of the people she worked with viewed Jane Doe 4 or her work in a negative light.

116.    Facing the abrupt loss of her job and her anticipated maternity leave, Jane Doe 4 was offered a cruel bargain: She could take her leave as anticipated, in exchange for a full release of claims. She was given less than two weeks to decide.

117.    In that time, Jane Doe 4 had trouble sleeping. As the primary wage-earner for her family, learning she would be terminated and would lose her promised leave soon before she was due to give birth caused her intense emotional turmoil. Exhausted, fearing for her family, and angry at her unjust termination, Jane Doe 4 reached out to a local employment lawyer, who said he would not take on MoFo, a Big Law behemoth, in litigation. Under extreme pressure, and feeling that she had no other choice, Jane Doe 4 demanded more time and more money, including the bonus money she had already earned for 2017.

MoFo rejected almost all her terms, agreeing only to a slight increase in bonus payout. Out of time and without alternative options, she reluctantly signed the agreement.

118.    Without her salary, Jane Doe 4 and her husband were unable to afford rent on their current home in the San Francisco Bay Area and had to move just weeks before her baby was due.

119.    Upon information and belief, MoFo did not terminate or take any adverse employment actions against Jane Doe 4's male colleagues for having children or taking leave. Upon information and belief, the material difference between the male associates who took leave but were not terminated and Jane Doe 4 was Jane Doe 4's status as a woman who had become pregnant and notified the Firm of her intent to take leave.

120.    Two attorneys above the associate level in her practice group advised Jane Doe 4 to speak with an attorney about the termination, and one told her via text message that MoFo's decision to terminate her was "unacceptable."

121.    MoFo's separation agreement entailed a separation from the Firm following a transition and notice period. A critical benefit of the agreement was that Plaintiff Jane Doe 4 would remain employed by the Firm and continue to be listed as a MoFo Associate through June 2018.

**B.      MoFo Retaliates Against Jane Doe 4 for Complaining of Gender Discrimination**

122.    In connection with her termination, Plaintiff Jane Doe 4 complained to the Firm that the timing and circumstances were suspicious and that she believed she was being fired for being pregnant and planning to take maternity leave. Plaintiff raised this concern to several attorneys at MoFo. She set up a meeting with the the head of her practice group, who had delivered the firm's termination decision to her ("Partner 4"), to tell him specifically that she believed that she was being fired because she was pregnant. MoFo would not address Jane Doe 4's complaints. Instead, MoFo insisted that she sign the separation agreement and pressured her to do so. Then, on or about June 13, 2018, Jane Doe 4 informed MoFo that she intended to pursue gender discrimination claims against the Firm.

123.    After Jane Doe 4's "maternity leave" with MoFo concluded in June 2018, she began to apply for lateral associate positions at comparable firms, working with an experienced recruiter. Jane Doe 4 is in a specialized field in which there are a substantial number of job openings but few associates at her level. There are typically a very small number of candidates and limited competition for available

positions. As a highly-qualified individual, Jane Doe 4 was in significant demand and should have had little difficulty finding a suitable job in her practice area.

124. But, while she was heavily recruited, Jane Doe 4 soon encountered a pronounced pattern of thwarted would-be job offers. The circumstances strongly lead her to believe that MoFo sabotaged her employment prospects by providing negative references in retaliation for her decision to pursue legal action against the Firm. Providing such negative references was against MoFo's standard policy and practice of giving only limited information confirming a candidate's employment at the Firm.

125. On three consecutive occasions during July to September 2018, Jane Doe 4 went through the full recruitment and interview process with prominent national firms. At the conclusion of each interview process, she was told to expect an offer. However, in each case, the promised offer was abruptly withdrawn or never materialized.

126. When Jane Doe 4's recruiter contacted the three firms for an explanation, she was in each case offered only vague platitudes, for example that the firm had "decided to go in a different direction." This left both Jane Doe 4 and the recruiter stymied and at a loss to explain each firm's sudden about-face.

127. *First*, in July 2018, Jane Doe 4 interviewed for an associate position with Pillsbury, Winthrop, Shaw, Pittman LLP. Jane Doe 4 had a very positive interview with the head of the practice group on July 25, 2018. She was told she would be a great fit with the team. Following this interview, she was told by her recruiter that the head of the practice group and the recruitment coordinator at Pillsbury were both "eager" for her "to come in next week and interview with others on the team."

128. On August 1, 2018, Jane Doe 4 had the second interview with Pillsbury. During this interview she met with six Pillsbury attorneys. One of the Pillsbury partners who interviewed her repeatedly and specifically mentioned that he knew MoFo Partner 4.

129. Later that same day Jane Doe 4 received a voicemail from her recruiter saying that Pillsbury's recruiting coordinator had already called her. Jane Doe 4's recruiter said in the voicemail that "I've got some very, very good information for you."

130. Jane Doe 4 received glowing feedback after the first and second interviews with Pillsbury. Jane Doe 4's recruiter received an email from Pillsbury's recruiter saying that everyone at Pillsbury that had met with Jane Doe 4 "loved her." Jane Doe 4 was copied on this email. Jane Doe 4's recruiter informed

her that Pillsbury was very interested and that she would soon receive an offer. The recruiter emphasized that Pillsbury was eager to move quickly and that an offer would be forthcoming in a day or two.

131.    Jane Doe 4 did not hear anything for approximately two weeks. During this time, Jane Doe 4's recruiter grew increasingly concerned because the process had unexpectedly slowed down and Pillsbury suddenly went quiet.

132.    On  or about August 15, 2018, Jane Doe 4 went to lunch with a former colleague from MoFo. The former colleague mentioned that one of the interviewing partners at Pillsbury had contacted Partner 4 at MoFo in order to inquire about Jane Doe 4.

133.    Approximately one or two weeks after this lunch, the recruiter contacted Pillsbury to follow up. Pillsbury then notified Jane Doe 4 and her recuiter that she would not be receiving an offer. Pillsbury's only explanation was that the group "couldn't come to a consensus" on hiring Jane Doe 4; it refused to say anything else or provide any details.

134.    Jane Doe 4's recruiter expressed great shock at these developments. She described the situation as very "weird" and said that she didn't believe or understand what was happening: everything had changed overnight.

135.    Prior to contacting MoFo, no one at Pillsbury had expressed any doubt or concern about Jane Doe 4's interviews or application.

136.    Based on the timeline of events, Jane Doe 4 believes that Pillsbury decided not to offer her a job based on negative comments made by MoFo Partner 4. At minimum, Jane Doe 4 believes that Partner 4 told Pillsbury that she had been fired by MoFo and that he falsely stated or implied that she was terminated "for cause" and/or based on her performance.

137.    This was not a one-time occurrence, but recurred in rapid succession.

138.    *Second*, in or around July 2018, Jane Doe 4 applied for a position with Goodwin Procter LLP.

139.    On August 20, 2018, Jane Doe 4 had a highly positive interview with two partners, including the head of the practice group she was applying to work with. The interview went far longer than scheduled, and Jane Doe 4 was invited back for a second interview with several attorneys at the firm– including attorneys from Goodwin's Boston office–on September 4, 2018. Because the initial interview

was so positive, the second interview was presented as an opportunity for Jane Doe 4 to meet the members of the team and, she believed, to start introducing her into the firm.

140.     Jane Doe 4 hit things off very well with the attorneys at Goodwin. At the end of this meeting, the head of the practice group made a point of coming in, even though she was not scheduled to speak with Jane Doe 4. The practice group head was very enthusiastic about Jane Doe 4's candidacy, and she was given the clear impression that the attorneys at Goodwin endorsed her for the job and were trying to sell her on the firm and the practice group.

141.     During the meeting, the Goodwin attorneys talked about connections and mutual contacts they had to individuals at MoFo.

142.     Following the interviews, Jane Doe 4's recruiter told her in words or in substance that an offer from Goodwin was in the bag.

143.     As with Pillsbury, the firm then did a complete one-eighty. Approximately one week after the second interview, Goodwin told Jane Doe 4's recruiter that the firm was not going to extend an offer to her and that it was instead going to hire someone else for the position.

144.     However, according to Jane Doe 4's recruiter, it did not appear that Goodwin actually hired anyone else for the position. For many months, Goodwin continued to post availability for the position for which Jane Doe 4 had applied.

145.     As with Pillsbury, Jane Doe 4's recruiter was at a loss and couldn't understand what had happened.

146.     Plaintiff Jane Doe 4 believes that, as with Pillsbury, she was about to be hired but the situation suddenly changed when the firm contacted MoFo for a job reference.

147.     *Third*, in or around August 2018, Jane Doe 4 applied for a position with Baker McKenzie.

148.     On August 24, 2018 Jane Doe 4 interviewed with four attorneys at Baker. On September 12, 2018, she had a follow-up call with two of the attorneys she had interviewed with initially. Again, Jane Doe 4's interviews with Baker went very well. Jane Doe 4 received follow up communications asking if she would be willing to accept specific terms and conditions of employment. Jane Doe 4 reluctantly agreed to Baker's requests for concessions, and the parties ironed out the terms of her offer.

\\

149.    Once again, Jane Doe 4 and her recruiter were positive that she would receive a job offer from Baker. In fact, Jane Doe 4's recruiter told her that she expected the offer to come quickly.

150.    About a week after the call in which she discussed specific terms of her employment with Baker, Jane Doe 4 was notified that she did not get the position. Again, Jane Doe 4 and her recruiter were completely surprised by the sudden decision to reject her for the position. It was extremely unusual to have three expected offers pulled under such circumstances.

151.    In light of the circumstances, Jane Doe 4 believes that the only explanation is that, during the intervening period, MoFo again conveyed negative information that derailed her candidacy.In retaliation for Jane Doe 4's complaints of discrimination, including notifying the Firm in June 2018 that she intended to pursue legal claims, MoFo provided negative job references and information to her potential subsequent employers, including Pillsbury, Goodwin, and Baker.

152.    Upon information and belief, MoFo at minimum stated or suggested that Jane Doe 4 had been fired "for cause" and/or due to performance issues. Such a reference is false and misleading. In fact, Jane Doe 4 was not terminated "for cause" or due to poor performance, but because she was pregnant and planned to take maternity leave. Further, giving information about an attorney's separation from the Firm would have been against MoFo's standard policy for providing references; Jane Doe 4 was thus singled out and treated differently from others who had not threatened to sue the Firm.

153.    Because of MoFo's retaliatory post-termination conduct, Jane Doe 4 was unable to find a comparable position to the one she held at the Firm and her reputation has been damaged in her field. She was forced to accept a position for significantly less compensation. Her daily commute is considerably longer, causing her substantial inconvenience.

## IX.    **PLAINTIFF JANE DOE 5**

154.    Plaintiff Jane Doe 5 was employed in Morrison & Foerster's Washington, D.C. office until August 2017.

155.    Plaintiff Jane Doe 5 has a B.B.A. and a J.D., and is admitted to the Washington, D.C. bar. Prior to joining the Firm, Jane Doe 5 worked at another large law firm in Washington, D.C.

156.    Jane Doe 5 joined MoFo as an associate.

\\

157.    After joining the Firm, Jane Doe 5 excelled in her job duties and was named a "Pro Bono All-Star."

**A.    Being a Mommy: Once She Returned from Maternity Leave, MoFo Took Adverse Employment Action Against Jane Doe 5**

158.    Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Jane Doe 5 went on maternity leave in 2016.

159.    Upon returning from leave, Jane Doe 5 learned that she had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion. Prior to that, Jane Doe 5's supervisors had given her no indication or notice that the Firm would not progress her. Jane Doe 5 had no history of performance issues nor had she ever been held back previously during her time at MoFo.

160.    Upon information and belief, male colleagues, including a male associate in the same office and same practice group, were advanced with Jane Doe 5's class year and received the corresponding pay increase. Additionally, upon information and belief, MoFo paid Jane Doe 5 less than male colleagues who worked the same number of hours as she did.

161.    Upon information and belief, the only material difference between the male associate who progressed and Jane Doe 5 was Jane Doe 5's status as a woman who had become pregnant and taken leave. In fact, in the one year that Jane Doe 5 received a less-than-glowing performance review, she was told that MoFo "had this exact same review and feedback with" the male associate referenced above who was paid more than Jane Doe 5.

**B.    The Same Thing Happened Again: After Jane Doe 5 Took Maternity Leave, She Was Terminated Because of Her Pregnancy and Maternity**

162.    The Firm's decision to hold Jane Doe 5 back was not the first time, nor the last time, the Firm discriminated against her due to her gender, pregnancy, or maternity.

