David W. Sanford (DC Bar No. 457933, admitted *pro hac vice*)
dsanford@sanfordheisler.com
Andrew Melzer (NY Bar No. 4270682, admitted *pro hac vice*)
amelzer@sanfordheisler.com
Carolin Guentert (*pro hac vice*)
cguentert@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5656
Facsimile: (646) 402-5651

Deborah K. Marcuse (DC Bar No. 99538, admitted *pro hac vice*)
dmarcuse@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert Street, Suite 1950
Baltimore, MD 21202
Telephone: (410) 834-7420
Facsimile: (410) 834-7425

Ed Chapin (CA Bar No. 53287)
echapin2@sanfordheisler.com
Jill Sullivan Sanford (CA Bar No. 185757)
jsanford@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
655 W. Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 577-4253
Facsimile: (619) 677-4250

*Attorneys for Plaintiffs*
*[Additional Attorneys Listed After Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERRY A. WILLIAM AND JOSHUA ASHLEY KLAYMAN,<br><br>                      Plaintiffs,<br><br>v.<br><br>MORRISON & FOERSTER LLP<br><br>                     Defendant. | **Case No.: 18-CV-2542 (JSC)**<br><br>**FOURTH AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Sherry A. William and Joshua Ashley Klayman ("Plaintiffs"), by and through their attorneys, Sanford Heisler Sharp, LLP, bring this action against Defendant Morrison & Foerster LLP. Plaintiffs allege, upon knowledge as to themselves and otherwise upon information and belief, that Defendant engages in a pattern and practice of discrimination based on gender, pregnancy, and maternity. Plaintiffs are victims of this discriminatory pattern and practice and have suffered unlawful retaliation for pursuing reports and complaints of discrimination on behalf of themselves and others, including this suit.

## I. **INTRODUCTION**

1.     Defendant Morrison & Foerster LLP ("Defendant," "MoFo," or "the Firm"), is one of the largest law firms in the nation, employing 1,000 attorneys across its 17 offices worldwide. MoFo specializes in a wide range of practice areas, including defense-side labor and employment law, in which the Firm defends clients against individual and class action employment lawsuits, including discrimination actions. The Firm markets itself as a progressive firm with policies and initiatives that champion the advancement of its female employees.[1] However, this is far from the truth.

2.     In reality, MoFo's policies, practices, and procedures are the insidious new face of the "old boys' club" culture that has long dominated law firms, suppressing female advancement by treating female lawyers in ways that accord with stereotyped expectations rather than objective performance. When female attorneys become mothers, their place in a firm culture built on gender stereotypes becomes even more tenuous: through policies like MoFo's, stereotyped expectations become reality as lawyering mothers are first marginalized and then blamed for their marginalization.

3.     Persistent stereotypes about working mothers have serious financial and social consequences for women. Women in law who have children and take maternity leave return to face a lower volume of work, reduced exposure to interesting projects, and fewer opportunities for advancement.[2] More often than not, the law firms in question are acting based on stereotypes they place on working mothers as being uncommitted to their jobs, overwhelmed, or no longer competent. When

---

[1] *See* Morrison & Foerster, *MoFo Women* (rev. Dec. 6, 2018), https://media2.mofo.com/documents/181113-mofo-women.pdf.

[2] *See, e.g.*, Marc Tracy, *What Happens to Pregnant Women at a Big Law Firm*, New Republic (Jul. 25, 2013), https://newrepublic.com/article/114026/why-big-law-firms-lag-behind-parental-leave.

working mothers are viewed through the warped lens of employer stereotypes, their actual commitment or output becomes irrelevant.

4. Women in the law already face significant challenges based on gender. Women are regularly excluded from the upper echelons of law firms nationwide and continue to encounter the "glass ceiling" at large law firms. A recent ABA study found that at law firms nationwide, female attorneys comprise about 45% of associates, but only 22.7% of partners and 19% of equity partners.[3] Men also far outpace women in their representation on firm-wide decision-making bodies.[4] Female attorneys across the board are paid significantly less than their male counterparts. A 2017 survey by the National Association for Women Lawyers found that the typical female attorney earns less than a typical male attorney at the same level, from lower ranks of associates all the way up to equity partners.[5] Even for associates, the median man makes on average $10,000 more per year than the median woman.[6]

5. Women in the legal profession also disproportionately shoulder the costs of bearing and rearing children. Because of this, female lawyers are forced to delay their decisions to have a child until after they attain partnership, or face the negative career consequences associated with motherhood.[7]

6. This dynamic is particularly pronounced at MoFo. When female lawyers return to work after maternity leave, MoFo presents them with a maddening Catch-22: denying them work or opportunities because of stereotyped expectations that they lack dedication, while demanding that they prove those expectations wrong by working tirelessly.

7. Female attorneys like the Plaintiffs who push back against the high cost of motherhood at MoFo are themselves pushed out of the Firm.

[3] Comm'n on Women in the Profession, Am. Bar Ass'n, *A Current Glance at Women in the Law 2018* (January 2018), http://www.americanbar.org/groups/women/resources/statistics.html.

[4] Nat'l Ass'n of Women Lawyers, *Annual Survey on Promotion and Retention of Women in Law Firms* (2017), https://www.nawl.org/p/cm/ld/fid=82#reports.

[5] *Id.*; *see also* Young Lawyer Ed. Bd., *The Real Women's Issue*, The Am. Lawyer, Aug. 2018, at 18.

[6] *See* Nat'l Ass'n of Women Lawyers, *supra* n.8.

[7] *See* Kyung Park & Nayoung Rim, *The Gendered Effects of Career Concerns on Fertility* (June 1, 2017), *available at* https://www.usna.edu/EconDept/RePEc/usn/wp/usnawp59.pdf.

8. Attorneys who are mothers are forced to prove their commitment to the Firm in a way their colleagues are not. They risk isolation, work droughts, and even being pushed out of their practice groups and the Firm as a whole if they do not meet the impossibly high standards that are set for female attorneys with children, particularly those who go on maternity leave while at the Firm. MoFo eventually pushes these women out of the Firm, impeding not only their opportunities for advancement internally but also their marketability at other firms.

9. The Firm vigorously markets its leave policies to female recruits as being particularly generous. But taking such leave comes with a price. In many cases, the first sign of trouble for mothers at MoFo comes without warning at their first review post-leave, sometimes only days or weeks after their return from leave At this review, attorneys whose upward trajectories were acknowledged and celebrated prior to their leaves are shocked to discover that, per Firm policy, MoFo has concluded without warning that they should be held back a full class year, and paid accordingly.

10. Notably, even while the Firm fails to pay mothers who have been held back on par with their actual seniority, it does not automatically bill their work out at a lower rate to clients. This failure to value the work of attorney mothers consistently illustrates the disjuncture between the Firm's perception of their value and their actual value in the marketplace.

11. Having branded a new mother returning to work with a marker of her insufficiency as compared to those who were formerly her peers, MoFo then invites her to seek out adequate work that will allow her to redeem herself. But she is already behind the eight ball. The scarlet letter imposed by the Firm unsurprisingly does not assist the new mother in marketing herself to partners. If she survives until her next review, she will be excoriated for her failure to bill, with no acknowledgment of the structural impossibility in which the Firm's own actions have trapped her. The longer this goes on, the less marketable she will become, both internally and externally.

12. If this were the only face of pregnancy and maternity discrimination at MoFo, attorney mothers would at least be presented with a pathway to success, albeit one that gives the lie to the Firm's generous promises. An attorney could simply work tirelessly through every pregnancy and "maternity leave" to become a preeminent exemplar of what success looks like for a lawyer who is also a mother.

13.     In fact, however, mothers at MoFo are damned if they do *and* damned if they don't, as powerfully illustrated by the experience of Plaintiff Klayman. Even while MoFo promoted Ms. Klayman as the epitome of maternal success at the Firm, it underpaid her in comparison to her less accomplished male counterparts, delayed her promotion while celebrating and advancing the male attorneys who discriminated against her, and ultimately pushed her out within six months of her first complaint about discrimination to Human Resources.

14.     To remedy the gender and pregnancy discrimination and retaliation they witnessed and experienced at the Firm, Plaintiffs William and Klayman seek all legal and equitable relief available under federal anti-discrimination statutes, including the Family and Medical Leave Act, ("FMLA"), 29 U.S.C § 2601 *et seq.*; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, as amended.

15.     Plaintiff William also brings claims of discrimination and retaliation under the California Fair Employment and Housing Act, ("FEHA"), Cal. Gov. Code § 12940 *et seq.*; the California Family Rights Act, ("CFRA"), Cal. Gov. Code § 12945.2; and the California Business and Professions Code, Cal. Bus. & Prof. Code § 17200 et seq.

16.     Plaintiff Klayman also brings claims of discrimination and retaliation under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107 and the New York Equal Pay Law, N.Y. Lab. Law § 194.

## II.     <u>THE PARTIES</u>

17.     **Plaintiff Sherry A. William** is a graduate of the University of California, Los Angeles and Harvard Law School.  At all times relevant to this action, Ms. William lived and worked in California. Ms. William was an Associate in Defendant's Los Angeles, California office from August 2015 until December 2019 as a member of the Project Finance Group within the Finance Department, now known as the Finance + Projects Group. For nearly two years, Ms. William was the Chair of MoFo's Working Parents Group in Los Angeles. Ms. William is active in the Los Angeles legal community, as well as the Egyptian-American legal community, and is the current President of both the Harvard Law School Alumni Association of Los Angeles and the League of Egyptian American Professionals.

