1  RACHEL S. BRASS, SBN 219301
   rbrass@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   555 Mission Street, Suite 3000
3  San Francisco, CA 94105-0921
   Telephone:   415.393.8200
4  Facsimile:  415.393.8306

5  MICHELE L. MARYOTT, SBN 191993
   mmaryott@gibsondunn.com
6  LAUREN M. BLAS, SBN 296823
     lblas@gibsondunn.com
7  RONALD GOMEZ, SBN 295274
     rgomez@gibsondunn.com
8  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
9  Los Angeles, CA  90071-3197
   Telephone:   213.229.7000
10 Facsimile:   213.229.7520

11 AMANDA C. MACHIN, admitted pro hac vice
   amachin@gibsondunn.com
12 GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue N.W.
13 Washington, D.C. 20036-5306
   Telephone:   202.955.8500
14 Facsimile:  202.467.0539

15 Attorneys for Defendant
   MORRISON & FOERSTER LLP
16

17                UNITED STATES DISTRICT COURT

18              NORTHERN DISTRICT OF CALIFORNIA

19                  SAN FRANCISCO DIVISION

20 SHERRY A. WILLIAM and JOSHUA          CASE NO. 3:18-cv-02542-JSC
   ASHLEY KLAYMAN,
21                                       **DEFENDANT MORRISON & FOERSTER
                 Plaintiffs,             LLP'S NOTICE OF MOTION AND
22                                       MOTION FOR SUMMARY JUDGMENT
        v.                               AGAINST PLAINTIFF SHERRY A.
23                                       WILLIAM**
   MORRISON & FOERSTER LLP,
24                                       **Hearing:**
                 Defendant.             Date:      Thursday, December 10, 2020
25                                       Time:      9:00 a.m.
                                         Place:     Courtroom E, 15th Floor
26                                       Magistrate Judge Jacqueline Scott Corley

27                        *PUBLIC COPY*
28 *Confidential Copy Lodged Pursuant to Local Rule 79-5(c)-(d)*

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 10, 2020, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom E of the above-captioned court, located on the 15th Floor at 450 Golden Gate Avenue, San Francisco, California 94102, defendant Morrison & Foerster LLP ("Morrison" or the "Firm") will, and hereby does, move this Court under Federal Rule of Civil Procedure 56 for summary judgment in favor of Morrison on all causes of action asserted by plaintiff Sherry William in the Fourth Amended Complaint ("4AC").

This Motion is based upon this Notice and Motion; the accompanying declarations of Rachel S. Brass, Anna Erickson White, Elizabeth C. Sluder, Victor S. Liang, Jason McCord, and Gabrielle Mitchell; and such additional evidence and argument as the Court may consider at the hearing on this Motion.

Dated: October 7, 2020

By:   /s/ Michele L. Maryott
Michele L. Maryott

MICHELE L. MARYOTT
RACHEL S. BRASS
RONALD J. GOMEZ
GIBSON, DUNN & CRUTCHER LLP

Attorneys for Defendant
MORRISON & FOERSTER LLP

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF ISSUES TO BE DECIDED ................................................... 2

III.    FACTUAL BACKGROUND ............................................................................... 2

        A.      Ms. William Failed to Develop Expected Skills Before Joining Morrison ................. 2

        B.      Ms. William Came to Morrison Ill-Prepared and Failed To Meet Expectations .......... 3

        C.      Morrison "Reclassified" Ms. William To Better Align Her Skills, Salary and Billing Rate ........................................................................................... 6

        D.      Morrison Terminated Ms. William After Two Years Without Improvement ............. 8

IV.     LEGAL STANDARD ........................................................................................ 10

V.      ARGUMENT ..................................................................................................... 10

        A.      Ms. William Cannot Prove Causation, An Essential Element of Her Discrimination (Counts 1 and 3), Retaliation (Counts 5 and 6), and FMLA Interference (Counts 2 and 4) Claims ........................................................... 11

                1.      Ms. William Was Reclassified Because She Did Not Perform At Her Class Level ...................................................................................... 13

                2.      Ms. William Received Fewer Work Opportunities Because She Was The Weakest Link In Her Group Objectively .................................... 14

                3.      Ms. William Was Terminated Because "This Is a for Profit Business" ......... 17

        B.      Ms. William Cannot Prove Intentional Pay Discrimination ........................................ 18

        C.      Ms. William Cannot Prove Any Other Decision Was Intentional Discrimination ................................................................................................. 19

        D.      Morrison's Reclassification Policy Did Not Have A Disparate Impact On Ms. William ................................................................................................... 21

        E.      Because Ms. William Cannot Prove Her Other Claims, The Unfair Competition Claim (Count 8) Fails ............................................................. 24

        F.      Ms. William Is Not Entitled To Punitive Damages .................................................... 24

VI.     CONCLUSION .................................................................................................. 25

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

## Cases

Page(s)

3

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................................10

4

5

*Bachelder v. Am. W. Airlines, Inc.*,
259 F.3d 1112 (9th Cir. 2001)...................................................................................12

6

*Bhan v. NME Hospitals*,
929 F.2d 1404 (9th Cir. 1991)...................................................................................10

7

8

*Blum v. Stenson*,
465 U.S. 886 (1984)..................................................................................................24

9

10

*Borges v. U.S. Bank*,
No. 12-2472, 2014 WL 530283 (E.D. Cal. Feb. 7, 2014)..........................................25

11

*Brooks v. City of San Mateo*,
229 F.3d 917 (9th Cir. 2000).....................................................................................19

12

13

*Clady v. L.A. Cty.*,
770 F. 2d 1421 (9th Cir. 1985)..................................................................................22

14

15

*Delaney v. SimplexGrinnell L.P.*,
No. CV10-05103 MEJ, 2012 WL 465177 (N.D. Cal. Feb. 13, 2012) .........................12

16

*Grosz v. Boeing Co.*,
455 F. Supp. 2d 1033 (C.D. Cal. 2006).....................................................................13

17

18

*Guz v. Bechtel Nat'l, Inc.*,
24 Cal. 4th 317 (2000) ..............................................................................................11

19

20

*Hardie v. Nat'l Collegiate Athletic Assoc.*,
876 F.3d 312 (9th Cir. 2017)......................................................................................23

21

*Hargrave v. Univ. of Wash.*,
113 F. Supp. 3d 1085 (W.D. Wash. 2015).................................................................12

22

23

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977)..................................................................................................11

24

25

*Johnson v. Hertz Local Edition Corp.*,
No. C 03-4439 MJJ, 2004 WL 2496164 (N.D. Cal. Nov. 3, 2004)..............................18

26

*Jones v. Nev.*,
No. 214CV01930APGNJK, 2016 WL 4707987 (D. Nev. Sept. 7, 2016) .....................13

27

28

*Kolstad v. Am. Dental Assoc.*,
527 U.S. 526 (1999)..................................................................................................25

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

Lazar v. Hertz Corp.,
  69 Cal. App. 4th 1494 (1999)...................................................................................24

Lewis v. City of Union City, Georgia,
  918 F.3d 1213 (11th Cir. 2019).........................................................................19, 20

Lopez v. Wash. Mut. Bank, FA,
  302 F.3d 900 (9th Cir. 2002)..................................................................................24

Lujan v. Defenders of Wildlife,
  504 U.S. 555 (1992).................................................................................................22

Lynn v. Regents of Univ. of Cal.,
  656 F.2d 1337 (9th Cir. 1981).........................................................................11, 12

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
  475 U.S. 574 (1986).................................................................................................10

McDonnell Douglas Corp. v. Green,
  411 U.S. 792 (1973).................................................................................................11

Meredith v. Beech Aircraft Corp.,
  18 F.3d 890 (10th Cir. 1994)..................................................................................15

Merrick v. Farmers Ins. Grp.,
  892 F.2d 1434 (9th Cir. 1990)................................................................................15

Miller v. Graham Cty.,
  635 F. App'x 362 (9th Cir. 2015) ...........................................................................12

Moran v. Selig,
  447 F.3d 748 (9th Cir. 2006)...........................................................................19, 20

Morgan v. Regents of Univ. of Cal.,
  88 Cal. App. 4th 52 (2000)......................................................................................12

Powell v. Consol. Edison Co. of N.Y., Inc.,
  No. 97-2439, 2001 WL 262583 (S.D.N.Y. Mar. 13, 2001) .............................15, 16

Ricci v. Destefano,
  557 U.S. 557 (2009).................................................................................................22

Sonner v. Premier Nutrition Corp.,
  971 F.3d 834 (9th Cir. 2020)...................................................................................24

St. Mary's Honor Ctr. v. Hicks,
  509 U.S. 502 (1993).................................................................................................12

