MICHELE L. MARYOTT, SBN 191993
 mmaryott@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
Facsimile:  949.451.4220

RACHEL S. BRASS, SBN 219301
 rbrass@gibsondunn.com
LAUREN M. BLAS, SBN 296823
 lblas@gibsondunn.com
RONALD GOMEZ, SBN 295274
 rgomez@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

AMANDA C. MACHIN (admitted *pro hac vice*)
 amachin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500
Facsimile:  202.467.0539

Attorneys for Defendant
MORRISON & FOERSTER LLP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERRY A. WILLIAM and JOSHUA ASHLEY KLAYMAN,<br><br>Plaintiffs,<br><br>v.<br><br>MORRISON & FOERSTER LLP,<br><br>Defendant. | CASE NO. 3:18-cv-02542-JSC<br><br>**DEFENDANT MORRISON & FOERSTER LLP'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN**<br><br>**Hearing:**<br>Date:  Thursday, December 10, 2020<br>Time:  9:00 a.m.<br>Place:  Courtroom E, 15th Floor<br>Magistrate Judge Jacqueline Scott Corley |

## *PUBLIC COPY*
## *Confidential Copy Lodged Pursuant to Local Rule 79-5(c)-(d)*

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 10, 2020, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom E of the above-captioned court, located on the 15th Floor at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Morrison & Foerster LLP ("Morrison" or the "Firm") will, and hereby does, move this Court under Federal Rule of Civil Procedure 56 for summary judgment in favor of Morrison on all causes of action asserted by Plaintiff Joshua Klayman in the Fourth Amended Complaint ("4AC").

This Motion is based upon this Notice and Motion, the accompanying Compendium of Declarations and all exhibits attached thereto, the Declaration of Rachel S. Brass and all exhibits thereto, and such additional evidence and argument as the Court may consider at the hearing on this Motion.

Dated: October 6, 2020

By:  */s/ Rachel S. Brass*
　　　　　　　　　　　　Rachel S. Brass

MICHELE L. MARYOTT
RACHEL S. BRASS
LAUREN M. BLAS
AMANDA C. MACHIN
GIBSON, DUNN & CRUTCHER LLP

Attorneys for Defendant
MORRISON & FOERSTER LLP

Gibson, Dunn & Crutcher LLP

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF
KLAYMAN– CASE NO. 3:18-CV-02542-JSC

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF ISSUES TO BE DECIDED ................................................... 2

III.  FACTUAL BACKGROUND ............................................................................... 2

IV.   LEGAL STANDARD ........................................................................................... 7

V.    ARGUMENT ........................................................................................................ 7

A.    Ms. Klayman's Choice To Work On Leave Defeats Her FMLA Claim
      (Count 2) ...................................................................................................... 7

B.    Ms. Klayman's Non-Promotion To Partner And Related Workplace Conflicts
      Were The Product Of Her Choices, Not Intentional Discrimination Claims
      (Counts 1 & 9)............................................................................................ 10

      1.    Morrison Did Not Promote Ms. Klayman In 2016 Or 2017 Because She
            Did Not Meet Its Standards And There Was No "Business Case" ................ 11

      2.    Morrison Did Not Intentionally Discriminate Against Ms. Klayman
            With Respect To Work Opportunities........................................................ 15

      3.    Morrison Did Not Treat Ms. Klayman "Less Well" Than Comparable
            Male  Colleagues (Count 9) ...................................................................... 16

C.    Morrison Did Not Intentionally Discriminate With Respect To Pay (Counts 12
      & 13) ........................................................................................................... 18

D.    Ms. Klayman Cannot Prove A Disparate Impact Claim (Count 1)............................ 20

      1.    There Is No Disparity In Of Counsel Compensation ..................................... 21

      2.    There Is No Disparity In Promotion To Partnership....................................... 22

E.    Ms. Klayman Cannot Prove A Claim For Retaliation (Counts 10 & 11) ................. 22

F.    Ms. Klayman Is Not Entitled To Punitive Damages........................................... 25

VI.   CONCLUSION ................................................................................................... 25

Gibson, Dunn &
Crutcher LLP

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Arnold v. Newsome*,

5

    No. 02-8696, 2005 WL 994454 (N.D. Ill. Mar. 25, 2005)............................................................12

6

*Bhan v. NME Hospitals*,

    929 F.2d 1404 (9th Cir. 1991)....................................................................................................7

7

8

*Boatwright v. Pac. Gas & Elec. Co.*,

    No. 16-0237874, 2017 WL 3579569 (N.D. Cal. July 6, 2017).....................................................8

9

*Borges v. U.S. Bank*,

10

    No. 12-2472, 2014 WL 530283 (E.D. Cal. Feb. 7, 2014)............................................................25

11

*Clady v. L.A. Cty.*,

    770 F.2d 1421 (9th Cir. 1985)..................................................................................................22

12

13

*Contreras v. City of L.A.*,

    656 F.2d 1267 (9th Cir. 1981)..................................................................................................21

14

*Cornwell v. Electra Cent. Credit Union*,

15

    439 F.3d 1018 (9th Cir. 2006)..................................................................................................10

16

*D'Onofrio v. Vacation Publ'ns, Inc.*,

    888 F.3d 197 (5th Cir. 2018)....................................................................................................10

17

18

*Davis v. Team Elec. Co.*,

    520 F.3d 1080 (9th Cir. 2008)..................................................................................................22

19

*DeLuca v. Sirius XM Radio, Inc.*,

20

    No. 12-8239, 2017 WL 3671038 (S.D.N.Y. Aug. 7, 2017)........................................................19

21

*Doubt v. NCR Corp.*,

    No. 09-5917, 2014 WL 3897590 (N.D. Cal. Aug. 7, 2014) .......................................................21

22

23

*Edgar v. JAC Products, Inc.*,

    443 F.3d 501 (6th Cir. 2006)....................................................................................................10

24

*Ellison v. Chartis Claims, Inc.*,

    178 A.D.3d 665 (2019) ............................................................................................................18

25

26

*Escriba v. Foster Poultry Farms, Inc.*,

    743 F.3d 1236 (9th Cir. 2014)....................................................................................................8

27

*Foster v. Arcata Assocs., Inc.*,

28

    772 F.2d 1453 (9th Cir. 1985), *overruled on other grounds by*

    *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991) ................................................18, 19

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF
KLAYMAN– CASE NO. 3:18-CV-02542-JSC

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Godbolt v. Verizon N.Y. Inc.*,
  981 N.Y.S.2d 694 (1st Dept. 2014)..............................................................................17

*Godwin v. Hunt Wesson, Inc.*,
  150 F.3d 1217 (9th Cir. 1998)......................................................................................10

*Grosz v. Boeing Co.*,
  455 F. Supp. 2d 1033 (C.D. Cal. 2006)....................................................................11, 12

*Hargrave v. Univ. of Wash.*,
  113 F. Supp. 3d 1085 (W.D. Wash. 2015)....................................................................11

*Hollowell v. Kaiser Found. Health Plan of the Nw.*,
  705 F. App'x 501 (9th Cir. 2017) ..................................................................................8

*Kolstad v. Am. Dental Ass'n*,
  527 U.S. 526 (1999).....................................................................................................25

*Lynn v. Regents of Univ. of Cal.*,
  656 F.2d 1337 (9th Cir. 1981)..................................................................................10, 11

*Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*,
  826 F.3d 1149 (8th Cir. 2016).........................................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).......................................................................................................7

*Meredith v. Beech Aircraft Corp.*,
  18 F.3d 890 (10th Cir. 1994).........................................................................................15

*Moran v. Selig*,
  447 F.3d 748 (9th Cir. 2006).........................................................................................11

*Museau v. Heart Share Human Servs. of N.Y.*,
  No. 12-cv-1851, 2014 WL 1277006 (E.D.N.Y. Mar. 27, 2014).....................................9

*O'Conner v. Consol. Coin Caterers Corp.*,
  517 U.S. 308 (1996)......................................................................................................10

*Powell v. Consol. Edison Co. of N.Y., Inc.*,
  No. 97-2439, 2001 WL 262583 (S.D.N.Y. Mar. 13, 2001) ..........................................15

*Reichman v. City of N.Y.*,
  179 A.D.3d 1115 (2020) ...............................................................................................18

*Rose v. Wells Fargo & Co.*,
  902 F.2d 1417 (9th Cir. 1990).......................................................................................20

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*South v. Cont'l Cas. Co.*,
  No. 17-5741, 2018 WL 4689106 (S.D.N.Y. Sept. 27, 2018)...........................................11, 17, 18

4

5

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993) ...........................................................................................................11

6

*Stout v. Potter*,
  276 F.3d 1118 (9th Cir. 2002)......................................................................................20, 22

7

8

*Swenson v. Potter*,
  271 F.3d 1184 (9th Cir. 2001)................................................................................................24

9

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
  809 F.2d 626 (9th Cir. 1987).................................................................................................7

10

*Taboas v. Fiddler, Gonzalez & Rodriguez, PSC*,
  39 F. Supp. 3d 188 (D.P.R. 2014).........................................................................................12

11

12

*Talwar v. Staten Island Univ. Hosp.*,
  No. 12-cv-33, 2016 WL 1298969 (E.D.N.Y. Mar. 31, 2016)..........................................11, 23

13

14

*Tex. Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981) .............................................................................................................10

