# EXHIBIT-152

## PUBLIC COPY

*Confidential Copy Submitted Under Seal
Lodged Pursuant to Local Rule 79-5(c)-(d)*

1  David W. Sanford (DC Bar No. 457933, *Pro Hac Vice*)
   dsanford@sanfordheisler.com
2  Andrew Melzer (NY Bar No. 4270682, *Pro Hac Vice*)
   amelzer@sanfordheisler.com
3  Carolin Guentert (NY Bar No. 5354519, *Pro Hac Vice*)
   cguentert@sanfordheisler.com
4  **SANFORD HEISLER SHARP, LLP**
   1350 Avenue of the Americas, 31st Floor
5  New York, New York 10019
   Telephone: (646) 402-5656
6  Facsimile: (646) 402-5651

7  Deborah K. Marcuse (DC Bar No. 995380, *Pro Hac Vice*)
   dmarcuse@sanfordheisler.com
8  **SANFORD HEISLER SHARP, LLP**
   111 S. Calvert Street, Suite 1950
9  Baltimore, MD 21202
   Telephone: (410) 834-7420
10 Facsimile: (410) 834-7425

11 Hannah Wolf (TN Bar No. 034349, *Pro Hac Vice*)
   hwolf@sanfordheisler.com
12 **SANFORD HEISLER SHARP, LLP**
   611 Commerce Street, Suite 3100
13 Nashville, TN 37203
   Telephone: (615) 434-7000
14 Facsimile: (615) 434-7020

15
   *Attorneys for Plaintiffs*
16 *[Additional Attorneys Listed After Signature Page]*

17                         UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF CALIFORNIA
18                              SAN FRANCISCO DIVISION

19 | | |
|---|---|
| SHERRY A. WILLIAM AND JOSHUA ASHLEY KLAYMAN, | **Case No.: 3:18-cv-02542** |
| Plaintiffs, | **PLAINTIFF JOSHUA ASHLEY KLAYMAN'S FOURTH AMENDED OBJECTIONS AND RESPONSES TO DEFENDANT'S SECOND SET OF INTERROGATORIES** |
| v. | |
| MORRISON & FOERSTER LLP | |
| Defendant. | |

**PROPOUNDING PARTY:** Defendant MORRISON & FOERSTER LLP

**RESPONDING PARTY:** Plaintiff Joshua Ashley Klayman

**SET NUMBER:** Two (2)

PLAINTIFF JOSHUA ASHLEY KLAYMAN'S FOURTH AMENDED OBJECTIONS AND
RESPONSES TO DEFENDANT'S SECOND SET OF INTERROGATORIES

**Interrogatory No. 18:** Identify all facts that support your allegation that Julia Balas was treated more favorably than you on the basis of parental status, as set forth in your responses to Morrison's First Set of Interrogatories.

**Objections:** Plaintiff objects to this Interrogatory as overbroad and unduly burdensome inasmuch as Defendant's definition of "identify" as applied to "facts" would require Plaintiff to identify all supporting documents and witnesses for each fact, information which is as easily identified if not more easily identified by Defendant than by Plaintiff. Plaintiff further objects to this Interrogatory to the extent that it calls for a legal or factual conclusion.

**Response:** Subject to and without waiving the foregoing objections, Plaintiff responds as follows:

In late 2014, Jeff Chester staffed Plaintiff on a wind deal where she would be reporting directly to him. Plaintiff was pregnant at the time, but she had not yet disclosed this to Jeff Chester. Although it was uncomfortable for Plaintiff to work with Jeff Chester (because of their prior relationship), Plaintiff agreed to work on the matter. In approximately November 2014, Jeff Chester asked Plaintiff to attend meetings related to this deal with him in Atlanta on December 4, 2014. Plaintiff agreed to go, but the client ultimately determined that it was not necessary for Plaintiff to travel. On December 2, 2014, Jeff Chester learned that Plaintiff was pregnant when Plaintiff emailed him concerning a document related to the deal and said, "Ok. Sounds good. Hope that you have a safe flight tomorrow and a good trip. (BTW, I just realized that I don't think that I told you that I'm expecting again. I am 5 months along, but I'm not showing yet, so no one would have even suspected if I'd gone to the meetings in Atlanta.)". Jeff Chester immediately responded by questioning the paternity of her unborn child, commenting sarcastically via his firm email, "Who's the lucky dad?," despite his actual knowledge that Plaintiff was engaged. Plaintiff reported this comment to Mark Wojciechowski. Prior to learning that Plaintiff was pregnant, Jeff Chester had told Jonathan Melmed how happy Jeff Chester was with Plaintiff's work, and Jeff Chester had emailed the client to say terrific things about Plaintiff, her work and his past experiences with her. However, approximately one month later, Jeff Chester took Plaintiff off of the wind deal and replaced her with Julia Balas, who at the time had no children. Jeff Chester emailed Shane Shelley in approximately January 2015 that the deal was full steam ahead and that Julia was replacing Plaintiff. After learning that Plaintiff was pregnant again, and before removing her from the matter, Jeff Chester spoke with Plaintiff about her

