# TAB I

**Declaration of S. Klein**

# PUBLIC COPY

*Confidential Copy Submitted Under Seal
Lodged Pursuant to Local Rule 79-5(c)-(d)*

RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

MICHELE L. MARYOTT, SBN 191993
  mmaryott@gibsondunn.com
LAUREN M. BLAS, SBN 296823
  lblas@gibsondunn.com
RONALD GOMEZ, SBN 295274
  rgomez@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

AMANDA C. MACHIN, *admitted pro hac vice*
  amachin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, D.C. 20036-5306
Telephone: 202.955.8500
Facsimile:  202.467.0539

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERRY WILLIAM and JOSHUA ASHLEY KLAYMAN, <br><br> Plaintiffs, <br> v. <br><br> MORRISON & FOERSTER LLP, <br><br> Defendant. | CASE NO.: 3:18-cv-02542-JSC <br><br> **DECLARATION OF SPENCER D. KLEIN** <br><br> Judge: Hon. Jacqueline Scott Corley <br><br> Action Filed: April 30, 2018 |

## DECLARATION OF SPENCER D. KLEIN

I, Spencer Klein, declare as follows:

1. I am a partner at Morrison & Foerster LLP ("Morrison" or the "Firm"), the Co-Head of the Firm's global Mergers & Acquisitions Group, and the Head of the Corporate Department in New York. I am a 1989 graduate of Hofstra University School of Law. I have been a partner at Morrison since 2010. Prior to joining Morrison, I was a partner at O'Melveny & Myers LLP, McDermott Will & Emery LLP, and Shearman & Sterling LLP. Since I joined Morrison, I have worked in the Firm's New York office. Through my experience at Morrison, I have personal knowledge of the matters and information set forth in this declaration and, if called upon to testify thereto, can and would competently do so.

2. In my role as Head of the Corporate Department in New York, I became familiar with a number of people who were Of Counsel in the Department in the 2017-2018 time frame, including Enrico Granata, Dario De Martino, and [REDACTED]. I also dealt with a number of departmental issues, including lateral hiring, associate and of counsel compensation issues, associate and of counsel evaluations, and similar administrative matters. This role gave me visibility into the client demand for our attorneys' time and into the roles and responsibilities of our attorneys.

3. Mr. Granata was a 2005 graduate of Columbia Law School. He joined the Firm in 2011 and was a star associate in the Mergers & Acquisitions group. He was promoted to of counsel on January 1, 2015. The Corporate Department, and the Mergers & Acquisitions group in particular, were very busy during the 2015 to 2018 timeframe as there was significant demand for our services. Mr. Granata also had nearly ten years of experience by the time he became an of counsel. Both of these things were accounted for when determining his of counsel compensation. When the time came to consider whether to promote him to partner, he was championed by a prominent partner in our department who had more work than he could do alone. That, in addition to his very strong work product, gave Mr. Granata a clear business case for partnership. Mr. Granata was promoted to partner on January 1, 2016.

4. [REDACTED] was a 2007 graduate of Columbia Law School. He joined the Firm as an of counsel in 2015 after more than seven years of practice at [REDACTED] As a member of the Corporate

practice group, ███████ practice focused on ████████████████████████████████████████. He was the only senior lawyer in the New York office who did fund formation work, and his retention was viewed as critical to the busy Corporate practice. All of these factors were accounted for in his of counsel compensation.

5. Mr. de Martino is a 2002 graduate of Federico II University School of Law. He practiced in Italy for approximately 3 years, and then completed the Columbia Law School L.L.M. program in 2006. He joined the Firm as an associate in 2015 after six years of practice at other U.S. firms and three years of practice in Italy. He practiced in the Mergers & Acquisitions group within the Corporate Department as well and excelled in his work. Even as an associate, Mr. de Martino had an impressive track record of generating collectable revenue (more than $1.5 million in 2018) and had a number of established client relationships, all of which gave him a strong business case for partnership. He was promoted to partner on January 1, 2019.

