# TAB T

Declaration of E. Sluder

# PUBLIC COPY

*Confidential Copy Submitted Under Seal Lodged Pursuant to Local Rule 79-5(c)-(d)*

RACHEL S. BRASS, SBN 219301
 rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:   415.393.8306

MICHELE L. MARYOTT, SBN 191993
 mmaryott@gibsondunn.com
LAUREN M. BLAS, SBN 296823
 lblas@gibsondunn.com
RONALD GOMEZ, SBN 295274
 rgomez@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:    213.229.7000
Facsimile:   213.229.7520

AMANDA C. MACHIN, *admitted pro hac vice*
 amachin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, D.C. 20036-5306
Telephone: 202.955.8500
Facsimile:   202.467.0539

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERRY WILLIAM and JOSHUA ASHLEY KLAYMAN,<br><br>             Plaintiffs,<br>     v.<br><br>MORRISON & FOERSTER LLP,<br><br>             Defendant. | CASE NO.: 3:18-cv-02542-JSC<br><br>**DECLARATION OF ELIZABETH C. SLUDER**<br><br>Judge:       Hon. Jacqueline Scott Corley<br><br>Action Filed: April 30, 2018 |

**DECLARATION OF ELIZABETH C. SLUDER**

I, Elizabeth Sluder, declare as follows:

1. I am a Partner at Morrison & Foerster LLP ("Morrison" or the "Firm"). I am a 2004 graduate of Tulane Law School. I have worked for Morrison as an attorney since 2013. From 2013 to 2015, I was an Of Counsel attorney, and on January 1, 2016, approximately twelve years after I graduated from law school, I was promoted to partner, my current position. Since I began working for Morrison, I have worked in the Firm's Los Angeles office. Through my experience at Morrison, I have personal knowledge of the matters and information set forth in this declaration and, if called upon to testify thereto, can and would competently do so.

2. I began working with Sherry William in or about August 2015, when she joined Morrison in the Los Angeles office to do project finance work. During her first performance year, from September 1, 2015 through August 31, 2016, we worked together on at least six deals.

3. In November 2016, the Associate General Counsel at a client contacted Mr. Chester and me to inform us of a new transaction. Mr. Chester and I agreed that I would lead the deal. Part of leading a deal is deciding which attorneys to staff on the deal. At the time, the only associates in our group were Julia Balas, Sherry William, and █████. I decided to staff Ms. █████. I asked Ms. █████ if she had the availability to assist with this deal, and she agreed.

4. A few weeks later, Ms. William informed me that she and Mr. Chester had a phone conversation with the client regarding the deal.

5. Mr. Chester confirmed shortly thereafter that, although he had participated in a conversation with the commercial lead at the client, I would run the deal, including preparing the actual acquisition agreement. I let Mr. Chester know that I had already staffed Ms. █████ on the deal and preferred to keep her on, and he agreed with my decision.

6. I staffed Ms. █████ on this deal because she and I had worked on a number of deals together (including matters for the same client) and had a good working relationship. More importantly, in my opinion, at the time and to this day, Ms. █████ was a better attorney than Ms. William on renewable energy transactions. Although she was three years junior to Ms. William, Ms. █████ was more efficient, more detail-oriented, and better informed about what was required in a

1 renewable energy merger and acquisition. As a result, she was also more cost-effective to the cost-conscious client. The decision had nothing to do with the fact that Ms. William had a child and, at the time, Ms. ███ did not. Such an accusation is absurd and, frankly, insulting to Ms. ███.

7.  In November 2016, Ms. William and I were working on a deal. We received a document from one of the parties in the transaction, and I told Ms. William multiple times that she did not need to mark up the document because we would receive a revised draft from the same party. Ms. William nevertheless prepared a markup of the document. Because Ms. William's time on this markup was unnecessary, I felt that it could not reasonably be billed to the client. I informed Mr. Chester that he could cut Ms. William's time on the unnecessary markup from the client bill. A true and correct copy of my email exchange with Mr. Chester regarding this issue is attached at **Exhibit A** and is identified by bates numbers MORRISON-0018013–MORRISON-0018016. I understand that, pursuant to the parties' agreement, information in this and other exhibits that would disclose attorney-client privileged or otherwise confidential information regarding the underlying matter was redacted prior to production.

8.  In or about November 2016, I staffed both Ms. William and Ms. ███ on a new transaction. The client asked me to send an associate to their office in San Francisco for a due diligence meeting. I asked Ms. ███ to go to the client meeting because, as the most junior associate on the deal team, she was the most qualified associate to perform the task and had the lowest billing rate.