163.    Before she had returned from maternity leave, Jane Doe 5 was encouraged to take a part-time schedule, and was told that if she took less than six months of maternity leave, as outlined in MoFo's relevant policy, she could return at a part-time or flexible schedule.

\\

164.    Approximately six months after returning from leave, Jane Doe 5 was notified that she would be terminated effective August 4, 2017. The partners who communicated this decision to her were unable to cite any specific instances in which Jane Doe 5's performance was lacking or called into question. In fact, the CFO at Jane Doe 5's primary client had praised her work and provided positive written feedback, and MoFo had considered little else in cobbling together the evaluation presented to Jane Doe 5 at this meeting: it had not allowed Jane Doe 5 to complete the standard self-evaluation prior to this conversation, did not refer to her work for other clients, and did not factor in her pro bono recognition. The feedback MoFo did include in her review came from an associate who had complained to Jane Doe 5 about her work schedule at a time when Jane Doe 5 had to periodically leave the office for pregnancy-related medical monitoring.

165.    MoFo all but openly acknowledged that maternity was the cause of Jane Doe 5's termination when, in the course of giving her notice of her termination, one of the partners—unprompted—informed her that MoFo had also already terminated the only other working mother in Jane Doe 5's practice group who had been on a part-time schedule.

166.    Shockingly, the same MoFo partners who informed Jane Doe 5 of her termination had, prior to speaking with her, approached one of her colleagues to inquire whether Jane Doe 5 would be likely to sue the Firm if she were terminated. That colleague herself was later terminated.

167.    Jane Doe 5 received her termination notice on May 5, 2017 and stopped working shortly thereafter.

**C.    The Firm Discriminated Against Jane Doe 5 Due to Her Gender, Favoring a Similarly Situated Male Colleague in Work and Development Opportunities**

168.    During Jane Doe 5's tenure at the Firm, even prior to her maternity leave, men in her practice group were shown preferential treatment. New business, training, and development opportunities were re-directed to a male associate who was the same class year as Jane Doe 5, even when Jane Doe 5 specifically requested those opportunities. That associate was given substantial leeway with his work: when he committed a fireable offense, he was not formally disciplined; instead, he continued to receive substantive work assignments over women.

\\

1

2        169.    The inequitable assignment of substantive work and access to influential partners has

3   negatively impacted Jane Doe 5 and other female attorneys who are pregnant or have children. The Firm's

    favoritism towards male attorneys impeded Jane Doe 5's ability to succeed at the Firm.

4        **D.    Jane Doe 5's Claims Are Timely**

5        170.    After being terminated in May 2017, Jane Doe 5 learned that she was pregnant in June

6   2017. During this pregnancy, Jane Doe 5 experienced severe complications that required consistent

7   medical monitoring and occasional unplanned hospital visits from approximately June to September 2017.

8        171.    From approximately June through September 2017, Jane Doe 5 suffered from severe

9   nausea and vomiting, and had difficulty keeping any food or liquids down. During this same period, Jane

10  Doe 5 also suffered from high blood pressure, leading to concerns that her pregnancy presented an

11  inordinate risk to both mother and child. The concerns over her blood pressure levels were so severe that

12  her blood pressure was monitored three times a day.

13       172.    From approximately June to September 2017, Jane Doe 5 was incapacitated and generally

14  confined to bed. During this period, Jane Doe 5 had to be constantly prepared to go into emergency

15  delivery in the event that her blood pressure was to become life-threateningly high.

16       173.    From approximately June through September 2017, Jane Doe 5 was not able to work or

17  handle her own affairs and needed assistance caring for her family. Due to her health concerns, Jane Doe

18  5 relied on her husband and mother for all childcare responsibilities. During this period, Jane Doe 5 was

19  primarily confined to bed and left the house only for medical appointments.

20       174.    In early January 2018, Jane Doe 5's blood pressure again reached dangerously-high levels;

21  she was in a life-threatening situation requiring continuous rest and monitoring and frequent medical

22  appointments. During this time, it remained a constant possibility that she would need to give birth on an

23  emergency basis.

24       175.    On January 18, 2018, Jane Doe 5's doctor sent her to the hospital because her blood

25  pressure was too high. Due to her blood pressure, her doctor advised that she should prepare for delivery.

26       176.    Jane Doe 5 delivered her child by C-Section on January 22, 2018. Following the birth of

27  her child, Jane Doe 5 experienced severe post-partum complications and continued to experience

28

dangerously high blood pressure. For approximately three months following her delivery, Jane Doe 5 was once again incapacitated and largely bed-ridden due to pregnancy and post-partum health complications.

177.    From approximately January through April 2018, Jane Doe 5 needed assistance with daily activities such as showering and changing. She was unable to care for her children and family; change diapers; perform basic functions like walking; or handle her own affairs, including financial matters. She relied on her husband to take care of her ordinary family and financial responsibilities.

178.    Jane Doe 5 was unable to work from approximately January to April 2018. She also did not leave her home during this period except for medical reasons, namely doctor and hospital visits.

179.    During these two periods of disability — approximately June to September 2017 and January to April 2018 — Plaintiff Jane Doe 5 was unable to pursue her legal claims against MoFo. She therefore seeks equitable tolling of the 300-day period in which to file an administrative complaint challenging her termination by the Firm.

180.    In or about early May 2018, shortly after she began to recover, Jane Doe 5 contacted legal counsel to seek legal advice and representation on her claims. Jane Doe 5's counsel promptly reached out to the attorneys representing MoFo to notify the Firm of her claims and to diligently pursue them on her behalf. The parties agreed to explore the possibility of a voluntary resolution before Jane Doe 5 proceeded to file an administrative charge and litigate her claims. Accordingly, the parties entered a tolling agreement to toll her claims and preserve all applicable statutes of limitations. This tolling agreement was in place and remained in effect from June 13, 2018 until after she filed her EEOC Charge on November 1, 2018.

181.    Based on the parties' tolling agreement and the equitable tolling Plaintiff Jane Doe 5 seeks, her EEOC Charge and associated claims are timely.

## X.    PLAINTIFF JANE DOE 6

182.    Plaintiff Jane Doe 6 worked in Morrison & Foerster's New York office until 2018.

183.    Plaintiff Jane Doe 6 has a B.A. and a J.D. and is a member of the New York bar. She was recruited to join the Firm as a well-respected lawyer in her practice area; since then, she has built a stellar reputation in her field.

184.    Because of her success in her foundational practice area and as an inducement to join the Firm, Jane Doe 6 was given a hiring bonus and promised a full bonus for her partial first year. MoFo also

indicated to her, including in her offer letter, that she would be considered for partner after two years at the Firm. When she was made Of Counsel after approximately one year at the Firm, she was told that it was a "placeholder" for partnership, and anticipated that she would be considered for partner at the end of her second year. However, despite her achievements and loyalty to the Firm, Jane Doe 6 was never made partner and was never even included on the official list for consideration.

185.    At the Firm, Jane Doe 6 excelled in her job duties while also demonstrating an exceptional willingness to be a team player, make sacrifices for her group, and promote the Firm. Performing partner-level work nearly from the outset, Jane Doe 6 also began to attract significant positive attention and business for MoFo and her colleagues, although she seldom received any billing credit for doing so.

186.    At MoFo, Jane Doe 6 also had a strong history of overwhelmingly positive evaluations and was recognized as a top performer, and she consistently demonstrated creative problem solving, client service, business development, and group leadership. She was active in pro bono work and in diversity and inclusion activities.

187.    Yet for all of Jane Doe 6's patience and dedication to her group and the Firm, her promised consideration for partnership at the Firm—and the pay increases associated with it—never came.

**A.    Being a Mommy: Once She Returned from Maternity Leave, MoFo Took Adverse Employment Action Against Jane Doe 6**

188.    Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Jane Doe 6 went on maternity leave during the statutory period.

189.    When Jane Doe 6 took maternity leave at MoFo, MoFo took adverse action against her. It denied her pay raises and promotions to which she was entitled, and ultimately demoted her. After Jane Doe 6 reported her concerns, MoFo deliberately created an intolerable working environment for Jane Doe 6 until she had no choice but to leave the Firm.

190.    While Jane Doe 6 was promoted to Of Counsel after approximately one year at the Firm, in which time Jane Doe 6 had a baby and took an abbreviated maternity leave (working through much of it), Jane Doe 6's salary was not increased at all at the time of her promotion. By contrast, a male attorney who made Of Counsel a few months before Jane Doe 6 had the opportunity to negotiate an Of Counsel contract with MoFo at the time of his promotion, and obtained higher pay. MoFo instructed Jane Doe 6 to

wait until the end of the year for a raise, but by the end of the year, when Jane Doe 6 was visibly pregnant, MoFo Management refused to negotiate an Of Counsel contract with her or raise her compensation to reflect her promotion above associates.

191.    Although Jane Doe 6 was performing partner-level work, MoFo instead kept her pay on par with associates, including some more junior to her. At the same time, while associates were entitled to a market bonus if they met their hourly requirements, MoFo told Jane Doe 6 that her of-counsel bonus would be discretionary and would not exceed the associate bonus. Indeed, MoFo told her that she should be thankful for what she was given, as it could have been substantially lower. On several occasions, partners in Jane Doe 6's practice group observed that she would have been better off financially had she remained an associate.

192.    Jane Doe 6's salary was kept at an 80% equivalent of a senior associate salary for two years. As a result, she was paid less in salary during the course of that second year than the Associates in the class from which she had been "promoted." At the suggestion of a supportive supervising partner ("Partner 5"), Jane Doe 6 repeatedly followed up with MoFo Management about her compensation, and she researched and provided data showing that her compensation was materially under-market. At the end of that second year, her salary was then adjusted slightly.

193.    A few months later, MoFo again made an upward adjustment to Jane Doe 6's salary, which nevertheless remained below the salary that she had indicated to MoFo Management was within the range of market. At approximately the same time, the Firm hired a male Of Counsel who was junior to Jane Doe 6 and had been an associate at his prior firm. Jane Doe 6 later learned that this male Of Counsel in her group was paid a salary above her own full-time equivalent. In fact, he was paid the same salary that Jane Doe 6 had identified as a market offer for a junior Of Counsel, a salary MoFo never offered Jane Doe 6 herself.

194.    MoFo never increased her salary again. She did not receive a raise or market step-up in her last two years at the Firm, despite repeated assurances from MoFo Management that she deserved a raise, and despite two market-wide associate salary increases during that time period. As a result, upon information and belief, she ultimately was paid less than male associates, Of Counsel, and partners who were performing work of substantially equal or lesser skill, effort, and responsibility. A male associate

reported to her that he was receiving bonuses in excess of associate bonuses and, therefore, in excess of Jane Doe 6's.

195.    When Jane Doe 6 raised her inequitable compensation with Firm leadership on multiple occasions, she was encouraged to "trust the partnership" and look forward to her own elevation to partner. Based on these representations, including that her compensation level was a short-term issue that would be resolved when she made partner, Jane Doe 6 patiently remained with the Firm. MoFo did not make her a partner, however.

196.    MoFo's concrete acts of discrimination against Jane Doe 6 include but are not limited to the following: A male associate from another firm, who had two fewer years of experience than Jane Doe 6, was brought in as Of Counsel in the same group and given higher pay than Jane Doe 6, even though practice group records show that his date of potential promotion to partner was later than Jane Doe 6's. Another male colleague who had similar experience was made Of Counsel at approximately the same time as Jane Doe 6 but was then elevated to the partnership at the end of that same year; he was also paid significantly more than Jane Doe 6 and his compensation was adjusted at the time of his elevation to Of Counsel. A third male colleague who had fewer years of experience was hired after Jane Doe 6 as an equity partner and paid significantly more than Jane Doe 6, even as she was asked by Firm partners to weigh in on certain of his matters (including during her maternity leave) because her expertise and experience were more trusted by the Firm's partners. Upon information and belief, none of these male attorneys was a substantial business generator. A male attorney in the same office who was promoted to Of Counsel multiple years after Jane Doe 6, and whom she provided guidance concerning Of Counsel compensation negotiations, was permitted to have a partner office, but MoFo never offered or gave to Jane Doe 6 a partner office.

197.    Upon information and belief, the only basis for MoFo's decision to compensate and promote these male attorneys over Jane Doe 6 was Jane Doe 6's status as a woman who had become pregnant and taken leave. Indeed, one MoFo partner told Jane Doe 6 outright that MoFo believed it could justify deferring her consideration for partnership because she had taken maternity leave.