18.     **Plaintiff Joshua Ashley Klayman** is a *summa cum laude* graduate of the University of Pennsylvania and a *cum laude* graduate of Temple University Law School, where she received a three-

year Law Faculty Scholar merit scholarship and was a member of Law Review. At all times relevant to this action, Ms. Klayman was a resident of New Jersey and worked in New York. Ms. Klayman joined MoFo's New York office on July 1, 2013 as an Associate. From July 1, 2014 until June 2018, Ms. Klayman was employed as Of Counsel in Defendant's New York office, as a member of the Financial Transactions Group within the Finance Department, now known as the Finance + Projects Group. As of June 2018, when she was pushed out of MoFo, Ms. Klayman was already one of the best-known blockchain and cryptocurrency lawyers in the United States and globally. For example, in late 2017, *Chambers and Partners* ranked her as one of the top twelve lawyers in this industry worldwide. She is now Global Tech Sector Co-Head, U.S. Head of FinTech and Head of Blockchain and Digital Assets for a large, global elite law firm, where she is Senior Counsel.

19. **Defendant Morrison & Foerster** ("MoFo" or "the Firm") is a law firm with offices worldwide, including one office in New York City and four offices in California, where according to its website it employs over 400 attorneys. During all relevant times, Morrison & Foerster was Plaintiffs' employer within the meaning of all applicable federal and state statutes.

## III.   JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over Plaintiffs' state law claims. The claims constitute the same case and controversy raised in the claims under federal law.

21. The Northern District of California has personal jurisdiction over the Firm because the Firm has headquarters in and transacts significant business in the State of California and in this District.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Defendant conducts substantial business in the Northern District of California, and because, upon information and belief, unlawful employment practices originated in this District.

23. Plaintiff William duly filed her first administrative charge before the California Department of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC") on April 24, 2018, and received her Notice of Right to Sue from the EEOC on June 18, 2018. Ms. William filed a second administrative charge before the EEOC and DFEH and received her Notices of Right to Sue dated February 20, 2019 and February 28, 2019, respectively. On February

12, 2020, Ms. William filed a third administrative charge before the EEOC and the DFEH. She is currently perfecting her right to sue before the EEOC and the DFEH.

24.     Plaintiff Klayman filed her administrative charge before the EEOC on November 20, 2018, and received her Notice of Right to Sue on March 1, 2019.

## IV.     FACTUAL ALLEGATIONS

### A.     MoFo Impedes the Advancement of Women Who Are Pregnant, Have Children, and Take Maternity Leave

25.     Pregnant women and mother are strikingly absent from the upper ranks of management at MoFo. To understand what happens to high-performing women at the Firm, one need only refer to the words of former partner and practice head Jeff Chester: "She became a mommy."

26.     The Firm boasts of its "work-life programs" for employees, including parental and adoption leave, parental transition time upon returning from leave, backup caregiving, flexible work options, and a reduced hours program.[8] Through these benefits, the Firm ostensibly allows, and even encourages, its female employees to take up to six months of maternity leave. Indeed, MoFo recently received recognition for offering the greatest number of weeks for paid primary caregiver leave amongst big law firms.[9]

27.     However, when women like the Plaintiffs take advantage of the Firm's "generous" maternity leave or notify the Firm that they have children, they are subjected to unwarranted suppression of pay, professional development, and promotions, and in some cases, even termination.

28.     Notably, Morrison & Foerster's standard operating procedure of holding back female associates who have taken maternity leave from advancement with their peers reinforces stereotypes that mothers are worse at and less committed to their jobs. When these associates return from leave, the Firm denies them assignments, business opportunities, and client contacts because of stereotype-driven perceptions that they lack commitment to their jobs, then chastises them for their failure to find work.

---

[8] See MoFo Women, supra n.1, at 15, 18.

[9] Yale Law Women, The Top Ten Female & Family Friendly Firms Lists of 2018 (2018), http://yalelawwomen.org/wp-content/uploads/2012/11/2018-FFFFI-Report_Final-2.pdf. Notably, the survey includes no data on how women are paid as compared to their male peers.

29.     The stereotype becomes self-reinforcing, and women become stuck. They now face a Hobson's choice: pay a motherhood penalty in the form of slower rates of progression and correspondingly lesser compensation, thus accepting lower pay for substantially equal work requiring equal skill, effort, and responsibility to that of their male colleagues; or, in the alternative, follow MoFo's mommy track out the door in hopes of rescuing their careers.

30.     In some cases, attorneys returning from maternity leave are not even given the courtesy of receiving prior notice that they will be held back. Only through checking the Firm's online portal do they learn that, despite solid or even stellar performance, they will not be progressing with their peers.

31.     In the Los Angeles office alone, Plaintiff William is aware that, since 2013, at least seven female attorneys have been held back upon their return from maternity leave.

32.     MoFo has a policy of holding back attorneys who have worked fewer than 600 hours in a year, as well as other attorneys who have worked low hours and are deemed insufficiently experienced to advance. In practice, MoFo's policy effectively and almost exclusively targets mothers who make the mistake of availing themselves of the full parental leave offered to primary caretakers, which with twenty weeks of leave and vacation time can easily total six months of leave. As a result of this and associated policies and practices regarding work assignment and other professional development opportunities, there is a dwindling proportion of women at each successive level of the Firm's hierarchy. For example, while women represent approximately 50% of the Firm's associates, only 25% of MoFo's partners are women.[10]

33.     Upon information and belief, men who become fathers or take advantage of the Firm's parental leave policy do not face disqualification from advancement and higher pay at the same rate as their female counterparts.

34.     Indeed, between 2014 and 2019, of the 25 associates who were held back in the year after they returned from parental leave, 24 were women.

---

[10] *Why MoFo*, Morrison Foerster, https://careers.mofo.com/why-mofo/ (last visited January 3, 2020).

**B.**     **The Firm's Male-Dominated Hierarchy Sets Policies that Disparately Impact Female Attorneys, in Particular Pregnant Women and Women with Children**

35.     Men dominate MoFo's leadership and management. Out of the six attorneys on MoFo's leadership team, only one woman holds a seat as a Managing Partner. As noted above, while women represent approximately 50% of the Firm's associates, only 25% of MoFo's 344 partners are female. MoFo's own website acknowledges that only 31% of the Partner Compensation Committee and 40% of the Board of Directors are women. The disproportionately large representation of men in leadership roles at MoFo facilitates discrimination against women, especially pregnant women and women with children, throughout the Firm.

36.     Upon information and belief, the overrepresentation of men and employees who are not pregnant or mothers in Firm leadership reproduces a pattern of discrimination against attorneys who are pregnant or mothers at MoFo. Discrimination based on pregnancy and maternity in turn exacerbates the underrepresentation of women in positions of power, not just by excluding many talented women from advancement due to maternity, but also because stereotypes about maternity have an impact on the advancement of women who are perceived to be of childbearing age.

37.     On information and belief, promotion and compensation decisions at Morrison & Foerster are controlled by a practice group's chair or head partner. As of January 2020, only 17 of the 66 partners in the Firm's New York office were female. Similarly, only 48 of the 119 partners in the Firm's California offices were female.[11]

38.     In some offices, it is not uncommon to see an entire practice group consisting primarily of female attorneys with a male chair or head who controls all compensation and promotion decisions for his team. One example of this arose at a MoFo partners meeting, where a film was presented that highlighted the "men behind" women partners (i.e., those men who had supported women to make partner). The meeting was the subject of later Women's Strategy Committee calls, because it brought to light that at MoFo, despite the Firm's veneer of being female-friendly, the support of a powerful male partner remains

---

[11] These numbers were derived from publicly-available information on MoFo's website identifying partners and their locations, but are likely inflated due to MoFo's practice of listing some partners under multiple offices.

the *sine qua non* for a women to make partner. Such support, in turn, is exponentially more difficult to obtain for women burdened by the stereotypes associated with pregnancy and motherhood.

39.     Upon information and belief, MoFo's standard operating procedure is to terminate or push out working mothers in a manner that makes it clear that their motherhood, not the quality or quantity of their work, is the decisive factor. Thus, on the one hand, female attorneys who return from leave on a flexible or part-time schedule are penalized for not committing to work full-time hours. At the same time, those who return full-time are steered toward part-time schedules and correspondingly lower compensation. Even if their salaries are leveled up to reflect that they are, in fact, working full-time hours, female attorneys who are nominally part-time still receive lower bonuses than their counterparts who work the same hours without the part-time label.

40.     Upon information and belief, Morrison & Foerster's leadership is aware of the Firm's inequitable promotion, pay, job assignment, and other practices, but has taken no steps to address the root causes of the disparity. Defendant is aware of the demographics of its workforce, including the underrepresentation of women in different levels and functions. Despite several initiatives the Firm has taken in the recent past, including since the filing of this lawsuit, all purportedly with the goal of reducing or eliminating this underrepresentation, the problem persists, maintained and magnified by Firm policies, practices, and procedures and a culture that stereotypes and undervalues female attorneys who choose to have children.

## V.     PLAINTIFF SHERRY A. WILLIAM

41.     Plaintiff William worked in Defendant's Los Angeles office from August 2015 until December 2019 as part of its Project Finance Group, which eventually became the Finance + Projects Group.

42.     Ms. William received her law degree from Harvard Law School and is admitted to the New York and California bars. During her interview process with MoFo, Ms. William's recruiter provided the Defendant with her resume and a list of representative matters that reflected her experience to date. She joined MoFo as a fifth-year associate with one young daughter after several years practicing law at another large law firm.

43.     Ms. William excelled at her duties at the Firm and received positive feedback in her evaluations until she became pregnant with her second daughter.

## A.     Once She Returned From Maternity Leave, MoFo Took Adverse Employment Action Against Plaintiff William

44.     Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, after having her second child, Plaintiff William went on maternity leave during the statutory period, about two years after she joined the Firm.

45.     On January 9, 2018, less than three weeks after her return from leave, Ms. William discovered through the Firm's online portal for employees that her salary no longer matched up to her class year. She had not been promoted with her peers, nor had she received the corresponding salary and bonus increase that should have accompanied her anticipated promotion.

46.     Ms. William's supervisors had given her no indication or notice that the Firm would not progress her. Ms. William had no history of performance issues, nor had she ever been held back previously during her time at MoFo.