Stanley v. Univ. of S. Cal.,
  178 F.3d 1069 (9th Cir. 1999)................................................................................19

Gibson, Dunn &
Crutcher LLP

*Stout v. Potter*,
    276 F. 3d 1118 (9th Cir. 2002)..................................................................................21, 22

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987)..........................................................................................10

*Tennial v. United Parcel Serv., Inc.*,
    840 F.3d 292 (6th Cir. 2016)..........................................................................................20

*Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,
    135 S. Ct. 2507 (2015)...................................................................................................23

*Texas Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981).......................................................................................................11

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013)...................................................................................................12

*Vasquez v. Cty. of L.A.*,
    349 F.3d 634 (9th Cir. 2003)..........................................................................................11

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002)........................................................................................12

*Weil v. Citizens Telecom Servs. Co.*,
    922 F.3d 993 (9th Cir. 2019)..........................................................................................20

*White v. Ultramar, Inc.*,
    21 Cal. 4th 563 (1999)...................................................................................................25

*Xin Liu v. Amway Corp.*,
    347 F.3d 1125 (9th Cir. 2003)........................................................................................12

*Young v. United Parcel Service, Inc.*,
    135 S. Ct. 1338 (2015)...................................................................................................20

*Zayed v. Apple Computers*,
    No. 04-01787-JM, 2006 WL 889571 (N.D. Cal. Apr. 5, 2006).....................................19

**Statutes**

42 U.S.C. § 2000e-2(a) ......................................................................................................11

42 U.S.C. § 2000e-2(k)(1)(A)(i) (2018)..............................................................................23

42 U.S.C. § 2000e-2(k)(1)(A)(ii) (2018) .............................................................................23

Cal. Bus. & Prof. Code § 17200 ...........................................................................................2

Gibson, Dunn &
Crutcher LLP

iv

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF – CASE NO. 3:18-CV-02542-JSC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Rules**

ABA Model Rule of Prof. Conduct 1.1 ..........................................................................24

ABA Model Rule of Prof. Conduct 1.5 ..........................................................................24

Fed. R. Civ. P. 56(c)........................................................................................................10

**Regulations**

29 C.F.R. § 1607.4(D)......................................................................................................22

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF – CASE NO. 3:18-CV-02542-JSC

1

## I.    INTRODUCTION

2       Ms. William told one story in private, and one to the world in this lawsuit.  In confidence, she

3   admitted she ███████████████████████████████████.  But in this court, she blamed Morri-

4   son for those failings, and went so far as to accuse the Firm of intentionally discriminating against her.

5   She compounded the false narrative when she amended her lawsuit and accused Morrison of retaliation.

6   In her own words, she knew, early in her career, that ████████████████████:

7       • ████████████████████████████████████████████

8         ██████████████████" (Nov. 2012)

9   Going into her job at Morrison, Ms. William knew ████████████████████

10      • "████████████████████████████████████████"

11        (Sept. 2015)

12      • "████████████████████████████████ (March 2016)

13  Once at Morrison, she knew she was ██████████████████████

14      • "████████████████████████████████████████"

         (Oct. 2015)

15      • "████████████████████████████." (March 2016)

16      • ████████████████████████████████████

17        (July 2016)

18      • "████████████████████." (Aug. 2016)

19      • ████████████████████████████████████████

20        ████████████████████████████████████████

21        ████████████(Feb. 2017)

22      • ████████████████████████████(Feb. 2017)

23  Shortly after being reclassified she confided the truth to a friend:

24      • "████████████████████████████████" (Jan. 2018)

25      • "████████████████████████████████." (Feb. 2018)

26      At end, Ms. William's own words are a complete answer to her many claims that she was treated

27  unfairly for unlawful reasons.  That Morrison saw and acted on what Ms. William knew to be true is

28  not discrimination in any form.  Summary judgment should be entered against her.

Gibson, Dunn &
Crutcher LLP

1

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

## II.    STATEMENT OF ISSUES TO BE DECIDED

Whether Morrison is entitled to summary judgment on Ms. William's claims of (1) disparate treatment under Title VII and the California Fair Employment and Housing Act ("FEHA") (Counts 1 and 3); (2) disparate impact under the same statutes; (3) retaliation under Title VII and FEHA (Counts 5 and 6); (4) interference with leave under the Family Medical Leave Act ("FMLA") and the California Family Rights Act ("CFRA") (Counts 2 and 4); (5) wrongful discharge in violation of public policy (Count 7); and (6) unfair competition (Cal. Bus. & Prof. Code § 17200) (Count 8).

## III.    FACTUAL BACKGROUND

### A.    Ms. William Failed To Develop Expected Skills Before Joining Morrison

Sherry William graduated from Harvard Law School in May 2010 in the wake of the Great Recession. Ex. 137 (William I) at 22:5–8.[1] She was "deferred" by Dewey & LeBeouf, and started her career in an immigrant fellowship program. *Id.* at 28:10–17, 29:17–30:4. She started working full-time at Dewey in January 2012, but did no project finance work there, and left in April 2012. *Id.* at 33:13–34:12 & Ex. 21 (William I, Ex. 1) (William Resume).

In May 2012, she joined her second firm, where she was treated ███████████████████ ████████████████. Ex. 137 (William I) at 36:22–23; Mitchell Decl. Ex. A (Offer Letter). At the time, Ms. William acknowledged that she needed to "██████████████████ █████████████████████████████." Mitchell Decl. Ex. B (2012 Self Evaluation). Her performance reviews aligned with that frank self-assessment. *See, e.g.*, *id.* at Ex. C ("██████ ██████" and "███████████"); Ex. D ("████████████████████████████ ████████████████████████████████████████████" and ████████████████ ████████████████"); Ex. E (needs to "███████████████████" and "█████ ████████████████████████████████████"); Ex. H (needs to "███████ ████████████████████████████████████."). In 2014, at Ms. William's request, her employer restored her 2010 class year. *Id.* Ex. G; Ex. 137 (William I) at 42:6-43:1. In ██████████████████; a week after her maternity leave ended, she relocated to LA. *Id.* at 69:21-25; 71:4-11.

---

[1]  Unless otherwise noted, numbered exhibits are attached to the Declaration of Rachel S. Brass.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

Gibson, Dunn &
Crutcher LLP

**B.**   **Ms. William Came to Morrison Ill-Prepared and Failed To Meet Expectations**

Ms. William joined Morrison's Los Angeles office in August 2015 as the third associate member of the office's Project Finance Group, which focused on renewable energy projects. Ex. 2 (William I, Ex. 5); McCord Decl. Ex. I (Offer letter). Morrison is an international law firm with over 1,000 attorneys worldwide. It represents a broad array of Fortune 100 and other leading companies across a range of industries. White Decl. at ¶ 4. The Firm is recognized for its leadership in supporting and promoting women and working parents. *Id*. at ¶ 5 and Exs. A-B. At the time of Ms. William's arrival, there was a single Project Finance Partner (Jeff Chester), one Of Counsel (Elizabeth Sluder), a senior associate one year senior to Ms. William (Julia Balas), and a junior associate (███████). *See* Ex. 35 (William I, Ex. 3). Ms. William was apprehensive about the group's dynamics, writing to a close friend that ███████████████████████████████████████████████████████ ███████████████" *Id*. With respect to Ms. Balas in particular, she recognized that she would "███████████████████████████████████████████████." *Id*. Rather than embrace the Firm and her new group, Ms. William was "███████████████████ ███████████████████████████████████████████████████ ███████." Ex. 33 (William II, Ex. 501); Ex. 37 (William II, Ex. 502). Thereafter, Ms. William repeated to close friends her true intentions: ███████████████████████████████ ███████████████████████████" Ex. 41 (William II, Ex. 508) at DOES34958; Ex. 33 (William II, Ex. 501) at DOES34792.

Nevertheless, Ms. William's perception that group dynamics would be important to her success was accurate, because at Morrison there is no formal system of assigning work to senior associates. Ex. 143 (Peck) at 230:24-231:10; Ex. 148 (Chester) at 63:5-14. Instead, senior associates are tasked with creating sufficient internal and external demand for their legal services to meet their minimum hours requirement. Ex. 143 (Peck) at 230:24-231:10. As Ms. William put it, "███████████████████ ███████████████████████" is important. Ex. 47 (William II, Ex. 516) (emphasis added). Ms. William alleges here that she was discriminated against and otherwise not valued because she is a parent. 4AC ¶ 144. Specifically, she claims that on her very first day at the Firm, Ms. Sluder said that she did not know that Ms. William was a parent when they hired her and that parents tend not to do

Gibson, Dunn & Crutcher LLP

3

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

well in the group.  *See* Ex. 137 (William I) at 134:6-15.  She also alleges that, a few months later, Jeff Chester told her that an associate he previously worked with left the practice of law to "become a mommy."  *See id.* at 163:16-23.  If true, which Morrison contests, Ms. Sluder and Mr. Chester none-theless incorporated Ms. William into Project Finance and, at the outset, kept her fully engaged.  Mor-rison's review period runs from September 1 to August 31.  Ex. 140 (30(b)(6)) at 140:15-20.  In her first performance year, Ms. William worked on at least six separate matters with each of them, billing 2,035 hours on an annualized basis.  *See id.* Ex. 2 (William I, Ex. 5) at MORRISON-287, 292–94.  In this period, she told friends ████████████████████████████████████████.  *Id.* Ex. 38 (William II, Ex. 503) at DOES34451-452, 474, 511.  In short, Mr. Chester and Ms. Sluder gave Ms. William the chance to learn the renewable energy space and show what she could do.  *See id.* at Ex. 2 (William I, Ex. 5) at MORRISON-292–94.