15

*Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,
  576 U.S. 519 (2015) .............................................................................................................21

16

17

*Thomas v. Douglas*,
  877 F.2d 1428 (9th Cir. 1989).....................................................................................23, 24, 25

18

19

*Tse v. N.Y. Univ.*,
  No. 10-7207, 2013 WL 5288848 (S.D.N.Y. Sept. 19, 2013).............................................17

20

*Tulino v. City of N.Y.*,
  813 F. App'x 725 (2d Cir. 2020)...........................................................................................23

21

22

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) .............................................................................................................22

23

24

*Van Asdale v. Int'l Game Tech.*,
  No. 04-703, 2009 WL 4828708 (D. Nev. Dec. 8, 2009).....................................................18

25

*Vasquez v. Cty. of L.A.*,
  349 F.3d 634 (9th Cir. 2003).................................................................................................10

26

27

*Villiarimo v. Aloha Island Air*,
  281 F.3d 1054 (9th Cir. 2002)...............................................................................................23

28

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Volpe v. Nassau Cty.*,
   915 F. Supp. 2d 284 (E.D.N.Y. 2013) ........................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................................21, 22

*Wards Cove Packing Co. v. Atonio*,
   490 U.S. 642 (1989) ........................................................................20

*Williams v. N.Y. City Hous. Auth.*,
   61 A.D.3d 62 (2009) ........................................................11, 17, 18, 24

*Williams v. Regus Mgmt. Grp.*,
   836 F. Supp. 2d 159 (S.D.N.Y. 2011)......................................15, 17

*Williams-Windom v. Potter*,
   No. 06-1561, 2007 WL 9724366 (C.D. Cal. Apr. 23, 2007) ........................12

*Zayed v. Apple Computers*,
   No. 04-01787-JM, 2006 WL 889571 (N.D. Cal. Apr. 5, 2006).....................15

**Statutes**

29 U.S.C. § 2612(a)(1)(C) ........................................................................7

29 U.S.C. § 2612(c) ........................................................................7

29 U.S.C. § 2615(a)(1) ........................................................................7

29 U.S.C. § 2617(a)(1)(A)(i)(I)........................................................10

29 U.S.C. § 2617(c)(1)-(2) ........................................................................8

42 U.S.C. § 1981a(b)(1) ........................................................................25

42 U.S.C. § 2000e-2(k)(1)(A)(i) ........................................................21

42 U.S.C. § 2000e-2(k)(1)(A)(ii) ........................................................21

**Rules**

Fed. R. Civ. P. 56(c)........................................................................7

**Regulations**

29 C.F.R. § 825.220(b) ........................................................................8

29 C.F.R. § 1607.4(D)........................................................................22

Gibson, Dunn &
Crutcher LLP

v

# I.    INTRODUCTION

Joshua Klayman started her career at Morrison & Foerster LLP in the Financial Transactions Group, which later became part of the Finance & Projects Group, doing traditional lender-side finance work.  Over time, however, Ms. Klayman gravitated toward higher-profile, less traditional work, eschewing the bread-and-butter Finance work for the allure of cryptocurrency, ICOs, blockchain and smart contracts.  Although the practice was novel and untested, she devoted hundreds of hours to writing and speaking engagements designed to elevate her reputation and ███████████████—but at the expense of billable work, basic principles of legal practice, and the Finance colleagues who had supported her.  She leaned in to the pursuit of blockchain stardom, and away from the path to partnership.

Ms. Klayman's choices did not lead to the result she wanted.  So she pointed fingers, claiming discrimination.  But the undisputed facts adduced in discovery show otherwise.

*First*, she contends that Morrison forced or required her to work while on maternity leave, even though the record evidence makes clear that *she* was the one who insisted on working, despite being repeatedly told that was not permitted or required.  Indeed, she made great show of her blockchain devotion saying things like, "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

*Second*, Ms. Klayman contends Morrison discriminated in not promoting her to partnership and contends that the promotion process disadvantages women who take leaves.  There is no evidence of the latter. As to the former, there is no question that she was intent on advancement and Morrison partners gave her clear guidance on how to best position herself.  But that guidance required a choice: return to the reliable but less glamorous financial transactions work where she was at her best, or continue to take a gamble on a practice area, and take the time needed to develop an actual book of business sufficient to sustain a Morrison equity partnership, while producing exceptional-quality work.  Ms. Klayman chose the blockchain path, but that was the longer road.  Thus, in 2017, she simply had not yet developed the "business case" or the reputation for exceptional work and partner-level judgment required to be promoted to partner at Morrison.

1    *Third*, Ms. Klayman complained to Human Resources about ████████████████

2    ████████████████, and convinced herself that the reason for her failure to advance was not her

3    own choices, but discrimination.  While she alleges that her reports resulted in retaliation, the evidence

4    shows that Ms. Klayman simply thought her complaint to HR would insulate her from the repercussions

5    of her pattern of increasingly unprofessional decisions and behavior.

6    *Finally*, Ms. Klayman alleges disparate treatment and impact discrimination in pay.  This claim

7    is baseless.  She has not identified any similarly situated men or childfree women who were paid more.

8    It didn't have to be this way.  Until Ms. Klayman quit, the Firm held out hope she could be

9    mentored into making better decisions and focusing her blockchain efforts not just on marketing, but

10   on generating paid work.  But ultimately, Ms. Klayman wasn't interested in being a team player, and

11   dismissed the advice of her friends and colleagues.  The record evidence in this case—from Ms. Klay-

12   man's own emails and documents to the dozens of witnesses who worked with or interacted with her—

13   makes abundantly clear that Ms. Klayman is her own worst enemy and unwilling to face the conse-

14   quences of her choices.  Summary judgment should be granted on all of Ms. Klayman's claims.

15   ## II.    STATEMENT OF ISSUES TO BE DECIDED

16   Whether Morrison is entitled to summary judgment on Ms. Klayman's claims of (a) interfer-

17   ence with leave under the Family Medical Leave Act ("FMLA") (Count 2); (b) disparate treatment

18   under Title VII, and the New York City Human Rights Law ("NYCHRL") (Counts 1 and 9); (c) vio-

19   lation of the federal and New York Equal Pay Act (Counts 12 and 13); (d) disparate impact under Title

20   VII and the NYCHRL; and (e) retaliation under Title VII and the NYCHRL (Counts 10 and 11).

21   ## III.    FACTUAL BACKGROUND

22   ████████████████████████████████, Ms. Klayman joined

23   Morrison as an associate in 2013.  Ex. 149, Wojciechowski ("Woj.") Tr. 152:25-154:13.[1]  It was her

24   fifth law firm in seven years.  Ex. 6 at MORRISON-212 (resume).  She was well into her third trimester

25   of pregnancy when offered a position in the Financial Transactions Group in the firm's Finance De-

26   partment.  Ex. 24, MORRISON-2290 (Final Offer Letter); Ex. 149, Woj. Tr. 155:12-16; Ex. 138, Klay-

27

28

[1]  Unless otherwise noted, numbered exhibits are attached to the Declaration of Rachel S. Brass.

man Tr. 185:10-186:17 (maternity leave a month after being hired); McCord Decl. Ex. A at MORRI-SON-12717 (HR File).  Among other terms, it was negotiated that her annual bonus would *not* be prorated for her upcoming leave, and that she would not be eligible for partnership consideration for at least two years.  Ex. 22, DOES-26237 (May 15, 2013 email re Offer Letter); Ex. 24, MORRISON-2290 (Offer Letter).

Following her return from leave in November 2013, she performed well, and in July 2014, was promoted to of counsel.  Ex. 6 at MORRISON-197 (2014 evaluation), McCord Decl. Ex. A, MORRISON-12712-17 (HR File).  Ms. Klayman adeptly handled the detailed aspects of her finance work, but struggled to make the decisions about what was material and what was not.  Ex. 7 at MORRISON-2310; Dopsch Decl. ¶ 2. ████████████████████████████████████████████████ ████████████████████████████████ Ex. 6 at MORRISON-199 (evaluation); Ex. 26, MORRISON-7945 (Woj. review). ████████████████████████████████ ████████████████████████████████████████ . Ex. 31, MORRISON-7476.

At Morrison, Practice Group Heads propose partnership candidates to Department Chairs.  Ex. 140, 30(b)(6) Tr. 213:4-214:1.  That list is winnowed by the Department Chairs and Firm management, which ultimately recommends a short list, and after further review and shortening, a slate of potential candidates is sent to the Partnership Review Committee.  *Id*. 214:5-22.  Ms. Klayman was twice recommended by her practice group to the Finance Department Chairs, but never advanced further.  Ex. 46, MORRISON-7531 (2016); Ex. 66, MORRISON-11332 (2017); 4AC ¶ 117.

Mark Wojciechowski, who had worked with Ms. Klayman at a different firm before joining Morrison, first identified Ms. Klayman as a potential candidate in 2016.  Ex. 149, Woj. Tr. 18:25–19:8, 238:3–240:15; Woj. Decl. ¶ 2.  At the time, however, the revenues of Ms. Klayman's practice group were down by over 20%, and there was no compelling case for adding an equity partner.  Ex. 149, Woj. Tr. 245:2–247:1; Ex. 145, Spiliotes Tr. 107:5-14 (2016 was a "really very bad financial year"); Ex. 142, Lee Tr. 155:24-157:3 (a 21.9% drop in revenue was "staggeringly large"); *id*. 152:14–153:7 (explaining that "it's plausibly possible that from one year to the next, the economic and/or strategic contributions of a practice group would have a material impact on that practice group's ability to support another partner"); Ex. 32, MORRISON-7526 ("very tough year to put forward a candidate").  Due to

1  reduced demand in 2016, no one from the entire Finance Department was put up.  Ex. 142, Lee Tr.