partners who were performing work of substantially equal or lesser skill, effort, and responsibility (*see* individuals identified in Plaintiff's responses to Interrogatory Nos. 2 and 3). Plaintiff does not know who specifically is responsible for her not receiving a raise after 2016, but she believes Mark Wojciechowski, Gary Lee, Nick Spiliotes and Jen Marines were involved in determining her pay.

- Morrison did not promote Plaintiff to partnership in 2015, 2016, and 2017. This is despite performing partner level work and despite being assured that her promotion to Of Counsel in mid-2014 was a placeholder for partnership. Plaintiff believes that Janet Stone Herman, Gary Lee, and Nick Spiliotes were involved in the decision to not put her up for partnership.

- A male associate from another firm, ▇▇▇▇▇▇, who had two fewer years of experience than Plaintiff, was brought in as of counsel in the same group and given higher pay than Plaintiff, even though practice group records showed that his earliest date of potential promotion to partner was a few years later than Plaintiff's.

- Another male colleague who had similar experience to Plaintiff, ▇▇▇▇▇▇ was made of counsel at approximately the same time as Plaintiff but was then elevated to the partnership at the end of that same year; he was also paid significantly more than Plaintiff, and his compensation was adjusted at the time of his elevation to of counsel.

- A third male colleague who had fewer years of experience than Plaintiff, Dario Avram, was hired after Plaintiff as an equity partner and paid significantly more than Plaintiff, even as Plaintiff was asked by Firm partners to weigh in on certain of his matters (including during her maternity leave).

- None of those male attorneys whom Plaintiff was paid less than had a meaningfully established (or, in some cases, any) personal book of business or had an industry-wide reputation comparable to Plaintiff's.

- Fredo Silva, a fourth male colleague in a transactional practice who was multiple class years behind Ms. Klayman, was promoted to equity partner as an eighth-year associate, while Ms. Klayman's partnership consideration was deferred multiple times.

- The Firm's Benefits Department, as well as Mark Wojciechowski and Peter Dopsch, encouraged Plaintiff to avail herself of its post-leave reduced hours policy, telling Plaintiff that it would "help" her group by reducing the target hours budget and costs for the group. Thus, Plaintiff reduced her

formal schedule to 80% but continued to work more than a full-time schedule. Plaintiff did this because she relied on the Firm's representation that it would be beneficial to her group and that the Firm would recognize her sacrifices by elevating her to partner. Ultimately, Morrison used this against Plaintiff when Suz Mac Cormac told her in May 2018 that her billable hours were too low, a strike against her partnership candidacy. However, her recorded hours were vastly more than the Firm's goals. Mark Wojciechowski also discouraged Plaintiff from returning to a full-time schedule in part in order to be able to reassign her billable time as nonbillable, thereby reducing the number of write-offs. Plaintiff does not believe any men were asked to take reduced work schedules or reduce their billable hours in a similar way.

- After Plaintiff announced that she was pregnant and due to give birth in late May/early June of 2017, partner Spencer Klein, and Dario de Martino began to exclude Plaintiff from group business, events, and leadership, all the while relying on her to continue pitching for and generating business. At the time that they began their efforts to take over the Blockchain + Smart Contracts Group, Spencer Klein was not part of the Blockchain + Smart Contracts Group (nor of the FinTech Group) and admitted that he had little to no knowledge about or experience in blockchain.