6. I first worked with Joshua Klayman in approximately 2014 on a deal for a client that required an attorney with expertise in financial transactions. To handle those aspects of the matter, I brought on my partner in the Finance Department, Mark Wojciechowski, to assist, and he in turn enlisted the help of Ms. Klayman. Ms. Klayman's performance on the matter was satisfactory, and I worked with her and Mr. Wojciechowski on another financing deal for the same client a few years later. I worked with Ms. Klayman on and off through 2017 and found her work to be good, although she was often very late about entering her time for matters. My expectation, consistent with the Firm's, is that time will be entered regularly, and I conveyed that expectation to Ms. Klayman.

7. In 2017, Tessa Schwartz, the Firm's Managing Partner, asked me and Mark Wojciechowski to supervise the blockchain initiative, aka the Blockchain + Smart Contracts Task Force. That group had been started by a group of non-partner lawyers including Ms. Klayman and Mr. de Martino, and Ms. Schwartz wanted to ensure partner supervision of the effort. I was asked to supervise because of the potential risks associated with cryptocurrencies and initial coin offerings (ICOs). I thereafter became intimately involved in a number of matters related to these blockchain efforts.

8. Most of my interactions with Ms. Klayman occurred in connection with the two client-billable matters we worked on together. In the context of the blockchain Task Force, our greatest area of interaction was in connection with a firmwide initiative to create guidelines for ICOs. During that multi-month effort, we repeatedly sought feedback from Ms. Klayman, but she was often non-responsive, or failed to engage in a timely way. On at least one occasion, I told Ms. Klayman I found her failure to be responsive and to timely engage was disrespectful to the time and effort of the more than 10 other senior lawyers involved in the process.

9. I recall that sometime in 2017, a question arose as to whether we would have a single chair or two co-chairs of Blockchain + Smart Contracts Task Force. Mr. de Martino told me that Ms. Klayman had been describing herself as the sole chair in marketing materials even though he believed he was also functioning as a co-chair. I consulted with Mr. Wojciechowski, and we agreed that Mr. de Martino and Ms. Klayman could be co-chairs of the Task Force, as we both agreed that reflected the actual and intended state of play.

10. During the time period when Ms. Klayman was out on maternity leave in 2017, I did not always include her in planning events out of a desire to respect her leave. I recall one such event involved blockchain in the context of M&A and other corporate issues, which were outside her practice area (financial transactions). The blockchain Task Force was a multi-disciplinary group involving attorneys from a number of practice areas, and I did not believe that it was an efficient use of Firm resources or otherwise made sense to involve every attorney in planning every event, particularly when that event was outside their area of specialty.

11. In 2017, I was asked by Nick Spiliotes and Janet Herman to provide feedback regarding Ms. Klayman's readiness for partner, which I did. I thought she was driven and self-motivated and was impressed by her efforts with the blockchain Task Force, but thought she needed more seasoning with respect to her communication style and judgment. In my opinion, Ms. Klayman sent too many emails with too much detail. Similarly, on client matters, I found that she was too in the weeds for a senior lawyer, and was not decisive in the advice that she gave. I had been trying to coach her on these issues, and hoped that she would ultimately become a partnership candidate.

12. Other than providing this requested feedback, I was not involved in any decisions about

1  whether to put Ms. Klayman up for partner.  Decisions about whom to put up for partnership
2  consideration start at the practice group level.  The practice groups make recommendations about who
3  in their groups to put forward for partnership, and those recommendations are evaluated by the
4  Department Chairs.  The list of recommendations is narrowed by the Department Chairs and Firm
5  management.  After additional review, a slate of potential candidates is sent to the Partnership Review
6  Committee.  Because Ms. Klayman was in the Financial Transactions Group and then later the Finance
7  & Projects Group in the Finance Department, and I was in the M&A Group in the Corporate
8  Department, I was not responsible for making a recommendation about whether to put her up for
9  partnership, for deciding whether she should be put for partnership, or deciding whether to advance her
10 candidacy further.  My role was limited to commenting on my professional interactions with her as part
11 of the feedback process.

12        13.    I first became aware that Ms. Klayman had raised complaints about ▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
26 /
27 /
28 /

     I declare under penalty of perjury that the foregoing is true and correct. Executed on October 5, 2020 in Stamford, Connecticut.

                                                */s/ Spencer D. Klein*
                                                Spencer D. Klein

**FILER'S ATTESTATION:**

I hereby attest that concurrence in the filing of this document has been obtained by the signatory to this Declaration.

*/s/ Rachel S. Brass*
Rachel S. Brass