9.  As part of the same transaction, Ms. William was required to draft and revise a limited liability company (LLC) Agreement. This particular agreement was between two parties, which made it slightly more complicated. Because of this, I provided Ms. William with precedent agreements to assist her. With these precedents (and other resources available through Morrison's interoffice database), and considering her seniority as a seventh year associate and exposure to such agreements from prior transactions, I did not believe that Ms. William would have any issues with this assignment. In my opinion, third and fourth year associates are regularly staffed on similar assignments.

10. In early February 2017, the client requested that we prepare a revised draft of the LLC Agreement, and Ms. William was tasked with preparing such draft. Prior to submitting her draft, Ms. William did not reach out to ask any questions or otherwise seek guidance regarding the LLC Agreement. Ms. William submitted her draft of the LLC Agreement to me a few days before the client

expected the draft, but while I was attending a conference in San Diego. Although we were actively working on other aspects of the same matter and revising documents while I was in attendance at the conference, Ms. William never mentioned to me that she had any questions or that there were any outstanding issues regarding the LLC Agreement that she had sent me. After the conference concluded (which was the same day we were expected to submit the revised LLC Agreement to the client), I went to Morrison's San Diego office to address business matters before driving to Los Angeles (since I would not be returning to Morrison's Los Angeles office before going home that night). I expected to quickly review the draft LLC Agreement, make minor edits, and forward it along to the client. Instead, when I opened Ms. William's draft, I saw that Ms. William had not addressed an entire section but for a note saying that she would recommend looking at precedents. It was clear to me that Ms. William was unable or unwilling to draft the section (or take the initiative to follow her own advice to look at precedents available to her). As a result, I determined that it would be more efficient, both in terms of client costs and my availability to revise and/or review additional drafts, to draft the section myself.

11. In my opinion, this kind of judgment is something that distinguishes a good associate from a bad associate. A good associate who does not know how to do something will research the issue (including reviewing precedents themselves), ask questions (and propose potential resolutions to those questions), and generally give it their best shot. Ms. William did not ask any questions about the unaddressed section and instead chose to push the issue down the road. This was not what I expected of a senior associate in terms of work quality or judgment.

12. This was not the only time that Ms. William performed below expectations on this same deal. In another instance, in March 2017, I received an email from the Associate General Counsel of the client asking if I had time to speak with her that day. Because this was out of the ordinary, I asked Ms. William if there was anything I should be aware of. Ms. William told me that she was unaware of any issue.

13. I immediately called the Associate General Counsel, who told me that she recently had a conversation with Ms. William. The client said that she did not appreciate Ms. William's tone on the call and that she expected better service from the Firm. I was very concerned and embarrassed about this complaint – it was the first time I had ever received such a complaint – and immediately emailed

the relationship partner for this matter to let her know what had occurred so she would not be caught unawares if the client contacted her directly. I was upset that the client did not receive the level of service they expected, but I was also concerned about how this would impact the Firm's long-term relationship with the client, if the client thought that I had staffed an associate who was unprofessional.

14. From that day forward, I participated in all client interactions on that deal. This was an unexpected level of additional work for me. In the normal course, I could delegate routine client interactions to a seventh year associate on the deal team. Unfortunately, after this incident I felt as though I could not trust Ms. William to interact with clients by herself.

15. Ultimately, I concluded that it would be very difficult to staff Ms. William on my matters going forward. I felt that her skillset, both as a Project Finance associate and in the more specific renewable energy space, did not match her senior-associate billing rate. Moreover, at this point, I had more junior associates who could complete any junior associate-level work and, in my opinion, did so more effectively.

16. I understand that Ms. William claims that I refused to meet with her to discuss her 2017 practice plan. Most of the associates in my group who wished to discuss their practice plan would simply come to my office with a draft of their practice plan for my review. I do not recall Ms. William ever coming to my office or otherwise providing a draft of her practice plan. Instead, my recollection is that Ms. William preferred to try and set up lunch meetings. If I declined any invitation, it would have been because I was very busy at the time and preferred to not schedule any work matters during the lunch hour. If Ms. William ever came to my office with a draft of her practice plan, or asked to set a non-lunch meeting for that purpose, I am certain I would have discussed it with her. I have no recollection of her ever doing so.

17. After Ms. William returned from her 2017 maternity leave, Mr. Chester and I tried to schedule a date to deliver her review. Because Mr. Chester and I were both scheduled to travel in early- to mid- January, the earliest convenient date that we would both be present in the Los Angeles office was the week of January 22, 2018. A true and correct copy of an email exchange regarding our efforts to schedule the meeting to deliver Ms. William's review is attached at **Exhibit B** and is identified by MORRISON-0017167 through MORRISON-0017678.