198.    Certain female partners with children at MoFo who are held up as exemplars of female success regularly boast of having taken almost no maternity leave.

**B.      The Maternity Double-Bind: MoFo Subjected Jane Doe 6 to Higher Expectations Due to Her Gender, Pregnancy, and Maternity, But Undermined and Penalized Jane Doe 6 Because She Took Maternity Leave**

199.    Instead of rewarding her success and ability, MoFo repeatedly questioned Jane Doe 6's commitment to her job, expecting her to prove herself by sacrificing her own pay and advancement in favor of others, and requiring her to work harder than those around her to "earn" fair treatment. Jane Doe 6 consistently worked more than full-time hours for part-time pay, including by working throughout her maternity leaves, during which she was encouraged by MoFo to continue to generate business and seek out opportunities, maintain her extensive non-billable contributions to the Firm, and continue to provide excellent client service.

200.    But for all Jane Doe 6's effort, it was never enough. She was repeatedly told to wait her turn and made to cede the way to a male attorney ("Attorney 1"). When Jane Doe 6 was pregnant, partners asked if she was "really" planning to return from leave. When she did return, MoFo encouraged Jane Doe 6 to maintain her "part-time" designation, denied her a raise commensurate with her experience and level of work, and again denied her promotion to partnership.

201.    Upon her return from maternity leave, MoFo encouraged Jane Doe 6 to avail herself of MoFo's post-leave reduced hours policy, assuring her it would not have adverse effects on her career at MoFo, and indicating that it could "help" her group by reducing the target hours budget and costs for the group. Jane Doe 6 reduced her formal schedule to 80%, but continued to work more than a full-time schedule, believing that the Firm would recognize her sacrifices by elevating her to partner. Jane Doe 6's "reduced hours" classification permitted MoFo (including partners from other groups) to classify or reassign portions of her otherwise billable time as nonbillable, thereby reducing the number of write-offs and assisting with budget management. At times, Jane Doe 6's billable hours were capped retroactively for matters, or she was asked to reclassify her billable hours as non-billable. While Jane Doe 6's salary (but, most years, not her bonus) generally was trued-up to reflect billable hours recorded in excess of her billable target, Jane Doe 6's compensation was not trued-up to reflect the significant non-billable hours recorded or worked by Jane Doe 6 that otherwise would have been billable hours.

\\

202.    Nevertheless, until her last six months at the Firm, when she experienced escalating retaliation after reporting her concerns about discrimination to HR, Jane Doe 6's client-billable hours for every calendar year significantly exceeded her budgeted goals, in at least one year exceeding 150% of her target. At all times, her overall recorded hours were vastly higher than the goals set for her by the Firm. She was regularly described as a "tireless" worker.

203.    Jane Doe 6 took these actions in reliance on the Firm's representation that it would recognize her sacrifices by elevating her to partner, and that a reduced-hours schedule would have no negative effect on her progress at the Firm. MoFo's Management and Attorney Development were aware of Jane Doe 6's actions, and she was presented as a model to others for how to be successful with a reduced hours schedule. In fact, however, once she reported discrimination to MoFo, and despite having been explicitly encouraged by MoFo management to focus on selling on behalf of her colleagues, Jane Doe 6 was ultimately told that her billable hours thereafter were too low, a strike against her for partnership.

204.    Upon information and belief, no men were encouraged to take reduced work schedules or reduce their billable hours in a similar way. MoFo encouraged Jane Doe 6 to do so because she was a woman and a mother.

205.    Over the following years, Jane Doe 6 continued to seek and was continually assured by partners that she deserved to join their ranks. At best, Jane Doe 6 was told to wait to the next annual round of promotions. At other times, she was outright ignored.

206.    When Jane Doe 6 announced that she was pregnant and due to give birth, a powerful MoFo Partner ("Partner 6") and Attorney 1 stepped in and began to exclude her from group business, events (including an event that she had devised, planned and obtained approval for), and leadership, and repeatedly gaslighting her, all the while relying on Jane Doe 6 to continue pitching for and generating business.

207.    Jane Doe 6 nevertheless continued her tireless commitment to her work. For instance, she billed over 350 client-billable hours in a single month, while approximately eight months pregnant. She led complicated, high-profile, high-pressure matters. She planned successful events for her practice group. Jane Doe 6 continued working around the clock during her maternity leave.

\\

208. Jane Doe 6 proved her success again and again, even as MoFo continued to undermine her, cutting her out of presentations she had prepared, failing to acknowledge or promote internally or externally her substantial contributions to the Firm, including for one of its most important clients, as well as her receipt of certain industry-leading awards and recognitions.

209. During Jane Doe 6's maternity leave, throughout which she was working full-time, MoFo appointed Attorney 1 to Jane Doe 6's role in her practice group without Jane Doe 6's knowledge or consent, effectively demoting her. This was after Jane Doe had already complained to MoFo partners about the discrimination she had been facing. When she complained to senior partners about this latest blow, Jane Doe 6 was advised not to raise the issue, but instead to cede her important position to Attorney 1 and await elevation to partnership. That elevation never came. Even after learning a few months later while she was still on maternity leave that she would not be elevated to partner that year, Jane Doe 6 continued to work tirelessly throughout her leave. Regardless, Partner 6 and Attorney 1 told her that they were excluding her from her practice group matters and events because she was on leave.

210. After MoFo yet again refused to elevate Jane Doe 6 to partnership, she raised her concerns about discrimination with MoFo's Director of Attorney Development. The Director's advice was that Jane Doe 6 refrain from informing those who had supported her candidacy that MoFo was not making her a partner. She instead suggested that Jane Doe 6 work with a job coach to address alleged concerns from Partner 6 about the length of her emails, despite the fact that she had not worked for Partner 6 during the review period and he was part of a different department. Moreover, partners in her group with whom Jane Doe 6 did work assured her that there was nothing wrong with her emails, and she had a long history at MoFo of evaluations praising her written communications. MoFo Management then told her to again look ahead to partnership in the coming year. While Jane Doe 6 followed in good faith these recommendations, the coach acknowledged that the stated concerns about Jane Doe 6 were questionable, both on their face and as justification for MoFo's decision not to promote Jane Doe 6 to partner.

211. Upon information and belief, Attorney Development expressly solicited from Partner 5 an example of an email in which Jane Doe 6 could have included less information. Attorney Development subsequently inserted into Jane Doe 6's evaluation summary, which otherwise praised her writing as clear, concise, and generally exceptional, a reference to potentially reducing the amount of content in certain

emails and the provision of a writing coach. Upon information and belief, this negative comment did not appear in any underlying data from Jane Doe 6's performance reviews, in that year or any other, but rather was added by Attorney Development solely to justify the deferral of Jane Doe 6's promotion to partnership.

212.    The Director also openly criticized Jane Doe 6 for working on maternity leave with her baby present, in one instance claiming that multiple partners had told her that Jane Doe 6 had acted like a "martyr" by explaining that her baby was in her lap and might make noises during internal conference calls.

213.    When, later during her maternity leave, a significant Firm client emailed MoFo Senior Management, without her knowledge, to praise her work and express his surprise that Jane Doe 6 had been passed over for partnership, MoFo Attorney Development reached out to her demanding to know whether she had solicited the client's intervention. Jane Doe 6 later learned that the client had reached out at the suggestion of a MoFo partner from another practice group who had supported her for partnership, after the client had questioned the MoFo partner about why Jane Doe 6 was not already a partner and why she was not being put up again in 2017. She also learned that a key member of MoFo management had described her in his response as being "tireless" and "incredibly passionate about [her practice]."

214.    Multiple partners expressed to Jane Doe 6 their views that, had she been a man, she likely would have been treated very differently by MoFo, with one explicitly stating that, if Jane Doe 6 were a man, "they would be carrying you on their shoulders."  Similarly, Jane Doe 6 was told by a partner that it seemed that she was being measured by a different standard than male would-be junior partners would be, implying that MoFo Management expected Jane Doe 6 to perform at the same level as a more senior male partner would be expected to perform before the Firm would consider Jane Doe 6 for promotion to a first-year partner.

## C.    MoFo Subjected Jane Doe 6 to Repeated, Demeaning Comments and Appointed a Male Harasser as a Group Head for Jane Doe 6

215.    In addition to requiring Jane Doe 6 to expend extra effort to prove herself to the Firm and then penalizing her for taking maternity leave, MoFo permitted ongoing, sex-based hostility directed at Jane Doe 6.

216.     Partner 2 subjected Jane Doe 6 to gender-based harassment and mistreatment, questioning whether her significant other had fathered the child she was then pregnant with, and insinuating she was low class, all while supervising her on a matter. Jane Doe 6 reported this information to partners.

217.     MoFo later installed and maintained Partner 2 as a group head for Jane Doe 6, giving him input into decisions about her salary and promotion, even though she had disclosed to appropriate MoFo personnel, including Attorney Development and others, that her prior romantic relationship with Partner 2 had ended after he coerced her into not keeping a wanted pregnancy with him. When she learned that Partner 2 would join the Firm, he expressly discouraged her from letting others at MoFo know that he and Jane Doe 6 had had a prior romantic relationship. Upon information and belief, during Jane Doe's maternity leave, after joining the Firm, Partner 2 falsely indicated to a supervising partner of Jane Doe 6 that he did not know Jane Doe 6 at all prior to joining MoFo. Concerns Jane Doe 6 expressed after Partner 2 was appointed as her group head, including to MoFo Attorney Development and male and female partners, as well as her requests that Partner 2 recuse himself from her promotion and compensation decisions fell on deaf ears. One partner cautioned Jane Doe 6 about disclosing this information to others, out of concern that she be seen as a "complainer" or that the relationship would reflect poorly on *her*. Partner 2 himself told Jane Doe 6 that it would look bad for her if others knew that he and she had a prior relationship. A male attorney suggested that it could actually be good for her career if Partner 2 "still wanted" her. Although Jane Doe 6 made every effort to deal professionally with Partner 2, as Jane Doe 6's group head, Partner 2 told another partner that there would never be a reason to elevate her to partnership.

218.     Partner 2 was not the only source of gender-based harassment. Other male MoFo partners and attorneys none of whom were in her foundational group, repeatedly subjected Jane Doe 6 to objectifying and demeaning comments: calling her a natural blonde to indicate she was "dumb;" telling her that people would not pay attention during a presentation because they were thinking about "how hot you are;" comparing her to Kim Kardashian; and suggesting she possessed only looks and no substance, despite the fact that her evaluations were across-the-board exemplary and recognized her accomplishments.

\\

219.     Disparaging and gendered remarks were not limited to Jane Doe 6. She heard Partner 6 and Attorney 1 speak negatively about other female attorneys and staff in a dismissive, intimidating, and insulting manner, calling them things like "incompetent," a "bitch," "a disaster," "uncoachable," "unprofessional," and "incapable of running [matters]." In truth, none of these slurs were accurate; indeed, some of these women were among MoFo's top performers.

220.     The imagery of women presented in MoFo's office underscored the objectifying, harassing behavior from Jane Doe 6's colleagues. In a shared working space in MoFo's New York office, pictures of scantily clad cheerleaders adorned the wall.

### D.     MoFo Retaliated Against and Constructively Discharged Jane Doe 6

221.     Over her last year at MoFo, Jane Doe 6 repeatedly reported MoFo's unfair treatment by Partner 6 and Attorney 1 to partners, MoFo Attorney Development, and MoFo Human Resources. In response, rather than investigating her concerns, MoFo escalated its campaign against Jane Doe 6 until she had no choice but to leave.

222.     Although Jane Doe 6 identified for MoFo numerous witnesses, including partners, to the inequitable treatment she had experienced, upon information and belief, MoFo never spoke with those individuals to properly investigate her complaints. Not only were Jane Doe 6's requests to be separated from those whom she reported for their discriminatory and retaliatory conduct ignored, MoFo affirmatively forced Jane Doe 6 to interact with them, including outside of the Firm, and, in some cases, to indirectly report to them.