47.     While MoFo reduced Plaintiff William's compensation as compared to her former class peers, the Firm nevertheless increased her external billing rate as though she had been promoted with her class. This telling inconsistency was only rectified after Ms. William raised the issue with upper management.

48.     Upon information and belief, members of Ms. William's class year who were not mothers, including two male associates in the same office, were advanced in accordance with their actual class year and received the corresponding pay increase. Upon information and belief, the only material difference between associates who progressed and Ms. William was that Ms. William had become pregnant and taken the full paid parental leave offered by MoFo.

49.     Indeed, a male colleague, in the same practice area who is one class year behind Ms. William, who had children and took paternity leave and who joined MoFo at the same time as Ms. William, has been progressed each year and, upon information and belief, is being groomed for partnership.

**B.** **"Parents Tend Not to Do Well In This Group:" MoFo Discriminated Against Plaintiff William Due to Her Pregnancy, Leave-Taking, and Maternity**

50.     The Firm's decision to hold back Ms. William after she returned from maternity leave was not the first time the Firm discriminated against her due to her gender and pregnancy or her status as a mother.

51.     On Plaintiff William's first day at the Firm, one of her supervising partners, Elizabeth Sluder, told her: "We didn't realize you were a parent when we extended you the offer," implying that Ms. William had concealed her motherhood during her interview process with the Firm. In fact, although it would have been unlawful for MoFo to require such a disclosure as part of the hiring process, Ms. William had been clear with the Firm's Human Resources department that she was interviewing during her maternity leave, and had told three Partners at the Firm that she had a child. Partner Sluder's comment made it clear from the start that Ms. William would face obstacles at the Firm because she was a mother; Partner Sluder later warned Ms. William that **"parents tend not to do well in this group."** In fact, at the time that Ms. William joined the Firm, except for Partner Chester who had one adult son, she was the only person in her group in the Los Angeles office who was a parent. Ironically, Partner Sluder was appointed by the Firm to be Ms. William's partner mentor.

52.     Partner Sluder continued to show preferential treatment toward attorneys without children and routinely denied Ms. William opportunities to complete substantive work. For example, Partner Sluder transitioned Ms. William off one matter to replaced her with another female associate who was not pregnant and did not have children, despite Ms. William's excellent performance.

53.     This kind of discriminatory conduct based on Plaintiff William's gender, pregnancy, and maternity was not limited to Partner Sluder. During the Firm's holiday party, another of her supervising partners, former MoFo Partner Jeff Chester, told Plaintiff William about a female associate who was "one of the best he had ever worked with." When Ms. William asked him what the attorney was doing now, he said that "she became a mommy."

**C.** **MoFo Unfairly Evaluated Ms. William's Performance Based on Stereotyped Expectations Related to her Pregnancy and Maternity**

54.     When she returned from maternity leave on or around December 21, 2017, Ms. William repeatedly sought to discuss the ongoing matters and status of her practice group with Partner Sluder, but

Partner Sluder rebuffed these attempts to reconnect. On or around January 8, 2018, in response to one of Ms. William's attempts to meet with Partner Sluder to discuss practice group business, Partner Sluder scheduled Ms. William's 2017 annual review for January 22, 2018. Ms. William later learned that the annual reviews for the rest of her group were conducted about one week before her return from leave.

55. On January 9, 2018—the day she learned that her salary no longer matched up with her class year—Ms. William called Partner Sluder to seek clarification about her promotion status. Partner Sluder told Ms. William that she would not be progressing; instructed her to speak with Partner Chester during her performance review, saying that he "had a plan for her"; and faulted Ms. William for having been on maternity leave when the performance reviews were conducted. Partner Sluder ended the call by terminating her mentor-mentee relationship with Ms. William, telling Ms. William that she should no longer consider Partner Sluder a sponsoring Partner and should direct all future inquiries to Partner Chester. Ms. William was not assigned another formal mentor until July or August 2018, months after this lawsuit was filed.

56. Ms. William complained to Erika Drous, a representative of the Firm's Attorney Development Group who was herself a former MoFo associate, about the Firm's decision to hold her back one year and the unilateral termination of her mentor-mentee relationship by Partner Sluder.

57. The next day, Partner Sluder told Ms. William that she had been instructed to tell Ms. William that the decision to hold Ms. William back was not "performance-based," and referred Ms. William to Attorney Development for any further questions. Partner Sluder ultimately moved Ms. William's annual review to January 18, 2018 after Attorney Development became aware that Ms. William's 2017 annual review had not taken place in December.

D. **"Ramp Up" Your Efforts: Following Her Maternity Leave, MoFo Encouraged Ms. William to Leave the Firm**

58. Partner Chester met with Ms. William in person in January 2018 to conduct her 2017 performance review, with Partner Sluder attending telephonically. Partner Chester told Ms. William that although she had been making good headway before her maternity leave, she should not be surprised that she was being held back after having taken maternity leave. He exhorted her to "ramp up" her efforts now that she had returned from leave, advising her to bill at least 2000 "substantive" hours before the end of

2018. This goal would have been challenging for any associate in Ms. William's practice group to reach, given that business in the group had been slow for some time. For an attorney who had just returned from leave and thus had no active pipeline of work, now saddled with the additional impediment of having been held back as a result of having taken leave, it was by definition almost impossible.

59.     Nevertheless, Ms. William made every effort to respond to this unrealistic expectation with energy and enthusiasm, actively requesting more work to ensure that she would be able to meet her elevated billable hours target. In response, however, Partner Sluder chided Ms. William for seeking more hours, indicating that she should "think of the team."

60.     Following Ms. William's review, she reached out to Janet Herman, the head of Attorney Development. Ms. Herman acknowledged that Ms. William was in a difficult position between Partner Sluder, who had unambiguously cut her off from the group, and Partner Chester, who had expressed the Firm's expectation that she bill 2000 hours without providing any viable means for her to do so. Ms. William also spoke with Ms. Drous, who told Ms. William repeatedly that, as a Senior Associate at MoFo, she needed a plan to advance within the Firm. Ms. Drous also acknowledged, however, that the comments from Ms. William's supervising partners indicated that there was no such plan for her advancement.

61.     MoFo's discriminatory conduct left Ms. William with no good choices. While the Firm was clearly signaling that she was not on a path to success, her prospects elsewhere were also limited by her lack of opportunities and support internally. At MoFo, at least, she had a job, a record of positive evaluations pre-dating her leave, and experience with a specific client base in a select practice. If she could just obtain work, she believed she could prove that she was the same talented lawyer she had been before she went on maternity leave.

62.     However, over the two years that followed, Ms. William did not receive *any* substantive assignments from the supervising partners within her practice group that would have allowed her to meet MoFo's minimum hourly requirements, let alone the elevated requirements imposed at her 2018 review.

63.     From the time Ms. William had joined the Firm as a fifth year associate until the time she went on maternity leave as a seventh year associate, she had worked almost exclusively on matters assigned to her by Partner Sluder or Partner Chester, or on matters that they had approved. In the rare instances she worked on matters that were not assigned by Partner Sluder or Partner Chester, she would

generally receive notice from Partner Chester or Partner Sluder that she would be assigned to a matter by such partner. Ms. William understood that they, as her supervising partners, generally controlled her work assignments and that if she worked with another partner, that partner would have spoken to either Partner Chester or Partner Sluder before approaching her.

64.     While Ms. William's supervising partners instructed her to seek work from other partners after she returned from maternity leave, they did not make introductions or otherwise help her obtain such assignments.

65.     Without any assistance from Partner Sluder or Partner Chester, it was virtually impossible for and unreasonable to expect that Ms. William would now get assignments on her own as a senior associate with a high billable rate and little work history with other Firm partners or practice groups.

66.     Ms. William reached out herself to seven different attorneys in five different MoFo offices in several different practice groups prior to the filing of this lawsuit and was unable to find any work.

67.     After the filing of this lawsuit, Ms. William was given a modest amount of work but only outside of her group and specialty area. For example, Ms. William took on additional pro bono work, as well as work for another practice group. Ms. William also readily took on "knowledge management" work when requested to do so by Partner Jackie Liu, even though this work was not billable to clients and not related to project finance. This workstream, like others, did not materialize into a substantial or consistent amount of hours.

68.     Ms. William also worked to bring in a new matter for the Firm and volunteered to help organize various MoFo events. However, without work from her practice group, which is expected to be the primary source of associate assignments, Ms. William was unable to meet her hours requirements for 2018 or 2019.

69.     Ms. William repeatedly sought, but MoFo failed to provide, any substantive guidance or development plan to meet the hours requirements imposed upon her in light of the dearth of work opportunities she faced. Indeed, when in mid-2018 she discussed her own proposed performance development plan with Partner Chester, he gave her no additional feedback beyond what she had been told in her performance review six months prior.

70.     Low hours became another self-fulfilling prophecy; MoFo set the stage and then blamed Ms. William for the results. Partners including Mark Wojciechowski, Jill Feldman, and Jackie Liu commented to Ms. William that her hours were low, but failed to offer her the work required to increase her hours. Upon information and belief, partners became increasingly less willing to give Ms. William more work because she had low hours, exacerbating her difficulty finding work both inside and outside of her practice group.

71.     At the time of her performance evaluation for 2018, Ms. William had only billed 21% of her hours requirement, significantly less than she billed in the year in which she took six months of maternity leave. Although MoFo acknowledged in this review that Ms. William was performing at the level expected and was willing to assist in matters, and indeed, even promoted her to the next class year, the Firm still faulted Ms. William for her failure to bill more hours, informing her that, as a result of her low hours, she would be subject to an additional mid-year review and potential termination.

72.     Ms. William never received the additional review that she had been told to expect. Though she reached out to her formal Partner mentor on several occasions in mid-2019 to schedule a discussion about the proposed practice plan the Firm should have been helping her generate, he cancelled their meeting and stopped responding entirely to her requests for a meeting.