       It quickly became clear, however, that Ms. William was "not at the level [commensurate] with her class."  Ex. 148 (Chester) at 112:10-16, 113:7-23, 114:3-10; 134:13-25.  This skill deficiency man-ifested itself, for example, in her billing time that partners felt "could not be passed onto the client."  *Id.* at 150:13-151:10.  Mr. Chester went so far as to ██████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████.  *Id.* at 114:3-14; *see* White Ex. D (Accounting Spreadsheet).  This is consistent with Ms. William's first annual review, for the period September 1, 2015 through August 31, 2016, which addressed concerns with the quality of her work.  For example, in connection with her drafting, she needed to "█████████████████████████████████████" and ██████████████ ████████████████████████████████████████████."  *Id.* Ex. 2 (William I, Ex. 5) at MORRISON-288.  While the review also highlighted "the more positive attributes of Ms. William," *id.* Ex. 150 (Sluder) at 149:6-14; *see also id.* at 150:2-10, it concluded that "██████████████████ ████████████████████████████████████████."  Ex. 2 (William I, Ex. 5) at MORRISON-288.  That was not news to Ms. William, who had been told as much at her prior firm, *see supra*, and told the same to friends.  *Id.* Ex. 42 (William II, Ex. 510) at DOES34426-27 ████████████████████████████████████ Ex. 37 (Ex. 502) at DOES34693-95 ████████████████████████████████████ *see*

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

*also* Ex. 42 (Ex. 510) at DOES34415 ("█████████████████████████"). Still, she did not ask for the help she knew she needed, as she did not want to "███████████████████████ ██████████████████████████." *Id.* Ex. 146 (William II) at 365:8-366:2; Ex. 38 (*id.* Ex. 503) at DOES34488.

      Regardless, Ms. William's performance did not improve during her second performance year, thereby widening the gap between her ability and the Firm's expectations. *See id.* Ex. 150 (Sluder) at 186:2-14; Ex. 148 (Chester) at 130:24-131:8. For example, Ms. William submitted a draft LLC Agreement to Ms. Sluder with an entire section unaddressed but for a note recommending that they look at precedents. Sluder Decl. ¶ 9-10. Because the client expected a draft the following day, Ms. Sluder was forced to review the precedents and redo the section herself. *Id.*; *see also* Ex. 148 (Chester) at 131:7 (Ms. William's work required "substantial revisions"). This and other inefficiency meant that much of Ms. William's time needed to be written off since it could not be justified to the client. *Id.* at 132:7-24, 130:24-131:8; Ex. 150 (Sluder) at 169:23-170:2; *see also* Sluder Decl. Ex. A (Email from Sluder to Chester) at Morrison-18013 ("I think we can cut much of Sherry's time"). Ms. William struggled in other areas as well. For instance, the Associate General Counsel of a client called Ms. Sluder and complained about Ms. William's tone and behavior on a telephone call. *Id.* at ¶ 12-14. At this time, Ms. William was paid and billed as a 7th-year associate, a level of seniority at which partners expect to delegate routine client interactions—yet, Ms. Sluder could not trust Ms. William. *Id.* Ultimately, Ms. Sluder concluded that she could not staff Ms. William because her billable rate did not match her skills, and she had junior associates to do junior associate-level work. Sluder Decl. at ¶ 15.

      Importantly, Ms. William was aware of the gap between her performance and that of other attorneys in her group. Ms. William realized that the attorneys in her group were "████████████ ████████████████████" and were "██████████████████" who "████████████████ █." Ex. 154 at DOES50912, 29, 64. By contrast, Ms. William lamented ███████████████ █████████████████████████████████████████████████████████ █████████████████ *Id.* at DOES50882-84; *see also id.* at DOES50895-910. Ultimately, she admitted that she ████████████████████████████████████████████████████████ ████ confiding to a friend in February 2017 "███████████████████████████

1  ████████████ and ████████████████████████████████████████████

2  ████████████████████ *Id.* at DOES50914-23.  But rather than putting in the work to develop

3  comparable industry knowledge, Ms. William ███████████████████████████████████████

4  ████  *See id.* at DOES50947 (As to Ms. Sluder: "█████████████████████████████"); *see also*

5  Ex. 42 (William II, Ex. 510) at DOES34409-11 (As to Ms. Balas: "███████████████████████

6  ███████████████████████████████████████████"); Ex 49 (William II, Ex. 518)

7  ("███████████████████████████████████████████████").

8       Ms. William's trajectory met more headwind when ██████████ joined the group in mid-

9  2016. Ms. █████—in Ms. William's words—was a "███████████████████████████████" Ex.

10  47 (William II, Ex. 516) at DOES33823.  Both Mr. Chester and Ms. Sluder sent increasing work to the

11  overperforming █████ rather than the underperforming William. *See id.* Ex. 13 (█████ evaluations)

12  at MORRISON-10286; Ex. 47 (William Vol. II, Ex. 516) at DOES33808-11.  That was no surprise to

13  Ms. William who described herself to a friend as "███████████████," *id.* Ex. 47 (William II, Ex.

14  516) at DOES312, and "███████████████████████████" *Id.* Ex. 87 (William II, Ex. 521)

15  at DOES35201-02.  In her own words, the other associates were "██████████████" and "████████

16  ████████████████████████████." Ex. 49 (William II, Ex. 518); Ex. 45 (William II, Ex. 514)

17  at DOES34152, DOES34163.  Thus, in the first six months of 2017—Ms. William annualized only

18  671 hours, 84% of the Firm's (prorated) expectation.  *Id.* Ex. 3 (William I, Ex. 6).

19  **C.    Morrison "Reclassified" Ms. William To Better Align Her Skills, Salary and Billing Rate**

20       **a.    Morrison's Reclassification Policy**

21       Ms. William's under-performance created a problem for the Firm.  Morrison, like many other

22  national firms, has a "lockstep" associate compensation structure, determined by salary class.  *See* Ex.

23  140 (30(b)(6)) at 52:11-23.  Associates are assigned to a "salary class" upon hire, and are evaluated

24  each year to determine if they are ready to "progress" to the next level of seniority with the rest of their

25  class.  An associate's salary increases if she progresses to the next level of seniority, as does her billable

26  rate, reflecting that in the ordinary course an associate has more skills and can operate with increased

27  independence each year.  *See* Ex. 53 (Comp. Brochure) at MORRISON-698.  That "progression" is not

28

Gibson, Dunn &
Crutcher LLP

6
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

automatic; instead, associates advance only after a comprehensive performance review and demonstration that they have acquired the expected skill set. *See id.*

For those associates whose skills and salary class do not align, there are several possible outcomes: Some are terminated, others are given a "not progress" review, which bars bonus eligibility and indicates that there are "serious concerns about [their] ability to ever develop those skills," Ex. 140 (30(b)(6)) at 180:1-3, 189:15-19, and those who have not had sufficient time to develop the skills and experience they need but are still bonus eligible are "reclassified." *Id.* at 179:14-180:3. There are mandatory and discretionary reclassifications. *Id.* at 193:8-18. Mandatory reclassification applies to associates who did not complete a minimum of 600 Legal Service Hours "at their current level of seniority" rendering them ineligible "for consideration to progress to the next seniority level." Ex. 53 (Comp. Brochure) at MORRISON-698; Ex. 140 (30(b)(6)) at 193:8-14. Discretionary reclassification is used when an associate completes at least 600 Legal Service Hours but has "not yet gained the requisite skills and experience to progress to the next level." Ex. 140 (30(b)(6)) at 193:15-17; *see also* 179:21-180:1; Ex. 53 (Comp. Brochure) at MORRISON-698. Reclassification may also be used with lateral attorneys who are operating below the salary class into which they were hired. Ex. 140 (30(b)(6)) at 178:18-179:1,190:7-18. Reclassified associates can and do succeed at Morrison, including later promotion to partner and of counsel. White Decl. ¶ 15. It is no black mark.