2  155:24–160:6, 174:9–179:22; Ex. 145, Spiliotes Tr. 110:5-20; Ex. 149, Woj. Tr. 233:6–235:11.

3         After Ms. Klayman learned that she would not be promoted in 2016, she sought concrete feed-

4  back on how to improve her chances.  Ex. 145, Spiliotes Tr. 116:12-25.  Because she was a serious

5  prospect for future promotion, Nick Spiliotes, a Finance Department Co-Chair, consulted partners with

6  whom she had worked.  *Id.* 134:24–135:4; Ex. 59, MORRISON-7459; Ex. 51, MORRISON-9002.  He

7  then gave her specific feedback, the most important being to seek out more *substantive* (billable) fi-

8  nancial transactions work with a variety of other partners (including influential partners), so that they

9  could attest to her abilities.  Ex. 145, Spiliotes Tr. 140:12–141:25.  But instead of taking that advice,

10  Ms. Klayman doubled down on what would become the center of her professional interest:  a new,

11  interdisciplinary Blockchain + Smart Contracts Task Force, which she co-founded with others, includ-

12  ing Corporate associate Dario de Martino.  Ex. 8, MORRISON-2258 (2016 Review of Dario); Ex. 133,

13  DOES-32184.  Ms. Klayman viewed blockchain as a "cutting edge" area of the law and devoted hun-

14  dreds of hours to marketing herself as a blockchain expert and generating long lists of her outreach

15  efforts.  Ex. 6, MORRISON-123-140; Ex. 64, MORRISON-18323 (lists).  These efforts, unfortunately,

16  detracted from her willingness to do traditional finance work, and the quality of the work when she

17  could be convinced to do so.  Dopsch Decl. ¶ 3.  And there was no clear "business case" for blockchain.

18  Ex. 145, Spiliotes Tr. 169:15-172:9; 194:25-195:18; Ex. 142, Lee Tr. 145:4-22.

19         In June 2017, Ms. Klayman took a third maternity leave.  McCord Decl. Ex. D, MORRISON-

20  12846-47 (2017 LOA Approval Letter).  Prior to the leave, she became increasingly territorial and

21  worried about having the ███████████████████████ Ex. 147, Klayman Tr. 384:15-

22  387:21; Ex. 56, MORRISON-13922-28 (attempting to exert control over all blockchain-related ex-

23  penditures).  Thus, during her four-month leave, Ms. Klayman ████████████████████

24  ███████████████ (*see* Brass Decl. ¶ 165 (time records)), notwithstanding repeated in-

25  struction that she need not work (*see* Ex. 60, MORRISON-2238-40; Ex. 61, MORRISON-27083-85;

26  Lamb Decl. ¶ 7) and against her mentor's advice that rather than focus "on the thick of thin things,"

27  she focus on generating billable work.  Ex. 149, Woj. Tr. 267:2-268:21; Ex. 114, MORRISON-7546

28  ("the key is for you to really streamline your BD so that you focus on what can yield billable work").

That same year, Mr. Wojciechowski again recommended Ms. Klayman for partnership consid-eration. Ex. 145, Spiliotes Tr. 167:24–168:13. ██████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████. *Id*. 145:2-9, 145:15-22, 151:9-20; Ex.

58, MORRISON-3850.  He and others solicited feedback from dozens of the identified partners.  Ex.

134, MORRISON-7165; Ex. 145, Spiliotes Tr. 178:12–181:1. ███████████████████

█████████████████████████████████████████.” *Id.*; Ex. 134 at MOR-

RISON-7166-73. ██████████████████████████████████████████████

██████████████████” (Ex. 145, Spiliotes Tr. 170:12), ████████████████████

████████████. Ex. 147, Klayman Tr. 412:12-19.  This was hardly the needed "chorus of support."

Ex. 145, Spiliotes Tr. 188:10–190:22.

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 80, MOR-

RISON-8224; Ex. 68 at MORRISON-13747.  She was offered a communications coach to help her

(*id.*), and was actively mentored by Finance Department Co-Chair Gary Lee and then-Deputy Chair

Jen Marines.  Ex. 145, Spiliotes Tr. 191:18-22; Ex. 90, MORRISON-9107; *see also* Ex. 88, MORRI-

SON-3271 (positive feedback from Lee); Ex. 142, Lee Tr. 245:2-247:25.

Ms. Klayman's own notes make the clear the guidance she was given.  Ex. 69, DOES-54032

(flagging ██████████████████████████████████████████████████

████████████████████████████████████████ as areas of feedback).  Yet upon her

return from leave, she did precisely the opposite, █████████████████████████

████████████████████████████████████████. Brass Decl. ¶

165.  At the same time, she became increasingly competitive with Mr. de Martino, the Corporate asso-

ciate with whom she had co-founded the Task Force.  Lockwood Decl. ¶¶ 5, 13.  In early November

2017, Ms. Klayman self-published a thinly veiled article excoriating him.  Ex. 76, MORRISON-2282.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF
KLAYMAN– CASE NO. 3:18-CV-02542-JSC

█████████████████████████████████████████████████████████████

██████████████████████████████████████. Ex. 151, Herman Tr. 127:9–130:19; Ex. 144, McCord Tr. 112:3-24. ██████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████ Ex. 144, McCord Tr. 85:6-19, 176:20-178:17, 186:7-190:1; Ex. 135, MORRI-SON-9754. ███████████████████████████. Ex. 144, McCord Tr. 195:1-196:12.

Ms. Klayman's response to the feedback regarding her judgment and communications were no better. She became increasingly non-responsive to routine emails (Dopsch Decl. ¶ 3), missed important calls with clients (Ex. 89, MORRISON-11318; Ex. 92, DOES-23817-18), failed to enter her time promptly (Klein Decl. ¶ 6), and "███████████████████████████." Ex. 94, MORRI-SON-2218. As a result, numerous partners continued to voice serious concerns about Ms. Klayman's judgment, her lack of teamwork, and her overall readiness for promotion. Ex. 145, Spiliotes Tr. 164:3-18, 165:5-25, 188:10–190:22; Ex. 155, MORRISON-7520; Ex. 142, Lee Tr. 145:4-22. All the while, she grew increasingly mistrustful and her complaints to HR intensified, as she tried, in her words, "██████████████████████████████████████" Ex. 147, Klayman Tr. 389:4-7; Exs. 119-125 (emails to HR); Ex. 132, DOES-29946; Woj. Decl. ¶ 5 (██████████████████████████████████████).

After months of interviewing for partner positions (*e.g.*, Ex. 93, DOES-41097, Ex. 86, DOES-22742), but failing to attract interest given her lack of business case (Ex. 147, Klayman Tr. 412:12-19), and generating the impression that she was "███████████████" and "████████████████████" (Ex. 93, DOES-41097; Ex. 147, Klayman Tr. 396:19-397:13), Ms. Klayman voluntarily resigned in June 2018. After generating only $██████████████████ (Ex. 147, Klayman Tr. 474:22–475:25), she returned to law firms, pitching her blockchain practice in a partnership bid (and ██████████████ ███████████████████████████) (Curry Decl. (SW-33); Hart Decl. ¶ 3; Burke Decl. Ex. 6, DOES-42886-87; Burke Decl. ¶ 10 & Ex. T, WHIS-603), but ██████████████████████████████ ██████████████████. Ex. 147, Klayman Tr. 412:12-19. She ultimately joined another firm as of counsel. Ex. Katz-Hickman Decl. Ex C., LINK-478-79.

## IV.  LEGAL STANDARD

Summary judgment should be granted to a defendant when there is "no genuine issue as to any material fact" (Fed. R. Civ. P. 56(c)), meaning, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations omitted).  A movant need not introduce evidence to negate the non-moving party's claims; they may simply point to portions of the pleadings, admissions, answers to interrogatories, and depositions which, along with any affidavits, show the absence of a genuine issue of material fact.  *Bhan v. NME Hosps.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the movant demonstrates the absence of genuine issues of material fact, the non-moving party "must produce *specific evidence* through affidavits or admissible discovery material, to show that the dispute exists." *Id.* (emphasis added).  Only "rational or reasonable" inferences may be drawn in favor of the non-moving party.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

## V.  ARGUMENT

Ms. Klayman owned and drove her career at Morrison.  From the beginning, she wanted to be a partner, and she made a series of decisions she thought best positioned her to get there.  When her plans and choices did not yield the desired results, she chose to disregard feedback that was intended to help her succeed and instead began pointing fingers, complaining to HR about purported discrimination by two male colleagues who participated in the Blockchain group while simultaneously making requests that, if honored, would prevent any meaningful investigation.  These decisions were Ms. Klayman's to make; that she is in hindsight unhappy does not establish that any decision affecting her, much less her own decision to leave Morrison, was "based on" discrimination.  Summary judgment for Morrison should be entered on all of her claims.