- Spencer Klein and Dario de Martino cut Plaintiff out of the Investing in Blockchain event she had initiated and planned, by omitting her from event materials and communications and rescheduling the event for the date that Plaintiff was due to give birth. Spencer Klein and Dario de Martino also minimized and failed to acknowledge internally or externally her substantial contributions to the Firm after she announced that she was pregnant, excluding her publications from the new MoFo blockchain-related tech blog in spring 2018 and attempting to cast her in a bad and false light in front of coworkers and potential clients by alleging that Plaintiff lacked good judgment, only cared about her own matters, and had inappropriately contacted a client that Dario de Martino claimed was his client.

- While Plaintiff was on maternity leave in 2017, Spencer Klein, with the support of the Firm, appointed Mr. de Martino to co-chair of Plaintiff's practice group without her knowledge or consent, effectively demoting her.

- Janet Stone Herman openly criticized Plaintiff for working on maternity leave with her baby present, in one instance in fall 2017 claiming that multiple partners had told her that Plaintiff had acted like a "martyr" by explaining that her baby was in my lap and might make noises during a conference call.
- In December 2014 Jeffrey Chester questioning whether Plaintiff's fiancé had fathered the child she was pregnant with. Jeffrey Chester also made comments implying that Plaintiff could not do her job and handle having a baby (see response to Interrogatory 18). At the end of 2014, Jeffrey Chester replaced Plaintiff on a deal with an attorney, Julia Balas, who did not have any children at the time.
- Mr. Chester was later installed as Plaintiff's group head on Tuesday, July 26, 2016, giving him input into decisions about Plaintiff's salary and promotion, even though Plaintiff had disclosed to Mark Wojciechowski, after she learned that Jeff Chester would be joining the Firm, that her prior relationship with Jeff Chester had ended after he forced Plaintiff to have an abortion.
- In 2016, while they were standing outside of Morrison's office, Spencer Klein called Plaintiff a natural blonde to indicate that she was "dumb" and suggesting she possessed only looks and no substance.
- In October 2017, Nick Spiliotes falsely told Janet Herman that Plaintiff had told a client that she was passed over for partner, and that Plaintiff was "stupid" for doing so.

**Interrogatory No. 20:** Identify and describe in detail all evidence that you contend proves your allegation that Morrison retaliated against you, including identifying each individual you allege retaliated against you, and the manner in which they allegedly did so. (Fourth Amended Complaint ¶¶ 213, 228.)

**Objections:** Plaintiff objects to Defendant's request to "describe in detail" and Defendant's definition of "identify" as overbroad and unduly burdensome. Plaintiff further objects to this Interrogatory in that it seeks discovery that is unreasonably cumulative and duplicative. Plaintiff also objects to this Interrogatory to the extent that it calls for a legal or factual conclusion.

**Response:** Subject to and without waiving the foregoing objections, Plaintiff responds as follows: Discovery in this case is ongoing and Plaintiff has not yet completed her investigation of the

facts in this case. Plaintiff contends that individuals at the Firm first began retaliating against her after she complained to Mark Wojciechowski in approximately March 2017 that Dario de Martino and Spencer Klein had removed her from the planning of a blockchain group event. Plaintiff contends that the actions taken by Dario de Martino and Spencer Klein in attempt to take over the blockchain group and to reduce her role in the group (*see* Response to Interrogatory 19) may have been retaliatory as well as discriminatory.

| | |
|---|---|
| 1 | ■ |
| 2 | ■ |
| 3 | ■ |
| 4 | ■ |
| 5 | ■ |
| 6 | ■ |
| 7 | ■ |
| 8 | ■ |
| 9 | ■ |
| 10 | ■ |
| 11 | ■ |
| 12 | ■ |
| 13 | ■ |
| 14 | ■ |
| 15 | ■ |
| 16 | ■ |
| 17 | ■ |
| 18 | ■ |
| 19 | ■ |
| 20 | ■ |
| 21 | ■ |
| 22 | ■ |
| 23 | ■ |
| 24 | ■ |
| 25 | ■ |
| 26 | ■ |
| 27 | ■ |
| 28 | ■ |

## VERIFICATION

I, Joshua Ashley Klayman, state under penalty of perjury that the foregoing "Plaintiff Joshua Ashley Klayman's Fourth Amended Objections and Responses to Defendant's Second Set of Interrogatories" is true and correct to the best of my knowledge, information and belief.

DATED August 11, 2020

*/s/ Joshua Ashley Klayman*
Joshua Ashley Klayman