18.     In April 2018 I asked Julia Balas, ▨▨▨▨▨▨, and our paralegal, ▨▨▨▨▨▨, to attend a meeting at our client's offices in San Diego.  This meeting was not open to everyone who did project finance work in LA, or who worked on matters for that client.  Instead, this was a pitch opportunity for Ms. Balas, a senior associate I was actively sponsoring with the hope that she might someday be promoted to partner.  The prospective work was a continuation of work that Ms. Balas, Ms. ▨▨▨▨ and Ms. ▨▨▨▨ had been doing for the client, so each already had developed an understanding of the client's needs and business.  Accordingly, I believed we were most likely to win the work if we proposed the same team.  I asked Ms. Balas to lead the pitch for this work because she was a superstar associate and I thought this would be a good opportunity for her to try and build her own book of business.

19.     In May 2018, a client sent an email to me, Mr. Chester, and Ms. William, since the three of us had each worked on previous transactions for the client.  In the email, the client asked each of us to perform specific tasks.  The client tasked Ms. William with reviewing the corporate governance of an acquisition target.  Therefore, as the deal proceeded, Ms. William reviewed the corporate documents, consistent with my understanding of the client's request.  Unfortunately, this particular deal died very quickly and, per Ms. William's reports to me, there ultimately were not many corporate documents for Ms. William to review before it ended.

20.     Mr. Chester left Morrison in July 2018.  At the time, I was very concerned that Mr. Chester would try to recruit valued associates who worked with both Mr. Chester and me to join him at his new firm.  To relieve any concerns that those associates may have had about Mr. Chester's departure, I started scheduling monthly meetings with those associates.  The intent was to provide more transparency into my practice – for example, provide updates on new deals that I had been contacted about and ongoing business development efforts (pitches, speeches, articles and conferences I was attending) – and provide a forum for the associates to air any concerns they had about Mr. Chester's departure, with the hope that they would gain comfort that I was remaining at Morrison and make them feel like staying at Morrison was the right decision too.  Therefore, while I typically do not schedule any business meetings or calls over the lunch hour, I decided to host working lunch meetings with the attorneys staffed on my renewable energy deals in a conscious effort to retain the most talented

associates who were working on my matters. These were not office-wide Project Finance meetings or meetings of the Energy Working Group. At the time, Ms. William was not speaking to me and never expressed any interest in working with me again. In addition, she was not valuable to my practice, and not working on any of my matters at the time. If Mr. Chester had tried to recruit her, or if she had tried to follow him to his new firm, I would not have made any effort to keep her at Morrison.

21.     Both before and after Mr. Chester's departure from Morrison, the transactional attorneys in the Los Angeles office also had monthly lunches, which Ms. William was invited to join and sometimes attended. One of the primary purposes of these lunches was to discuss the deals and transactions that the attending partners and associates were working on. This gave associates the opportunity to gain a better understanding of deal flow in the office and around the Firm.

22.     In September 2019, I attended an event for the Mexican Chamber of Commerce hosted at our Los Angeles office. I had no role in the planning of this event or in determining who was invited. It is my belief that this event was planned by the head of Morrison's marketing team supporting both the Energy Working Group and the Latin America practice group. I was invited on short notice when the original Morrison representatives (from our Miami office) were unable to attend. I believe that the head of marketing also invited ▬▬▬▬, who had previously practiced law for several years in Mexico, and Hector Gallegos. At the time I was championing Ms. ▬▬▬ to this head of marketing due to her Latin America and cross border experience. This event had nothing to do with renewable energy or project finance work. As far as I know, Ms. ▬▬▬ and I were the only attorneys in Los Angeles who did project finance work invited to attend. Mr. Gallegos is a litigation partner.

23.     Contrary to Ms. William's allegations, I do not have a bias against attorneys who are pregnant, take parental leave, or are parents. Indeed, in just the group of Los Angeles associates who do project finance work, I have successfully worked with, mentored, and/or sponsored Ms. Balas (who was pregnant in 2016, had a daughter in March 2017, and who I sponsored to partnership while on her second maternity leave), Ms. ▬▬▬ (who was pregnant in 2019, had a son in February 2020, and took maternity leave thereafter) and ▬▬▬ (who has multiple children).

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 4, 2020 in Santa Monica, California.

*Elizabeth C. Sluder*

Elizabeth C. Sluder