223.     Having effectively demoted Jane Doe 6, passed her over for partner one more time, and acknowledged that she deserved but failed to provide a raise when her partnership was again deferred, MoFo now retaliated against Jane Doe 6 in response to her complaints. Upon information and belief, this retaliation was coordinated among multiple MoFo attorneys, including Partner 6 and HR. The Firm began funneling more work and responsibility away from Jane Doe 6 to her male colleagues and undermining her reputation inside and outside the Firm, attempted to prevent her from reporting to a supportive supervising partner, attempted to exclude her from events immediately relevant to her practice, unreasonably restricted her ability to onboard and otherwise process matters, sought to limit her ability to work with other supportive partners, and, in certain instances, even physically intimidated her.

224.    When Jane Doe 6 highlighted the extensive documentation of her achievements and leadership since joining the Firm, encouraging HR to review her annual performance reviews, historical hours records and other evidence of excellence, the Firm doubled down on its retaliatory campaign against her, attempting to generate a paper trail to mar her exemplary record. By restricting her ability to onboard matters, including for certain prominent clients, MoFo reduced the hours she could credit as billable, thwarted her ability to staff matters, and sometimes frustrated potential clients who wanted to engage the Firm or receive basic documents, including engagement letters. When Jane Doe 6 asked for the same type of administrative or paralegal support to help on-board and process matters and bills that Partner 6 and Attorney 1 received, she was denied.

225.    False statements and gaslighting from MoFo compounded the retaliatory assault.  When Jane Doe 6 learned about planned events or meetings from which Attorney 1 and Partner 6 had excluded her, she was told that such events had not been planned or scheduled, despite evidence to the contrary. When she explained to HR her method for accurately recording time using the history function of the Firm's document management system, the function was permanently disabled for her the next day and never reinstated. Harsh and accusatory emails from certain MoFo partners would be followed immediately by friendly and understanding phone calls directing her to ignore the emails just sent. Oral direction from certain partners to take or refrain from taking certain actions was followed by emailed criticism for having followed the direction. Two partners would give, almost simultaneously, conflicting instructions that could not both be satisfied, such as that two different, purportedly urgent internal MoFo activities be completed at the exact same time. Supportive MoFo partners and others reported to Jane Doe 6 rumors designed to undermine her, including, among other things, that Partner 6 had told others that she would be leaving the Firm, which Jane Doe 6 then had to refute at an internal meeting she was leading. She continued reporting to HR, but the retaliatory campaign only escalated.

226.    From the time of her initial report to HR, MoFo set nearly impossibly-high expectations for Jane Doe 6. In one instance, partners from another group, with whom Jane Doe 6 had not previously worked, required her to travel internationally on their behalf for informational meetings, despite Jane Doe 6's supervising partner strongly advising them that she was too busy and despite her need to bring her baby (whom she was breastfeeding) with her. To show her dedication, Jane Doe 6 got her baby a passport,

1  traveled alone with her infant on her lap (as a lap-child) on the redeye for an approximately 11 hour flight

2  with a significant time change, found childcare abroad in a country Jane Doe 6 had never before visited

3  by a woman whom Jane Doe 6 had never before met, and made every effort to make the trip work,

4  ultimately creating lasting relationships abroad with some of those to whom she presented on MoFo's

5  behalf and leading to client referrals.

6       227.    Even as Jane Doe 6 was scheduled to travel alone and abroad with her infant at the behest

7  of those partners, a partner from another group, with whom Jane Doe 6 had never worked previously, set

8  an informational call for the middle of the night, local time, and requested that she participate. Jane Doe

9  6 tried to make the call work, to show her dedication. The partner ultimately indicated that the time could

10  not be moved regardless. When Jane Doe 6 missed the call—in part because her MoFo phone, email, and

11  calendar were not working properly abroad, a problem to which she alerted both MoFo IT and the partners

12  with whom she was traveling—the partners chastised her harshly, even as her relationship with the client

13  remained positive.

14       228.    Immediately after she returned from that trip, MoFo acted to separate Jane Doe 6 from a

15  supportive supervising partner, demanding that she report instead to a more senior partner outside her

16  practice group with whom she had never worked or even previously met in person. At the same time,

17  despite her ongoing requests, MoFo never separated her from any of the attorneys whose discriminatory

18  or retaliatory conduct she had reported to HR. To the contrary, in some cases, she was expressly required

19  to report to or be directly supervised by such partners. Among other things, despite discomfort that she

20  expressed in writing, she was forced by MoFo Management and HR to work on a matter for Partner 6 and

21  to enter and bill her time for it. In addition, Jane Doe 6 was forced by MoFo Management, partners, and

22  HR to invite Partner 6 to a small off-site client development meeting that she had arranged, despite her

23  request to, instead, bring Partner 5, who was similarly qualified.

24       229.    The retaliation Jane Doe 6 faced after making a report of discrimination to HR, while

25  devastating, did not come as a complete surprise, as multiple MoFo partners whom she had consulted in

26  advance had predicted this outcome. One partner had encouraged her to get a lawyer, while Attorney

27  Development had warned her that reporting her concerns could doom her chances at partnership, and

28  suggested that she would be better off simply resigning. Nevertheless, Jane Doe 6 understood that MoFo

policy required that she make a report to HR and provide the Firm an opportunity to investigate and remedy the situation.

230.    On many occasions, Partner 5, who was Jane Doe 6's primary supervising partner, recognizing her value to the group and the Firm more broadly, attempted to advocate for her, including for her to be promoted and properly compensated. Not only was he largely unsuccessful, but, on some occasions, he seemed to experience pressure and retaliation (in multiple and intensifying forms) by MoFo in response to his efforts on Jane Doe 6's behalf, particularly after Jane Doe 6 had begun reporting her concerns to HR. Ultimately, MoFo effectively removed Partner 5 from his role supervising Jane Doe 6, excluding him from meetings about Jane Doe 6's future at MoFo and replacing him with partners from outside of Jane Doe 6's practice group. At times, MoFo exploited Jane Doe 6's desire to minimize retaliation against Partner 5 to obtain her compliance with improper or unreasonable demands.

231.    Those whom Jane Doe 6 reported for discrimination and retaliation attempted to justify unreasonably impeding her ability to onboard matters by casting her in a false light and suggesting that she was attempting to expose MoFo to unwarranted risks. In fact, however, Jane Doe 6 herself had proposed, and subsequently tightened, the Firm's risk management protocol for her practice area.

232.    Despite Jane Doe 6's best efforts to remedy the situation, MoFo's efforts to push her out only intensified. Faced with no other option but to leave, Jane Doe 6 tendered her resignation. Even after tendering her resignation, Jane Doe 6 continued to work with her colleagues on important matters and collaborate with them to help them develop new business, including on her very last day at the Firm.

233.    After Jane Doe 6 notified MoFo of her intention to pursue this lawsuit, it retaliated against her by attempting to undermine her reputation with others in her field. For example, Attorney 1 and Partner 6 refused (including, purportedly, on behalf of MoFo) to participate in certain non-MoFo business networking and similar activities without assurance that Jane Doe 6 was not a participant in those events.

234.    In addition to subjecting her to ongoing retaliation, MoFo elevated Attorney 1 to partner. Upon information and belief, Attorney 1's path to candidacy differed significantly from Jane Doe 6's: for example, while she was subject to unwarranted criticism from Partner 6 (with whom she had not worked during the review period) and never put on the list for consideration, his path was cleared.

\\

1

## XI.   PLAINTIFF JANE DOE 7

2

235.   Plaintiff Jane Doe 7 worked in Morrison & Foerster's New York office until September

3

2016.

4

236.   Plaintiff Jane Doe 7 has a B.A. and a J.D. and is admitted to the New York bar.

5

237.   After working at MoFo as a summer associate during law school, Jane Doe 7 was offered

6

a permanent position with the Firm and accepted a full-time associate position after graduating law school.

7

238.   When she was at MoFo, Jane Doe 7 excelled in her job duties. Prior to taking maternity

8

leave, she received consistently positive feedback in her annual evalutions.

9

### A.   Being a Mommy: Once She Returned from Maternity Leave, MoFo Took Adverse

10

### Employment Action Against Plaintiff Jane Doe 7

11

239.   Knowing that the Firm permitted, and believing that it encouraged, its female employees

12

to take maternity leave, Plaintiff Jane Doe 7 took maternity leave twice, the latter of which spanned 2015-

13

2016.

14

240.   After Jane Doe 7 took her first maternity leave, she returned on a reduced-hours schedule,

15

at 80%. At her performance review, she was not progressed with her class and given her first, unjustified,

16

negative evaluation at the Firm. She had no history of performance issues, nor had she ever been held

17

back previously during her time at MoFo. She was told she did not seem "committed" enough to the Firm.

18

241.   Jane Doe 7 took her second maternity leave from the last quarter of 2015 into the first

19

quarter of 2016.

20

242.   During her maternity leave, in the first quarter of 2016, her Partner-supervisor ("Partner

21

7") emailed her to tell her that he wanted to speak about her compensation in the next two weeks. When

22

Jane Doe 7, who was still on leave, spoke with him on the telephone, he suggested to her that she would

23

again not be progressed with her class. In the call, Partner 7 told her that holding her back a class year

24

would put "less pressure" on Jane Doe 7 when she returned. It became clear she had no choice in the

25

matter when Jane Doe 7 returned from maternity leave and had her formal review in March or April 2016,

26

at which time MoFo's decision to hold Jane Doe 7 back a year was definitively conveyed to her. Again,

27

MoFo cited the proposition that she had not proved she was "committed" to the Firm.

28

243.     Upon information and belief, male colleagues, including male associates in her same office and class year, were advanced with Jane Doe 7's class year and received the corresponding pay increase. Upon information and belief, the only material difference between the male associate and Jane Doe 7 was Jane Doe 7's status as a woman who had become pregnant and taken leave.

244.     Upon information and belief, Jane Doe 7 billed more than 600 hours before she took her second maternity leave in 2015.

**B.     After Jane Doe 7 Took Maternity Leave, She Was Isolated and Eventually Discharged**

245.     The Firm's decision to hold Jane Doe 7 back was not the first or last time the Firm discriminated against her due to her gender, pregnancy, or maternity.

246.     When Jane Doe 7 returned to work in 2016, she returned on a part-time schedule. At first, when she received significantly less work from her group, Jane Doe 7 attributed it to the "ramp up" period the Firm advertises. Jane Doe 7 expected that her workload would eventually return to normal.

247.     It soon became clear that the dearth of work was the new normal. MoFo diverted opportunities away from her and toward more junior male associates. She was given less important assignments that were not commensurate with her experience or skill set. Her diminishing workload made it even harder to ask for work from the all-male Partners in her practice area. She was not included in weekly practice group trainings.

248.     Approximately 3 months after she returned from leave, in mid-2016, Jane Doe 7 was informed that she had not done enough to show that she was committed to the Firm, and told that it was time for her to move on. She was given the option of two months of probation to prove that she was committed, after which she understood she would be fired, or a three-month window in which she would be permitted to look for other employment and then expected to "resign" from the Firm. Given that MoFo had already held her back, isolated her from her practice group, and papered her record, Jane Doe 7 believed such mistreatment would continue and may increase if she stayed for the "probation" period. Seeing the writing on the wall and no real option, Jane Doe 7 left. In short, she was terminated.

## CLASS AND COLLECTIVE ALLEGATIONS

249.     Plaintiffs incorporate allegations from the previous paragraphs of the Second Amended

1   Complaint (hereinafter "this Complaint") alleging class-based discrimination against female attorneys and

2   mothers. from the previous paragraphs of the Second Amended Complaint (hereinafter "this Complaint")

3        250.    Plaintiffs Jane Does 1-6 ("Class Representatives") represent a class consisting of all female

4   attorneys at the Firm who have or will be employed by MoFo in the United States during the applicable

5   liability period to the date of judgment, as well as a subclass of all female attorneys who have been or will

6   be employed by MoFo in the United States, and who have been or will become pregnant or a mother,

7   and/or take maternity leave during the applicable liability period (the "pregnancy subclass"). Plaintiffs

8   Jane Does 1-4 ("California Class Representatives") seek to represent subclasses of all female attorneys

9   who have been or will be employed by MoFo in California (a) during the applicable liability period to the

10  date of judgment (the "California subclass"); and (b) who have been or will become pregnant or a mother,

11  and/or take maternity leave during the applicable liability period through the date of judgment (the

12  "California pregnancy subclass"). Plaintiffs Jane Does 6 and 7 seek to represent subclasses of all female

13  attorneys who have been or will be employed by MoFo in New York (a) during the applicable liability

14  period to the date of judgment (the "New York subclass"); and (b) who have been or will become pregnant

15  or a mother, and/or take maternity leave during the applicabile liability period through the date of

16  judgment (the "New York pregnancy subclass").