73.     At the same time, Ms. William's practice group was picking up work and actively hiring new attorneys at multiple levels to do it, pulling two associates from the 2018 entering class to join the group in November 2018 and opening several new engagements with clients. Others in her group were able to attain their hours expectations in 2018 and 2019, but the group continued to withhold work from Ms. William, while also excluding her from exposure to client and networking events. As a result, the last project finance deal Ms. William worked on was before she went out on maternity leave in June 2017. She found work on one active deal outside of her practice group that closed in October 2019, but received no work after that time, despite her continued outreach to partners inside and outside of her practice group.

74.     Internally, Ms. William was ostracized from her group and regularly excluded from project finance group meetings. For example, while the partner who delivered her 2018 performance review encouraged her to attend more industry events, her group excluded her from just such a conference on or about February 6, 2019. After Ms. William learned of the conference, she sought permission from Partner

Chester to attend; he grudgingly allowed her to participate in a MoFo-hosted reception, but told her that she could not attend the conference itself. Because of her commitment to her group and desire to make industry connections, Ms. William drove over two and half hours to attend the reception, despite only having received permission to attend that day.

75. On several occasions, including in August and October 2019, Ms. William saw that her practice group had scheduled or held meetings of the entire group but had failed to invite her to attend. Additionally, many of her colleagues actively avoided her and ignored her even in passing interactions. Some would even pointedly leave a room if she entered it, and the offices on either side of her were vacated and converted to visitor offices.

76. For two years, MoFo denied Ms. William work opportunities while berating her for failing to obtain them. Despite Ms. William's extensive efforts to seek out work, since returning from maternity leave, Ms. William received neither project finance work nor substantive assignments from her practice group.

77. On some of the few occasions work was made available to her, it became clear that it was only a pretext to attack her performance by subjecting every document she touched to heightened scrutiny and taking pains to flag every minor error.

**E. MoFo Retaliated Against Ms. William, Made Every Effort to Force her to Quit, and Ultimately Wrongfully Terminated Her Without Notice After A Hastily-Scheduled and Plainly Pretextual Review**

78. As set forth above, MoFo retaliated against Ms. William for bringing this lawsuit by refusing to provide her work and freezing her out of her practice group, ultimately setting her up for a retaliatory termination.

79. On December 3, 2019, less than a week after Ms. William disclosed in a Court filing that she would no longer proceed under a pseudonym in her ongoing litigation against the Firm, MoFo informed Ms. William during a hastily-scheduled annual review that she would be terminated at the end of the year.

80. Ms. William did not receive a written review prior to or during her annual review. The Partner tasked with delivering her review cited her low hours and her allegedly inadequate work performance as the basis for her termination.

81. No one at MoFo had previously indicated to Ms. William that her work performance was so inadequate as to be grounds for termination. Indeed, Ms. William had been praised for her performance on the last deal she had worked on, and had also been contacted directly by a client to handle work without a partner shortly before and again after she was notified of her termination.

82. MoFo's decision to terminate Ms. William was the product of discriminatory and retaliatory animus.

## VI. **PLAINTIFF JOSHUA ASHLEY KLAYMAN**

83. Plaintiff Klayman worked in Morrison & Foerster's New York office from July 2013 until June 2018. By the time she left the Firm, Ms. Klayman was an accomplished finance lawyer and one of the best-known cryptocurrency and blockchain attorneys in the United States and globally.

84. Among her many accolades, Ms. Klayman has been recognized by *Chambers and Partners* in its inaugural FinTech guide as one of the top 12 Blockchain and Digital Currency lawyers globally, and has been ranked "Band 1" for such category for every year since *Chambers* introduced such a banded ranking. *SuperLawyers* also identified her as a Top Women Lawyer for the New York Metro Area, as well as a Rising Star in the New York Metro Area in the areas of Securities and Corporate Finance, Banking, and Business/Corporate Law. In 2018, Ms. Klayman was named as one of the Top 10 Pioneers in Blockchain and Digital Assets for the WeUniteWe campaign in connection with the United Nations' launch of the Decade of Women.

85. Ms. Klayman regularly participates in think tanks and speaks on panels in her industry. She is a frequent contributor to major industry and mainstream publications who has been named to the Women in FinTech Powerlist and holds a key leadership role with a prominent blockchain industry trade association. Ms. Klayman is also the co-founder and a director of a national non-profit focused on diversity in blockchain.

86. Plaintiff Klayman received her law degree from Temple University and is a member of the New York bar. She was recruited to join the Firm as a well-respected lawyer in her practice area, and over the following years built a stellar reputation in her field.

87. Because of her success in her foundational practice area, and as an inducement to join the Firm, MoFo gave Ms. Klayman a hiring bonus and promised her a full bonus for her partial first year.

MoFo also indicated to Ms. Klayman, including in her offer letter, that she would be considered for partner after two years at the Firm.

88.    When she was made Of Counsel after approximately one year at the Firm, Ms. Klayman was told that her new title was a "placeholder" for partnership, and was led to believe that she would be considered for partner at the end of her second year.

89.    However, despite her achievements and loyalty to the Firm, Ms. Klayman was never made partner and was never even included on the Firm's official list for consideration.

90.    At the Firm, Ms. Klayman excelled in her job duties while also demonstrating an exceptional willingness to be a team player, make sacrifices for her group, and promote the Firm. Performing partner-level work almost from the outset, Ms. Klayman also began to attract significant positive attention and business for MoFo and her colleagues, although she seldom received any billing credit for doing so.

91.    At MoFo, Ms. Klayman also had a strong history of overwhelmingly positive evaluations and was recognized as a top performer, and she consistently demonstrated creative problem solving, client service, business development, and group leadership, including as the founding Chair of the Firm's Blockchain + Smart Contracts Group, which she originally co-founded with an associate in her practice group. Colleagues recognized her as a talented finance lawyer who regularly performed at the level of a partner within her practice group.

92.    Ms. Klayman was also active in pro bono work and in diversity and inclusion activities. At MoFo, Ms. Klayman served on MoFo's Women's Strategy Committee; was the Co-Chair of MoFo's New York Women's Affinity Group;[12] started a Women in Finance networking group; participated in diversity recruiting; was an active member of MoFo's Pro Bono practice and initiated and served as senior advisor for a new, diversity and inclusion-focused pro bono practice area; co-founded MoFo's Annual CEO Diversity Forum: Change from the Top; and regularly participated in Firm events and marketing initiatives, including several that she planned and procured.

---

[12] When Ms. Klayman suggested that the New York Women's Affinity Group consider women's parenting issues and work/life programming, other group members expressed concern that focusing on such issues would be construed by MoFo's male partners as a lack of commitment to their careers.

93.     Yet for all of Ms. Klayman's patience and dedication to her group and the Firm, her promised consideration for partnership at the Firm—and the pay increases associated with it—never came.

## A.     Once She Returned from Maternity Leave, MoFo Took Adverse Employment Action Against Ms. Klayman

94.     Knowing that the Firm permitted, and believing that it encouraged, its female employees to take maternity leave, Ms. Klayman went on maternity leave during the statutory period.

95.     When Ms. Klayman took maternity leave at MoFo, MoFo took adverse action against her. It denied her pay raises and promotions to which she was entitled, and ultimately demoted her. After Ms. Klayman reported her concerns, MoFo deliberately created an intolerable working environment for Ms. Klayman until she had no choice but to leave the Firm.

96.     While Ms. Klayman was promoted to Of Counsel after approximately one year at the Firm, in which time Ms. Klayman had a baby and took an abbreviated maternity leave (working through much of it), Ms. Klayman's salary was not increased at all at the time of her promotion. By contrast, a male attorney who made Of Counsel a few months before Ms. Klayman had the opportunity to negotiate an Of Counsel contract with MoFo at the time of his promotion, and obtained higher pay. MoFo instructed Ms. Klayman to wait until the end of the year for a raise, but by the end of that year, when Ms. Klayman was visibly pregnant, MoFo Management refused to negotiate an Of Counsel contract with her or raise her compensation to reflect her promotion above associates.

97.     Although Ms. Klayman was performing partner-level work, MoFo instead kept her pay on par with associates, including some more junior to her. At the same time, while associates were entitled to a market bonus if they met their hourly requirements, MoFo told Ms. Klayman that her of-counsel bonus would be discretionary and would not exceed the associate bonus. Indeed, MoFo told her that she should be thankful for what she was given, as it could have been substantially lower. On several occasions, partners in Ms. Klayman's practice group observed that she would have been better off financially had she remained an associate.

98.     Ms. Klayman's salary was kept at an 80% equivalent of a senior associate salary for two years. As a result, she was paid less in salary during the course of that second year than the Associates in the class from which she had been "promoted." At the suggestion of a supportive supervising partner,

Partner Wojciechowski, Ms. Klayman repeatedly followed up with MoFo Management about her compensation, and she researched and provided data showing that her compensation was materially under-market. At the end of that second year, her salary was then adjusted slightly.

99.     A few months later, MoFo again made an upward adjustment to Ms. Klayman's salary, which nevertheless remained below the salary that she had indicated to MoFo Management was within the range of market. At approximately the same time, the Firm hired a male Of Counsel who was junior to Ms. Klayman and had been an associate at his prior firm. Ms. Klayman later learned that this male Of Counsel in her group was paid a salary above her own full-time equivalent. In fact, he was paid the same salary that Ms. Klayman had identified as a market offer for a junior Of Counsel, a salary MoFo never offered Ms. Klayman herself.

100.     MoFo never increased her salary again. She did not receive a raise or market step-up in her last two years at the Firm, despite repeated assurances from MoFo Management that she deserved a raise, and despite two market-wide associate salary increases during that time period. As a result, upon information and belief, she ultimately was paid less than male associates, Of Counsel, and partners who were performing work of substantially equal or lesser skill, effort, and responsibility. A male Associate reported to her that he was receiving bonuses in excess of associate bonuses and, therefore, in excess of Ms. Klayman's.