### b.    Morrison's Decision To Reclassify Ms. William

By 2017, it had become clear to Mr. Chester and Ms. Sluder that Ms. William did not perform at her class level, although they disagreed on how to address that problem in her 2017 review (covering September 1, 2016 to August 31, 2017). Ms. Sluder wanted to ███████ Ms. William, while Mr. Chester believed that she was "███████ Ex. 75 (Chester Ex. 2); Ex. 148 (Chester) at 123:11-124:1, 137:21-138:3; Ex. 150 (Sluder) at 163:20-25; 164:1-166:5; 169:20-170:2. The only point of consensus was to not increase her billing rate. Ex. 150 (Sluder) at 186:2-24; Ex. 75 (Chester Ex. 2).

Mr. Chester and Ms. Sluder sought guidance from Morrison's Attorney Development Group ("ADG"), which focused on non-partner development and counseling, and was centrally involved in associate reviews. *See* Ex. 150 (Sluder) at 185:14-186:1. ADG suggested a discretionary reclassification. *See* Ex. 148 (Chester) at 123:11-124:1; *see also* Ex. 77 (Sluder Ex. 11). Reclassification would

Gibson, Dunn &
Crutcher LLP

7

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

allow Ms. William to █████████████████████ Ex. 150 (Sluder) at 187:23-188:3.  Ms. William's 2017 review reflected that reclassification outcome, such that she was again a 7th-year associate in 2018, paid ███████, and billed at the rate then allocable to 7th year associates.  *See* Ex. 3 (William I Ex. 6); McCord Decl. Ex. H at MORRISON-43666; White Decl. ¶ 12.  Although Ms. William's evaluation referenced the ████████████████████████████████████████████████████████████.  Ex. 3 (William I,  Ex. 6) at MORRISON-461 █████████████████████████████████████████████████████████████████████████████████████ █████████████████████████).

Ms. William took a maternity leave in June 2017 and returned in late December 2017.  Ex. 137 (William I) at 197:4-9; 126:23-127:5.  Given this timing, Ms. William did not receive her review during the same timeframe as other associates (typically in November or December) but Mr. Chester and Ms. Sluder set a meeting to deliver her review in late-January (after efforts to find a date convenient for all).  *Id.*; Ex. 79 (Sluder Ex. 12); Sluder Decl. Ex. B (email regarding scheduling).  Unfortunately, due to a data entry error, Ms. William learned of the reclassification decision from Morrison's intranet before that meeting.  Ex. 79.  After receiving the review, Ms. William reached out to Erika Drous in ADG, who offered advice on how to respond to the review.  *See id.* Ex. 141 (Drous Dep.) at 149:2-22; 152:1-21, 153:23-154:9; 155:7-156:20.

**D.   Morrison Terminated Ms. William After Two Years Without Improvement**

In the first half of 2018, following Ms. William's reclassification, her group in LA was "slow" as the renewable energy business reacted to a change in the United States tax code.  *See* Ex. 148 (Chester) at 170:15-21; Ex. 87 (William II, Ex. 521) at DOES35204.  While some new matters came in, "████████████████████████████████████████████████████████████████████████████████████" Ex. 148 (Chester) at 170:24-171:6; Ex. 150 (Sluder) at 219:18-220:9.  That Sherry was least capable is not in dispute—she confided to a friend in February 2018 that "██████████████████████████████████████████." Ex. 87 (William II, Ex. 521) at DOES35201-02.  When two former summer associates started their Morrison careers doing project finance in fall 2018, their first-year rates further diminished demand for Ms. William's work.  *See* Sluder Decl. Exs. 12, 14.

Gibson, Dunn & Crutcher LLP

1    In April 2018, Ms. William filed this lawsuit, and subsequently shifted into "coast" mode. De-

2    spite advice to be proactive, Ms. William reached out to ███████████████████

3    ████████████████████████████████████████████ Ex. 143 (Peck) at

4    230:24-231:10, 38:22-40:4;198:6-199:17; Ex. 128 (Peck Ex. 21); Ex. 130 (Peck Ex. 23); Ex. 153 (In-

5    terrog. No. 12); Ex. 146 (William II) at 427:4-25.  She recorded a mere 387 client billable hours *for the*

6    *entire year* in 2018 (23% of her 1,950 minimum expectation), and recorded around 720 hours to "keep-

7    ing current," but still was paid a $██████ annual salary from January through June, and a $██████

8    annual salary from July through December.  Ex. 4 (William I, Ex. 7); White Decl. Ex.  C ("Keeping

9    Current" time entries) at MORRISON-948–85; McCord Decl. Ex. H (William HR File) at MORRI-

10   SON-43666; White Decl. ¶ 24.  According to Ms. William, "keeping current" included time "at my

11   desk doing nothing," shopping online, and browsing social media. Ex. 137 (William I) at 191:7-192:14.

12   Ms. William was explicitly warned in her 2018 Evaluation, delivered in December 2018, that ████

13   ████████████████████████████████████████████████████

14   ████████████████" *Id.* Ex. 4 (William I, Ex. 7).

15        Yet, the next year brought no such improvement.  Ms. William recorded only 766 billable hours

16   (40% of her 1,950 minimum expectation), while being paid $██████  Ex. 5 (2019 Evaluation);

17   McCord Decl. Ex. H.  What little work she performed remained below expectations.  *See* Ex. 143

18   (Peck) at 223:19-224:8 ("████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ██████")); Liang Decl. ¶ 11 (describing a credit agreement drafted by Ms. William in 2019 as "of

21   the quality expected from a first or second-year associate").

22        At the end of 2019, a year after a written warning that she risked ██████████  and after three

23   continuous years of low hours and poor performance, Ms. William was terminated on December 3,

24   2019. Ex. 5 (2019 Evaluation); Ex. 143 (Peck) at 249:22-251:9; 258:21-259:15.  She was given a four-

25   week notice period, ████████████████████████.  *See* McCord Decl. Exs. J-K (MORRISON-

26   43525, MORRISON-43526).

27

28

Gibson, Dunn &
Crutcher LLP

9

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

# IV.    LEGAL STANDARD

Summary judgment is proper when there is "no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue* of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases added).  No genuine issue of material fact exists with respect to a claim or claims "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).  Movants need not necessarily put on evidence to negate their opponents' claims; they may simply point to portions of the pleadings, admissions, answers to interrogatories, and depositions which, along with any affidavits, show the absence of a genuine issue of material fact.  *Bhan v. NME Hospitals*, 929 F.2d 1404, 1409 (9th Cir. 1991).  Where the moving party demonstrates the absence of genuine issues of material fact, the opposing party "must produce *specific evidence* through affidavits or admissible discovery material, to show that the dispute exists."  *Id.* (emphasis added).  Only "rational or reasonable" inferences are drawn in favor of the non-moving party.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

# V.    ARGUMENT

Sherry William came to Morrison ill-prepared for the job she sought, and then failed to perform at the level expected for her salary class once she was in that job.  Though she privately conceded ████ ███████████████████████, Ms. William's reaction to being held accountable was to charge the Firm with unlawful discrimination.  The problem for Ms. William, however, is that her own statements defeat her claims.  The undisputed evidence shows that she joined Morrison without the requisite training, experience, or substantive knowledge.  While Ms. William now blames bias against mothers for her failures, her statement two months before she filed this lawsuit that "████████████████████████████ ████████████████████████████ fully aligns with the facts on the ground.  As she confided to multiple friends, on multiple occasions, ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████.  When Ms.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

Gibson, Dunn & Crutcher LLP

William was reclassified—and thus given the opportunity to reset her career at Morrison by aligning her skills with her billing rate—she filed this lawsuit and continued to cash her substantial paycheck, while making, at best, minimal efforts to meet the firm's expectations regarding performance and billable hours.  None of this, nor Morrison's decision to terminate Ms. William after two additional years where she failed to meaningfully contribute, amounts to discrimination or retaliation.

A.    **Ms. William Cannot Prove Causation, An Essential Element of Her Discrimination (Counts 1 and 3), Retaliation (Counts 5 and 6), and FMLA Interference (Counts 2 and 4) Claims**

Ms. William's complaint includes a laundry list of allegedly discriminatory decisions Morrison made about her, but the cause of each and every one of those decisions are facts Ms. William admitted were true in candid moments: ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████  Ms. William's lack of necessary skill, resulting poor performance, and failure to contribute to the Firm, caused each and every decision about which she complains here.