### A.  Ms. Klayman's Choice To Work On Leave Defeats Her FMLA Claim (Count 2)

Under the FMLA, an employee is generally entitled to up to 12 weeks of unpaid maternity leave and an employer may not interfere with the employee's attempt to take such leave.  *See* 29 U.S.C. §§ 2612(a)(1)(C) & (c), 2615(a)(1).  "[I]nterfering with" includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b); *Boatwright v. Pac. Gas & Elec. Co*., No. 16-0237874, 2017 WL 3579569, at *7 (N.D. Cal. July 6, 2017).

Gibson, Dunn & Crutcher LLP

A plaintiff claiming FMLA interference must prove, *inter alia*, that her employer denied her FMLA benefits to which she was entitled. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014). Ms. Klayman's decision to work on leave precludes proof of this essential element.

Ms. Klayman took three maternity leaves while at Morrison. The first began on July 19, 2013, and is not at issue here. The second ran from April 20 to August 28, 2015. Lamb Decl. ¶ 5, McCord Decl. Ex. C, MORRISON-14744 (leave of absence confirmation). Ms. Klayman's claims regarding this leave are time-barred.[2] In any event, her emails at the time confirm that any work was her choice:

Ex. 36, DOES-33704 (bold added); Ex. 34, MORRISON-43656; Ex. 147, Klayman Tr. 356:24-358:5.

Her third leave began on June 5, 2017, within a year of the creation of the Blockchain + Smart Contracts Task Force. Woj. Decl. ¶ 3; Lamb Decl. ¶ 5; McCord Decl. Ex. A at MORRISON-12713. In Ms. Klayman's (oft-repeated) words, this was a ." Ex. 55, MORRISON-13934 (" "); Ex. 138, Klayman Tr. 34:16-35:15; Ex. 56 at MORRISON-13923 (similar); Ex. 57 at MORRISON-13956 (similar). As in 2015, she made clear her choice to work, even when colleagues told her not to. For instance, when a partner instructed her to "STOP answering emails!!!!!!!," when she was about to deliver, Ms. Klayman responded, " Ex. 60, MORRISON-2238; Ex. 62 at MORRISON-13977 (emphasis added). And when a partner apologized after learning he had interrupted her leave, she responded,

---

[2] Absent a showing of willfulness, the statute of limitations on an FLSA claim is two years. 29 U.S.C. § 2617(c)(1)-(2). There is no evidence of any willful violation of the FMLA here. Under the analogous FLSA, an employer acts "willfully" when it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Hollowell v. Kaiser Found. Health Plan of the Nw.*, 705 F. App'x 501, 503 (9th Cir. 2017). There is no evidence of either.

1    ██████████████████████████████████████████████████████████ Ex. 61,

2    MORRISON-27083 (emphasis added).

3          To be clear, Morrison never requires attorneys to work while on leave—and prohibits it on

4    disability leave—and most attorneys, including women promoted to partner during or after a leave,

5    don't work.  Lamb Decl. ¶ 4; Ex. 144, McCord Tr. 100:7-19; Balas Decl. ¶ 3.  For example, Jen Ma-

6    rines, a Finance Department Co-Chair, learned she had been promoted to partner while on maternity

7    leave.  Marines Decl. ¶ 2; *see also* Ex. 144, McCord Tr. 100:7-19.  Ms. Klayman was repeatedly re-

8    minded of these policies and norms, including by influential partners (Jackie Liu and Jamie Levitt, Ex.

9    57 at MORRISON-13956; Ex. 60, MORRISON-2238), and Morrison's Senior Benefits Manager (Ex.

10   1, DOES-53830 (voicemail)), but she demurred because she thought she might "make partner"—some-

11   thing she asked to be kept secret.  Lamb Decl. ¶ 8; *see also* Lockwood Decl. ¶ 11 (similar).[3]

12         Critically, Ms. Klayman never suggested her work was involuntary.  Ex. 147, Klayman Tr.

13   354:14-21, 387:8-390:23; Lamb Decl. ¶ 9.  Instead, she wrote that while it was the "████████

14   ████████████████████," she was "not complaining at all."  Ex. 74, MORRISON-13996-98.  Further

15   belying any suggestion of coercion, on the rare occasions that partners contacted her during her leave

16   with work opportunities, she enthusiastically accepted while making clear she did so voluntarily.  *See,*

17   *e.g.*, Ex. 78, DOES-24288-89 (████████████████████████████).  Indeed, when involv-

18   ing others to protect Ms. Klayman's leave was suggested, she tried to insert herself.  Ex. 70, MORRI-

19   SON-13985; Ex. 144, McCord Tr. 85:20-87:12, 101:19-102:2 (████████████████████████

20   ████████████████████████.  And she admitted, ████████████████████████

21   ████████████████████████████████████████."  Ex. 36, DOES-33704.

22   That she later regretted her choice does not establish interference.  *See Museau v. Heart Share Human*

23   *Servs. of N.Y.*, No. 12-cv-1851, 2014 WL 1277006, at *4–5 (E.D.N.Y. Mar. 27, 2014) (granting sum-

24   mary judgment where plaintiff voluntarily worked on leave and did not complain about being con-

25   tacted); *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1159–60 (8th Cir. 2016)

26   (FMLA regulations "permit voluntary and uncoerced acceptance of work by employees on medical

27   ───────────────────────────

28   [3]  Ms. Klayman did not tell the Firm for two months that she had delivered her baby (Lamb Decl. ¶¶ 5, 8) and did not submit the disability leave paperwork.  Ex. 67, MORRISON-16129, Ex. 73, MORRI-SON-14136; McCord Decl. ¶ 19.

Gibson, Dunn &
Crutcher LLP

leave, so long as acceptance is not a condition of employment"); *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 210 (5th Cir. 2018) (no interference where work optional).

Finally, Ms. Klayman's claim fails on the separate ground that she offers no evidence of harm. *See Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507–08 (6th Cir. 2006) ("[T]he FMLA is not a strict-liability statute . . .  Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm."); *see also* 29 U.S.C. § 2617(a)(1)(A)(i)(I) (employer liable for compensation and benefits lost "by reason of the violation").  Ms. Klayman was fully paid, retained all benefits, and was reinstated as an of counsel when she returned from leave. Ex. 138, Klayman Tr. 185:24-186:17; Lamb Decl. ¶ 6.  Summary judgment should be granted on this claim.

**B.    Ms. Klayman's Non-Promotion To Partner And Related Workplace Conflicts Were The Product Of Her Choices, Not Intentional Discrimination Claims (Counts 1 & 9)**

Ms. Klayman claims Morrison intentionally discriminated against her on the basis of gender and maternity status by not making her a partner, passing her over for work opportunities, and treating her "less well" than similarly situated male colleagues because of her gender and maternity leaves.  She asserts these claims under Title VII and New York City's Human Rights Law.  None have any merit.

Disparate treatment under Title VII requires a showing of *intentional* discrimination or animus by the defendant based on a protected characteristic (*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)), which can be established through direct or indirect evidence.  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).  Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (citations and quotations omitted).  In the absence of direct evidence, courts use the *McDonnell Douglas* burden-shifting framework.  *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 640–41 (9th Cir. 2003) (citation omitted).

In all disparate treatment cases, the facts must "create an inference that an employment decision was ***based on*** an illegal discriminatory criterion" (*O'Conner v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (quotation marks omitted, emphasis added)), meaning that there is "a logical connection between each element of the prima facie case and the illegal discrimination."  *Id.* at 311-12.  Although a prima facie case raises an "inference of discrimination" (*Lynn v. Regents of Univ. of Cal.*,

656 F.2d 1337, 1344 (9th Cir. 1981)), the employer "need only 'articulate some legitimate, non-discriminatory reason'" for the adverse action against the employee to rebut that inference. *Hargrave v. Univ. of Wash.*, 113 F. Supp. 3d 1085, 1095 (W.D. Wash. 2015) (quoting *Lynn*, 656 F.2d at 1344). "If the employer articulates such a reason, the burden shifts to the plaintiff to show that the reason was a 'pretext or discriminatory in its application,'" meaning the discriminatory reason "more likely motivated the employer" or that the proffered explanation is "unworthy of credence." *Id*. A "reason cannot be proved to be 'a pretext *for discrimination'* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

To prove disparate treatment under the NYCHRL, Ms. Klayman must show that she was treated "less well" than similarly situated male attorneys. *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 78 (2009). NYCHRL claims otherwise follow the *McDonnell Douglas* burden-shifting framework. *South v. Cont'l Cas. Co.*, No. 17-5741, 2018 WL 4689106, at *8 (S.D.N.Y. Sept. 27, 2018). "[D]istrict courts may still grant summary judgment with respect to NYCHRL claims if there is no genuine dispute as to any material fact regarding plaintiff's claim and the employer's affirmative defense." *Talwar v. Staten Island Univ. Hosp.*, No. 12-cv-33, 2016 WL 1298969, at *5 (E.D.N.Y. Mar. 31, 2016).

### 1. Morrison Did Not Promote Ms. Klayman In 2016 Or 2017 Because She Did Not Meet Its Standards And There Was No "Business Case"

To establish a *prima facie* case of failure to promote, Ms. Klayman must show that she was intentionally not made a partner while men or women who were comparable "in all material respects" were promoted. *Grosz v. Boeing Co.*, 455 F. Supp. 2d 1033, 1040 (C.D. Cal. 2006) (citing *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)). She cannot make even that threshold showing, much less show that Morrison's justifications for not promoting her—the absence of a "chorus of support," the lack of a business case, and continuing concerns about her judgment—are pretextual.