17       251.    Plaintiffs also seek to represent a collective of female attorneys employed by MoFo during

18  the applicable liability period (a) who were not compensated equally to male attorneys who had

19  substantially similar job classifications, functions, titles, and/or duties; (b) who were not compensated

20  equally to male attorneys who performed substantially similar work; and/or (c) who were denied equal

21  compensation to similarly situated male attorneys by being held back to lower pay levels than male

22  attorneys who performed substantially similar work and had substantially similar experience.

23     **XII.**   **CLASS ALLEGATIONS UNDER RULE 23 OF THE FEDERAL RULES OF CIVIL**

24          **PROCEDURE**

25       252.    MoFo tolerates and cultivates a work environment that discriminates against female

26  attorneys, in particular those who are pregnant or take maternity leave.

27       253.    Female attorneys, pregnant attorneys, and mothers are subjected to continuing unlawful

28  disparate treatment in pay and promotions. Moreover, the Firm's policies, practices, and procedures have

an ongoing disparate impact on female attorneys and mothers.

254. The Firm maintains policies, practices, and procedures for setting compensation that promote gender-based inequities in compensation, and policies, practices, and procedures for promotion that lead to gender-based inequalities in promotion. The Firm's discriminatory policies, practices, and procedures include a system where women who become pregnant and take maternity leave are denied opportunities for advancement in the Firm's hierarchy, as well as the higher pay afforded to their male colleagues. Specifically, the Firm maintains a pay system that includes a lock-step pay scale, under which women who are pregnant or take maternity leave are routinely held back, resulting in pay differentials between men and women and less frequent promotions for mothers. MoFo circumvents the pay scale by holding mothers back a year, and this results in lower pay for women who continue to do the same work as their male colleagues with similar levels of experience.

255. The Firm's nationwide policies, practices, and procedures result in lower compensation for female attorneys than similarly situated male attorneys.

256. In general, the policies, practices, and procedures that govern the pay and promotions of female attorneys lack the sufficient standards, quality controls, implementation metrics, transparency, and oversight to ensure equal opportunity at the Firm.

257. Because the Firm's management does not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies, practices, and procedures, female attorneys suffering from discrimination are without recourse. Whatever complaint and compliance policies may exist lack meaningful controls, standards, implementation metrics, and means of redress such that upper management may ignore, disregard, minimize, cover up, mishandle, or otherwise fail to properly respond to evidence of discrimination in the workplace.

258. The Firm's policies, practices, and procedures are not valid, job-related, or justified by business necessity. Alternative, objective, and more valid procedures are available to the Firm that would avoid such a disparate impact on female attorneys. The Firm has failed or refused to use such alternative procedures.

259. Upon information and belief, the Firm's discriminatory employment practices, policies, and procedures are centrally established and implemented at the highest levels of the Firm.

260.     Upon information and belief, the Firm's employment policies, practices, and procedures are not unique nor limited to any office or practice group; rather, they apply uniformly and systematically to attorneys throughout the Firm, occurring as a pattern or practice throughout all office locations and practice groups.

261.     Because of the Firm's systemic pattern or practice of gender and pregnancy discrimination, the Plaintiffs and members of the proposed Class have suffered harm including lost compensation, back pay, employment benefits, and emotional distress.

262.     The Plaintiffs and members of the Class have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief. The Plaintiffs and members of the Class have suffered and are now suffering irreparable injury from the Firm's ongoing, unlawful policies, practices, and procedures set forth herein, and they will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

**A.  Rule 23 Class Definition**

263.     The proposed Rule 23 Class consists of all female attorneys who are, have been, or will be employed by the Firm in the United States during the applicable liability period until the date of judgment. Upon information and belief, there are more than 40 members of the proposed Class.

264.     Plaintiffs Jane Does 1-6 also seek to represent a subclass of female attorneys who are, have been, or will be employed at the Firm in the United States, and who have been or will become pregnant or a mother, and/or take maternity leave between during the applicable liability period through the date of judgment (the "pregnancy subclass").

265.     Plaintiffs Jane Does 1-6 are each members of the Class and pregnancy subclass. Plaintiff Jane Doe 7 is a member of the pregnancy subclass as to her FMLA claims.

266.     Jane Does 1-4 further seek to represent subclasses of female attorneys in California (a) during the applicable liability period through the date of judgment (the "California subclass"); and (b) who have been or will become pregnant or a mother, and/or take maternity leave during the applicable liability period through the date of judgment (the "California pregnancy subclass").

267.     Jane Does 1-4 are each members of the California subclasses.

268.     Jane Does 6 and 7 further seek to represent subclasses of female attorneys who have been

or will be employed by MoFo in New York (a) during the applicable liability period to the date of judgment (the "New York subclass"); and (b) who have been or will become pregnant or a mother, and/or take maternity leave during the applicabile liability period through the date of judgment (the "New York pregnancy subclass").

269.    Jane Does 6 and 7 are each members of the New York subclasses.

270.    The systemic gender and pregnancy discrimination described in this Complaint has been, and is, continuing in nature.

271.    Plaintiffs reserve the right to amend the class definitions based on discovery or legal developments.

**B.  Efficiency of Class Prosecution of Class Claims**

272.    Certification of the proposed Class and subclasses is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the Class.

273.    The individual claims of Class Representatives require resolution of the common questions concerning whether the Firm has engaged in a pattern and/or practice of gender discrimination against its female attorneys, particularly against women who are pregnant or have children, and whether its policies, practices, and procedures have an adverse effect on the Class. Class Representatives seek remedies to eliminate the adverse effects of such discrimination in their own lives, careers, and working conditions and in the lives, careers, and working conditions of the class members, and to prevent the Firm's continued gender discrimination.

274.    The Class Representatives have standing to seek such relief because of the adverse effect that such discrimination has on them individually and on female attorneys generally. MoFo caused Class Representatives' injuries through its discriminatory policies, practices, and procedures and through the disparate impact its policies, practices, and procedures have on female and/or pregnant attorneys. These injuries are redressable through systemic relief, such as equitable and injunctive relief and other remedies sought in this action. In addition, proper relief for Class Representatives' individual discrimination claims can include promotion and increased compensation. Class Representatives have a personal interest in the policies, practices, and procedures implemented at the Firm.

275.    To obtain relief for themselves and the class members, the Class Representatives will first establish the existence of systemic gender discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

276.    Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the class members, and the Firm.

## C.  Numerosity and Impracticability of Joinder

277.    The Class that the Class Representatives seek to represent is so numerous that joinder of all members is impracticable. In addition, joinder is impractical as the attorneys are physically based in different locations throughout the United States. Fear of retaliation on the part of the Firm's present and former female attorneys is also likely to undermine the possibility of joinder.

## D.  Common Questions of Law and Fact

278.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to their individual claims and those of the Class they seek to represent.

279.    The common issues of law include, *inter alia*: (a) whether MoFo has engaged in unlawful, systemic gender discrimination in its work assignment, promotion, and compensation policies, practices, and procedures; (b) whether the failure to institute adequate standards, quality controls, implementation metrics or oversight of those policies, practices, and procedures violates federal and state law, including Title VII, the FMLA, the FEHA, the CEPA, the CFRA, the NYCHRL, the NYEPA, and/or other statutes; (c) whether the lack of transparency and opportunities for redress in those systems violates federal and state law, including Title VII, the FMLA, the FEHA, the CEPA, the CFRA, the NYCHRL, the NYEPA, and/or other statutes; (d) a determination of the proper standard for proving whether MoFo's employment policies, practices, and procedures had a disparate impact on the Class and subclasses; (e) a determination of the proper standards for proving a pattern or practice of discrimination by the Firm against its female attorneys, and under the disparate treatment theory of liability for attorneys; (f) whether MoFo's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace

violates Title VII and other statutes; and (g) whether the Firm is liable for continuing systemic violations of Title VII and other statutes.

280.   The common questions of fact include, *inter alia*, whether the Firm has: (a) intentionally held back female attorneys who have children on its pay scale because they took maternity leave; (b) used a compensation system that lacks appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (c) relied on compensation criteria that perpetuate discrimination, such as basing salaries on prior salaries or on whether that person was pregnant or took maternity leave; (d) compensated female attorneys less than similarly situated male attorneys in base salary, bonuses, and/or promotions; (e) allocated Firm resources, including mentoring time, billable assignments, and development opportunities in ways that undermined and/or frustrated the work and the advancement of female attorneys, especially those who are pregnant or have children; (f) minimized, ignored, or covered up evidence of gender and pregnancy discrimination in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination; (g) cultivated an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled, or covered up evidence of or complaints of gender discrimination; and (h) otherwise discriminated against female attorneys, especially those who are pregnant or have children, in the terms and conditions of employment.

281.   Upon information and belief, the Firm's employment policies, practices, and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to attorneys throughout the Firm, occurring as a pattern or practice throughout all office locations and practice groups. They thus affect the Class Representatives and class members in the same ways regardless of the office location or practice group in which they work. Discrimination in compensation occurs as a pattern or practice throughout the Firm's offices and practice groups.

### E.  Typicality of Claims and Relief Sought

282.   The Class Representatives' claims are typical of the claims of the proposed Class and subclasses. The Class Representatives possess and assert each of the claims they assert on behalf of the proposed Class and subclasses. They pursue the same factual and legal theories and seek similar relief.

283.   Like members of the proposed Class and subclasses, the Class Representatives are female

1   attorneys who were employees of the Firm during the liability period and who were pregnant, had children,

2   and took or were preparing to take maternity leave during the liability period.

3           284.    Differential treatment between male and female attorneys occurs as a pattern or practice

4   throughout all offices and practice groups of the Firm. The Firm discriminates against female attorneys,

5   especially those who are pregnant or have children, in compensation and promotion and subjects them to

6   a work culture predominated by men. This differential treatment has affected the Class Representatives

7   and the class members in the same or similar ways.

8           285.    The Firm has failed to respond adequately or appropriately to evidence and complaints of

9   discrimination. The Class Representatives and class members have been affected in the same or similar

10  ways by the Firm's failure to implement adequate procedures to detect, monitor, and correct this pattern

11  or practice of discrimination.

12          286.    The Firm has failed to create adequate procedures to ensure its executive leadership

13  complies with equal employment opportunity laws regarding each of the policies, practices, and

14  procedures referenced in this Complaint, and the Firm has failed to discipline adequately others in Firm

15  leadership when they violate anti-discrimination laws. These failures have affected the Class

16  Representatives and the class members in the same or similar ways.

17          287.    The relief necessary to remedy the claims of the Class Representatives is the same as that

18  necessary to remedy the claims of the proposed class members.

19          288.    The Class Representatives seek the following relief for their individual claims and for the

20  claims of the members of the proposed Classes: (a) a declaratory judgment that the Firm has engaged in

21  systemic gender and pregnancy discrimination against female attorneys by (i) denying promotions to

22  female attorneys who are pregnant, have children, or take maternity leave and on the basis of gender, (ii)

23  paying female attorneys and those who are pregnant, have children, or take maternity leave less than their

24  male counterparts in base compensation and/or bonuses, in a way that is not consistent with a legitimate

25  lock-step or seniority system, (iii) failing to investigate or respond to evidence of discrimination in the

26  workplace against female attorneys, especially those who are pregnant or have children, and (iv) otherwise

27  exposing female attorneys, especially those who are pregnant or have children, to differential treatment;

28  (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects

a restructuring of the Firm's policies, practices, and procedures for promoting and awarding compensation to female attorneys; (d) equitable relief that effects a restructuring of the Firm compensation system so female attorneys receive the compensation they would have been paid in the absence of the Firm's discrimination; (e) back pay, front pay, reinstatement, and other equitable remedies necessary to make female attorneys whole from the Firm's past discrimination; (f) compensatory damages; (g) punitive damages to deter the Firm from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs, and expenses.

## F.  Adequacy of Representation

289.     The Class Representatives' interests are coextensive with those of the members of the proposed Class. The Class Representatives seek to remedy the Firm's discriminatory policies, practices, and procedures so female attorneys, and those who are pregnant, have children, or take maternity leave, will not receive disparate pay and differential treatment.

290.     The Class Representatives are willing and able to represent the proposed Class fairly and vigorously as they pursue their similar individual claims in this action.