101.     When Ms. Klayman raised her inequitable compensation with Firm leadership on multiple occasions, she was encouraged to "trust the partnership" and look forward to her own elevation to partner. Based on these representations, including that her compensation level was a short-term issue that would be resolved when she made partner, Ms. Klayman patiently remained with the Firm. MoFo did not make her a partner, however.

102.     MoFo's concrete acts of discrimination against Ms. Klayman include but are not limited to the following: A male associate from another firm, who had two fewer years of experience than Ms. Klayman, was brought in as Of Counsel in the same group and given higher pay than Ms. Klayman, even though practice group records show that his date of potential promotion to partner was later than Ms. Klayman's. Another male colleague who had similar experience was made Of Counsel at approximately the same time as Ms. Klayman but was then elevated to the partnership at the end of that same year; he

was also paid significantly more than Ms. Klayman and his compensation was adjusted at the time of his elevation to Of Counsel. A third male colleague who had fewer years of experience was hired after Ms. Klayman as an equity partner and paid significantly more than Ms. Klayman, even as she was asked by Firm partners to weigh in on certain of his matters (including during her maternity leave) because her expertise and experience were more trusted by the Firm's partners. A fourth male colleague in a transactional practice who was multiple class years behind Ms. Klayman was promoted to equity partner as a seventh-year associate, while Ms. Klayman's partnership consideration was deferred multiple times. A male attorney in the same office who was promoted to Of Counsel multiple years after Ms. Klayman, and whom she provided guidance concerning Of Counsel compensation negotiations, was permitted to have a partner office, but MoFo never offered or gave to Ms. Klayman a partner office. Upon information and belief, none of these male attorneys was a substantial business generator.

103. Upon information and belief, the only basis for MoFo's decision to compensate and promote these male attorneys over Ms. Klayman was Ms. Klayman's status as a woman who had become pregnant and taken leave. Indeed, one MoFo partner told Ms. Klayman outright that MoFo believed it could justify deferring her consideration for partnership because she had taken maternity leave.

104. Certain female partners with children at MoFo who are held up by the Firm as exemplars of female success regularly boast of having taken almost no maternity leave.

**B. The Maternity Double-Bind: MoFo Subjected Ms. Klayman to Higher Expectations Due to Her Gender, Pregnancy, and Maternity, But Undermined and Penalized Ms. Klayman Because She Took Maternity Leave**

105. Instead of rewarding her success and ability, MoFo repeatedly questioned Ms. Klayman's commitment to her job, expecting her to prove herself by sacrificing her own pay and advancement in favor of others, and requiring her to work harder than those around her to "earn" fair treatment. Ms. Klayman consistently worked more than full-time hours for part-time pay, including by working throughout her maternity leaves. During these leaves, MoFo encouraged Ms. Klayman to continue to generate business and seek out opportunities, maintain her extensive non-billable contributions to the Firm, and continue to provide excellent client service.

106. But for all Ms. Klayman's effort, it was never enough. She was repeatedly told to wait her turn and made to cede the way to a male Associate, Dario de Martino. When Ms. Klayman was pregnant,

partners asked if she was "really" planning to return from leave. When she did return, MoFo encouraged Ms. Klayman to maintain her "part-time" designation, denied her a raise commensurate with her experience and level of work, and again denied her promotion to partnership.

107.     Upon her return from maternity leave, MoFo encouraged Ms. Klayman to avail herself of MoFo's post-leave reduced hours policy, assuring her it would not have adverse effects on her career at MoFo, and indicating that it could "help" her group by reducing the target hours budget and costs for the group. Ms. Klayman reduced her formal schedule to 80%, but continued to work more than a full-time schedule, believing that the Firm would recognize her sacrifices by elevating her to partner. Ms. Klayman's "reduced hours" classification permitted MoFo (including partners from other groups) to classify or reassign portions of her otherwise billable time as nonbillable, thereby reducing the number of write-offs and assisting with budget management. At times, Ms. Klayman's billable hours were capped retroactively for matters, or she was asked to reclassify her billable hours as non-billable. While Ms. Klayman's salary (but, most years, not her bonus) generally was trued-up to reflect billable hours recorded in excess of her billable target, Ms. Klayman's compensation was not trued-up to reflect the significant non-billable hours recorded or worked by Ms. Klayman that otherwise would have been billable hours.

108.     Nevertheless, until her last six months at the Firm, when she experienced escalating retaliation after reporting her concerns about discrimination to Human Resources, Ms. Klayman's client-billable hours for every calendar year significantly exceeded her budgeted goals, in two years exceeding 150% of her target. At all times, her overall recorded hours were vastly higher than the goals set for her by the Firm. In at least one year, Ms. Klayman's combined billable and non-billable hours totaled approximately 3,000 hours. She was regularly described as a "tireless" worker.

109.     Ms. Klayman took these actions in reliance on the Firm's representations that it would recognize her sacrifices by elevating her to partner, and that a reduced-hours schedule would have no negative effect on her progress at the Firm. MoFo's Management and Attorney Development were aware of Ms. Klayman's actions, and she was presented as a model to others for how to be successful with a reduced hours schedule. Indeed, multiple women confided in Ms. Klayman for advice and to express their trepidation about becoming mothers at MoFo.

110. However, once she reported discrimination to MoFo, and despite having been explicitly encouraged by MoFo management to focus on selling on behalf of her colleagues, Ms. Klayman was ultimately told that her billable hours thereafter were too low, a strike against her for partnership.

111. Upon information and belief, no men were encouraged to take reduced work schedules or reduce their billable hours in a similar way. MoFo encouraged Ms. Klayman to do so because she was a woman and a mother.

112. Over the following years, Ms. Klayman continued to seek and was continually assured by partners that she deserved to join their ranks. In the best-case scenario, Ms. Klayman was told to wait to the next annual round of promotions. At other times, she was outright ignored.

113. When Ms. Klayman announced that she was pregnant and due to give birth, a powerful MoFo Partner, Spencer Klein, and Mr. de Martino stepped in and began to exclude her from the Blockchain + Smart Contract group business, events (including an event that she had devised, planned and obtained approval for), and leadership. They also repeatedly gaslighted her, all the while relying on Ms. Klayman to continue pitching for and generating business.

114. Ms. Klayman nevertheless continued her tireless commitment to her work. For instance, she billed over 350 client-billable hours in a single month, while approximately eight months pregnant. She led complicated, high-profile, high-pressure matters. She planned successful events for her practice group. Ms. Klayman continued working around the clock during her maternity leave.

115. Ms. Klayman proved her success again and again, even as MoFo continued to undermine her, cutting her out of presentations she had prepared, failing to acknowledge or promote her substantial contributions to the Firm as well as her receipt of certain industry-leading awards and recognitions.

116. During Ms. Klayman's maternity leave, throughout which she was working full-time, MoFo appointed Mr. de Martino to Ms. Klayman's role in her practice group without her knowledge or consent, effectively demoting her. This was after Ms. Klayman had already complained to MoFo partners about the discrimination she had been facing. When she complained to senior partners about this latest blow, Ms. Klayman was advised not to raise the issue, but instead to cede her important position to Mr. de Martino and await elevation to partnership. That elevation never came. Even after learning a few months later while she was still on maternity leave that she would not be elevated to partner that year, Ms.

Klayman continued to work tirelessly throughout her leave. Regardless, Partner Klein and Mr. de Martino told her that they were excluding her from her practice group matters and events because she was on leave.

117.    After MoFo yet again refused to elevate Ms. Klayman to partnership, she raised her concerns about discrimination with MoFo's Director of Attorney Development. The Director's advice was that Ms. Klayman refrain from informing those who had supported her candidacy that MoFo was not making her a partner. She instead suggested that Ms. Klayman work with a job coach to address alleged concerns from Partner Klein about the length of her emails, despite the fact that she had not worked for Partner Klein during the review period and he was part of a different department. Moreover, partners in her group with whom Ms. Klayman did work assured her that there was nothing wrong with her emails, and she had a long history at MoFo of evaluations praising her written communications. MoFo Management then told her yet again that she should wait to be treated fairly and should look ahead to partnership in the coming year. While Ms. Klayman followed these recommendations in good faith, the coach acknowledged that the stated concerns about Ms. Klayman were questionable, both on their face and as justification for MoFo's decision not to promote Ms. Klayman to partner.

118.    Upon information and belief, Attorney Development expressly solicited from Partner Wojciechowski an example of an email in which Ms. Klayman could have included less information. Attorney Development subsequently inserted into Ms. Klayman's evaluation summary, which otherwise praised her writing as clear, concise, and generally exceptional, a reference to potentially reducing the amount of content in certain emails and the provision of a writing coach. Upon information and belief, this negative comment did not appear in any underlying data from Ms. Klayman's performance reviews, in that year or any other, but rather was added by Attorney Development as pretext to justify the deferral of Ms. Klayman's promotion to partnership.

119.    The Director also openly criticized Ms. Klayman for working on maternity leave with her baby present, in one instance claiming that multiple partners had told her that Ms. Klayman had acted like a "martyr" by explaining that her baby was in her lap and might make noises during internal conference calls. In fact, MoFo had encouraged Ms. Klayman to work while out on leave.

120.    Later during her maternity leave, a significant Firm client emailed MoFo Senior Management, without her knowledge, to praise her work and express his surprise that Ms. Klayman had

been passed over for partnership. MoFo Attorney Development confronted her demanding to know whether she had solicited the client's intervention. Ms. Klayman later learned that the client had reached out at the suggestion of a MoFo partner from another practice group who had supported her for partnership, after the client had questioned the MoFo partner about why Ms. Klayman was not already a partner and why she was not being put up again in 2017. She also learned that a key member of MoFo management had described her in his response as being "tireless" and "incredibly passionate about [her practice]."