Disparate treatment discrimination occurs where an employer "treats some people less favorably than others *because of* their race, color, religion, sex, or national origin."  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (emphasis added); *see also* 42 U.S.C. § 2000e-2(a).  Plaintiffs proceeding under a disparate treatment theory are required to prove that the defendant "intentionally discriminated" against them.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Intentional discrimination may be proved by either direct or indirect (circumstantial) evidence.  *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003).  Where an individual plaintiff has no direct evidence of intentional discrimination, her disparate treatment claim is evaluated under the *McDonnell Douglas* burden-shifting framework.  *See Vasquez*, 349 F.3d at 640-41 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000) (applying the *McDonnell Douglas* framework to FEHA claims).  If a prima facie case is shown, it raises an "inference of discrimination."  *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1344 (9th Cir. 1981).  To rebut that inference, the employer "need only 'articulate some legitimate, non-discriminatory reason for the employee's rejection.'  If the employer articulates such a reason, the burden shifts to the plaintiff

Gibson, Dunn &
Crutcher LLP

11

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

1    to show that the reason was a 'pretext or discriminatory in its application,'" meaning the discriminatory

2    reason "more likely motivated the employer" or that the proffered explanation is "unworthy of cre-

3    dence." *Hargrave v. Univ. of Wash.*, 113 F. Supp. 3d 1085, 1085 (W.D. Wash. 2015) (quoting *Lynn*,

4    656 F.2d at 1345).   A "reason cannot be proved to be 'a pretext *for discrimination*' unless it is

5    shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor*

6    *Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

7            Proof of a retaliation claim similarly requires establishing that an adverse employment action

8    occurred *because of* protected activity—a plaintiff must show: "1) [she] engaged in a protected activity;

9    2) [she] suffered an adverse employment decision; and 3) *there was a causal link between the protected*

10   *activity and the adverse employment decision*."   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054,

11   1064 (9th Cir. 2002) (emphasis added); *see also Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th

12   52, 69 (2000) (applying same standard to FEHA claim).   To demonstrate the requisite causal link, the

13   plaintiff "must establish that . . . her protected activity was a but-for cause of the alleged adverse action

14   by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

15           Where, as in this case, Ms. William alleges that Morrison took an adverse employment action

16   because she has used FMLA leave, the Court must treat the claim not as one for retaliation or discrim-

17   ination, but rather, as a claim of interference with rights guaranteed by statute.   *See Bachelder v. Am.*

18   *W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001).   The elements of an "interference" claim are (1)

19   entitlement to the FMLA right; (2) the employer's interference with that right; and (3) *a causal con-*

20   *nection between the interference and the harm*.   *See id.* at 259 F.3d at 1124; *Xin Liu v. Amway Corp.*,

21   347 F.3d 1125, 1132 n.4 (9th Cir. 2003) (applying the same standard to CFRA claims).   Courts gener-

22   ally interpret "interference" to mean that the medical leave constituted a "negative factor" in an adverse

23   employment action.   *See Delaney v. SimplexGrinnell L.P.*, No. CV10-05103 MEJ, 2012 WL 465177,

24   at *7 (N.D. Cal. Feb. 13, 2012).

25           Under any of these claims, a lack of causal connection between the protected activity and the

26   adverse action requires summary judgment.   *See Miller v. Graham Cty.*, 635 F. App'x 362, 364 (9th

27   Cir. 2015) (affirming employer's summary judgment on plaintiff's Title VII claim because plaintiff

28   failed to allege a nexus between direct evidence of discrimination and adverse employment action);

Gibson, Dunn &
Crutcher LLP

12
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

*Grosz v. Boeing Co.*, 455 F. Supp. 2d 1033, 1044 (C.D. Cal. 2006) (granting summary judgment on retaliation claim because there was no causal connection between plaintiff's complaint and her termination); *Jones v. Nev.*, No. 214CV01930APGNJK, 2016 WL 4707987, at *1 (D. Nev. Sept. 7, 2016) (granting summary judgment in favor of employer because plaintiff failed to offer "evidence to show a causal connection between his use of FMLA leave and the adverse employment action").  Here, the undisputed evidence prevents any showing of that causal link for any of Ms. William's claims.

### 1.    Ms. William Was Reclassified Because She Did Not Perform At Her Class Level

Ms. William was reclassified because her substantive legal knowledge and skills did not justify an increased billable rate.  *See* Ex. 150 (Sluder) at 186:2-187:6.  In February 2017, the middle of the performance year that resulted in reclassification, Ms. William told it like it is: ███████████

███ Ex. 154 at Ex. A, DOES50882–84 (emphasis added).  The problem was, Ms. William did not perform as a 7th year associate—her drafting needed substantial revision, and she could not function without substantial supervision (which was atypical for someone of her seniority).  *See* Ex. 148 (Chester) at 130:24-132:3; Ex. 150 (Sluder) at 164:6-165:3.  Indeed, even prior to the reclassification decision, Mr. Chester *was already* ████████ Ex. 148 (Chester) at 114:3-21; White Decl. Ex. D.  And Ms. Sluder believed Ms. William's performance was so deficient that it justified ██████. Ex. 150 (Sluder) at 163:20-25.  That deficiency is no surprise, as Ms. William acknowledged, ███████████ Ex. 37 (Ex. 502) at DOES34693-95.  Moreover, Ms. William *knew* t███████ *See* Ex. 154 at Ex. A, DOES50882–928 ("██████████ ").  Giving Ms. William a longer runway to improve and realign her rate with her skills, rather than terminating her, is a legitimate nondiscriminatory reason for reclassification.  Ms. William can point to no evidence that shows her pregnancy or maternity leave—rather than her performance—caused her reclassification.  To the contrary, her hours contribution before her leave placed her outside the mandatory reclassification group.  Ex 3 (William I, Ex. 6); Ex. 53 (Comp. Brochure) at

Gibson, Dunn & Crutcher LLP

MORRISON-698.  Moreover, any reference to a lack of sufficient time to develop skills and experience must be taken in the context of substantive performance deficiencies in her legal skills and abilities that pre-dated her leave.  *See id.* Ex. 75 (Chester, Ex. 2) at MORRISON-6335; Ex. 3 (William I, Ex. 6) at MORRISON-461.  Ultimately, the undisputed evidence demonstrates that Ms. William's reclassification was the product of a compromise ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████.  *Id.* Ex. 148 (Chester) at 137:21-138:3; Ex. 150 (Sluder) at 163:20-166:5; 169:20-170:2; 186:2-24.

### 2.  Ms. William Received Fewer Work Opportunities Because She Was The Weakest Link In Her Group Objectively

There is no question that, over time, work flowed to others in her group before it was given to Ms. William, but there is no evidence that pregnancy or parenthood was the reason.  As noted, she was behind in terms of her legal skills and abilities, her ███████████████████████ to justify her work to clients—making her less profitable, and the other associates in her group were "████████ Ex. 148 (Chester) at 112:10-16; 114:3-21; Ex. 49 (William II, Ex. 518) at DOES33947.  Ms. William admits that ████████████████████████████████████████████████████████ ████████████████████.  Ex. 146 (William II) at 384:22-385:10; Ex. 47 (William II, Ex. 516) at DOES33815-16.  And Ms. William admitted to ████████████████████████  *See, e.g.*, Ex. 42 (William II, Ex. 510) at DOES34415, DOES34426-27; Ex. 37 (William II, Ex. 502) at DOES34693-95; *see also* Ex. 45 (William II, Ex. 514) at DOES34163.  A choice to use the more talented, efficient and profitable associate when they are available is a legitimate, nondiscriminatory reason for any work assignment decisions about which Ms. William complains.  After all, ████████████ ████  *Id.* Ex. 87 (William II, Ex. 521) at DOES35225.

Those problems were exacerbated when Plaintiff returned from leave because, as Plaintiff admits, ████████████████████████████.  *See* Ex. 87 (William II, Ex. 521) at DOES35204; Ex. 148 (Chester) at 170:15-21.  That too is a legitimate non-discriminatory reason her work fell in 2018.  Moreover, the fact that available work went to the most talented associates is no surprise.  Ms. William admits that ████████████████████████████████████████ Ex. 146 (William

Gibson, Dunn & Crutcher LLP

II) at 390:14-391:14.  Further, partners "w███████████████████████████████████

███████" *Id.* at 392:1-6.  None of those factors favored Ms. William, and over time, her competition

for the work grew more fierce.  Work flowed to the people who were the most capable of doing it—

"█████████████████████████████████." *Id.* Ex. 148 (Chester) at 170:24-171:6.