***No Prima Facie Case of Discrimination.*** Partnership at a prominent law firm like Morrison is not graduation, and associates and of counsel do not become "qualified" for partner simply by performing well. McCord Decl. Ex. E at MORRISON-1058-59 (standards for admission to partnership). Qualification is a multi-factored decision encompassing an attorney's skill set, other candidates in the pipeline, and the business case for partnership, which would include "how busy [a] practice group is," whether the practice area will continue to grow, "how the firm is doing financially" and whether the

candidate "looks like they will develop the skills necessary to bring in business to the firm." Ex. 140, 30(b)(6) Tr. 90:5-91:13; *see also* Ex. 145, Spiliotes Tr. 37:3-9, 42:3-44:6 (co-chair testimony re same ); Ex. 143, Peck Tr. 29:8-30:15 (PRC member testimony re same).

Based on these factors, Ms. Klayman was not "qualified" to become a partner in 2016 or 2017. As she was told, her judgment needed further development, she had not yet generated widespread support from partners for her promotion, and the Firm did not yet understand her business case. *E.g.*, Ex. 145, Spiliotes Tr. 188:16-189:3 ("Again, the chorus of support that you need to become a partner wasn't there"); Ex. 69, DOES-54032 (Ms. Klayman's notes of feedback she received, including ████████ ████████████████████████████████████. Further, prominent partners were concerned about Ms. Klayman's judgment, skills, and business case. *See* p. 6, *supra*.

Moreover, Ms. Klayman cannot identify anyone outside her protected classes who was "similarly situated" to her in "all material respects" and promoted. *Grosz*, 455 F. Supp. 2d at 1040; *see also Taboas v. Fiddler, Gonzalez & Rodriguez, PSC*, 39 F. Supp. 3d 188, 203 (D.P.R. 2014) (comparators "work[ed] in the same position and division" as plaintiff (the litigation division)); *Arnold v. Newsome*, No. 02-8696, 2005 WL 994454, at *10 (N.D. Ill. Mar. 25, 2005) (similarly situated attorneys had to be "directly comparable" in "performance, qualifications, experience, and education"); *Williams-Windom v. Potter*, No. 06-1561, 2007 WL 9724366, at *3 (C.D. Cal. Apr. 23, 2007) (same).

Three of the "comparators"—Sean Ruff, Dario Avram, and Elizabeth Sluder—either had independent books of business or were focusing on practice areas critically important to the Firm at the time. Mr. Ruff, the only person who made partner in the Finance Department during the two years Ms. Klayman was a potential candidate (2016 and 2017) (A.E. White Decl. ¶ 21), had established a business case by twice generating over $1 million in annual billings, focused his practice on Financial Services, and had extensive experience with laws and regulations regarding electronic payments—none of which is true for Ms. Klayman. Ex. 145, Spiliotes Tr. 70:24-72:17, 82:19-97:14; Ex. 149, Woj. Tr. 225:10-226:13; A.E. White Decl. Ex. I at MORRISON-11610-35. Mr. Avram lateraled to the firm *as a partner* because, unlike Ms. Klayman, he had been a partner at his prior firm, and ████████████████ ████████████████████████████████████████████. Ex. 43, MORRISON-10688 (lateral materials); Ex. 149, Woj. Tr. 237:22–240:15. And Ms. Sluder made partner in 2015 (a year in

which no one suggested Ms. Klayman was ready), with specialized expertise in renewable energy in the then-separate Project Finance group (two central firm priorities).  Ex. 150, Sluder Tr. 123:15-25 (Project Finance was a separate group in 2015); Ex. 148, Chester Tr. 61:7-62:14 (Project Finance merged with Financial Transactions in or around 2016 or 2017); A.E. White Decl. Ex. F at MORRI-SON-10931-50 (Sluder partnership memo); Ex. 142, Lee Tr. 64:21-69:24.

Three other "comparators"—Enrico Granata, Alfredo Silva, and Dario de Martino—were in the high-demand Corporate Department—not Finance—and the decision to put them up for partner was made by different people.  Ex. 140, 30(b)(6) Tr. 213:4–214:22.  Mr. Granata (also promoted in 2015) was more experienced than Ms. Klayman, and was championed by a prominent partner who had more work than he could do alone, giving him a clear business case for partnership.  Klein Decl. ¶ 3; A.E. White Decl. Ex. F, at MORRISON-10837-55.  Mr. Silva was sponsored by (among other people), Suz Mac Cormac and Department Co-Chair Jackie Liu, who recognized him as critical to their busy practices.  Liu Decl. ¶ 3; A.E. White Decl. Ex. H at MORRISON-10579-96.  Mr. de Martino, who retained his focus on M&A while working on blockchain, made partner *after* Ms. Klayman resigned based on a record of generating *collectable* revenue (more than $1.5 million in 2018) (Klein Decl. ¶ 5); Ms. Klayman herself described him as having "lots of client relationships" and a "very bright future here." A.E. White Decl. Ex. K at MORRISON-11803-24; Ex. 44, MORRISON-2576 (client relationships email); Ex. 143, Peck Tr. 163:21–165:5.

In sum, the experience and expertise, practice area, and/or the business case for partnership of these individuals are all materially different from Ms. Klayman's.  She thus cannot prove a prima facie Title VII disparate treatment case for non-promotion.

***Legitimate Non-Discriminatory Reasons For Non-Promotion***.  Summary judgment should also be granted because Morrison had legitimate, non-discriminatory reasons for not promoting Ms. Klayman to partner in 2015, 2016, or 2017.

No one suggested that Ms. Klayman was ready for partnership consideration in 2015, and there is no evidence that anyone promised that timeline to her.  Rather the unambiguous statement in her carefully negotiated offer letter says that 2015 was the first possible year of consideration, consistent with Morrison's general practice.  Ex. 24, MORRISON-2290 (Final Offer Letter); Ex. 140, 30(b)(6)

Tr. 236:7-22.  For example, Finance Department attorney Marc-Alain Galeazzi's ███████████

████████████████████████████████████████████████████████████████████████████

██████  Spiliotes Decl. ¶ 6; McCord Decl. ¶ 20.  Similarly, Geoff Peck, a financial transactions partner,

██████████████████████████████████████████████████████.  Ex. 143, Peck Tr.

16:13–20:19.  █████████████  than Ms. Klayman had been at Morrison in 2017 (four years), or out

of school (ten-plus years).  McCord Decl. Ex. A, MORRISON-12712-17.

As for 2016 and 2017, the undisputed evidence shows that, notwithstanding Ms. Klayman's

own hype (*see* 4AC ¶¶ 83-85), Morrison had significant, legitimate concerns about her candidacy, in-

cluding a lack of business in her Group and Department in 2016, her decision to transition her focus

from traditional financial transactions to blockchain in 2017, and lingering doubts about her judgment,

skills, and communication style.  *See* pp. 4-6, *supra*; Dopsch Decl. ¶ 3.  In addition, she lacked a clear

business case:  blockchain's future was uncertain and Morrison is conservative about whom it pro-

motes; Mr. Wojciechowski had not identified promoting Ms. Klayman as his succession plan; and there

was no client demanding that she be made partner.  Dopsch Decl. ¶ 4; Ex. 145, Spiliotes Tr. 164:3-18,

165:5-25, 188:10–190:22; Ex. 155, MORRISON-7520 █████████████████████████████████

███████████████████████████████);  Ex. 142, Lee Tr. 145:4-22.  Ms. Klayman

was not yet qualified to be an equity partner (McCord Decl. Ex. E at MORRISON-1059-60 (outlining

the "Standards for Admission to Partnership"); Ex. 140, 30(b)(6) Tr. 228:2-7 (explaining these were

the applicable standards)), which is a legitimate non-discriminatory reasons for not promoting her.

***No Pretext.***  Morrison hired Ms. Klayman knowing she would shortly take a maternity leave

and made her of counsel months after her return, belying any claim that it was biased against her or

that its reasons for not promoting her in 2017 were pretextual.  Ex. 149, Woj. Tr. 155:12-16; McCord

Decl. Ex. A at MORRISON-12717.  That is consistent with Morrison's broader track record—women

made up nearly 50% of the partnership classes during each year Ms. Klayman was eligible for consid-

eration.  Ex. 144, McCord Tr. 100:7-19; A.E. White Decl. ¶ 22.

The only "evidence" Ms. Klayman can muster is a single 2016 email from Mr. Spiliotes saying

"since [Ms. Klayman] is just back in the office, it makes sense to wait" to put her up for partner.  Ex.