291.     The Class Representatives have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interests, experience, and resources of the Class Representatives and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

## G.  Requirements of Rule 23(b)(2)

292.     The Firm has acted on grounds generally applicable to the Class Representatives and the proposed Class by adopting and following systemic policies, practices, and procedures that discriminate on the basis of gender, pregnancy, and maternity. Gender discrimination is the Firm's standard operating procedure rather than a sporadic occurrence.

293.     The Firm has also acted or refused to act on grounds generally applicable to the Class Representatives and the proposed Class by, *inter alia*: (a) using a promotion system that systematically, intentionally, or knowingly disadvantages women, pregnant women, and mothers; (b) systematically,

intentionally, or knowingly denying promotions for women, pregnant women, and mothers in favor of similarly situated males; (c) using a compensation system and promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (d) compensating women, pregnant women, and mothers less than similarly situated males in salary and/or bonuses; (e) systematically, intentionally, or knowingly compensating women, pregnant women, and mothers less than similarly situated male attorneys, including less base salary and/or bonus pay; (f) minimizing, ignoring, or covering up evidence of gender, pregnancy, and maternity discrimination in the workplace and/or otherwise mishandling the investigation of and response to complaints of discrimination; (g) cultivating an indifference to evidence of discrimination in the workplace or otherwise minimizing, ignoring, mishandling, or covering up evidence or complaints of gender, pregnancy, and maternity discrimination; and (h) otherwise discriminating against women, pregnant women, and mothers in the terms and conditions of employment as attorneys.

294.    The Firm's policies, practices, and procedures with respect to compensation have led to gender, pregnancy, and maternity discrimination and stratification. The systemic means of accomplishing such gender-based stratification include, but are not limited to, the Firm's policies, practices, and procedures for awarding base compensation, bonus pay, and promotions to female attorneys and those who are pregnant or have children. These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; and opportunities for redress or challenge. As a result, female attorneys and attorneys who are pregnant or who have children are compensated within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably or fairly manage or reward them.

295.    The Firm's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

296.    Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of the Firm's systemic gender discrimination. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by the Class Representatives and class members of monetary and non-monetary remedies for individual losses caused by the systemic

1    discrimination, as well as their recovery of compensatory and punitive damages.

2        **H. Requirements of Rule 23(b)(3)**

3        297.    The common issues of fact and law affecting the claims of the Class Representatives and

4    proposed class members—including, but not limited to, the common issues identified above—

5    predominate over any issues affecting only individual claims. The common issues include whether the

6    Firm has engaged in gender, pregnancy, and maternity discrimination against female attorneys by paying

7    and promoting female attorneys, particularly those who become mothers or take or prepare to take

8    maternity leave, less than their male counterparts.

9        298.    A class action is superior to other available means for fairly and efficiently adjudicating

10   the claims of the Class Representatives and members of the proposed Class.

11       299.    By virtue of the pattern or practice of discrimination at the Firm, the Class Representatives

12   and class members are eligible for monetary remedies for losses caused by the systemic discrimination,

13   including back pay, front pay, reinstatement, compensatory damages, and other relief.

14       300.    Additionally, or in the alternative, the Court may grant "partial" or "issue" certification

15   under Rules 23(c)(4). Resolution of common questions of fact and law would materially advance the

16   litigation for all class members.

17       **XIII.   COLLECTIVE ALLEGATIONS UNDER THE EQUAL PAY ACT**

18       301.    Plaintiffs incorporate all allegations of this Complaint alleging class-based discrimination.

19       302.    Plaintiffs bring collective claims under the Equal Pay Act pursuant to Section 16(b) of the

20   Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective

21   Action. The EPA Action includes female attorneys (a) who were not compensated equally to male

22   attorneys who had substantially similar job classifications, functions, titles, and/or duties, (b) who were

23   not compensated equally to male attorneys who performed substantially similar work, and/or (c) who were

24   denied equal compensation to similarly situated male attorneys by being held back to lesser pay levels

25   than male attorneys who performed substantially equal work and had substantially similar experience.

26       303.    Plaintiffs and the Collective Action members are similarly situated with respect to their

27   claims that the Firm paid and promoted them less than their male counterparts.

28       304.    There is a common nexus of fact and law suggesting that Plaintiffs and the Collective

Action members were discriminated against in the same manner. Questions at issue in the case include:

(a)     Whether the Firm unlawfully awarded less in base pay to female attorneys than to similarly-qualified male attorneys for substantially equal work;

(b)     Whether the Firm unlawfully awarded less in bonuses to female attorneys than similarly-qualified male attorneys for substantially equal work;

(c)     Whether the Firm unlawfully assigned and continues to assign female attorneys into positions with lesser pay and other compensation than similarly-qualified male attorneys who perform substantially equal work;

(d) Whether the Firm's resulting failure to compensate female attorneys on a par with comparable male attorneys was willful within the meaning of the EPA.

305.     Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiff are similar to the claims of the EPA Collective Action Class.

306.     Plaintiffs and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles, and/or duties; and (c) are subject to the Firm's common policy and practice of gender discrimination in failing to compensate female attorneys commensurate with compensation given to male attorneys who perform substantially equal work.

**XIV.   COUNTS**

**CLASS AND COLLECTIVE COUNTS**

**COUNT 1**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(e) *et seq.*,**

***as amended by the* PREGNANCY DISCRIMINATION ACT OF 1978**

**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**

**On Behalf of Class Representatives and the Pregnancy Subclass**

307.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

308.     This Count is brought on behalf of the Class Representatives and members of the Pregnancy subclass within the statutory period.

309. MoFo has discriminated against Class Representatives and all members of the subclass in violation of Title VII by subjecting them to different treatment on the basis of their gender, including pregnancy and maternity. The members of the Class have been disparately impacted and disparately treated as a result of MoFo's wrongful conduct and its policies, practices, and procedures.

310. MoFo has discriminated against the subclass members by treating them differently from and less preferably than similarly situated male employees and female employees who are not pregnant and who do not have children, and by subjecting them to differential and substandard terms and conditions of employment including, but not limited to, discriminatory denials of fair compensation, discriminatory denials of promotional opportunities, and discriminatory treatment with respect to leave, work responsibilities, and other terms and conditions of employment in violation of Title VII.

311. MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representatives and the members of the proposed subclass, entitling the Class Representatives and the members of the subclass to punitive damages.

312. As a result of MoFo's conduct alleged in this Complaint, Class Representatives and the members of the subclass have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

313. By reason of MoFo's discrimination, Class Representatives and members of the subclasses are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

314. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 2

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000(e) *et seq.*

### GENDER DISCRIMINATION

### On Behalf of Class Representatives and the Class

315. Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

316. This Count is brought on behalf of the Class Representatives and all members of the Class.

317.   MoFo, an employer of Class Representatives and Class Members within the meaning of Title VII, has discriminated against the Class Representatives and the Class Members in violation of Title VII by subjecting them to different treatment on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

318.   MoFo has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against Class Representatives and the Class by, among other things: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; discriminating against Class Representatives and class members in pay and promotions; discriminatorily denying development opportunities; and other forms of discrimination.

319.   These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on Class Representatives and the Class with respect to the terms and conditions of their employment.

320.   As a result of this disparate treatment and disparate impact discrimination, MoFo has treated Class Representatives and the Class differently from and less preferentially than similarly situated male employees with respect to pay and promotions.

321.   MoFo has failed to prevent, to respond to, to investigate adequately, and/or to appropriately resolve this gender discrimination.

322.   MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and the Class, entitling the Class Representatives and all members of the Class to punitive damages.

323.   By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the Class, the Class Representatives and all members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

324.   By reason of MoFo's discrimination, the Class Representatives and the Class are entitled to all legal and equitable remedies available for violations of Title VII.

325.     As a result of MoFo's conduct alleged in this Complaint, the Class Representatives and the Class have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, including interest.

326.     As a further result of MoFo's unlawful conduct, the Class Representatives and the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Class Representatives and the Class are entitled to recover damages for such injuries from MoFo under Title VII.

327.     Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT 3

**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT,**

**29 U.S.C § 2601 *et seq.***

**DISCRIMINATION, INTERFERENCE AND RETALIATION**

**On behalf of All Plaintiffs and the Pregnancy Subclass**

328.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

329.     This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the Pregnancy subclass.

330.     Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of FMLA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. Plaintiffs took or were preparing to take approved FMLA leave for maternity leave.

331.     MoFo interfered with the taking of protected maternity leave by Plaintiffs and subclass members and retaliated and discriminated against them for the taking of such leave, in violation of the FMLA.

332.     MoFo interfered with the taking of protected maternity leave by Plaintiffs and subclass members and retaliated and discriminated against them for taking such leave by using the taking of FMLA leave as a negative factor in employment actions, including, *inter alia*, failing to promote them, denying them career-advancement opportunities and work opportunities, making inaccurate statements harmful to

their professional careers, terminating them, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

333.    MoFo acted willfully, intentionally, and with reckless disregard for Plaintiffs' and subclass members' rights under the FMLA.

334.    As a direct and proximate result of MoFo's actions, Plaintiffs and subclass members suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

335.    By reason of MoFo's discrimination, Plaintiffs and subclass members are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

## COUNT 4

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, *as amended by*

### THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 216(b)

### DENIAL OF EQUAL PAY FOR EQUAL WORK

### On Behalf of All Plaintiffs and the EPA Collective Action Plaintiffs

336.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

337.    This Count is brought on behalf of all Plaintiffs and the EPA Collective Action, including all EPA Collective Action Plaintiffs who "opt-in" to this action.

338.    MoFo has discriminated against Plaintiffs and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act of 1963 in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.*, as amended by the EPA, by providing them with a lower rate of pay than similarly situated male colleagues on the basis of their gender, female, even though Plaintiffs and all others similarly situated performed similar duties requiring the same skill, effort, and responsibility as their male counterparts.

339.    Plaintiffs, all EPA Collective Action Plaintiffs, and similarly situated male attorneys all perform similar job duties and functions. Plaintiffs, all EPA Collective Action Plaintiffs, performed jobs that required equal skill, effort, and responsibility to their similarly situated male attorneys.

\\

340.     MoFo discriminated against Plaintiffs and all EPA Collective Action Plaintiffs by subjecting them to discriminatory pay in violation of the Equal Pay Act.

341.     The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

342.     MoFo caused, attempted to cause, or contributed to the continuation of pay discrimination based on gender, in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because MoFo has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

343.     As a result of MoFo's conduct as alleged in this Complaint, Plaintiffs and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

344.     By reason of MoFo's discrimination, Plaintiffs and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

345.     Attorneys' fees should be awarded under 29 U.S.C. §216(b).

## COUNT 5

### VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,

### Cal. Gov. Code § 12940, *et seq*.

### PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION

### On behalf of California Class Representatives and the California Pregnancy Subclass

346.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

347.     This Count is brought on behalf of Plaintiffs Jane Does 1-4 (the "California Class Representatives") in their individual and representative capacities, and all members of the California pregnancy subclass.

348.     MoFo has discriminated against the California Class Representatives and the California pregnancy subclass in violation of the FEHA by subjecting them to different treatment because and on the basis of their gender, in particular their pregnancy and maternity, including by engaging in

intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

349.    MoFo has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against the California Class Representatives and the California pregnancy subclass by, among other things: maintaining a discriminatory system for promotions, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women who are pregnant or have children, and other forms of discrimination.

350.    These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on the California Class Representatives and the members of the California pregnancy subclass with respect to the terms and conditions of their employment.

351.    As a result of this disparate treatment and disparate impact discrimination, MoFo has treated the California Class Representatives and California pregnancy subclass differently from and less preferentially than similarly situated male attorneys and female attorneys who are not pregnant or do not have children, with respect to pay and promotions.

352.    MoFo has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

353.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the California Class Representatives and all members of the California pregnancy subclass, entitling the California Class Representatives and all members of the California pregnancy subclass to punitive damages.

354.    As a result of MoFo's conduct alleged in this Complaint, the California Class Representatives and the California pregnancy subclass have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

355.    By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of the California Class Representatives and the members of the California pregnancy subclass, the continuing violations doctrine applies to all violations alleged herein.

\\

356.   By reason of MoFo's discrimination, the California Class Representatives and the members of the California pregnancy subclass are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

357.   Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

<u>COUNT 6</u>

**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**

**Cal. Gov. Code § 12940, *et seq*.**

**GENDER DISCRIMINATION**

**On behalf of California Class Representatives and the California Subclass**

358.   Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

359.   This Count is brought on behalf of the California Class Representatives in their individual and representative capacities, and all members of the California subclass.