121. Multiple partners expressed to Ms. Klayman their views that, had she been a man, she likely would have been treated very differently by MoFo, with one explicitly stating that, if Ms. Klayman were a man, "they would be carrying you on their shoulders." Similarly, Ms. Klayman was told by a partner that it seemed that she was being measured by a different standard than that applied to male would-be junior partners, implying that MoFo Management expected Ms. Klayman to perform at the same level as a more senior male partner before it would consider her for promotion to first-year partner.

### C. MoFo Subjected Ms. Klayman to Repeated, Demeaning Comments and Knowingly Appointed a Harassing Former Boyfriend Who Had Followed Her to the Firm as Head of Her Practice Group

122. In addition to requiring Ms. Klayman to expend extra effort to prove herself to the Firm and then penalizing her for taking maternity leave, MoFo permitted ongoing, sex-based hostility directed at Ms. Klayman.

123. A Partner subjected Ms. Klayman to gender-based harassment and mistreatment, questioning whether her significant other had fathered the child she was then pregnant with, and insinuating she was low class, all while supervising her on a matter. Ms. Klayman reported this information to partners.

124. MoFo later installed and maintained this same Partner as a group head for Ms. Klayman, giving him input into decisions about her salary and promotion, even though she had disclosed to appropriate MoFo personnel, including Attorney Development and others, that she had a prior serious romantic relationship with this Partner, which she had ended. When this Partner joined the Firm, he expressly discouraged Ms. Klayman from letting others at MoFo know that they had a prior relationship. Upon information and belief, during Ms. Klayman's maternity leave, this Partner falsely indicated to a

supervising partner of Ms. Klayman that he did not know Ms. Klayman at all prior to joining MoFo. This Partner himself told Ms. Klayman that it would look bad for her if others knew that they had a prior relationship.

125. Ms. Klayman expressed concerns to MoFo Attorney Development and male and female partners after this Partner was appointed as her group head, and requested that this Partner recuse himself from her promotion and compensation decisions. These pleas fell on deaf ears. A different partner cautioned Ms. Klayman about disclosing this information to others, out of concern that she be seen as a "complainer" or that the relationship would reflect poorly on *her*. Mr. de Martino even suggested that it could actually be good for her career if this Partner with whom she had a prior relationship "still wanted" her. Although Ms. Klayman made every effort to deal professionally with this Partner, as Ms. Klayman's group head, this Partner told another partner that he would never see a reason to elevate Ms. Klayman to the partnership.

126. The Partner described above was not the only source of gender-based harassment. Other male MoFo partners and attorneys, none of whom were in her foundational group, repeatedly subjected Ms. Klayman to objectifying and demeaning comments: telling her that people would not pay attention during a presentation because they were thinking about "how hot you are;" comparing her to Kim Kardashian; and suggesting she possessed only looks and no substance, despite the fact that her evaluations were exemplary across-the-board. Additionally, Partner Klein called her a natural blonde to indicate she was "dumb." After Ms. Klayman left the Firm, a former MoFo Practice Group Head informed her that MoFo partners and other employees had made comments about Ms. Klayman that he characterized as "misogyny."

127. Ms. Klayman was not the only target of disparaging gendered remarks at MoFo. She heard Partner Klein and Mr. de Martino speak negatively about other female attorneys and staff in a dismissive, intimidating, and insulting manner, calling them things like "incompetent," a "bitch," "a disaster," "uncoachable," "unprofessional," and "incapable of running [matters]." In truth, none of these slurs were accurate; indeed, some of these women were among MoFo's top performers.

128. The imagery of women presented in MoFo's office underscored the objectifying, harassing behavior from Ms. Klayman's colleagues. In one shared working space in MoFo's New York office, pictures of scantily clad cheerleaders adorned the wall.

**D.      MoFo Retaliated Against and Constructively Discharged Ms. Klayman**

129. Over her last year at MoFo, Ms. Klayman repeatedly reported MoFo's unfair treatment by Partner Klein and Mr. de Martino to partners, MoFo Attorney Development, and MoFo Human Resources. In response, rather than investigating her concerns, MoFo escalated its campaign against Ms. Klayman until she had no choice but to leave.

130. Although Ms. Klayman identified for MoFo numerous witnesses, including partners, to the inequitable treatment she had experienced, upon information and belief, MoFo never spoke with those individuals to properly investigate her complaints. In fact, after Ms. Klayman left the Firm, a former MoFo Practice Group Head told Ms. Klayman that the Head of Human Resources had told him not to discuss with her any of Partner Klein's discriminatory and retaliatory conduct toward her, and that Human Resources had instructed this partner that he "had to take the Firm's side." Not only were Ms. Klayman's requests to be separated from those whom she reported for their discriminatory and retaliatory conduct ignored, MoFo affirmatively forced Ms. Klayman to interact with them, including outside of the Firm, and, in some cases, to indirectly report to them.

131. Having effectively demoted Ms. Klayman, passed her over for partner one more time, and acknowledged that she deserved but failed to provide a raise when her partnership was again deferred in 2017, MoFo now retaliated against Ms. Klayman in response to her complaints. Upon information and belief, this retaliation was coordinated among multiple MoFo attorneys both inside and outside of her department, including Partner Klein and the Head of Human Resources. The Firm began funneling more work and responsibility away from Ms. Klayman to her male colleagues and undermining her reputation inside and outside the Firm. It attempted to prevent her from reporting to a supportive supervising partner, Partner Wojciechowski, and attempted to exclude her from events immediately relevant to her practice. The Firm also unreasonably restricted her ability to onboard and otherwise process matters, sought to limit her ability to work with other supportive partners, and, in certain instances, even physically intimidated her.

132.    When Ms. Klayman highlighted the extensive documentation of her achievements and leadership since joining the Firm and encouraged Human Resources to review her annual performance reviews, historical hours records and other evidence of excellence, the Firm responded by doubling down on its retaliatory campaign against her, attempting to generate a paper trail to mar her exemplary record. By restricting her ability to onboard matters, including for certain prominent clients, MoFo reduced the hours she could credit as billable (requiring her to record them as non-billable marketing hours), thwarted her ability to staff matters, and sometimes frustrated potential clients who wanted to engage the Firm or receive basic documents, including engagement letters. When Ms. Klayman asked for the same type of administrative or paralegal support to help on-board and process matters and bills that Partner Klein and Mr. de Martino received, she was denied.

133.    False statements and gaslighting from MoFo compounded the retaliatory assault.  When Ms. Klayman learned about planned events or meetings from which Mr. de Martino and Partner Klein had excluded her, she was told that such events had not been planned or scheduled, despite clear evidence to the contrary. When she explained to Human Resources her method for accurately recording time using the history function of the Firm's document management system, the function was permanently disabled for her the next day and never reinstated. Harsh and accusatory emails from certain MoFo partners would be followed immediately by friendly and understanding phone calls directing her to ignore the emails just sent. Oral direction from certain partners to take or refrain from taking certain actions was followed by emailed criticism for having followed those directions. Two partners would give, almost simultaneously, conflicting instructions that could not both be satisfied, such as that two different, purportedly urgent internal MoFo activities be completed at the exact same time. Supportive MoFo partners and others told Ms. Klayman about rumors designed to undermine her, including, among other things, that Partner Klein had told others that she would be leaving the Firm. Ms. Klayman then had to refute the rumors at an internal meeting she was leading. She continued reporting to Human Resources, but the retaliatory campaign only escalated.

134.    From the time of Ms. Klayman's initial report to Human Resources, MoFo set nearly impossibly-high expectations for her. In one instance, partners from another group, with whom Ms. Klayman had not previously worked, required her to travel internationally on their behalf for informational

meetings, despite her supervising partner strongly advising them that she was too busy and despite her need to bring her baby (whom she was breastfeeding) with her. To show her dedication, Ms. Klayman got her baby a passport, and traveled alone with her infant on her lap (as a lap-child) on the redeye for an approximately 11-hour flight with a significant time change. She then found childcare abroad in an unfamiliar country she had never been to before, provided by a woman whom Ms. Klayman had never met. Ms. Klayman made every effort to make the trip work, ultimately creating lasting relationships abroad with some of those to whom she presented on MoFo's behalf and leading to client referrals.

135.    Even as Ms. Klayman was scheduled to travel alone and abroad with her infant at the behest of those partners, a partner from another group, with whom Ms. Klayman had never worked previously, set an informational call for the middle of the night, local time, and requested that she participate. Ms. Klayman tried to make the call work, to show her dedication. The partner ultimately indicated that the time could not be moved. When Ms. Klayman missed the call—in part because her MoFo phone, email, and calendar were not working properly abroad, a problem to which she alerted both MoFo IT and the partners with whom she was traveling—the partners chastised her harshly, even as her relationship with the client remained positive and remains so to this day. MoFo also chastised her for leaving the trip early to return to New York to accept a prestigious award, even though she had received permission from the Firm to do so. To date, MoFo promotes Ms. Klayman's receipt of that award on its website.[13]

136.    Immediately after she returned from that trip, MoFo acted to separate Ms. Klayman from a supportive supervising partner, Partner Wojciechowski, demanding that she report instead to a more senior partner outside her practice group with whom she had never worked or even previously met in person. At the same time, despite her ongoing requests, MoFo never separated her from any of the attorneys whose discriminatory or retaliatory conduct she had reported to Human Resources. To the contrary, in some cases, she was expressly required to report to or be directly supervised by such partners. Among other things, despite discomfort that she expressed in writing, she was forced by MoFo Management and Human Resources to work on a matter for Partner Klein. In addition, Ms. Klayman was forced by MoFo Management, partners, and Human Resources to invite Partner Klein to a small off-site

---

[13] *See Decade Of Women Names Morrison & Foerster LLP's Joshua Ashley Klayman Among its Top 10 Frontier Women*, https://www.mofo.com/resources/news/180321-decade-women-klayman-top-frontier.html (last visited Feb. 10, 2020).

client development meeting that she had arranged, despite her request to, instead, bring Partner Wojciechowski, who was similarly qualified.