Ms. William will no doubt seek to pin her failure to meet expectations on two alleged stray

remarks by Mr. Chester and Ms. Sluder.  But stray remarks "are insufficient to establish discrimina-

tion." *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990) ("stray remarks . . . , when

unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegiti-

mate criteria").  Moreover, it is undisputed that for nearly a year and a half after these alleged comments

were made, Mr. Chester and Ms. Sluder staffed Ms. William (a parent) and gave her multiple chances

to prove herself.  Ex. 3 (William Ex. 6).  Indeed, in 2016, Ms. William annualized 2,035 hours, which

included assignments that Ms. William admits were "████████ and "████████." *See id.*; Ex. 38

(William II Ex. 503) at DOES34451-52; Ex. (William II) at 409:16-410:14.  In other words, after the

two alleged remarks, each staffed Ms. William on an extensive number of matters, and gave her more

than ample opportunity to demonstrate her abilities.  She simply did not do so.

The lack of causation is further underscored by the experience of Ms. William's colleague and

fellow mother, Julia Balas.  Ms. Balas took maternity leave *in the same year* and *in the same practice

group*, was not reclassified and did not have any difficulty finding work either inside the group or

outside.  Ex. 137 (William Vol. I) at 149:21-150:5; Ex. 148 (Chester) at 101:1-8.  She was ultimately

promoted to partner in late 2019 and became a partner in 2020.  Ex. 139 (2020 Partner Class Announce-

ment); *see also*, *e.g.*, *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 897 (10th Cir. 1994) (affirming

grant of summary judgment on Title VII disparate treatment claim based on gender when another

woman was promoted to the position in question); *Powell v. Consol. Edison Co. of N.Y., Inc.*, No. 97-

2439, 2001 WL 262583, at *11 (S.D.N.Y. Mar. 13, 2001) (evidence that members of plaintiff's pro-

tected class received the promotion at issue negates any inference that the employer's decision not to

promote plaintiff was based upon discriminatory animus).

Regardless, given the shortage of work and level of competition in her practice group after Ms.

William's leave and reclassification, Ms. William was advised several times to seek out work from

Gibson, Dunn &
Crutcher LLP

15
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

others at the Firm, to increase her billable hours.  Her failure to do so also rests at her feet—there is no evidence linking her inability to attract interest in her legal services to her parental status.  At Morrison, the onus is on a senior associate like Ms. William to meet her billable hours requirement by building relationships with partners that she wanted to work with and proving that she can meet their clients' needs.  *See* Ex. 143 (Peck) at 230:23-231:10; *see also id.* at 38:22-40:4.  Ms. William's partner mentor advised her on ways to create this demand by internally marketing herself through an active process that required "regularly speaking with partners with whom she wants to work" and "giving presenta- tions internally and authoring articles."  Ex. 130 (Peck Ex. 23).  Despite this advice, Ms. William █████ ██████████████████████████████████████████████████████████████████████████████████████████████ ██████ .  *See* Ex. 153 (Interrog. No. 12); Ex. 146 (William II) at 427:4-25; Ex. 130 (Peck Ex. 23). Besides these minimal efforts, Ms. William did very little to establish internal demand for her services. There is no evidence that Ms. William █████████████████████████████████████████████████████████ ████████████████████████████████████ .  *See id.*  She also did not make any meaningful efforts to cultivate relationships with partners who could send her billable work.  The co-chair of her practice group said she ████████████████████ Ex. 149 (Wojciechowski) at 35:6-12, 43:3-45:13. And, shockingly, Ms. William even █████████████████████████████████ Ex. 143 (Peck) at 198:6-202:22; Ex. 130 (Peck Ex. 23).  In sum, Ms. William did not put in the necessary work to create a demand for her services.  Even Josh Klayman, the other plaintiff in this lawsuit, ██████████ ████████ Ex. 146 (William II) at 428:1-12.

Other lawyers in her group—including other women and mothers—had multiple sources of work other than Ms. Sluder and Mr. Chester.  *See id.* Ex. 148 (Chester) at 98:22-99:10; *see also* Exs. 16 at MORRISON-9936; Ex. 15 at MORRISON-9990 (Evaluations of Balas and ██████ discussing work for partners outside of their group); Sluder Decl. ¶ 23 (Ms. Balas became a parent in 2017, and Ms. ██████ was pregnant with her first child in 2019).

Nor is there is any evidence that Ms. William's failure to find work was caused by her lawsuit. Ms. William admits that she has no direct evidence of such a claim.  Ex. 137 (William I) 255:19-21. That is unsurprising, as her ability to attract work fell significantly in 2017 and early 2018—before she filed this lawsuit.  And that colleagues did not necessarily seek out Ms. William's work is justified by

Gibson, Dunn & Crutcher LLP

16

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

the same considerations that affected her ability to attract work in LA Project Finance.  Indeed, Ms. William agrees that not staffing her in response to her outreach efforts inside and outside LA Project Finance was not necessarily discriminatory.  For example, although co-plaintiff Ms. Klayman was one of the attorneys ███████████████████████████, Ms. William does not claim this was discrimination.  *See id.* at 428:1-20.  Yet Ms. William asks the court to make the inference that *every other* attorney's failure to staff Ms. William was for discriminatory reasons.  That inference is not reasonable in light of the undisputed evidence that while Ms. William made little effort to secure work for herself, partners at the Firm actively tried to find ways to create work opportunities for Ms. William.  For example, the Firm agreed to allow Mr. Peck to ████████████████ on his matters.  *Id.* Ex. 143 (Peck) at 217:6-13; White Decl. Ex D.  Additionally, multiple partners, including Mr. Chester, Ms. Sluder, and Mark Wojciechowski, recommended Ms. William to other partners.  *See* Ex. 148 (Chester) at 96:9-14; Ex. 150 (Sluder) at 144:17-145:12; Ex. 149 (Wojciechowski) at 45:3-19, 50:23-51:22; Ex. 127 (Chester: "Sherry is available and I would encourage you to use her") at MOR-RISON-18051.  On at least one instance, ████████████████████████████████████████ ██████████████████████████████████████████ Ex. 130 (Peck Ex. 23).  Ms. William's failure to aggressively seek work, combined with her lack of effort to build subject matter expertise, or develop relationships with partners created the same problem outside LA Project Finance as within it—Ms. William did not create demand for her legal services, something Morrison required of all senior associates.[2]

### 3.   Ms. William Was Terminated Because "This Is a for Profit Business"

Ms. William claims that her termination 18 months after she filed this lawsuit was unlawful retaliation.  But a lawsuit is a not a "get-out-of-work-free" card.  At the time of her termination, Ms. William was an 8th year associate with three consecutive years of poor performance and extremely low

---

[2] William alleges that she was not invited to events ostensibly related to LA Project Finance work. But she was invited to, and attended, events that were open to the entire group.  *See* Sluder Decl. ¶¶ 21.  And where she was not initially invited, when she asked, she was included.  *See* Ex. 131 (MORRISON-562).  While Ms. William alleges that she was not invited to LA Project Finance lunches, that is because they did not occur.  Sluder Decl. ¶ 20.  Instead, attorneys actively working on renewable energy deals periodically met to discuss their matters, including in working lunches. *Id.*  Finally, while Ms. William complains of not being invited to a client visit, such visits were not open invitations.  *Id.* at ¶ 18.  Instead, they were related to a specific deal for the client.  *Id.*

Gibson, Dunn & Crutcher LLP

billable hours.  *See* pp. 7-9, *supra*; Ex. 143 (Peck) at 271:10-19.  Ultimately, if associates are not "per-forming properly, if they're not generating income for us and generating revenue, it's perfectly reason-able that we would need to . . . ███████ . . because this is a for profit business." *Id.* at 280:5-13.  In 2018, Ms. William annualized just *387 billable hours* (21% of her minimum expectation) and was explicitly told that ████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 4 (William I, Ex. 7).  In response, Ms. Wil-liam annualized just *766 hours* in 2019 (40% of her minimum expectation).  Ex. 5 (2019 Evaluation). Setting aside this utter failure to demonstrate a "significant" improvement in hours contribution, the work she performed also failed to meet expectations.  *See* Ex. 143 (Peck) at 223:19-224:8; Liang Decl. ¶¶ 9-18.

Ms. William understood how her firm worked, telling a friend in January 2018, "████████ ████████████████████████████████████████." Ex. 136 (William Vol. I Ex. 4).  Her mentor Mr. Peck testified to the same: "██████████████████████████████████████ ███████████████████████████████████████████████████" Ex. 143 (Peck) at 258:21-259:15.  Performance, not retaliation, caused Ms. William's termination.