46, MORRISON-7531-32.  But this does not support her argument.  As Mr. Spiliotes testified, the

purpose of his email was to help Ms. Klayman get the depth of exposure and experience that successful candidates for partner typically have. Ex. 145, Spiliotes Tr. 74:2-24. His judgment proved to be prescient, as the feedback collected from partners she identified confirmed. Ex. 134, MORRISON-7165. His affirmation to her in 2017 (during a subsequent leave) that she would be a very strong candidate in 2018 (Ex. 145, Spiliotes Tr. 188:10-189:17 ("we talked to her about what she could do . . . and I think we were pretty clear that we were prepared to support her in the next round"); Ex. 69, DOES-54032 (notes to self ▮▮▮▮▮▮▮)), and his recommendation of Ms. Marines for partnership while she was on leave negate any inference of animus. *See, e.g.*, *Powell v. Consol. Edison Co. of N.Y., Inc.*, No. 97-2439, 2001 WL 262583, at *11 (S.D.N.Y. Mar. 13, 2001) (evidence that members of plaintiff's protected class received the promotion at issue negates any inference that the employer's decision not to promote plaintiff was based upon discriminatory animus); *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 897 (10th Cir. 1994) (affirming grant of summary judgment on Title VII disparate treatment claim based on gender when another woman was promoted to the position in question); *see* p. 9, *supra*.[4]

## 2. Morrison Did Not Intentionally Discriminate Against Ms. Klayman With Respect To Work Opportunities

Ms. Klayman next claims she was deprived of various work opportunities because she took maternity leaves. The standard for disparate treatment with respect to work opportunities is effectively the same as for promotion, but requires evidence that not receiving the opportunity was "reasonably likely to impair [her] job performance or prospects for advancement or promotion." *See, e.g.*, pp. 11-12, *supra*; *Zayed v. Apple Computers*, No. 04-01787-JM, 2006 WL 889571, at *7-8 (N.D. Cal. Apr. 5, 2006); *Williams v. Regus Mgmt. Grp.*, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011).

Ms. Klayman complains that she was replaced on a deal while pregnant, and required to bring a partner (Spencer Klein) to a pitch after accusing him of discrimination. *See* Ex. 152, 8/11/20 SROG Resp. 14:22-27; Ex. 103, MORRISON-3566. Even if true, she has not adduced evidence that either occurrence was "reasonably likely to impair [her] job performance or prospects for advancement or promotion." *Zayed*, 2006 WL 889571, at *8. Regardless, there are legitimate, non-discriminatory

---

[4] Ms. Klayman assumes that another partner, Jeff Chester, was biased against her based on a prior relationship and negatively influenced her career, but the record makes clear he had no input whatsoever. Ex. 145, Spiliotes Tr. 138:14-16 (Chester did not weigh in on Klayman in 2016); Ex. 149, Woj. Tr. 257:14–260:17. Ms. Klayman's speculation cannot create a material question of fact.

explanations for each.  Regarding the replacement on the deal, the record shows that Ms. Klayman was on vacation during a key period of the transaction, and was replaced due to business necessity.  Ex. 29, MORRISON-43653; Ex. 148, Chester Tr. 198:19-199:20; Balas Decl. ¶¶ 4-5.  As for the pitch, although Ms. Klayman wanted to bring Mr. Wojciechowski, others thought Mr. Klein's skills as a Corporate lawyer were better suited to the pitch.  Ex. 144, McCord Tr. 159:25-160:18.  Picking the "best person" for a client's needs is a legitimate, non-discriminatory reason for the request.  Because Ms. Klayman cannot establish an intentional deprivation of opportunities nor adduce evidence of pretext, summary judgment should be granted.

### 3.   Morrison Did Not Treat Ms. Klayman "Less Well" Than Comparable Male Colleagues (Count 9)

Ms. Klayman contends that the NYCHRL also was violated insofar as she was allegedly treated "less well" than similarly situated men.  She asserts several different theories in support of her claim, including being "excluded" from blockchain-related events while on leave and "demoted" when Mr. de Martino became her co-chair of the Blockchain + Smart Contracts Task Force (Ex. 152, 8/11/20 SROG Resp. 17:25-27).  She also asserts a theory of hostile work environment based on negative or sexist comments (*e.g.*, 4AC ¶¶ 123, 126-128; Ex. 152, 8/11/20 SROG Resp. 18:14-16).  The undisputed evidence confirms none of these claims has merit.

As to the first example, for starters, the Blockchain + Smart Contracts Task Force was an assortment of lawyers "across practice groups," including "some finance," "some corporate," "some regulatory," and "other areas."  Ex. 143, Peck Tr. 107:21-109:12; Lockwood Decl. ¶¶ 2-3.  Ms. Klayman was undoubtedly active, but she was not the only member or founder, nor was Finance the only department involved.  For example, Ms. Klayman claims she was excluded from planning certain Task Force events (Ex. 152, 8/11/20 SROG Resp. 17:16-24), but one concerned M&A and corporate issues—not finance (Ex. 147, Klayman Tr. 368:18–371:17; de Martino Decl. ¶ 2), and she was ultimately invited and involved with the second (a healthcare-focused event in June 2018).  Klein Decl. ¶ 13; Ex. 119, MORRISON-43650.  And while she characterizes having a Task Force co-chair as a "demotion," that does not support a claim under the NYCHRL for the simple reason that it was not a demotion at all.  Firm management proposed having co-chairs in the fall of 2016, before Ms. Klayman's leave, and the supervising partners were aligned on having Mr. de Martino and Ms. Klayman in those roles.  Ex. 65,

1    MORRISON-14609; Ex. 50, MORRISON-7527; Woj. Decl. ¶ 4.  Sharing leadership is not a demotion

2    as that term is ordinarily understood—though the inability to do so demonstrates a lack of the collegi-

3    ality partnership requires.  These incidents provide no basis to find that Ms. Klayman was treated "less

4    well . . . in a way that was more than trivial, insubstantial, or petty."  *Regus*, 836 F. Supp. 2d at 173.

5         Ms. Klayman also asserts a hostile work environment theory under the NYCHRL.  4AC ¶¶ 123,

6    126–128.  To prove that claim, she must identify conduct above a "petty slight or trivial inconven-

7    ience."  *Williams*, 61 A.D.3d at 80.  There must be some evidence that "discriminatory intent" under-

8    pinned them, and "a few stray comments or events are insufficient, even under the more liberal NY-

9    CHRL, for [a plaintiff's] claim to survive summary judgment."  *South*, 2018 WL 4689106, at *13; *Tse*

10   *v. N.Y. Univ.*, No. 10-7207, 2013 WL 5288848, at *15 (S.D.N.Y. Sept. 19, 2013) (a few stray comments

11   insufficient to withstand defendant's summary judgment motion on hostile work environment claim);

12   *Godbolt v. Verizon N.Y. Inc.*, 981 N.Y.S.2d 694, 695–96 (1st Dept. 2014) (similar).

13        Ms. Klayman points to several comments to support her hostile work environment claim, but

14   these are (at best) stray remarks and insufficient as such to demonstrate a hostile work environment.

15   *South*, 2018 WL 4689106, at *13.  For example, Ms. Klayman mentions Mr. Chester's inquiry about

16   her child's paternity after she shared that she was "███████████."  Ex. 23, MORRISON-2679.  Alt-

17   hough perhaps tone-deaf, the inquiry was sincere: the two had dated before either came to Morrison,

18   and as he testified, he "████████████████████████" at the time.  Ex. 148, Chester Tr. 194:6-17. This

19   mirrored Ms. Klayman's comment about how "████████████████████████████████."  Ex.

20   138, Klayman Tr. 98:8-14.  Although she now asserts that the comment "impl[ied] that [she] could not

21   do her job and handle having a baby" (Ex. 152, 8/11/20 SROG Resp. 18:6-7), there is no factual basis

22   for that inference, particular since he knew she had been a successful lawyer-parent since law school

23   and "admired [her] for her accomplishments."  Ex. 148, Chester Tr. 189:16-25.

24        Other alleged remarks, such as calling Ms. Klayman a "natural blonde to indicate she possessed

25   only looks and no substance" (Ex. 152, 8/11/20 SROG Resp. 18:14-16), are unsubstantiated hearsay

26   about which she lacks personal knowledge, and there is none of the requisite evidence of discriminatory

27   intent behind them.  *See Van Asdale v. Int'l Game Tech.*, No. 04-703, 2009 WL 4828708, *1, *5 (D.

28   Nev. Dec. 8, 2009) (deposition testimony pertaining to defendant contacting a third party was double

hearsay and therefore inadmissible even though one statement qualified as a party admission). Indeed, Ms. Klayman claims to have actually heard only one of the comments alleged in the Complaint—i.e., Mr. Klein referring in passing to *another* female attorney as a " ███ *See* Ex. 138, Klayman Tr. 203:12-21. If this were true, it is an archetypical stray remark. *See, e.g.*, *Williams*, 61 A.D.3d at 80; *South*, 2018 WL 4689106, at *13; *Reichman v. City of N.Y.*, 179 A.D.3d 1115, 1117 (2020) (holding that a stray anti-Semitic remark made by the plaintiff's coworker was more akin "to a personality difference than evidence of discrimination"; *Ellison v. Chartis Claims, Inc.*, 178 A.D.3d 665, 669 (2019) (holding that "the two isolated remarks challenged by the plaintiff constituted no more than petty slights or trivial inconveniences"). Summary judgment should be granted on this claim as well.