360.   MoFo has discriminated against the California Class Representatives and the California subclass in violation of the California Fair Employment and Housing Act (the "FEHA"), Cal. Gov. Code § 12940, *et seq.*, by subjecting them to different treatment because and on the basis of their gender (including pregnancy), by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

361.   MoFo has engaged in an intentional, firm-wide, and systemic policy, pattern, and/or practice of discrimination against the California Class Representatives and the California subclass by, among other things: maintaining a discriminatory system for compensation, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women, and other forms of discrimination.

362.   These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on the California Class Representatives and the members of the California subclass with respect to the terms and conditions of their employment.

363.   As a result of this disparate treatment and disparate impact discrimination, MoFo has treated the California Class Representatives and California subclass differently from and less preferentially than similarly situated male attorneys with respect to pay and promotions.

364.   MoFo has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

365.   MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the California Class Representatives and all members of the California subclass, entitling the California Class Representatives and all members of the California subclass to punitive damages.

366.   As a result of MoFo's conduct alleged in this Complaint, California Class Representatives and the California subclass have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

367.   By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of the California Class Representatives and the members of the California subclass, the continuing violations doctrine applies to all violations alleged herein.

368.   By reason of MoFo's discrimination, California Class Representatives and the members of the California subclass are entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

369.   Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

## COUNT 7

### VIOLATION OF THE CALIFORNIA FAMILY RIGHTS ACT,

### Cal. Gov. Code § 12945.2

### DISCRIMINATION, INTERFERENCE AND RETALIATION

### On behalf of California Class Representatives and the California Pregnancy Subclass

370.   Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

371.   This Count is brought on behalf of California Class Representatives in their individual and representative capacities, and all members of the California pregnancy subclass.

372.   Under the California Family Rights Act ("CFRA"), an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent

position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of CFRA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. California Class Representatives took or were preparing to take approved CFRA leave for maternity leave and bonding leave.

373.   MoFo interfered with the taking of protected maternity and bonding leave by California Class Representatives and subclass members, and retaliated and discriminated against them for taking such leave, in violation of the CFRA.

374.   MoFo interfered with the taking of protected maternity and bonding leave by California Class Representatives and subclass members, and retaliated and discriminated against them for taking such leave, by using the taking of CFRA leave as a negative factor in employment actions, including, *inter alia*, failing to promote them, denying them career-advancement opportunities and work opportunities, making inaccurate statements harmful to their professional careers, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

375.   MoFo acted willfully, intentionally, and with reckless disregard for California Class Representatives' rights under the CFRA.

376.   As a direct and proximate result of MoFo's actions, California Class Representatives suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs, and are entitled to all legal and equitable remedies available.

377.   By reason of MoFo's discrimination, California Class Representatives and class members are entitled to all legal and equitable remedies available for violations of the CFRA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation.

\\
\\
\\
\\
\\

## COUNT 8

**VIOLATION OF THE CALIFORNIA EQUAL PAY ACT, *as amended by* THE CALIFORNIA FAIR PAY ACT, Cal. Lab. Code § 1197.5, *et seq.*; CALIFORNIA EQUAL PAY ACT, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015)**

**DENIAL OF EQUAL PAY FOR EQUAL & SUBSTANTIALLY SIMILAR WORK**

**On behalf of California Class Representatives and the California Subclass**

378.     Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

379.     This Count is brought on behalf of the California Class Representatives in their individual and representative capacities, and all members of the California subclass.

380.     MoFo has discriminated against the California Class Representatives and all members of the California subclass in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5 (West 2015) (amended 2015), *et seq.* MoFo has paid California Class Representatives and members of the California subclass less than similarly situated male attorneys in the same establishment performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

381.     MoFo has discriminated against the California Class Representatives and the California subclass in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5, *et seq.* MoFo has paid California Class Representatives and members of the subclass less than similarly situated male attorneys performing substantially equal work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

382.     MoFo subjected California Class Representatives and the members of the California subclass to common discriminatory pay policies, practices, and procedures including: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for promotions; and other forms of discrimination affecting pay.

383.     The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, or the quantity or quality of production, or a bona fide factor other than sex, such as education, training, or experience, but was due to gender. In the alternative, to the extent that MoFo relied upon one or more of these factors, said factor(s) were not reasonably applied and did/do not account

for the entire wage differential.

384.   The foregoing conduct constitutes a willful violation of the California Equal Pay Act, Cal. Lab. Code §1197.5 *et seq*., as amended by the California Fair Pay Act. Therefore, a three-year statute of limitations applies to such violations, pursuant to California Equal Pay Act, Cal. Lab. Code § 1197.5(h), *et seq*., and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5(h).

385.   As a result of MoFo's conduct alleged in this Complaint and/or MoFo's willful, knowing, and intentional discrimination, the California subclass members have suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

386.   California Class Representatives and the California subclass are therefore entitled to all legal and equitable remedies, including doubled compensatory awards for all willful violations.

387.   Attorneys' fees should be awarded under California Labor Code § 1197.5(g).

<u>**COUNT 9**</u>

**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE,**

**Cal. Bus. & Prof. Code § 17200 *et seq*.**

**UNFAIR COMPETITION**

**On behalf of California Class Representatives and the California Subclass**

388.   Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

389.   This Count is brought on behalf of California Class Representatives in their individual and representative capacities, and all members of the California subclass.

390.   MoFo is a "person" as defined under California Business & Professions Code § 17201.

391.   MoFo's willful failure to pay women equally, to promote women equally, and otherwise to offer women equal employment opportunities as alleged above, constitutes unlawful, unfair and/or fraudulent activity prohibited by California Business and Professions Code § 17200. As a result of its unlawful, unfair and/or fraudulent acts, MoFo reaped and continues to reap unfair benefits and illegal profits at the expense of California Class Representatives and the California subclass. MoFo should be enjoined from this activity.

392.    Accordingly, California Class Representatives and the California subclass members are entitled to restitution with interest and other equitable relief, pursuant to Business & Professions Code § 17203.

**COUNT 10**

**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,**

**N.Y.C. Admin. Code § 8-101, *et seq.***

**GENDER DISCRIMINATION**

**On behalf of Jane Does 6 and 7 and the New York subclass**

393.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

394.    This Count is brought on behalf of Plaintiffs Jane Does 6 and 7 in their individual and representative capacities, and all members of the New York subclass.

395.    Defendant, an employer within the meaning of the NYCHRL, wrongfully discriminated against Jane Does 6 and 7 and members of the New York subclass in violation of the NYCHRL by treating them less well because of and on the basis of their gender, including by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

396.    MoFo has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against Jane Does 6 and 7 and the New York subclass by, among other things: maintaining a discriminatory system for compensation, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development, and other forms of discrimination.

397.    These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on Jane Does 6 and 7 and the members of the New York subclass with respect to the terms and conditions of their employment.

398.    Defendant's discrimination and termination or constructive discharge were adverse employment actions that materially and adversely affected Jane Doe 6's and Jane Doe 7's employment in violation of the NYCHRL.

399.    As a result of this disparate treatment and disparate impact discrimination, MoFo has treated Jane Does 6 and 7 and the New York subclass differently from and less preferentially than similarly situated male attorneys, with respect to pay and promotions.

400.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

401.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Jane Does 6 and 7 and members of the New York subclass, entitling them to punitive damages.

402.    By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of Jane Does 6 and 7 and the New York subclass, they are entitled to application of the continuing violations doctrine to all violations alleged herein.

403.    MoFo's discrimination against Jane Does 6 and 7 the New York subclass caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

404.    Jane Does 6 and 7 are therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including reinstatement and an award of punitive damages.

405.    Attorneys' fees should be awarded under N.Y.C. Admin. Code § 8-502(g).

## COUNT 11

### VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,

### N.Y.C. Admin. Code § 8-101, *et seq.*

### PREGNANCY, MATERNITY, AND CAREGIVER DISCRIMINATION

### On behalf of Jane Does 6 and 7 and the New York pregnancy subclass

406.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

407.    This Count is brought on behalf of Plaintiffs Jane Does 6 and 7 in their individual and representative capacities, and all members of the New York pregnancy subclass.

408.    Defendant, an employer within the meaning of the NYCHRL, wrongfully discriminated against Jane Does 6 and 7 and members of the New York pregnancy subclass in violation of the NYCHRL

by treating them less well because of and on the basis of their gender, in particular their pregnancy and maternity, including by engaging in intentional disparate treatment, and by maintaining uniform policies, practices, and procedures that have an adverse, disparate impact on them.

409.    MoFo has engaged in an intentional, firm-wide and systemic policy, pattern, and/or practice of discrimination against Jane Does 6 and 7 and the New York pregnancy subclass by, among other things: maintaining a discriminatory system for promotions, maintaining a discriminatory system for promotions, unwarrantedly suppressing pay, promotions, and professional development for women who are pregnant or have children, and other forms of discrimination.

410.    These foregoing common policies, practices, and procedures have produced an unjustified disparate impact on Jane Does 6 and 7 and the members of the New York pregnancy subclass with respect to the terms and conditions of their employment.

411.    Defendant's discrimination and termination or constructive discharge were adverse employment actions that materially and adversely affected Jane Doe 6's and Jane Doe 7's employment in violation of the NYCHRL.

412.    As a result of this disparate treatment and disparate impact discrimination, MoFo has treated Jane Does 6 and 7 and the New York pregnancy subclass differently from and less preferentially than similarly situated male attorneys and female attorneys who are not pregnant or do not have children, with respect to pay and promotions.

413.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

414.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Jane Does 6 and 7 and all members of the New York pregnancy subclass, entitling them to punitive damages.

415.    By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of Jane Does 6 and 7 and the New York pregnancy subclass, they are entitled to application of the continuing violations doctrine to all violations alleged herein.

416.    MoFo's discrimination against Jane Does 6 and 7 the New York pregnancy subclass caused them to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial

losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

417.   Jane Does 6 and 7 and members of the subclass are therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including reinstatement and an award of punitive damages.

418.   Attorneys' fees should be awarded under N.Y.C. Admin. Code § 8-502(g).

**COUNT 12**

**VIOLATION OF THE NEW YORK EQUAL PAY LAW,**

**N.Y. Lab. Law § 194**

**UNEQUAL PAY**

**On behalf of Jane Does 6 and 7 and the New York subclass**

419.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

420.   This Count is brought on behalf of Jane Does 6 and 7 in their individual and representative capacities, and all members of the New York subclass.

421.   Defendant MoFo, the employer of Jane Does 6 and 7 within the meaning of the New York Equal Pay Law, has discriminated against Jane Does 6 and 7 and members of the New York subclass in violation of New York Labor Law § 194 by subjecting them to unequal pay on the basis of sex and by treating them differently and less preferably when compared to male attorneys in the same establishment performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

422.   Defendant subjected Jane Does 6 and 7 and members of the New York subclass to common discriminatory pay policies, practices, and procedures including: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for advancement; and other forms of discrimination affecting pay.

423.   The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, or the quantity or quality of production, or a bona fide factor other than sex, such as education, training, or experience, but was due to gender. In the alternative, to the extent that Defendant relied upon one or more of these factors, said factor(s) were not job-related, not consistent with business

1    necessity, not reasonably applied and/or did/do not account for the entire wage differential.

2        424.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the

3    wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant

4    willfully violated the New York Equal Pay Law by intentionally paying Jane Doe 6 and Jane Doe 7 and

5    subclass members less than similarly situated men.

6        425.    As a result of Defendant's conduct alleged in this Complaint and/or Defendant's willful,

7    knowing, and intentional discrimination, the New York subclass members have suffered and will continue

8    to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well

9    as non-economic damages.

10       426.    Jane Does 6 and 7 and the New York subclass members are therefore entitled to all

11   remedies available for violations of New York Labor Law § 194, including liquidated damages and

12   attorneys' fees and costs for all willful violations, pursuant to New York Labor Law § 198(1-a).

13                              **INDIVIDUAL COUNTS**

14                                 **COUNT 13**

15           **VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**

16                       **42 U.S.C. § 2000e-2(a),** *et seq.*

17                                **RETALIATION**

18                       **On behalf of Jane Does 1 and 4**

19       427.    Jane Does 1 and 4 re-allege and incorporate by reference each and every allegation

20   contained in the previous paragraphs of this Complaint as though fully set forth herein.

21       428.    Jane Does 1 and 4 engaged in protected activity that included, but is not limited to,

22   complaining to MoFo about gender and pregnancy discrimination and participating in, supporting, and

23   pursuing this action.