137. The retaliation Ms. Klayman faced after making a report of discrimination to Human Resources, while devastating, did not come as a complete surprise, as multiple MoFo partners whom she had consulted in advance had predicted this outcome. One partner had encouraged her to get a lawyer, while Attorney Development had warned her that reporting her concerns could doom her chances at partnership and suggested that she would be better off simply resigning. Nevertheless, Ms. Klayman understood that MoFo policy required that she make a report to Human Resources and provide the Firm an opportunity to investigate and remedy the situation.

138. On many occasions, Partner Wojciechowski, who was Ms. Klayman's primary supervising partner, recognizing her value to the group and the Firm more broadly, attempted to advocate for her, including for her to be promoted and properly compensated. Not only was he largely unsuccessful, but, on some occasions, he seemed to experience pressure and retaliation (in multiple and intensifying forms) from MoFo in response to his efforts on Ms. Klayman's behalf, particularly after Ms. Klayman had begun reporting her concerns to Human Resources. Ultimately, MoFo effectively removed Partner Wojciechowski from his role supervising Ms. Klayman, excluding him from meetings about Ms. Klayman's future at MoFo and replacing him with partners from outside of Ms. Klayman's practice group. At times, MoFo exploited Ms. Klayman's desire to minimize retaliation against Partner Wojciechowski to obtain her compliance with improper or unreasonable demands.

139. The individuals whom Ms. Klayman reported for discriminating and retaliating against her attempted to justify further adverse treatment, including unreasonably impeding her ability to onboard matters, by casting her in a false light and suggesting that she was attempting to expose MoFo to unwarranted risks. In fact, however, Ms. Klayman herself had proposed, and subsequently tightened, the Firm's risk management protocol for her practice area.

140. Despite Ms. Klayman's best efforts to remedy the situation, MoFo's efforts to push her out only intensified. Faced with no other option but to leave, Ms. Klayman tendered her resignation. Even after tendering her resignation, Ms. Klayman continued to work with her colleagues on important matters and collaborate with them to help them develop new business, including on her very last day at the Firm.

141. After Ms. Klayman notified MoFo of her intention to pursue this lawsuit, it retaliated against her by attempting to undermine her reputation with others in her field. For example, Mr. de Martino and Partner Klein refused (including, purportedly, on behalf of MoFo) to participate in certain non-MoFo business networking events and similar activities without assurance that Ms. Klayman was not a participant. Upon information and belief, such undermining was intended to, and in certain instances did, curtail Ms. Klayman's professional opportunities.

142. In addition to subjecting her to ongoing retaliation, MoFo elevated Mr. de Martino to partner. Upon information and belief, Mr. de Martino's path to candidacy differed significantly from Ms. Klayman's: for example, while she was subject to unwarranted criticism from Partner Klein (with whom she had not worked during the review period) and never put on the list for consideration, his path was cleared.

## VII. COUNTS

### COUNT 1

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000(e) *et seq.*, *as amended by the* PREGNANCY DISCRIMINATION ACT OF 1978**

**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**

**On Behalf of Plaintiff William and Plaintiff Klayman**

143. Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

144. MoFo has discriminated against the Plaintiffs in violation of Title VII by subjecting them to different treatment on the basis of their gender, including pregnancy and maternity. Plaintiffs have been disparately impacted and disparately treated as a result of MoFo's wrongful conduct and its policies, practices, and procedures.

145. MoFo has discriminated against Plaintiffs by treating them differently from and less preferably than similarly situated male employees and female employees who are not pregnant and who do not have children, and by subjecting them to differential and substandard terms and conditions of employment including, but not limited to, discriminatory denials of fair compensation, discriminatory denials of promotional opportunities, and discriminatory treatment with respect to leave, work responsibilities, and other terms and conditions of employment in violation of Title VII.

146.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiffs, entitling them to punitive damages.

147.    As a result of MoFo's conduct alleged in this Complaint, Plaintiffs have suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

148.    By reason of MoFo's discrimination, Plaintiffs are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

149.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### <u>COUNT 2</u>

### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT,

### 29 U.S.C § 2601 *et seq.*

### DISCRIMINATION, INTERFERENCE AND RETALIATION

### On Behalf of Plaintiff William and Plaintiff Klayman

150.    Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

151.    Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of FMLA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. Plaintiffs took or were preparing to take approved FMLA leave for maternity leave.

152.    MoFo interfered with the taking of protected maternity leave by Plaintiffs and retaliated and discriminated against them for the taking of such leave, in violation of the FMLA.

153.    MoFo interfered with the taking of protected maternity leave by Plaintiffs and retaliated and discriminated against them for taking such leave by using the taking of FMLA leave as a negative factor in employment actions, including, *inter alia*, failing to promote them, denying them career-advancement opportunities and work opportunities, making inaccurate statements harmful to their professional careers, terminating them, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

154. MoFo acted willfully, intentionally, and with reckless disregard for Plaintiffs' rights under the FMLA.

155. As a direct and proximate result of MoFo's actions, Plaintiffs suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

156. By reason of MoFo's discrimination, Plaintiffs are entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 2617.

## COUNT 3

### VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,

### Cal. Gov. Code § 12940, *et seq*.

### PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION

### On behalf of Plaintiff William

157. Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

158. Ms. William was an employee of MoFo from August 2015 to December 2019.

159. MoFo discriminated against Ms. William in violation of the FEHA by subjecting her to different treatment because and on the basis of her gender, specifically her pregnancy and maternity, including by denying her career-advancement opportunities and work opportunities, making inaccurate statements harmful to her professional career, creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave, and ultimately terminating her.

160. As a result of this disparate treatment, MoFo has treated Ms. William differently from and less preferentially than similarly situated male attorneys and female attorneys who are not pregnant or do not have children, with respect to pay and promotions.

161. MoFo has failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

162. MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. William.

163. Ms. William has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

164. MoFo's conduct alleged in this Complaint was a substantial factor in causing Ms. William's harm.

165. By reason of the continuous nature of MoFo's discriminatory conduct, which persisted throughout the employment of Ms. William, the continuing violations doctrine applies to all violations alleged herein.

166. By reason of MoFo's discrimination, Ms. William is entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

167. Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

<u>COUNT 4</u>

**VIOLATION OF THE CALIFORNIA FAMILY RIGHTS ACT,**

**Cal. Gov. Code § 12945.2**

**DISCRIMINATION, INTERFERENCE AND RETALIATION**

**On behalf of Plaintiff William**

168. Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

169. Under the California Family Rights Act ("CFRA"), an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Further, an employer cannot use the taking of CFRA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions. Ms. William was eligible for and took approved CFRA leave for maternity leave and bonding leave.

170. Ms. William provided reasonable notice to MoFo of her need for maternity leave and bonding leave, including its expected timing and length.

171. MoFo refused to return Ms. William to the same or a comparable job when her maternity leave and bonding leave ended. MoFo retaliated and discriminated against Ms. William for taking such

leave, by using the taking of CFRA leave as a negative factor in employment actions, including, *inter alia*, denying her career-advancement opportunities and work opportunities, making inaccurate statements harmful to her professional career, and creating an environment hostile to pregnancy and the taking of statutorily protected maternity leave.

172. MoFo acted willfully, intentionally, and with reckless disregard for Ms. William's rights under the CFRA.

173. Ms. William suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

174. MoFo's conduct in refusing to return Ms. William to the same or a comparable job when her maternity leave and bonding leave ended was a substantial factor in causing Ms. William's harm.

175. By reason of MoFo's discrimination, Ms. William is entitled to all legal and equitable remedies available for violations of the CFRA, including an award of liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs, and other compensation.

## COUNT 5

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,

### 42 U.S.C. § 2000e-2(a), *et seq.*

### RETALIATION

### On behalf of Plaintiff William

176. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

177. Ms. William engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination and participating in, supporting, and pursuing this action.

178. MoFo retaliated against Ms. William by depriving her of adequate work, providing her with negative performance reviews, threatening her with termination, and terminating her employment.

179. MoFo's retaliatory acts against Ms. William were a direct and proximate result of their protected activities.

180. A reasonable person would find MoFo's retaliatory acts materially adverse and such acts

would dissuade a reasonable person from making or supporting a charge of discrimination.

181. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Ms. William's rights, entitling her to punitive damages.

182. Defendant's actions and failures to act have caused Ms. William to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

183. Ms. William is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

184. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 6

**VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,**

**Cal. Gov. Code § 12940, *et seq*.**

**RETALIATION**

**On behalf of Plaintiff William**

185. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

186. Ms. William engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination and participating in, supporting, and pursuing this action.

187. MoFo retaliated against Ms. William by depriving her of adequate work, providing her with negative performance reviews, threatening her with termination, and terminating her employment.

188. Ms. William's protected activity was a substantial motivating reason for MoFo's retaliatory acts.

189. A reasonable person would find MoFo's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

190. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Ms. William's rights, entitling her to punitive damages.

191. Ms. William has suffered and continues to suffer harm, including, without limitation, lost

earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

192.    MoFo's retaliatory acts were a substantial factor in causing Ms. William's harm.

193.    Ms. William is therefore entitled to all legal and equitable remedies available for violations of the FEHA, including an award of punitive damages.

194.    Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

## COUNT 7

## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

### On behalf of Plaintiff William

195.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

196.    Ms. William was employed by MoFo from August 2015 until December 2019, when MoFo terminated Ms. William's employment.

197.    MoFo's gender and pregnancy discrimination and retaliation were substantial motivating reasons for Ms. William's discharge.