At bottom, Ms. William can adduce no evidence to support a claim that discrimination *caused* any of her complained adverse employment actions, or that Morrison's legitimate nondiscriminatory reasons for its actions are pretextual.  Ms. William's own words doom any argument to the contrary.[3]

## B.     Ms. William Cannot Prove Intentional Pay Discrimination

There is no direct evidence that Ms. William was paid less than other attorneys because she had a child or was on maternity leave.  And because Morrison's decision to reclassify Ms. William was entirely lawful and appropriate given her performance issues, it cannot give rise to a pay claim.  Nor is there any reasonable inference that leave or parental status was the reason for her pay given the treat-ment of Ms. Balas during the same period.  Ms. William nevertheless maintains that her pay was dis-criminatory, pointing to two not-reclassified *litigation* associates purportedly paid more.  4AC ¶ 48; *see also* Exs. 10-11 (████████ ███ Evaluations).  But these are not cognizable comparators, as the

---

[3]  Ms. William also claims wrongful termination in violation of public policy, 4AC, Count 7, but that claim fails because she is without a viable discrimination claim. *See Johnson v. Hertz Local Edition Corp.*, No. C 03-4439 MJJ, 2004 WL 2496164, at *5 (N.D. Cal. Nov. 3, 2004).

Gibson, Dunn &
Crutcher LLP

18

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

"common core" of day-to-day tasks of a *litigation* associate, including brief writing, deposition taking, and discovery, critically differ from those of a *transactional* associate, including drafting deal documents, running due diligence, and negotiations.  Moreover, unlike Ms. William, their ███████████ ████████████████████████████ *Compare id.* Ex. 10 (█████ Evaluations) at MOR-RISON-10231; Ex. 11 (████ Evaluations) at MORRISON-10113 *with* Ex. 3 (William 2017 Evaluation) at MORRISON-463; *see also* Ex. 137 (William Vol. I) at 39:25–42:5; 54:14-55:3 (describing tasks on past transactions); Ex. 147 (Klayman Vol. II) ("there's a lot of stuff that I don't know because I'm not a litigator . . . I am a transaction attorney.").  Accordingly, Ms. William cannot prove even a prima facie case of pay discrimination, compelling summary judgment.  *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir. 1999).

**C.     Ms. William Cannot Prove Any Other Decision Was Intentional Discrimination**

Ms. William claims that she was denied work opportunities because she was a parent and took maternity leave.  *See* 4AC ¶ 159.  The law, however, requires that Ms. William prove those lost opportunities were "reasonably likely to impair [her] job performance or prospects for advancement or promotion."  *Zayed v. Apple Computers*, No. 04-01787-JM, 2006 WL 889571, at *7 (N.D. Cal. Apr. 5, 2006) (involving allegations that employee was not promoted and also deprived of various work opportunities).  There is no evidence of any qualifying opportunities here.  To the extent Ms. William complains of exclusion from a partner-only happy hour or other social interactions, these are not cognizable "adverse employment actions."  *See Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action.").

In any event, Ms. William cannot establish a prima facie case because she cannot identify a single similarly situated male colleague or female colleague without children who was treated better.  *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (granting summary judgment when identified comparators were not similarly situated in "all material respects").  To be similarly situated, a comparator must have dealt with the same supervisor as the plaintiff.  *See Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1228–29 (11th Cir. 2019) (adopting "all material respects" standard and explaining that

Gibson, Dunn & Crutcher LLP

a similarly situated comparator will "ordinarily . . . have been under the jurisdiction of the same super-

visor as the plaintiff"). Indeed, "a plaintiff and her comparators must be sufficiently similar, in an

objective sense, that they 'cannot reasonably be distinguished.'" *Lewis*, 918 F.3d at 1229 (citing *Young*

*v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015)). Additionally, "[d]ifferences in experience

and disciplinary history" can disqualify a plaintiff's proffered comparators. *Tennial v. United Parcel*

*Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016) (applying "all material respects" standard and holding

that comparator was not similarly situated in part because comparator was meeting his performance

goals and plaintiff was not). Finally, a similarly situated comparator must have a "similar job" and

perform similar duties. *See Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 1004 (9th Cir. 2019).

Here, each of the associates Ms. William has identified in discovery as comparators fail this

standard—they were at different seniority levels, in entirely different departments, or supervised by

different partners.[4] Only one—████████████—was even in the same practice group. Ex. 17 (██████

However, the undisputed evidence shows that Mr. ████ is not comparable to Ms. William in many

other important aspects, let alone "all material respects." *Moran*, 447 F.3d at 755. First, unlike Ms.

William, ████████ as an associate, brought to the Firm a client matter worth nearly $775,000 in

billable time. *See* Ex. 85 (Email from Moser to Herman); Ex. 149 (Wojciechowski) at 141:3-142:5.

Second, unlike Ms. William, Mr. ███████████████████████████████████ Ex. 143 (Peck) at

268:24-69:21. Third, whereas Ms. William's work involved Project Finance, and her primary super-

visors were LA partners Chester and Sluder, ███████ work involved Financial Transactions, and

his primary supervisors were NY partners Wojciechowski, Peck, Peter Dopsch, and David Kaufman.

Ex. 149 (Wojciechowski) at 92:16-94:13; 101:4-17. Indeed, over the course of their careers, they only

worked with *two* of the same Morrison partners. *Compare* Exs. 2-5 (William) *with* Ex. 17 (████).

Finally, ██████████████ voluntarily while Ms. William opted to stay at Morrison—even during

the year after she was told a failure to improve risked ████████ *See* Ex. 143 (Peck) at 262:6-263:3;

---

[4] *Compare* Ex. 3 (William) (*Class of 2010; LA Finance & Projects*) *with* Ex. 12 ████████ (Class of 2018; LA Finance & Projects), Ex. 13 ███████ (Class of 2015; LA Finance & Projects), Ex. 14 ██████ (Class of 2018; LA Finance & Projects), Ex. 15 ████████ (Class of 2013; LA Finance & Projects), Ex. 16 (Balas) (Class of 2009; LA Finance & Projects), Ex. 10 ████) (Class of 2010; Labor & Employment), Ex. 11 ████████ (Class of 2010; IP); Ex. 17 (████ (Class of 2011; NY Finance & Projects), Ex. 18 ██████ (Class of 2002; NY Finance & Projects); Ex. 19 ████ (Class of 2014; SF Finance & Projects), Ex. 20 ████ (Class of 2012; SF Finance & Projects).

20

Ex. 149 (Wojciechowski) at 69:20-70:6.  These significant, undisputed, differences between Mr. ███ and Ms. William make Mr. ███ an inappropriate comparator to Ms. William.  Absent any identifiable comparators, Ms. William cannot make a prima facie claim of disparate treatment.

**D.    Morrison's Reclassification Policy Did Not Have A Disparate Impact On Ms. William**

Ms. William challenges Morrison's application of the facially neutral reclassification policy as having a disparate impact on women who take a pregnancy leave, including her.  To prove this claim, Ms. William must identify "a significant disparate impact on a protected class caused by a specific, identified, employment practice or selection criterion."  *Id*.  Such a showing is "usually accomplished by statistical evidence showing that an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of actual applicants."  *Stout v. Potter*, 276 F. 3d 1118, 1122 (9th Cir. 2002) (citations and quotations omitted).  Here, she can make no such showing.

Morrison's reclassification policy has two paths:  "mandatory reclassification" for associates who do not complete 600 Legal Services Hours and "discretionary reclassification" for associates who have completed at least 600 Legal Service Hours but have "not yet gained the requisite skills and experience to progress to the next level."  Ex. 53 (Comp. Brochure) at MORRISON-701.  Ms. William was the subject of a discretionary reclassification.

As the Firm's Compensation Brochure indicates, "progression" at Morrison is not assumed but occurs *only if* an associate has acquired the expected skills to progress and there is alignment in their skill set and the billing rate that will be charged for their services.  *See* Ex. 53 (Comp. Brochure) at MORRISON-698.  Thus, reclassification is not a demerit or a permanent or insurmountable setback; it is more akin to a withholding of a promotion.  *See* Ex. 140 (30(b)(6)) 179:21-180:1, 188:25-189:14; *see also Stout*, 276 F.3d at 1122 (affirming denial of disparate impact claim based on a policy requiring selection for screening interviews *before* being eligible for promotion).

In assessing whether a promotion policy causes a disparate impact, "the appropriate comparison is between the composition of candidates seeking promotion and the composition of those ***actually promoted***."  *Stout*, 276 F.3d at 1123 (citation omitted) (emphasis added).  Under the dominant rule in the Ninth Circuit, a court should compare the ***pass rates*** of the allegedly adversely impacted group to the non-adversely impacted group.  *See, e.g.*, *Ricci v. Destefano*, 557 U.S. 557, 586 (2009); *Stout*, 276

Gibson, Dunn &
Crutcher LLP

21

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

F.3d at 1124 (comparing the selection rate of male and female candidates who *were interviewed* and thus considered for promotion); *Clady v. L.A. Cty.*, 770 F. 2d 1421, 1429-30 (9th Cir. 1985) (comparing pass rates of Hispanic candidates to white candidates and rejecting argument to compare fail rates); 29 C.F.R. § 1607.4(D).  Under the EEOC's guidelines, a "selection rate for any [protected] group which is less than four-fifths . . . of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact . . ." 29 C.F.R. § 1607.4(D).  Although this 80% standard is not absolute, it is a useful rule of thumb to determine whether a "statistical disparity is 'substantial' or 'significant' in a given case." *Clady*, 770 F.2d at 1428-29.