## C.    Morrison Did Not Intentionally Discriminate With Respect To Pay (Counts 12 & 13)

To establish a prima facie case of pay discrimination under Title VII, Ms. Klayman must show that (1) the work of the employees of one sex required the exercise of substantially equal skill, effort, and responsibility and was performed under working conditions similar to that of employees of the opposite sex; and (2) the pay to men and women was unequal. *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1465–66 (9th Cir. 1985) (citations omitted), *overruled on other grounds by Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991) (explaining that "when a Title VII claimant contends that she has been denied equal pay for substantially equal work . . . Equal Pay Act standards apply"); *see also Volpe v. Nassau Cty.*, 915 F. Supp. 2d 284, 292 n.5 (E.D.N.Y. 2013) (NYLL claims for pay disparity analyzed under same standard as EPA. There is no such evidence here.

Ms. Klayman theorizes she was paid less than comparable male colleagues because she was (1) "encouraged" to "avail herself of [the firm's] post-leave reduced hours policy," and was "discouraged . . . from returning to a full-time schedule in part in order to be able to reassign her billable time as nonbillable, thereby reducing the number of write-offs" (Ex. 152, 8/11/20 SROG Resp. 16:26-27, 17:6-8), and (2) "not allow[ed] . . . to negotiate an of counsel contract after she was promoted" in 2014, did not get a "meaningful pay raise for over a year," and "at the time of her departure from MoFo, her annualized salary was still at an associate's level," but with a discretionary bonus. *Id.* 15:18-28.

As to the first point, the evidence shows she was not "discouraged" from adopting a full-time schedule. Mr. Wojciechowski, her mentor, was open to whatever schedule Ms. Klayman wanted, and

(consistent with Firm policy), was simply the "notification partner" copied on her election of a reduced-hours schedule. Ex. 149, Woj. Tr. 158:7–161:3; Ex. 25, MORRISON-2293.  She admitted that she did not have ███████████████████████████████████████████████████ (Ex. 147, Klayman Tr. 363:9-22), and ████████████████████████████████████████████████ ██████████  *Id.* 363:18-364:6; Ex. 6 at MORRISON-134 (advised on "achieving success on a reduced-hours schedule").  Thus, to the extent her pay was lower on average than male or non-parent of counsel, it was the product of Ms. Klayman's choices, not intentional discrimination.  *Cf. DeLuca v. Sirius XM Radio, Inc.*, No. 12-8239, 2017 WL 3671038, at *16 (S.D.N.Y. Aug. 7, 2017) (no adverse employment action where action was result of employee's own choices).

As to the second point, Ms. Klayman ignores that she got a raise in January 2014 and a bonus after promotion; her of counsel compensation was then reassessed annually, consistent with other of counsel.  *E.g.*, Ex. 95, MORRISON-8222; Ex. 30, MORRISON-8897; Ex. 140, 30(b)(6) 93:4-96:1. Regardless, Ms. Klayman cannot establish that any men earned more than she did with "substantially equal skill, effort, and responsibility."  *Foster*, 772 F.3d at 1465-66.  Morrison's of counsel pay policy, including the payment of bonuses and other performance-based upside, is highly individualized due to the wide spectrum in of counsel experience, roles, and responsibilities.  Ex. 140, 30(b)(6) Tr. 39:25-40:11.  There is also negotiation involved, as Ms. Klayman appreciated when joining her current firm. Burke Decl. Ex. T, WHIS-603, Ex. U, WHIS-613-14, Ex. W, WHIS-625, Ex. Y, WHIS-629.

In any event, she identifies no proper comparator paid more.  Three of the men she identifies— partners Dario Avram and Alfredo Silva, and then-associate Dario de Martino—were not of counsel and any difference in pay between them is attributable—at a minimum—to the different compensation structures for their roles.  Ex. 140, 30(b)(6) Tr. 39:25-40:11, 52:21–54:14 (lockstep associate compensation and bonuses).  The of counsel comparators are equally unhelpful.  While Ms. Klayman cherry-picks individuals whom she believes (rightly or wrongly) had higher salaries, she ignores the many male of counsel who made less than she did, and the female of counsels who made more than her alleged comparators.  Brass Decl. ¶ 161.

██████████████████, for example, was an of counsel in the ██████████████—with different skills and working conditions—and made less than or the same base salary as Ms. Klayman when accounting

Gibson, Dunn & Crutcher LLP

for Ms. Klayman's reduced hours.  McCord Decl. ¶ 21; A.E. White Decl. ¶ 26.  Elizabeth Sluder, Jeff Kayes, Marc-Alain Galeazzi, ███████████, ███████████, and ███████████ each had more experience and in-demand specialties, as did Sean Ruff, ███████████, and ███████████, who also had significant personal books of business.  Spiliotes Decl. ¶¶ 3-11.  ███████████ had the same years of experience as Ms. Klayman, but was in a higher-demand practice.  Spiliotes Decl. ¶ 3.  As for Enrico Granata and ███████████, each were of counsel in the Corporate Department and are not valid comparators.  Ex. 9, MORRISON-10252; A.E. White Decl. Ex. F at MORRISON-10837; Klein Decl. ¶ 4.  ███████████ was in the Tax Department and is an improper comparator too.  A.E. White Decl. ¶ 27.  And although ███████████ was in the Project Finance and Development Group, ███████████ and negotiated pay that reflected his value in a competitive hiring marketplace.  *See* Woj. Decl. ¶ 6.  By contrast, when Ms. Klayman left Morrison, her recruiter candidly noted that her pay at Morrison had been "███████████."  Burke Decl. ¶ 7.

There is no basis to infer that Ms. Klayman experienced pay discrimination, and summary judgment therefore should be granted to Morrison on her pay claims.

## D.     Ms. Klayman Cannot Prove A Disparate Impact Claim (Count 1)

Ms. Klayman also claims pay and promotion discrimination under a disparate impact theory.  Unlike disparate treatment, a disparate impact claim involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002) (quotation omitted).  To prove a prima facie case of disparate impact discrimination, a plaintiff must identify, among other requirements, "a significant disparate impact on a protected class caused by a specific, identified, employment practice or selection criterion." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656-57 (1989)).  Such a showing is "usually accomplished by statistical evidence showing that an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of actual applicants." *Stout*, 276 F.3d at 1122 (citations and quotations omitted).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "either discredit the plaintiff's statistics or submit its own statistics which show that no disparity exists." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990); *Doubt v. NCR Corp.*, No. 09-5917, 2014

WL 3897590, at *7 (N.D. Cal. Aug. 7, 2014) (analyzing disparate impact claim in the context of pay).

### 1.     There Is No Disparity In Of Counsel Compensation

Ms. Klayman's contention that Morrison's of counsel compensation policy disparately impacts women who take maternity leaves fails for at least three reasons.  First, the policy is designed to compensate of counsel for their broad range of experiences and demand for their services.  *See supra* at p. 19.  It is thus precisely the kind of highly individualized and discretionary policy the Supreme Court has held does not support a disparate impact claim.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355–59 (2011).  Second, there is no statistically significant disparate impact.  The of counsel attorney pool is small (between 55 and 64, counted on January 1 of each year), and the group who took a parental leave is smaller still (four instances for men and six for women from 2015 to 2019).  Although any inferences to be drawn from these data are limited at best (*see Contreras v. City of L.A.*, 656 F.2d 1267, 1273-74 (9th Cir. 1981)), there is no disparate impact here because the women of counsel who took leaves were paid between *101% and 127%* of what the men of counsel who took leaves were paid (using median base pay and bonus).  Brass Decl. ¶ 162.

Third, the of counsel compensation policy is justified by a "business necessity" (42 U.S.C. § 2000e-2(k)(1)(A)(i))—meaning there is a "manifest relationship to job performance" (*Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519, 531 (2015) (internal quotations omitted))—and there is no "available alternative . . . practice that has less disparate impact and serves [the firm's] legitimate needs."  *Id.* at 2518 (quotations omitted); *see* 42 U.S.C. § 2000e-2(k)(1)(A)(ii).  As noted, a lockstep compensation policy for of counsel would not adequately reflect of counsel's range of experiences and contributions to the business.  Some are "fairly senior attorneys" who "provide a certain level of expertise"; others are "not quite ready to be considered for partner, but there may be an anticipation that they may be considered for partner"; others may have just lateraled to the firm; and still others "are put in the of counsel position because they're not likely to be put up for partner, but they would like to stay at the law firm." Ex. 140, 30(b)(6) Tr. 59:1-60:12.  Because of counsel are by definition not similarly situated, there must be flexibility in setting their compensation.  *Id.* 39:25–40:11, 44:12–45:10, 67:7–70:16; McCord Decl. Ex. E at MORRISON-1061.

## 2.    There Is No Disparity In Promotion To Partnership

Ms. Klayman also contends that a lack of rigor around the partnership candidacy process disparately impacts women and women who take leaves.  4AC ¶ 35.  As with the policy governing of counsel compensation, the partnership evaluation process is another discretionary, highly individualized process that cannot be analyzed through a disparate impact lens.  *Dukes*, 564 U.S. at 355–59.