24       429.    MoFo retaliated against Jane Doe 1 by depriving her of adequate work, providing her with

25   negative performance reviews, and threatening her with termination. Upon information and belief, MoFo

26   also retaliated against Jane Doe 4 by, *inter alia*, providing negative references and hindering her ability to

27   find new employment.

28       430.    MoFo's retaliatory acts against Jane Does 1 and 4 were a direct and proximate result of

their protected activities.

431.    A reasonable person would find MoFo's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

432.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Jane Does 1 and 4's rights, entitling them to punitive damages.

433.    Defendant's actions and failures to act have caused Jane Does 1 and 4 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

434.    Jane Does 1 and 4 are therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

435.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 14

### VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,

### Cal. Gov. Code § 12940, *et seq.*

### RETALIATION

### On behalf of Jane Does 1 and 4

436.    Jane Does 1 and 4 re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

437.    Jane Does 1 and 4 engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination and participating in, supporting, and pursuing this action.

438.    MoFo retaliated against Jane Doe 1 by depriving her of adequate work, providing her with negative performance reviews, and threatening her with termination. Upon information and belief, MoFo also retaliated against Jane Doe 4 by, *inter alia*, providing negative references and hindering her ability to find new employment.

439.    MoFo's retaliatory acts against Jane Does 1 and 4 were a direct and proximate result of their protected activities.

440.    A reasonable person would find MoFo's retaliatory acts materially adverse and such acts

would dissuade a reasonable person from making or supporting a charge of discrimination.

441.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Jane Does 1 and 4's rights, entitling them to punitive damages.

442.    Defendant's actions and failures to act have caused Jane Does 1 and 4 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

443.    Jane Does 1 and 4 are therefore entitled to all legal and equitable remedies available for violations of the FEHA, including an award of punitive damages.

## COUNT 15

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000e-2(a), *et seq.*,

### WRONGFUL TERMINATION

### On behalf of Jane Doe 4

444.    Jane Doe 4 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

445.    MoFo terminated the employment of Jane Doe 4 due to gender and pregnancy discrimination. MoFo's discharge of Jane Doe 4 was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of Title VII.

446.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Jane Doe 4, entitling her to punitive damages.

447.    MoFo's discharge of Jane Doe 4 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

448.    Jane Doe 4 is therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of punitive damages.

449.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

\\

\\

## COUNT 16

### CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,

### Cal. Gov. Code § 12940, *et seq.*

### WRONGFUL TERMINATION

### On behalf of Jane Doe 4

450.    Jane Doe 4 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

451.    MoFo terminated the employment of Jane Doe 4 due to gender and pregnancy discrimination. MoFo's discharge of Jane Doe 4 was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of the FEHA.

452.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Jane Doe 4, entitling her to punitive damages.

453.    MoFo's discharge of Jane Doe 4 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

454.    Jane Doe 4 is therefore entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of punitive damages.

455.    Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

## COUNT 17

### RESCISSION OF CONTRACT,

### Cal. Civil Code § 1688, *et seq.*

### On behalf of Jane Doe 4

456.    Jane Doe 4 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

457.    On or about November 17, 2017, as a result of Defendant's coercion and/or excessive pressure in light of Jane Doe 4's pregnancy, exhaustion, economic vulnerability, emotional anguish, and lack of alternatives for income, Jane Doe 4 signed the severance agreement.

458.    Defendant's wrongful acts caused or induced Jane Doe 4 to endorse the severance

agreement. Defendant thus obtained Jane Doe 4's signature to the severance agreement through duress and/or undue influence in violation of California law.

459.    Jane Doe 4 is therefore entitled to a judgment from this Court declaring that the severance agreement is invalid, void, and rescinded. Pursuant to Cal. Civil Code § 1693, Jane Doe 4 will tender restoration as deemed appropriate by the Court.

## COUNT 18

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000e-2(a), *et seq.*

### WRONGFUL TERMINATION

### On behalf of Jane Doe 5

460.    Jane Doe 5 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

461.    MoFo terminated the employment of Jane Doe 5 due to gender and pregnancy discrimination. MoFo's discharge of Jane Doe 5 was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of Title VII.

462.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Jane Doe 5, entitling her to punitive damages.

463.    MoFo's discharge of Jane Doe 5 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

464.    Jane Doe 5 is therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of punitive damages.

465.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

\\
\\
\\
\\
\\

## COUNT 19

**VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**

**D.C. Code §§ 2-1401, *et seq.***

**DISCRIMINATION AND WRONGFUL TERMINATION**

**On behalf of Jane Doe 5**

466.    Jane Doe 5 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

467.    MoFo, an employer within the meaning of the DCHRA, wrongfully discriminated against and terminated Jane Doe 5's employment due to gender, pregnancy, and maternity discrimination. MoFo's wrongful termination was an adverse employment action that materially and adversely affected Doe 5's employment in violation of the DCHRA.

468.    MoFo's discrimination against and discharge of Jane Doe 5 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

469.    Jane Doe 5 is therefore entitled to all legal and equitable remedies available for violations of the DCHRA, including reinstatement and an award of punitive damages.

470.    Attorneys' fees should be awarded under D.C. Code § 2-1403.13(e).

## COUNT 20

**VIOLATION OF THE DISTRICT OF COLUMBIA FAMILY AND MEDICAL LEAVE ACT,**

**D.C. CODE § 32-501 *et seq.***

**DISCRIMINATION, INTERFERENCE AND RETALIATION**

**On behalf of Jane Doe 5**

471.    Jane Doe 5 re-alleges and incorporates by reference each and every allegation in the previous paragraphs of this Complaint as though fully set forth herein.

472.    MoFo interfered with the taking of protected maternity leave by Jane Doe 5 and discriminated against her for the taking of such leave, in violation of the DCFMLA.

473.    MoFo interfered with the taking of protected maternity leave by Jane Doe 5 and retaliated and discriminated against her for taking such leave by using the taking of DCFMLA leave as a negative

factor in employment actions, including, *inter alia*, failing to promote her, denying her career-advancement opportunities and work opportunities, making inaccurate statements harmful to her professional career, creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave, and terminating her employment.

474.    MoFo acted willfully, intentionally, and with reckless disregard for Jane Doe 5' rights under the DCFMLA.

475.    As a direct and proximate result of MoFo's actions, Jane Doe 5 suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

476.    By reason of MoFo's actions, Jane Doe 5 is entitled to all legal and equitable remedies available for violations of the DCFMLA, including an award of consequential damages and prejudgment interest.

## COUNT 21

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000e-2(a), *et seq.*

### WRONGFUL CONSTRUCTIVE DISCHARGE

### On behalf of Plaintiff Jane Doe 6

477.    Plaintiff Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

478.    MoFo constructively terminated the employment of Jane Doe 6 due to gender and pregnancy discrimination. MoFo's discharge of Jane Doe 6 was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of Title VII.

479.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Jane Doe 6, entitling her to punitive damages.

480.    MoFo's discharge of Jane Doe 6 caused her to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

481.     Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of punitive damages.

482.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 22

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000e-2(a), *et seq.*

### RETALIATION

### On behalf of Jane Doe 6

483.     Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

484.     Jane Doe 6 engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination in compensation and promotion. She complained to members of the Firm on numerous occasions, including, but not limited to, Partner 5, MoFo Human Resources and MoFo Attorney Development.

485.     MoFo constructively terminated Jane Doe 6's employment in retaliation for her discrimination complaints. MoFo also retaliated against Jane Doe 6 by, *inter alia*, undermining her client relationships, failing to promote her to partner, demoting her, and undermining her reputation in her field. These adverse employment actions materially and adversely changed Jane Doe 6's terms and conditions of employment.

486.     MoFo's retaliatory acts against Jane Doe 6 were a direct and proximate result of her protected activities.

487.     A reasonable employee would find MoFo's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

488.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Jane Doe 6's rights, entitling her to punitive damages.

489.     Defendant's actions and failures to act have caused Jane Doe 6 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

490.     Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

491.     Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 23

**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,**

**N.Y.C. Admin. Code § 8-101, *et seq.***

**RETALIATION**

**On behalf of Jane Doe 6**

492.     Jane Doe 6 re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

493.     Jane Doe 6 engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination in compensation and promotion. She complained to members of the Firm on numerous occasions, including, but not limited to, Partner 5, MoFo Human Resources and MoFo Attorney Development.

494.     By objecting to discrimination based on gender and pregnancy, Jane Doe 6 engaged in an activity protected by the New York City Human Rights Law.

495.     MoFo constructively terminated Jane Doe 6's employment in retaliation for her discrimination complaints. MoFo also retaliated against Jane Doe 6 by, *inter alia*, undermining her client relationships, failing to promote her to partner, demoting her, and undermining her reputation in her field. These adverse employment actions materially and adversely changed Jane Doe 6's terms and conditions of employment.

496.     Defendant's actions and failures to act have caused Jane Doe 6 to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

497.     Jane Doe 6 is therefore entitled to all legal and equitable remedies available for violations of the NYCHRL, including an award of punitive damages.

\\

\\

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on their own behalf and on behalf of the Class, subclasses, and EPA Collective Action, request the following relief:

a.  Acceptance of jurisdiction of this case;

b.  Certification of this case as a class action under Federal Rule of Civil Procedure 23, on behalf of the proposed Plaintiff Class and subclasses, designation of the proposed Class Representatives as representatives of this Class and subclasses, and designation of Plaintiffs' counsel of record as Class Counsel;

c.  Designation of this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and:

    i.  promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

    ii. tolling the statute of limitations on the claims of all members of the EPA Opt-In Class from the date the original Complaint was filed until the class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

d.  Designation of Plaintiffs as representatives of the EPA Collective Action;

e.  A declaratory judgment that the practices complained of therein are unlawful and violate, among other laws, 42 U.S.C. § 2000(e) *et seq.*, as amended; 29 U.S.C. § 2601, *et seq.*; 29 U.S.C. § 206, *et seq.*; and the applicable state and local laws;

f.  A determination that Jane Doe 4's severance agreement has been rescinded;

g.  A determination that Jane Doe 5 is entitled to equitable tolling of the limitations period for her claims;

h.  A permanent injunction against MoFo and its partners, officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with

them from engaging in any further unlawful practices, policies, customs, and usages set forth therein;

i.    An Order requiring the Firm to initiate and implement programs that (i) remedy the hostile work environment at Morrison & Foerster; (ii) ensure prompt, remedial action regarding all claims of gender, pregnancy, and maternity discrimination; and (iii) eliminate the continuing effects of the discrimination and retaliatory practices described therein;

j.    An Order requiring MoFo to initiate and implement systems for promoting and compensating female attorneys in a non-discriminatory manner;

k.    An Order directing MoFo to adjust the compensation and title for Class Representatives and the class members to the level that they would be enjoying but for MoFo's discriminatory policies, practices, and procedures;

l.    An award of back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the Plaintiffs, Members of the Classes, and Members of the EPA Collective Action, in an amount not less than $50,000,000;

m.    An award of nominal, liquidated, and compensatory damages to Plaintiffs and Members of the Classes, in an amount not less than $50,000,000;

n.    Award punitive damages to Plaintiffs and Members of the Classes, in an amount not less than $100,000,000;

o.    An award of penalties available under applicable laws, including waiting time penalties;

p.    An award of litigation costs and expenses, including reasonable attorneys' fees to the Plaintiffs;

q.    An award of pre-judgment and post-judgment interest; and

r.    Such other and further relief as the Court may deem just and proper.

\\

\\

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues triable of right to a jury.

Dated: May 21, 2019

Respectfully Submitted,

 _/s/ David W. Sanford_____
David W. Sanford (admitted *pro hac vice*)
Deborah K. Marcuse (admitted *pro hac vice*)
Ed Chapin (CA Bar No. 53287)
Jill Sullivan Sanford (CA Bar No. 185757)
Hannah Wolf (admitted *pro hac vice*)
Danielle Fuschetti (CA Bar No. 294065)
**SANFORD HEISLER SHARP, LLP**

*Attorneys for Plaintiffs, the Proposed Classes, and the Proposed Collective*

[*Continued from Caption Page*]

Danielle Fuschetti (CA Bar No. 294065)
dfuschetti@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021

Hannah M. Wolf (*admitted pro hac vice*)
hwolf@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Telephone: (615) 434-7004
Facsimile: (615) 434-7020

*Attorneys for Plaintiffs, the Proposed Classes, and the Proposed Collective*