198.    MoFo's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Ms. William, entitling her to punitive damages.

199.    Ms. William has suffered and will continue to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

200.    MoFo's discharge of Ms. William was a substantial factor in causing Ms. William's harm.

201.    Ms. William is therefore entitled to all legal and equitable remedies available for wrongful discharge in violation of public policy, including reinstatement, attorneys' fees, and an award of punitive damages.

**COUNT 8**

**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE,**

**Cal. Bus. & Prof. Code § 17200 *et seq.***

**UNFAIR COMPETITION**

**On behalf of Plaintiff William**

202. Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

203. MoFo is a "person" as defined under California Business & Professions Code § 17201.

204. MoFo's discriminatory and retaliatory conduct against Ms. William on the basis of her gender and pregnancy, as alleged above, constitutes a violation of FEHA and the California Family Rights Act as set forth above. MoFo has also engaged in similar conduct towards other employees in California.

205. MoFo's conduct constitutes unlawful, unfair and/or fraudulent activity prohibited by California Business and Professions Code § 17200. As a result of its unlawful, unfair and/or fraudulent acts, MoFo reaped and continues to reap unfair benefits and illegal profits at the expense of Ms. William and other MoFo employees who take maternity leave and to engage in unfair competition towards competitors which follow the law. MoFo should be enjoined from this activity.

206. Accordingly, Ms. William is entitled to restitution with interest and other equitable relief, pursuant to Business & Professions Code § 17203.

**COUNT 9**

**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,**

**N.Y.C. Admin. Code § 8-101, *et seq.***

**PREGNANCY, MATERNITY, AND CAREGIVER DISCRIMINATION**

**On behalf of Plaintiff Klayman**

207. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

208. During all times relevant to this claim, Ms. Klayman was an employee of Defendant MoFo.

209. MoFo subjected Ms. Klayman to discrimination in the terms, conditions, or privileges of employment in violation of the NYCHRL. MoFo treated Ms. Klayman less well than similarly-situated male counterparts.

210. As a result of MoFo's unlawful conduct, Ms. Klayman has suffered and continues to suffer harm, including but not limited to working in an environment charged with discrimination on the basis of gender and maternity; emotional distress; and other damages.

211. Plaintiff is entitled to all remedies available for violations of the NYCHRL, including lost compensation, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

<u>**COUNT 10**</u>

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**

**42 U.S.C. § 2000e-2(a), *et seq.***

**RETALIATION**

**On behalf of Plaintiff Klayman**

212. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

213. Ms. Klayman engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination in compensation and promotion. She complained to members of the Firm on numerous occasions, including, but not limited to, Partner Wojciechowski, MoFo Human Resources and MoFo Attorney Development.

214. MoFo constructively terminated Ms. Klayman's employment in retaliation for her discrimination complaints. MoFo also retaliated against Ms. Klayman by, *inter alia*, undermining her client relationships, failing to promote her to partner, demoting her, and undermining her reputation in her field. These adverse employment actions materially and adversely changed Ms. Klayman's terms and conditions of employment.

215. MoFo's retaliatory acts against Ms. Klayman were a direct and proximate result of her protected activities.

216. A reasonable employee would find MoFo's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

217. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Ms. Klayman's rights, entitling her to punitive damages.

218.    Defendant's actions and failures to act have caused Ms. Klayman to suffer harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

219.    Ms. Klayman is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

220.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

### COUNT 11

### VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW,

### N.Y.C. Admin. Code § 8-101, *et seq.*

### RETALIATION

### On behalf of Plaintiff Klayman

221.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

222.    Ms. Klayman engaged in protected activity that included, but is not limited to, complaining to MoFo about gender and pregnancy discrimination in compensation and promotion. She complained to members of the Firm on numerous occasions, including, but not limited to, Partner Wojciechowski, MoFo Human Resources and MoFo Attorney Development.

223.    By objecting to discrimination based on gender and pregnancy, Ms. Klayman engaged in an activity protected by the New York City Human Rights Law.

224.    MoFo retaliated against Ms. Klayman for engaging in protected activity by constructively terminating her employment. MoFo also retaliated against Ms. Klayman by, *inter alia*, undermining her client relationships, failing to promote her to partner, demoting her, and undermining her reputation in her field. These adverse employment actions materially and adversely changed Ms. Klayman's terms and conditions of employment.

225.    MoFo's retaliatory or discriminatory act or acts would be reasonably likely to deter a person from engaging in protected activity.

226.    MoFo had the power to hire, fire, and alter the terms and conditions of Ms. Klayman's employment.

227. MoFo participated in conduct giving rise to the retaliation based on Ms. Klayman engaging in protected activity.

228. MoFo further aided, abetted, incited, compelled and/or coerced the retaliation based on Ms. Klayman's complaints of discrimination based on gender by failing to investigate or take appropriate remedial measures despite being informed about the existence of retaliatory conduct.

229. As a result of MoFo's unlawful conduct, Ms. Klayman has suffered and continues to suffer harm, including but not limited to lost earnings, lost future employment opportunities, other financial losses, emotional distress, and other non-economic damages.

230. Ms. Klayman is entitled to all remedies available for violations of the NYCHRL, including lost compensation, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT 12

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, *as amended by*

### THE EQUAL PAY ACT OF 1963, 29 U.S.C. § 216(b)

### DENIAL OF EQUAL PAY FOR EQUAL WORK

### On behalf of Plaintiff Klayman

231. Plaintiffs re-allege and incorporate each and every allegation in this Complaint.

232. MoFo has discriminated against Ms. Klayman within the meaning of the Equal Pay Act of 1963 in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.*, as amended by the EPA, by providing her with a lower rate of pay than similarly situated male colleagues on the basis of her gender, female, even though Ms. Klayman performed similar duties requiring the same skill, effort, and responsibility as her male counterparts.

233. Ms. Klayman and similarly situated male attorneys all performed similar job duties and functions. Ms. Klayman performed jobs that required equal skill, effort, and responsibility to similarly situated male attorneys.

234. MoFo discriminated against Ms. Klayman by subjecting her to discriminatory pay in violation of the Equal Pay Act.

235. The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

236. MoFo caused, attempted to cause, or contributed to the continuation of pay discrimination based on gender, in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because MoFo has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

237. As a result of MoFo's conduct as alleged in this Complaint, Ms. Klayman has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

238. By reason of MoFo's discrimination, Ms. Klayman is entitled to all legal and equitable remedies available for violations of the PEA, including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

239. Attorneys' fees should be awarded under 29 U.S.C. § 216(b).

<u>COUNT 13</u>

**VIOLATION OF THE NEW YORK EQUAL PAY LAW,**

**N.Y. Lab. Law § 194**

**UNEQUAL PAY**

**On behalf of Plaintiff Klayman**

240. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

241. Defendant MoFo, the employer of Ms. Klayman within the meaning of the New York Equal Pay Law, has discriminated against Ms. Klayman in violation of New York Labor Law § 194 by subjecting her to unequal pay on the basis of sex and by treating her differently and less preferably when compared to male attorneys in the same establishment performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

242.    Defendant subjected Ms. Klayman to common discriminatory pay policies, practices, and procedures including: maintaining a discriminatory system of determining compensation; maintaining a discriminatory system for advancement; and other forms of discrimination affecting pay.

243.    The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, or the quantity or quality of production, or a bona fide factor other than sex, such as education, training, or experience, but was due to gender. In the alternative, to the extent that Defendant relied upon one or more of these factors, said factor(s) were not job-related, not consistent with business necessity, not reasonably applied and/or did/do not account for the entire wage differential.

244.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the New York Equal Pay Law. Moreover, Defendant willfully violated the New York Equal Pay Law by intentionally paying Ms. Klayman less than similarly situated men.

245.    As a result of Defendant's conduct alleged in this Complaint and/or Defendant's willful, knowing, and intentional discrimination, Ms. Klayman has suffered and will continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

246.    Ms. Klayman is therefore entitled to all remedies available for violations of New York Labor Law § 194, including liquidated damages and attorneys' fees and costs for all willful violations, pursuant to New York Labor Law § 198(1-a).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

a.    Acceptance of jurisdiction of this case;

b.    A declaratory judgment that the practices complained of therein are unlawful and violate, among other laws, 42 U.S.C. § 2000(e) *et seq.*, as amended; 29 U.S.C. § 2601, *et seq.*; 29 U.S.C. § 206, *et seq.*; and the applicable state and local laws;

c.    An award of back pay, front pay, lost benefits, reinstatement, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the Plaintiffs in an amount to be proved at trial;

d.    An award of nominal, liquidated, and compensatory damages to Plaintiffs in an amount to be proved at trial;

e.    An award of punitive damages to Plaintiffs in an amount to be proved at trial;

f.    An award of penalties available under applicable laws, including waiting time penalties;

g.    An award of litigation costs and expenses, including reasonable attorneys' fees to the Plaintiffs;

h.    An award of pre-judgment and post-judgment interest; and

i.    Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues triable of right to a jury.

Dated: February 14, 2020                      Respectfully Submitted,

                                              _/s/ David W. Sanford_____
                                              David W. Sanford (admitted *pro hac vice*)
                                              Deborah K. Marcuse (admitted *pro hac vice*)
                                              Ed Chapin (CA Bar No. 53287)
                                              Jill Sullivan Sanford (CA Bar No. 185757)
                                              Hannah M. Wolf (admitted *pro hac vice*)
                                              Danielle Fuschetti (CA Bar No. 294065)
                                              Carolin Guentert (*admitted pro hac vice*)
                                              **SANFORD HEISLER SHARP, LLP**

                                              *Attorneys for Plaintiffs*

[*Continued from Caption Page*]

Danielle Fuschetti (CA Bar No. 294065)
dfuschetti@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021

Hannah M. Wolf (*admitted pro hac vice*)
hwolf@sanfordheisler.com

**SANFORD HEISLER SHARP, LLP**
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Telephone: (615) 434-7004
Facsimile: (615) 434-7020

*Attorneys for Plaintiffs*