Ms. William was not promoted under the policy on a discretionary basis.  Over the period from 2015-2019, however, 92.1% of the time when women took maternity leave (105/114), 99.2% of the time when men took paternity leave (123/124), and 99.5% of the time when women took no leave in a year (836/840) they were deemed to have acquired the necessary skills and experience to be promoted.  Brass Decl. ¶ 159.  Because the ratio of the pass rate for women who took leave and the pass rate for men and for women who did not take leave is approximately 93% (92.1/99.2 or 99.5), she cannot establish a prima facie case of disparate impact discrimination.  *See Ricci*, 557 U.S. at 586; *Stout*, 276 F.3d at 1124; *Clady*, 770 F.2d at 1429-30.  In other words, because the ratio of the pass rate for women who took leave compared to the pass rate for men and for women who did not take leave is greater than the 80% benchmark, there is no prima facie case of disparate impact discrimination.

Ms. William lacks standing to challenge mandatory reclassification because she met the 600 Legal Service Hours requirement in each year of practice and was never subject to a mandatory reclassification. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  In any event, out of the 121 instances of women taking maternity leave over the same 2015 to 2019 period, 114 (or 94.2%) had at least 600 Legal Services Hours during the year, as did all men who took paternity leave.  Brass Decl. ¶ 160.  Here too, the 80% benchmark is readily met.

Moreover, even if Ms. William had established a disparate impact, her claim would still fail because the reclassification policy is justified by a "business necessity" (42 U.S.C. § 2000e-2(k)(1)(A)(i) (2018)) and there is no "available alternative . . . practice that has less disparate impact and serves [the Firm's] legitimate needs." *Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys.*

Gibson, Dunn &
Crutcher LLP

22
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

*Project*, 135 S. Ct. 2507, 2518 (2015) (quotation omitted); *see* 42 U.S.C. § 2000e-2(k)(1)(A)(ii) (2018). In general, in the context of hiring or promotions, the business necessity defense shields employers from disparate impact liability where their hiring or promotion criteria have a "manifest relationship to job performance." *Tex. Dept. of Hous.*, 135 S. Ct. at 2517 (internal quotations omitted). The criteria need not be "essential or indispensable to achieving its stated goal," but the defendant "must produce evidence that the practice serves legitimate ends." *Hardie v. Nat'l Collegiate Athletic Assoc.*, 876 F.3d 312, 320 (9th Cir. 2017).

As Morrison's Rule 30(b)(6) witness Anna Erickson White testified, the purpose of reclassification is to provide associates with more runway to develop the skills and experience needed to advance. Ex. 140 (30(b)(6)) at 179:21-180:1, 188:25-189:14. It is a sign of faith in the associate's ability to succeed at the Firm, not a covert message to seek employment elsewhere. *Id.* Ms. William decries the policy on the assumption that all associates are entitled to advancement and increased pay as a matter of course. But the alternative for associates lacking the necessary skills is not advancement, it is ███████████████████████████████████████████████

Reclassification occurs not only after a leave of absence, but for many reasons as well. An associate may have moved practice groups and needs time to learn a new field. Ex. 140 (30(b)(6)) at 178:18-21. A practice group may be slow, meaning that an associate is not getting the typical expected range of experiences. *Id.* at 178:22-23. Or a lateral associate—like Ms. William—has a skill set and experience that "doesn't match up under the partner's assessment [of] what they would expect for an attorney in their group at that level at that time." *Id.* at 178:18-179:1,190:7-18. That is precisely the situation Ms. William encountered.

The reason for Morrison's reclassification policy is simple and irrefutable: as a general matter, the Firm would not attract many clients if it continued to increase billing rates for associates whose skills did not support those rates, and it cannot pay more to associates who have not sufficiently contributed to the Firm's bottom line. Therefore, a holistic assessment of an associate's performance, skills, and experiences is essential to determine whether they will be successful at the next level of seniority. Further, maintaining alignment between billing rates and associate skill and experience preserves clients' trust that the rates they are being charged accurately reflect the nature of the services

Gibson, Dunn &
Crutcher LLP

23
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC

being rendered. *See Blum v. Stenson*, 465 U.S. 886, 899 (1984) ("The 'quality of representation' . . . generally is reflected in the reasonable hourly rate."); *see also*, *e.g.*, Model Rule of Prof. Conduct 1.5 ("A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount of expenses" and shall consider "the skill requisite to perform the legal service properly" in setting the fee); *id*. Rule 1.1 (declaring that a lawyer shall provide "competent representation" to a client and therefore cannot charge for inexperience); 4AC ¶ 47 (tacitly admitting that clients expect to be charged a lower rate for less senior lawyers by faulting the Firm for temporarily increasing her billing rate despite her reclassification). Because the reclassification policy is consistent with business necessity, Ms. William's disparate impact claim fails.

**E.      Because Ms. William Cannot Prove Her Other Claims, The Unfair Competition Claim (Count 8) Fails**

Plaintiff also claims unfair competition in violation of California Business and Professions Code § 17200. *See* 4AC, Count 8. However, as demonstrated above, Ms. William cannot prove any of the claims pursuant to FEHA or CFRA. Therefore, Ms. William's unfair competition claim fails as a matter of law. *Lopez v. Wash. Mut. Bank, FA*, 302 F.3d 900, 907 (9th Cir. 2002) (where there is no predicate violation of underlying statute, Section 17200 claims necessarily fail) (citing *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505 (1999); *see also Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) ("the traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a party requests restitution under [California's Unfair Competition Law]").

**F.      Ms. William Is Not Entitled To Punitive Damages**

Discrimination claimants who seek punitive damages under 42 U.S.C. § 1981a must meet a heightened standard. First, punitive damages are only available under a disparate treatment theory of intentional discrimination. *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 534 (1999). Second, the plaintiff must demonstrate: (1) that a supervisor acted with "malice or with reckless indifference to the federally protected rights of an aggrieved individual," and (2) that punitive damages can be imputed to the employer. *Id.* at 534, 539-40. A corporate employer "is liable for punitive damages for acts of its employee only if one of its managing agents 'authorized or ratified the wrongful conduct for which [actual] damages are awarded.'" *Borges v. U.S. Bank*, No. 12-2472, 2014 WL 530283, at *12 (E.D.

1    Cal. Feb. 7, 2014) (citations omitted); *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999) (managing

2    agent is someone who "exercises substantial discretionary authority over decisions that ultimately de-

3    termine corporate policy").

4         Ms. William cannot meet this demanding standard.  Ms. William claims that the "worst thing

5    that has happened" to her at Morrison was "being shut out and pushed out of this practice group" and

6    not being staffed on a renewable energy deal since before she went on leave.  Ex. 137 (William I) at

7    178:25-179:6.  However, as is explained in detail above, Mr. Chester and Ms. Sluder's decision to not

8    staff Ms. William was not based on malice or reckless indifference; it was due to Ms. William's *ad-*

9    *mitted* shortcomings as a senior associate and the availability of significantly better associates ███

10   ██████████████████████    at *every* level of seniority in the practice group.  *See* §§ B-D, *supra*.  Ms.

11   William, like all associates at Morrison, was not *guaranteed* work on deals of her choice.  *See* Ex. 143

12   (Peck) at 230:24-231:10.  She had to earn the trust of partners staffing the deals and show why she was

13   a better choice than other available associates.  *Id.*  She could not do that and was not staffed as a result.

14   Therefore, the *worst* thing that happened to Ms. William, in her own words, was being subjected to the

15   marketplace for work that every other associate participates in and failing to succeed.  This is an insuf-

16   ficient basis to sustain a claim of punitive damages.

17                           **VI.    CONCLUSION**

18         For the foregoing reasons, the Court should grant Morrison's Motion for Summary Judgment.

19   Dated: October 7, 2020

20                                     MICHELE L. MARYOTT
                                       RACHEL S. BRASS
21                                     RONALD J. GOMEZ
                                       GIBSON, DUNN & CRUTCHER LLP
22

23

24                                     By:  */s/ Michele L. Maryott*
                                              Michele L. Maryott
25
                                       Attorneys for Defendant
26                                     MORRISON & FOERSTER LLP

27

28

Gibson, Dunn &
Crutcher LLP

25
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF S. WILLIAM – CASE NO. 3:18-CV-02542-JSC