Regardless, there is no disparate impact here.  In assessing whether a promotion policy causes a disparate impact, "the appropriate comparison is between the composition of candidates seeking promotion and the composition of those actually promoted."  *Stout*, 276 F.3d at 1123.  Under the EEOC's guidelines, a "selection rate for any race, sex, or ethnic group which is less than four-fifths . . . of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4(D) (2019).  Although this 80% standard is not absolute, it is a useful rule of thumb to determine whether a "statistical disparity is 'substantial' or 'significant' in a given case."  *Clady v. L.A. Cty.*, 770 F.2d 1421, 1428-29 (9th Cir. 1985).  Here, the available data confirms the process does not disparately impact women generally or women who take leave in particular, as both groups have been extremely successful at the Firm.  Between 2016 and 2019, 10 of the 19 attorneys promoted from associate to partner were women, and 7 had taken a parental leave.  Brass Decl. ¶ 163.  Seven of the 16 attorneys promoted from of counsel to partner over the same period were women, and 3 had taken a parental leave.  *Id*.  In other words, out of the 35 people promoted to partner during this period, women who took leaves were promoted at a greater rate than those who had not (10/35, or 28.6%, as compared to 7/35, or 20%), which defeats any claim of disparate impact.  The benchmark is also easily cleared when only gender is considered—over the same period, 48.6% of promotions to partner were women, and 51.4% of promotions were men, for a ratio of 94.4%.

## E.    Ms. Klayman Cannot Prove A Claim For Retaliation (Counts 10 & 11)

Counts 10 and 11 concern alleged retaliation.  Under Title VII, to establish a prima facie case, she must show, among other elements, a causal link between protected activity and any alleged adverse employment action.  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089–94 (9th Cir. 2008); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (protected activity must be but-for cause of alleged adverse action).  Summary judgment also should be granted under the NYCHRL where there is no

evidence that defendant's actions were caused by retaliatory animus.  *See Talwar*, 2016 WL 1298969, at \*13.  If she establishes a prima facie case, "then *McDonnell Douglas* burden-shifting is appropriate." *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1064 (9th Cir. 2002).  Employees proceeding under a constructive discharge theory must show that "a reasonable person in the employee's position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989); *see also Tulino v. City of N.Y.*, 813 F. App'x 725, 726 & n.1 (2d Cir. 2020) (noting that NYCHRL standard generally mirrors Title VII).

The gravamen of Ms. Klayman's retaliation claim—which Morrison disputes but does not move on here—is that after announcing her pregnancy, she began to clash with Mr. Klein and Mr. de Martino, whom she viewed as "████████████████████" of the Task Force.  *E.g.*, 4AC ¶ 129; Ex. 152, 8/11/20 SROG Resp. 17:10-24, 18:27–20:5; Ex. 147, Klayman Tr. 389:4-7.  In December, she complained to Ms. Herman in the ADG (Ex. 151, Herman Tr. 127:4-128:22), and in January 2018, she contacted Morrison's Chief HR Officer, Jason McCord, to complain about perceived mistreatment by these two men.  Ex. 126 at DOES-15251.  She continued to complain that Morrison did not do enough to "████████████████" (Ex. 116, DOES-51547) and that other attorneys at the firm were treating her unfairly.  *See, e.g.*, Ex. 121 at DOES-14309 (cast in a ██████ ").

There is no evidence that the "unfair treatment" she alleges was caused by her contact with HR.  As noted, Ms. Klayman insisted ████████████████████████████████ (Ex. 96, MORRISON-3807), and any belief they knew of her complaint earlier is pure speculation.  Klein Decl. ¶ 13; de Martino Decl. ¶ 3 (denying knowledge of same).  To the extent certain attorneys became frustrated with her, the record shows it was warranted.  For example, she was invited to go to Israel to feature her blockchain practice to potential clients, but once there, spent her time sightseeing, arrived late for one of the few meetings she bothered to attend, was absent during most of a business meal, and ultimately skipped several relationship meetings in Tel Aviv to co-host an event and accept an award in New York.  Ex. 91, MORRISON-9151 (report re Israel trip); Ex. 147, Klayman Tr. 417:16– 419:24.  On another occasion, she insisted on joining a client call, but then no-showed without apology. Ex. 89, MORRISON-11318; Ex. 92 at DOES-23818 ("████████████████████.").  Even Mr. Wojciechowski, one of her staunchest supporters, found that she "started to flounder" "when [she] left

1   our group to focus on Blockchain." Ex. 149, Woj. Tr. 267:10-17, 268:10-21; Ex. 142, Lee Tr. 250:20-

2   254:20.  Rational displeasure with unprofessionalism is not evidence of retaliation.

3        If Ms. Klayman suggests that Morrison's failure to separate her from Mr. Klein and Mr. de

4   Martino created an environment in which she could not work, that too is the result of her choices.  Ms.

5   Klayman didn't want an investigation—indeed, ████████████████████████████████████████

6   ████████████████████████████████████████. Ex. 144, McCord Tr. 177:11-178:17;

7   *see also, e.g.*, Ex. 113, DOES-51434; Ex. 109, MORRISON-3769; Ex. 118, MORRISON-8248.[5]  What

8   she wanted was for ███████████████████████████████████████████ based on

9   her say-so.  Ex. 104, DOES-14995 ("████████████████████████████████.").  The firm

10  wasn't obligated to do that. *See Swenson v. Potter*, 271 F.3d 1184, 1196 (9th Cir. 2001).

11       ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████. Lockwood Decl. ¶¶ 5, 7, 8, 12-14;

14  Ex. 144, McCord Tr. 189:3-15; Ex. 135, MORRISON-9754; *see also* Ex. 81, MORRISON-3201; Ex.

15  105, MORRISON-3473; Ex. 106, MORRISON-3481 (███████████████████████████████

16  ██████████████████; *see also* pp. _, *infra*. ████████████████████████████

17  ████████████████████████ (Ex. 144, McCord Tr. 195:1-196:12), ████████████████

18  ████████████████████████████████████████. *Id*. 85:7-19; Ex. 135,

19  MORRISON-9754. ██████████████████████, Ms. Klayman chose to quit, as mediation did

20  not meet her true aim—unfettered control over ██████████ Ex. 147, Klayman Tr. 389:4-7.  But of

21  course, practice groups do not "belong" to any one attorney at Morrison (A.E. White Dec. ¶ 4), and

22  there is simply no plausible basis to fault Morrison for Ms. Klayman's dissatisfaction with her col-

23  leagues. *See Thomas*, 877 F.2d at 1434 ("subjective personal discomfort" that was "the product of

24  human nature" insufficient to support constructive discharge claim).

25       Ms. Klayman's own emails show that the conduct she was experiencing was, at most, petty

26  workplace angling. *Williams*, 61 A.D.3d at 80 ("petty slights or trivial inconvenience" insufficient to

27  establish a prima facie case). ████████████████████████████████████████████████

28

---

[5]  For apparently the same reason, Ms. Klayman deposed neither Mr. Klein nor Mr. de Martino.

Gibson, Dunn &
Crutcher LLP

24

1    ███████████████████████████████████████████████████ (*see, e.g.*, Ex. 156,

2    MORRISON-13694; Ex. 82, MORRISON-13534; Ex. 84, MORRISON-3194); ████████

3    ████████████████████████████████████████████████████████ (Ex. 97,

4    MORRISON-3466); and believing that ██████████████████████████████████

5    ████████████████████████████████████████████ (Ex. 107, MORRI-

6    SON-3488; Ex. 108, MORRISON-3492). ████████████████████████████████

7    ███████████████████ (Ex. 110, MORRISON-3658; Ex. 112, MORRISON-3791), and became enraged

8    that he was ████████████████████████████████ (Ex. 111, MORRISON-3690).

9    There are many more examples (*see, e.g.*, Ex. 98, MORRISON-3596, Ex. 115, MORRISON-3799,

10   Ex. 100, MORRISON-3305, Ex. 101, MORRISON-3306, Ex. 102, MORRISON-3471), but none

11   would prompt one to resign. Summary judgment should be granted. *Thomas*, 877 F.2d at 1434.

12   **F.      Ms. Klayman Is Not Entitled To Punitive Damages**

13          Punitive damages are only available for disparate-treatment claims and require proof that (1) a

14   supervisor acted with "malice or with reckless indifference to the federally protected rights of an ag-

15   grieved individual," and (2) punitive damages can be imputed to the employer under a "managing

16   agent" theory. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 539-40 (1999) (quoting 42 U.S.C.

17   § 1981a(b)(1)); *Borges v. U.S. Bank*, No. 12-2472, 2014 WL 530283, at *13 (E.D. Cal. Feb. 7, 2014)

18   (citations omitted). There is no record evidence that meets this demanding standard. Although Ms.

19   Klayman claims to have had negative experiences with certain senior partners, such as Spencer Klein

20   and Jeff Chester, neither was the final decisionmaker regarding her career at the firm and thus could

21   not have been responsible for the harms she claims to have suffered. Spiliotes Decl. ¶ 13; Klein Decl.

22   ¶ 12. Moreover, Morrison has a made a good faith effort to comply with Title VII. *Kolstad*, 527 U.S.

23   at 544; pp. 23-24, *supra*. Summary judgment should be granted to Morrison.

### VI.      CONCLUSION

24

25          The Court should grant summary judgment to Morrison on all of Ms. Klayman's claims.

26

27

28

Gibson, Dunn &
Crutcher LLP

1   Dated: October 6, 2020

2                                   MICHELE L. MARYOTT
3                                   RACHEL S. BRASS
                                    LAUREN BLAS
4                                   RONALD GOMEZ
                                    AMANDA C. MACHIN
5                                   GIBSON, DUNN & CRUTCHER LLP

6

7                               By:  */s/ Rachel S. Brass*
8
                                         Rachel S. Brass
9                               Attorneys for Defendant
10                              MORRISON & FOERSTER LLP

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26