David W. Sanford (*pro hac vice*)
dsanford@sanfordheisler.com
Andrew Melzer (*pro hac vice*)
amelzer@sanfordheisler.com
Carolin Guentert (*pro hac vice*)
cguentert@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas
New York, New York 10019
Telephone: (646) 402-5656
Facsimile: (646) 402-5651

Deborah K. Marcuse (*pro hac vice*)
dmarcuse@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 S. Calvert St., Ste. 1950
Baltimore, MD 21202
Telephone: (410) 834-7420
Facsimile: (410) 834-7425

Ed Chapin (CA Bar No. 53287)
echapin2@sanfordheisler.com
Jill Sullivan Sanford (CA Bar No. 185757)
jsanford@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
655 W. Broadway, Suite 1700
San Diego, CA 92101
Telephone: (619) 577-4253
Facsimile: (619) 677-4250

*Attorneys for Plaintiffs*
*[Additional Attorneys Listed After*
*Signature Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERRY A. WILLIAM and JOSHUA ASHLEY KLAYMAN,<br><br>Plaintiffs,<br><br>v.<br><br>MORRISON & FOERSTER LLP,<br><br>Defendant. | CASE NO. 3:18-cv-02542-JSC<br><br>**PLAINTIFF JOSHUA ASHLEY KLAYMAN'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing:**<br>Date:      Thursday, December 10, 2020<br>Time:      9:00 a.m.<br>Place:     Courtroom E, 15th Floor<br>Judge:    Hon. Jacqueline Scott Corley |

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND ........................................................................................1

LEGAL STANDARD ...................................................................................................5

ARGUMENT .................................................................................................................5

    I.     Genuine Factual Disputes Exist as to Ms. Klayman's FMLA Claims................................5

         A.  Ms. Klayman Was Pressured to Work During Her Maternity Leave ............................6

         B.  Ms. Klayman's Maternity Leave Was a Negative Factor in Denial of
Partnership ............................................................................................................7

    II.    Genuine Factual Disputes Exist as to Ms. Klayman's Discrimination
Claims ...............................................................................................................................8

         A.  Discrimination Based on Defendant's Failure to Promote Ms. Klayman
to Partner ............................................................................................................8

              1.  Ms. Klayman Has Set Forth a Prima Facie Case under Title VII
and NYCHRL ...............................................................................................8

              2.  Defendant's Proffered Reasons for Non-promotion Are Pretextual................10

         B.  Discrimination Based on Less Favorable Treatment ....................................15

    III.   Genuine Factual Disputes Exist as to Ms. Klayman's Retaliation Claim.........................17

    IV.   Genuine Factual Disputes Exist as to Ms. Klayman's Unequal Pay Claim.......................21

         A.  Ms. Klayman Performed Substantially Equal Work to Her Male
Comparators ........................................................................................................21

         B.  Ms. Klayman Was Paid Less than Her Male Comparators..........................................22

         C.  Defendant Fails to Prove that it Has an Undisputed Affirmative Defense ..................23

    V.    Ms. Klayman Is Entitled to Seek Punitive Damages ........................................25

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001) .........................................7

*Beck v. UFCW, Local 99*, 506 F.3d 874 (9th Cir. 2007)............................................................9

*Bowden v. Potter*, 308 F. Supp. 2d 1108 (N.D. Cal. 2004).......................................................10

*Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53 (2006)............................................17

*Chauca v. Abraham*, 30 N.Y.3d 325 (2017) ............................................................................25

*Clark v. AmTrust N. Am.*, No. 16-cv-05561, 2018 WL 839148
    (N.D. Cal. Feb. 13, 2018)....................................................................................................7

*Cooper v. United Air Lines, Inc.*, 82 F. Supp. 3d 1084 (N.D. Cal. 2015)......................23, 24

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)...........................................................24

*Duane v. IXL Learning, Inc.*, No. C 17-00078, 2017 WL 2021358
    (N.D. Cal. May 12, 2017) ....................................................................................................7

*Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F. Supp. 985 (D.N.J. 1996) ...........22

*Earl v. Nielsen Media Research, Inc.* 658 F.3d 1108 (9th Cir. 2011) ...................................13

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 966 F. Supp. 2d 949
    (N.D. Cal. 2013).................................................................................................................25

*EEOC v. Maricopa Cty. Cmty. Coll. Dist.*, 736 F.2d 510 (9th Cir. 1984) .....................21, 23

*Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006).................................................................17, 21

*Gaub v. Prof. Hosp. Supply, Inc.*, 845 F. Supp. 2d 1118 (D. Id. 2012) ...............................17

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998) ...............................................9

*Hein v. Oregon Coll. of Educ.*, 718 F.2d 910 (9th Cir. 1983)..............................21, 22, 23

*Jordan v. Clark*, 847 F.2d 1368, 1377 (9th Cir. 1988) ..........................................................20

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999)..................................................................25

*Lam v. Univ. of Hawaii*, 40 F.3d 1551 (9th Cir. 1994) ..........................................................14

*Liu v. Amway Corp.*, 347 F.3d 1125 (9th Cir. 2003) ................................................................7

*Malin v. Hospira, Inc.*, 762 F.3d 552 (7th Cir. 2014) ............................................7

*Maxwell v. City of Tucson*, 803 F.2d 444 (9th Cir. 1986) ...............................21

*McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70 (2d Cir. 2010) ..........................16

*Meredith v. Beech Aircraft Corp.*, 18 F.3d 890 (10th Cir. 1994) ........................15

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013) ...................15, 17, 21

*Miller v. Fairchild Indus., Inc.*, 885 F.2d 498 (9th Cir. 1989)................................20

*Passananti v. Cook Cty.*, 689 F.3d 655 (7th Cir. 2012) ......................................16

*Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493
     (9th Cir. 2000)..............................................................................25

*Peoples v. Cty. of Contra Costa*, No. C 07-00051, 2008 WL 2225671
     (N.D. Cal. May 28, 2008) .................................................................14

*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004)........................8, 10

*Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018 (9th Cir. 2004)..............................13

*Powell v. Consolidated Edison Co. of N.Y., Inc.*, No. 97-2439, 2001 WL 262583
     (S.D.N.Y. Mar. 13, 2001) .............................................................14, 15

*Price v. McDonald's Corp.*, 156 Fed. App'x 899 (9th Cir. 2005) ........................11

*Ramirez v. Kingman Hosp., Inc.,* 374 F. Supp. 3d 832 (D. Ariz. 2019) ...............12

*Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000) .............................................7

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010) ..........16

*Riddle v. Washington*, 454 Fed. App'x 613 (9th Cir. 2011) ..............................12

*Rizo v. Yovino*, 950 F.3d 1217 (9th Cir. 2020)............................................24, 25

*Sanders v. City of Newport*, 657 F.3d 772 (9th Cir 2011) ..................................6

*Schmidt v. Shasta Cty. Marshal's Office*, No. 2:14-cv-02471, 2017 WL 4038356
     (E.D. Cal. Sept. 13, 2017) ...............................................................17

*Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406 (9th Cir. 1996) ....................5

*Stanley v. Univ. of So. Cal.*, 178 F.3d 1069 (9th Cir. 1999) ..........................21, 23

*Stimmel v. Sessions*, 879 F.3d 198 (6th Cir. 2018) ...................................................................9

*Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859 (9th Cir. 1996) .............................14

*Talwar v. Staten Island Univ. Hosp.*, 610 Fed. App'x 28 (2d Cir. 2015) ............................21

*Valentine v. Cal. Emp't Dev. Dep't*, No. CV 10-8717, 2012 WL 386682
    (C.D. Cal. Feb. 6, 2012) ...........................................................................................................8

*Vasquez v. Cty. of L.A.*, 349 F.3d 634 (9th Cir. 2003) ............................................................9

*Warren v. City of Carlsbad*, 58 F.3d 439 (9th Cir. 1995) ......................................................5

*Washburn v. Gymboree Retail Stores, Inc.*, No. C11-822, 2012 WL 3818540
    (W.D. Wash. Sept. 4, 2012) ....................................................................................................7

*Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62 (N.Y. App. 2009) ..............................9, 21

## Rule, Statutes, and Regulations

Fed. R. Civ. P. 56(c) ..................................................................................................................5

29 U.S.C. § 2615(a)(1) ...............................................................................................................7

29 U.S.C. § 2617(c)(2) ...............................................................................................................8

42 U.S.C. § 1981a(b)(1) ...........................................................................................................25

29 C.F.R. § 1620.13(e) .............................................................................................................22

**INTRODUCTION**

Plaintiff Joshua Ashley Klayman is an accomplished finance lawyer and pioneer in the field of blockchain and digital assets. During her five-year tenure at Defendant Morrison & Foerster ("MoFo" or the "Firm"), she worked on many of the Firm's most high-profile and landmark deals, representing premier corporate clients in large-scale and complex borrower-side transactions and major financings for M&A deals. At MoFo, Ms. Klayman was lauded as an exceptional lawyer and leader and was widely viewed as on track to become partner. Despite assurances that she was qualified for partnership, and indeed, already operating at a partner level, the Firm never made her partner. Instead, after she reported that gender and pregnancy discrimination were holding her back from advancing, the Firm retaliated against her—subjecting her to excessive scrutiny, failing to meaningfully investigate her complaints, and creating an intolerable work environment that ultimately forced her to resign.

Based on a skewed presentation of the evidence, Defendant seeks summary judgment on the ground that all material facts relevant to Ms. Klayman's claims are undisputed. Dkt. 151 at 8.[1] Yet Defendant ignores and at times misrepresents record evidence that supports Plaintiff's claims; makes arguments that depend on the Court granting inferences and credibility assumptions in *Defendant's* favor, contrary to governing law; and disregards controlling case law that contravenes certain of its legal arguments. As set forth below, Defendant has not met its burden to show that Ms. Klayman cannot fulfill an essential element of her claims or that it has a complete defense to those claims. In light of the numerous genuine issues of material fact, Ms. Klayman is entitled to have her case heard by a jury.

**FACTUAL BACKGROUND**

In July 2013, Ms. Klayman joined MoFo as an associate in its Financial Transactions Group. Ex. 21, MORRISON-2290. A few weeks later, she went on her first maternity leave at the Firm. Ex. 61, MORRISON-12837. Upon her return in November 2013, ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████ Ex. 2, Klayman Resp. to Rog. 19. ███████████████████, Ms. Klayman agreed to transition to an 80% reduced hours schedule. *Id.*; Ex. 22, MORRISON-2293.

---

[1] Page numbers cited herein refer to the ECF page numbers.

In recognition of Ms. Klayman's exemplary performance, the Firm promoted her to Of Counsel in July 2014. Ex. 20, MORRISON-197; Ex. 58, MORRISON-12744. She was informed that the promotion was a "placeholder" for partnership. Ex. 3, Klayman I Tr. 233:17–238:5. However, unlike ▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ms. Klayman did not receive a raise. *Id.*; Ex. 73, MORRISON-43544; Ex. 1, Def. Resp. to RFA 39. Because MoFo only nominally increased her salary in 2015, Ms. Klayman repeatedly fought for a raise commensurate with her value. Ex. 42, MORRISON-8897; Ex. 59, MORRISON-12755. It took until February 2016 for the Firm to admit that her salary was ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 60, MORRISON-12760 at -12761. But after the Firm increased Ms. Klayman's base compensation in 2016, it did not again adjust her compensation for the remainder of her tenure. Ex. 1, Def. Resp. to RFA 48. Ms. Klayman ultimately earned less than other men doing substantially equal work. *See* Marcuse Decl. ¶¶ 78–99.

Ms. Klayman took a second maternity leave in 2015 and worked through much of that leave, hoping that her sacrifices and commitment would improve her chances of being elevated to the partnership. Ex. 67, MORRISON-14744; Ex. 2, Klayman Resp. to Rog. 11. But her second leave was a bridge too far for MoFo. At the end of 2015, despite glowing reviews, the Firm deferred her candidacy for partnership until the fall of 2016. Ex. 19, MORRISON-190 at -192.

In 2016, Ms. Klayman devised and co-founded what became the Firm's Blockchain + Smart Contracts Group, of which she became Chair. Ex. 3, Klayman I Tr. 28:10–30:15. Her 2016 review praised her leadership in this area, noting, "She is . . . spearheading the blockchain/smartcontracts [sic] taskforce, which industry experts consider the most disruptive technology since the invention of the internet." Ex. 18, MORRISON-174 at -175. But, despite feedback from her reviewers that her work was partner level, the Firm decided in the fall of 2016 that Ms. Klayman's partnership vote would be deferred yet another year. Ex. 24, MORRISON-2303; Ex. 18, MORRISON-174 at -176; Ex. 35, MORRISON-7520. In coming to that decision, MoFo expressly held her maternity leave against her, noting that "since [she] is just back in the office, it makes sense to wait." Ex. 37, MORRISON-7531 at -7532. The Firm instead hired a male lateral partner for her group that year. Ex. 50, MORRISON-10688.

In early 2017, Ms. Klayman announced that she was again pregnant. Ex. 4, Klayman II Tr. 371:17–376:19. She had delayed revealing her pregnancy because she knew that her supervisor, Mr.

Wojciechowski, would be disappointed that she was to take another leave. *Id.*; Ex. 2, Klayman Resp. to Rog. 11. And indeed, upon announcing her pregnancy, then-associate Dario de Martino and partner Spencer Klein began to exclude her from the planning and marketing materials for an event series that she had organized and obtained approval for; they even changed the date of the event to one near when she was due to give birth. Ex. 4, Klayman II Tr. 368:17–371:16; Ex. 10, DOES13375.

Ms. Klayman went on her third maternity leave from June through November 2017. Ex. 62, MORRISON-12838. Although she genuinely loved her work and wanted to stay involved, she was repeatedly pressured to do more. Ex. 4, Klayman II Tr. 350:12–353:23. Mark Wojciechowski routinely sent follow-up emails if Ms. Klayman did not respond within a few hours while she was on leave. Ex. 70, MORRISON-20849; Ex. 71, MORRISON-23127. He candidly revealed that working during leave was critical to Ms. Klayman's partnership chances, and he chided her for not being more aggressive about seeking billable work while on leave, stating, "I'm happy to back you up while your [sic] on leave, but as I said our new management are cold-blooded economic animals. Actually bringing in the work and/or billing time is the absolute primary distinguishing factor for making partner and getting compensated." Ex. 68, MORRISON-18323 at -18324.

While on maternity leave in 2017, Ms. Klayman also learned that Dario de Martino had been installed as Co-Chair of the Blockchain + Smart Contracts Group, thereby effectively demoting her from Chair to Co-Chair. Ex. 44, MORRISON-9103. No one at the Firm had discussed this change with Ms. Klayman before it occurred, and Mr. Wojciechowski cautioned her that complaining would make her seem like a ██████████ Ex. 3, Klayman I Tr. 41:3–42:11.

Ms. Klayman also learned during her 2017 maternity leave that her partnership candidacy would again be torpedoed. Though her practice group had recommended her for partnership, before she would be put on the official list for consideration, █████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ Ex. 31, MORRISON-7164; Ex. 65, MORRISON-13746. The result was predetermined: ███████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* Yet the result

of which they complained had been engineered by the limited investigation they undertook: though Ms. Klayman provided them a list of 21 partners who could attest to her core finance work, as well as a separate list of 48 partners who could attest to her blockchain work, ███████████████████ ████████████████████████████ *Compare* Ex. 29, MORRISON-3854 *and* Ex. 28, MORRISON-3850 *with* Ex. 31, MORRISON-7164. Mr. Spiliotes and Ms. Herman also solicited feedback from partner Spencer Klein—whom Ms. Klayman had not identified as a reference—elevating his individual critique to an alleged problem with Ms. Klayman's communication style writ large. Ex. 31, MORRISON-7164; Ex. 65, MORRISON-13746. They then suggested that she work with a coach to address these alleged issues. Ex. 65, MORRISON-13746. When Ms. Klayman later sought clarity about MoFo's reasons for declining to put her up for partner in 2017, Ms. Herman noted that unnamed persons had complained that Ms. Klayman "acted like a martyr" by mentioning that she had her baby on her lap during conference calls. Ex. 3, Klayman I Tr. 315:10–316:23. This, along with her supervisor's exhortation to do more, was the thanks she received for toiling through her leaves.

In stark contrast with the Firm's tepid account of her prospects for partnership, Ms. Klayman's 2017 year-end reviews were detailed, voluminous, and superlative. Ex. 17, MORRISON-123. The contrast only enhanced her sense that her gender and pregnancies were impeding her ability to advance. In December 2017, Ms. Klayman reported to Ms. Herman that she believed she was being discriminated against. Ex. 10, DOES13375. Then, in January 2018, she reiterated her concerns to Chief Human Resources ("HR") Officer Jason McCord. Ex. 63, MORRISON-13702; Ex. 7, McCord Tr. 112:3–113:5.

Immediately following Ms. Klayman's complaint to Mr. McCord, he reached out to ████████ ███████████████████████████ Ex. 7, McCord Tr. 115:25–116:14. Although Ms. Klayman had been working at MoFo for more than four years, with talents and a work ethic that were well-documented by the Firm, ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ Ex. 40, MORRISON-8222.

From this inauspicious start, MoFo launched a systematic campaign to suppress its mistakes by trivializing Ms. Klayman's discrimination complaint and subjecting Ms. Klayman to unwarranted and harsh scrutiny. In the months following her reports to Attorney Development and HR, partners around

the Firm began emailing each other, Mr. McCord, and Ms. Herman to disparage her with undeservedly harsh criticism about her work and her character. *E.g.* Ex. 53, MORRISON-11318; Ex. 46, MORRISON-9151. Some partners spread rumors she was leaving the firm; others stated outright ███ █████████████ *E.g.* Ex. 26, MORRISON-3831; Ex. 27, MORRISON-3842; Ex. 46, MORRISON-9151. Meanwhile, the Firm failed to appropriately investigate Ms. Klayman's discrimination complaint, ██████████████████████████████████████████████████████████ ████████████████████ *E.g.* Ex. 7, McCord Tr. 196:23–197:18; Ex. 52, MORRISON-11240. Though the Firm claimed its hands were tied by Ms. Klayman's concerns about confidentiality, behind the scenes, news of her complaint spread apparently unhindered by any such concerns. *E.g.* Ex. 7, McCord Tr. 196:23–197:18; Ex. 6, Herman Tr. 146:12–147:19, 209:3–21, 216:16–217:2. The proverbial writing was on the wall: attacked from all sides and fearing reputational harm throughout the Firm and even outside it, Ms. Klayman felt she had no choice but to resign in June 2018. Ex. 15, DOES36202.

## LEGAL STANDARD

Summary judgment must be denied unless the movant can show that there is no genuine issue of material fact concerning the plaintiff's claims. Fed. R. Civ. P. 56(c). Such an issue is raised when the plaintiff produces evidence showing a discriminatory motive or that the employer's non-discriminatory explanation is not credible. *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995). A court views the evidence in the light most favorable to the non-moving party and resolves all inferences in its favor. *Id.* The Ninth Circuit sets a "high standard for the granting of summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). A plaintiff need only present "very little evidence to survive summary judgment . . . because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Id.* (citation and quotation marks omitted).

## ARGUMENT

### I.  Genuine Factual Disputes Exist as to Ms. Klayman's FMLA Claims

There are genuine factual disputes as to whether MoFo interfered with Ms. Klayman's maternity leave, both by pressuring her to work during those leaves and by using her protected leaves as a negative factor in an adverse employment action. Summary judgment should therefore be denied.

A. Ms. Klayman Was Pressured to Work During Her Maternity Leave

Defendant misconstrues the record when it claims partners contacted Plaintiff to work during her leave only on "rare occasions" and that she otherwise chose to work voluntarily. Dkt. 151 at 15–16. The evidence makes clear that these statements are at minimum disputed, if not altogether untrue: prior to going on maternity leave in 2017, Ms. Klayman participated in a call hosted by the Firm's Women's Strategy Committee, in which partner ███████ stated that there is no excuse for any Firm attorney to be unavailable, even when out on leave. Ex. 2, Klayman Resp. to Rog. 11. Moreover, a partner sent her a work-related email the very first day of her 2017 leave (Ex. 69, MORRISON-18450), the first of thousands she would send and receive during her leave. Ms. Klayman's supervisor Mark Wojciechowski also made clear his expectation that she would respond promptly to his inquiries, despite her being on leave. If Ms. Klayman did not respond to his email within several hours, he would email her again with "???" Ex. 70, MORRISON-20849; Ex. 71, MORRISON-23127.

While Ms. Klayman did some work voluntarily, she did so in the belief that it was her only viable path to partnership, even as Mr. Wojciechowski pressured her to do ever more. Ex. 4, Klayman II Tr. 392:1–10 ("I was just trying to . . . make partner and . . . not be pushed out of my group… it didn't feel like a choice."). Mr. Wojciechowski made clear that her potential for advancement depended on working through leave, explaining in an email on June 28, 2017: "This is the sort of work you need to capture. . . . I'm happy to back you up while your [sic] on leave, but as I said our new management are cold-blooded economic animals. Actually bringing in the work and/or billing time is the absolute primary distinguishing factor for making partner and getting compensated." Ex. 68, MORRISON-18323 at -18324. Ms. Klayman replied with a list of the calls, pitches, interviews, and other work she was doing, noting that she was "at about 150% of goal for my billable hours." *Id.* She concluded, "I want you to see that I am working around the clock every day on this stuff, with a baby on my lap, and still trying to work on billable matters . . . . It is not really maternity leave at all." *Id.*

Defendant is also mistaken that Ms. Klayman offers no evidence of harm stemming from its FMLA violation: having deprived her of leave to which she was entitled is itself cognizable harm under the FMLA. *See Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir 2011) (claim established when employer denies FMLA benefits to which plaintiff is entitled); *see also* 29 U.S.C. § 2615(a)(1).

"The harm is the deprivation of the substantive statutory right." *Washburn v. Gymboree Retail Stores, Inc.*, No. C11-822, 2012 WL 3818540, at *6 (W.D. Wash. Sept. 4, 2012) (citing *Liu v. Amway Corp.*, 347 F.3d 1125, 1135 (9th Cir. 2003)). Summary judgment must therefore be denied.

B. <u>Ms. Klayman's Maternity Leave Was a Negative Factor in the Denial of Partnership</u>

Summary judgment must also be denied because Defendant fails entirely to address Ms. Klayman's claim that MoFo interfered with her leave by using it as a negative factor in its decision to deny her partnership. Yet Plaintiff has evidence that (1) she took FMLA-protected leave; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to her leave. *Duane v. IXL Learning, Inc.*, No. C 17-00078, 2017 WL 2021358, at *2 (N.D. Cal. May 12, 2017) (citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001)). Defendant does not dispute the first element, that Ms. Klayman took leave protected by the FMLA. Dkt. 151 at 14–17. The second element is undeniably in Plaintiff's favor, while the third is disputed.

The Ninth Circuit defines adverse employment actions broadly. *Ray v. Henderson*, 217 F.3d 1234, 1240–42 (9th Cir. 2000) (recognizing a circuit split regarding what constitutes an adverse employment action and aligning itself with circuits that define it broadly). Failing to promote an employee is a materially adverse employment action under the FMLA. *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014) (citation omitted). Because MoFo decided not to promote Ms. Klayman to partner in both 2016 and 2017, it therefore subjected her to adverse actions both years. *Id.*

Further, the record shows that Ms. Klayman's protected leaves were causally related to MoFo's decisions to deny her a promotion. In the FMLA context, causation is satisfied if the protected leave "constituted 'a negative factor' in an adverse employment decision." *Clark v. AmTrust N. Am.*, No. 16-cv-05561, 2018 WL 839148, at *15 (N.D. Cal. Feb. 13, 2018). Ms. Klayman took her second maternity leave in 2015 (Ex. 67, MORRISON-14744), and in July 2016, Mr. Spiliotes noted that it "makes sense to wait" to nominate her for partner "since she is just back in the office." Ex. 37, MORRISON-7531 at -7532. He therefore concluded that Ms. Klayman "[d]oesn't pass the threshold straight-face test," even before he had seen any data. *Id.* at -7531; *see also* Ex. 76, MORRISON-7191 █████████████████████████████████████████████████████████████████). Mr. Spiliotes further testified that ████████████████████████████████████████████████████████████████████████████████████████

1   ████████████████████████████████████████████████████████

2   ████████████████   Ex. 8, Spiliotes Tr. 74:2–78:2. A jury could thus easily find that Ms. Klay-

3   man's 2015 maternity leave was a "negative factor" in MoFo's decision not to promote her in 2016.[2]

4       The evidence also raises a triable issue of fact as to whether Ms. Klayman's 2017 maternity

5   leave (and prior leaves) constituted a negative factor in MoFo's decision not to promote her in 2017.

6   As noted above, when Ms. Klayman sought feedback from Ms. Herman as to why her 2017 partnership

7   bid had been unsuccessful, Ms. Herman explained that others had accused Ms. Klayman of "acting like

8   a martyr" by mentioning that her baby was on her lap during conference calls. Ex. 3, Klayman I Tr.

9   315:10–316:23. If Ms. Klayman's leave were a non-factor, MoFo would have ignored or reprimanded

10  these naysayers, not elevated their comments to justify its decision.

11      Because a juror could find that Ms. Klayman's leave was a negative factor in her non-promotion

12  to partner, and because Defendant neglected to move for summary judgment on this theory, summary

13  judgment on Ms. Klayman's FMLA claim as to partnership denial must be denied.

14  **II.    Genuine Factual Disputes Exist as to Ms. Klayman's Discrimination Claims**

15      Summary judgment should also be denied on Ms. Klayman's discrimination claims because she

16  sets forth a prima facie case based both on her non-promotion to partner as well as other unfavorable

17  treatment she suffered based on gender and pregnancy. Moreover, there is ample evidence to raise a

18  triable issue of fact regarding whether MoFo's proffered justifications are pretextual.

19      A.  Discrimination Based on Defendant's Failure to Promote Ms. Klayman to Partner

20          1.  *Ms. Klayman Has Set Forth a Prima Facie Case under Title VII and NYCHRL*

21      One common way of stating a prima facie case of discrimination under Title VII is for a plaintiff

22  to show that: (1) she belongs to a protected class, (2) she was qualified for her position, (3) she suffered

23  an adverse employment action, and (4) similarly situated individuals outside her protected class were

24  treated more favorably, or other circumstances surrounding the adverse action give rise to an inference

25  of discrimination. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). Under the more

26  _____

27  [2] These statements and other evidence regarding Ms. Klayman's leave demonstrate that Morrison "ei-
    ther knew or showed reckless disregard for the matter of whether its conduct was prohibited by the

28  [FMLA]," such that the three-year statute of limitations for willful violations should apply. *Valentine
    v. Cal. Emp't Dev. Dep't*, No. CV 10-8717, 2012 WL 386682, at *6 (C.D. Cal. Feb. 6, 2012) (citation
    omitted); 29 U.S.C. § 2617(c)(2). It is impossible that Morrison lacked knowledge of the FMLA.

lenient New York City Human Rights Law ("NYCHRL"), a plaintiff need only show that she was treated "less well" than similarly situated employees who are men. *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009). MoFo does not dispute that Ms. Klayman belongs to a protected class or that she suffered an adverse action; it contends only that she was not qualified to become partner and that she lacks a proper comparator who was treated more favorably. *See* Dkt. 151 at 18–20. Defendant is wrong on both counts.

The record evidence is more than sufficient to raise a triable issue of fact regarding Ms. Klayman's qualifications for partnership. As set forth above, she received sterling reviews and was recognized for "partner level" work. *E.g.* Ex. 24, MORRISON-2303; Ex. 35, MORRISON-7520; Ex. 23, MORRISON-2294; Ex. 11, DOES15288; Ex. 39, MORRISON-7575; Ex. 76, MORRISON-7191. The Firm moreover explicitly linked the denial of partnership to her maternity leave. Ex. 37, MORRISON-7531 at -7532; Ex. 3, Klayman I Tr. 315:10–316:23; *see Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1219 (9th Cir. 1998) (direct evidence of discrimination sufficient to create triable issue of fact).

The record also reveals that similarly-qualified men were promoted to partner during the relevant period, and MoFo's post hoc excuses present issues of fact for a jury. MoFo argues Sean Ruff is not a proper comparator because of the billing credit he received, his focus on Financial Services, and his experience with laws and regulations regarding electronic payments. Dkt. 151 at 19. But these distinctions are immaterial, even if true, because employees need not be identical: "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003); *see also Stimmel v. Sessions*, 879 F.3d 198, 212 (6th Cir. 2018) ("similarly situated" inquiry "should not demand exact correlation, but should instead seek relevant similarity"); *Beck v. UFCW, Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007) ("[W]hether two employees are similarly situated is ordinarily a question of fact."). MoFo fails to establish as undisputed fact that Ms. Klayman and Mr. Ruff did not have similar jobs and display similar conduct. On the contrary, Mr. Ruff was, like Ms. Klayman, an Of Counsel in the Finance Department, until he ███████████ ███████████████████ in 2017 and ultimately made partner in 2018. Ex. 55, MORRISON-11610. Just like Ms. Klayman, Mr. Ruff's job entailed advising clients with respect to financial technology and transactions, developing business, and engaging in pro bono service. *Id.*

Defendant's attempts to distinguish other attorneys in the Finance Department likewise fail to establish undisputed fact. MoFo argues that Dario Avram was ███████████████████ ██████████████████ (Dkt. 151 at 19) but fails to provide any authority why this would render him dissimilarly situated from Ms. Klayman with respect to their jobs. In fact, Ms. Klayman was asked to ██████████████████████ while she was on maternity leave. Ex. 74, MORRISON-18997; Ex. 75, MORRISON-19436. Similarly, MoFo attempts to distinguish Elizabeth Sluder based on her expertise in renewable energy (Dkt. 151 at 19–20), but Ms. Klayman had also worked on multiple energy matters while at MoFo. Ex. 18, MORRISON-174 at -185; *see also Bowden v. Potter*, 308 F. Supp. 2d 1108, 1116 (N.D. Cal. 2004) (citing Third Circuit case holding that a "teaching-oriented" professor and a "research-oriented" professor were similarly situated under Title VII).

MoFo also argues that Enrico Granata, Alfredo Silva, and Dario de Martino were not similarly situated to Ms. Klayman because they worked in the Corporate Department. Dkt. 151 at 20. ███████ ██████████████████████████ each of these men had similar jobs to Ms. Klayman in that they represented and advised clients in various corporate and financial transactions. Ex. 51, MORRISON-10837, Ex. 49, MORRISON-10578, Ex. 56, MORRISON-11803. Defendant's other purported distinctions are too picayune to mandate judgment as a matter of law.

In sum, MoFo's efforts to slice and dice Plaintiff's comparators wears thin. Ms. Klayman was at least as qualified as her comparators, or a composite thereof. In any event, where the totality of the evidence points to discrimination, a specific comparator is not needed. *See Peterson*, 358 F.3d at 603 (as alternative to comparator evidence, a plaintiff can provide evidence of "other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination").

2.   *Defendant's Proffered Reasons for Non-promotion Are Pretextual*

MoFo provides the following reasons for failing to promote Ms. Klayman: (1) lack of business in her group and department in 2016; (2) her decision to focus on blockchain rather than traditional finance in 2017; (3) doubts about her judgment, skills, and communication style; and (4) lack of a clear business case. Dkt. 151 at 21. A juror could find that each of the proffered reasons is pretextual.

First, though MoFo claims there was a lack of business in 2016, the department nonetheless hired a male lateral partner, Dario Avram, that year. Ex. 50, MORRISON-10688. And notwithstanding

1   [REDACTED] Mr. Wojciechowski believed that Ms. Klayman was de-

2   serving of partnership consideration. Ex. 9, Wojciechowski Tr. 237:2–17; Ex. 76, MORRISON-7191.

3   Indeed, he deliberately chose not to attribute the decision to pass her up for partner in 2016 to [REDACTED]

4   [REDACTED] Ex. 35, MORRISON-7520 [REDACTED]

5   [REDACTED]

6   [REDACTED]

7   [REDACTED]. Based on this evidence, a jury could conclude that MoFo's first rationale for not promoting

8   Ms. Klayman in 2016 is mere pretense. *See Price v. McDonald's Corp.*, 156 Fed. App'x 899, 902 (9th

9   Cir. 2005) ("[S]hifting, contradictory, implausible, uninformed, or factually baseless justifications for

10  [an employer's] actions may raise a triable issue of pretext[.]") (citation omitted).

11          Second, while the Firm faults Ms. Klayman for supposedly transitioning her focus from tradi-

12  tional finance work to blockchain, it actively encouraged her to do so. Ms. Klayman received uniform

13  praise for her efforts to build the blockchain practice: her 2016 review commended her for "spearhead-

14  ing the blockchain/smartcontracts [sic] taskforce, which industry experts consider the most disruptive

15  technology since the invention of the internet." Ex. 18, MORRISON-174 at -175. That review "encour-

16  aged" Ms. Klayman to pursue her stated goals, including her goal that MoFo "own" the block-

17  chain/smart contracts space. *Id.* at -176, -178. Likewise, her 2017 review stated that she had "greatly

18  impressed a number of people with her passion and leadership of the Firm's blockchain initiative," that

19  her "work on behalf of the firm's blockchain practice is nothing short of extraordinary," and that she

20  was "essential to bringing visibility to our blockchain and smart contracting capabilities at MoFo." Ex.

21  17, MORRISON-123 at -125, -126. In fact, Ms. Klayman wrote in her own practice development plan

22  that although she was developing expertise and recognition in cryptocurrency, her "overarching goals"

23  were to "support my Practice Group and our Firm" and would "redirect my energy" if requested. *Id.* at

24  -138. Yet, no one requested that she do so—that is, not until after the Firm had already decided not to

25  promote her to partner and needed a post hoc justification.[3] Ex. 65, MORRISON-13746. Had MoFo

---

[3] MoFo's claim that Ms. Klayman went against its advice and wishes is all the more specious given

that [REDACTED]

[REDACTED] Ex. 32, MORRISON-7357 at -7359.

genuinely been concerned that Ms. Klayman was abandoning her practice to go off on a lark, this would have been well-documented. *See Ramirez v. Kingman Hosp., Inc.*, 374 F. Supp. 3d 832, 852–53 (D. Ariz. 2019) (citing *Riddle v. Washington*, 454 Fed. App'x 613, 614 (9th Cir. 2011)).

Third, Defendant claims there were doubts regarding Ms. Klayman's judgment, skills, and communication style, citing the declaration of Peter Dopsch. Dkt. 151 at 21. But Mr. Dopsch states that "by 2017, I rarely worked with Ms. Klayman, even on routine matters." Dkt. 155-8, Dopsch Decl. ¶ 3. In fact, he did not submit feedback for Ms. Klayman's reviews in 2016 or 2017. *See* Ex. 18, MORRISON-174; Ex. 17, MORRISON-123. It is puzzling why Defendant relies on the declaration of someone who "rarely worked" with Plaintiff during the relevant period to argue that she was unqualified for partnership. In reality, the record is replete with evidence that numerous colleagues believed Ms. Klayman's judgment, skills, and communication style were superlative, exposing this rationale as bald pretext.[4]

When Mr. Spiliotes and Ms. Herman sought to collect feedback on Ms. Klayman's partnership candidacy in 2017, only Spencer Klein, out of the dozens of others they spoke to, suggested that she needed to improve her communications. Ex. 31, MORRISON-7164 at -7167. Elevating this single negative comment to an overarching critique, while ignoring many more enthusiastic accounts (*see id.*; Ex. 65, MORRISON-13746), is plainly cherry-picking. The Firm's magnification of the critique of one male partner—whom Ms. Klayman alleges engaged in discriminatory conduct against her, no less—also suggests that the conclusion as to her candidacy was preordained. Indeed, their preconceived notions of Ms. Klayman are evident from ███████████████████████████████████████ ████████████████████████████████████████████████ Ex. 31, MORRISON-7164.

MoFo's assertion that Ms. Klayman needed a "chorus of support" from partners familiar with her foundational practice is also pretextual because Mr. Spiliotes and Ms. Herman chose not to reach out to █████████████████████████████████████████████

---

[4] Ex. 24, MORRISON-2303 (████████████████████████████████████████████

████; Ex. 23, MORRISON-2294 ███████████████████████████████████████████████

████████████████████████████████████████████████

*Compare* Ex. 29, MORRISON-3854 *with* Ex. 31, MORRISON-7164 (only contacting ███ refer-ences she had provided on her recent finance deals). The "chorus of support" was also not required of other candidates: for example, well after the start of this litigation, Mr. Wojciechowski *sponsored* ███ ███ for partner despite not having worked with her at all. Ex. 57, MORRISON-12042 at -12054; Ex. 9, Wojciechowski Tr. 221:2–18; 226:16–228:18. Why then were the many partners who supported Ms. Klayman's candidacy but who were only familiar with her blockchain work written off as illegitimate? And, ███████████████████████████████████ ███████████████████ (Ex. 31, MORRISON-7164), other candidates had as few as ███████████. Ex. 55, MORRISON-11610; Ex. 56, MORRISON-11803. It is undisputed that this was not the standard process for vetting partner candidates, and that Ms. Klayman underwent a level of investigation not imposed on male candidates. Ex. 65, MORRISON-13746 ("in my 20+ years of doing this never went to this level of detail and investigation"). The Firm's departures from its usual practices are strong evidence of pretext. *See Earl v. Nielsen Media Research, Inc.* 658 F.3d 1108, 1117–18 (9th Cir. 2011); *Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018, 1026–27 (9th Cir. 2004).

Fourth, MoFo claims that Plaintiff lacked a business case because the future of blockchain was uncertain. But at the start of 2018, her practice group noted in its ███████ that ███████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████ Ex. 32, MORRISON-7357 at -7359. Moreover, in 2018, the Firm apparently had no qualms promoting Dario de Martino—Ms. Klayman's Co-Chair of the blockchain practice—to partner. Ex. 56, MORRISON-11803.[5]

Defendant further claims that Ms. Klayman lacked a business case because Mr. Wojciechowski had not identified promoting her in his succession plan. Even if true, the significance is entirely unclear. There is no evidence that this was a requirement for partnership, while the record is abundantly clear that he ardently supported Ms. Klayman for partner. Ex. 9, Wojciechowski Tr. 209:25–211:14. MoFo

---

[5] In fact, when Mr. de Martino was put up for partner, ███████████████████████ ███████████████████████████ Ex. 56, MORRISON-11803 at -11817 ███████████████████████████ ███████████████████████████████████████████████

1    next asserts that no client was demanding that Ms. Klayman be made partner. Again, there is no evi-

2    dence that this was a requirement for partnership. But even accepting that the Firm considered this a

3    strike against her candidacy, MoFo ignores evidence that ████████████████████████████

4    ████████████████████████████████████████████████████████ Ex. 43, MOR-

5    RISON-9011 ████████████████████████████████████████████████████

6    ████████████████████████████████████████████. Rather than attribute

7    this endorsement to Ms. Klayman's skills and qualifications for partnership, the Firm used it against

8    her: ████████████████████████████████████████████████████████████

9    ████████████████████████████ *Id.* ███████████████████████████

10   ████████████████████████████████ *Id.* In their eyes, she could do no right.

11   Finally, Defendant argues that Mr. Spiliotes' email, stating that "since [Ms. Klayman] is just

12   back in the office, it makes sense to wait [to nominate her for partner]," provides no evidence of pretext.

13   Dkt. 151 at 22–23; Ex. 37, MORRISON-7531. Though MoFo claims this statement had nothing to do

14   with gender or maternity leave, Mr. Spiliotes' testimony, which specifically invoked Plantiff's mater-

15   nity leaves, indicates otherwise. Ex. 8, Spiliotes Tr. 74:2–75:16; *see Strother v. S. Cal. Permanente*

16   *Med. Grp*., 79 F.3d 859, 870 (9th Cir. 1996) ("The same evidence can be used to establish a *prima*

17   *facie* case *and* to create a genuine issue regarding whether the employer's explanations are pre-

18   textual."). While MoFo's gloss is implausible, it is for a jury to determine what he really meant. And

19   contrary to Defendant's assertion, Mr. Spiliotes' recommendation of Jennifer Marines for partnership

20   while she was on leave hardly "negate[s] any inference of animus." Dkt. 151 at 22. Favorable treatment

21   of another member of the protected class does not entitle MoFo to summary judgment. *See Lam v.*

22   *Univ. of Hawaii*, 40 F.3d 1551, 1561–62 (9th Cir. 1994) (in case alleging race and sex bias, favorable

23   treatment of other Asian women did not entitle defendant to summary judgment); *Peoples v. Cty. of*

24   *Contra Costa*, No. C 07-00051, 2008 WL 2225671, at *8 (N.D. Cal. May 28, 2008) (evidence that

25   another African American received promotion did not support summary judgment on race discrimina-

26   tion claims). Moreover, Ms. Marines took maternity leave starting in August 2014 (Dkt. 155-13, Ma-

27   rines Decl. ¶ 2)—two years prior to the discriminatory conduct alleged here.[6]

28

---

[6] Defendant's reliance on *Powell v. Consolidated Edison Co. of N.Y., Inc.*, No. 97-2439, 2001 WL

1   Because Plaintiff has set forth a prima facie case and produced evidence that MoFo's proffered

2   non-discriminatory reasons for non-promotion are pretextual, summary judgment must be denied.

3           B.  <u>Discrimination Based on Less Favorable Treatment</u>

4        In addition to her non-promotion to partner, Ms. Klayman also alleges that she was discrimi-

5   nated against on the basis of gender because she was treated "less well" than similarly-situated men in

6   violation of the NYCHRL. For a NYCHRL claim to survive summary judgment, "the plaintiff need

7   only show that her employer treated her less well, at least in part for a discriminatory reason. The

8   employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was

9   not caused by discrimination, but it is entitled to summary judgment on this basis only if the record

10  establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions." *Mihalik v. Credit*

11  *Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013) (citation omitted).

12       Ms. Klayman was treated less well than her male colleagues when she was denied a raise at the

13  time of her promotion to Of Counsel in 2014. Ex. 58, MORRISON-12744. At that time, the Firm

14  concluded that her salary of ▆▆▆▆▆▆ should not increase and that the promotion would be a change in

15  title only. *Id.* In contrast, only months prior, male associate Enrico Granata had been promoted to Of

16  Counsel and had received a pay increase from ▆▆▆▆▆▆▆▆▆. Ex. 73, MORRISON-43544; Ex.

17  1, Def. Resp. to RFA 39. Only after persistent follow-up by Ms. Klayman did the Firm eventually agree

18  to increase her base compensation rate, retroactively to ▆▆▆▆▆ for 2015, and to ▆▆▆▆▆▆ in 2016.

19  Ex. 59, MORRISON-12755; Ex. 60, MORRISON-12760. Ms. Klayman's base compensation rate re-

20  mained at ▆▆▆▆ for the remainder of her tenure at MoFo. Ex. 1, Def. Resp. to RFA 48. MoFo fails

21  to proffer any explanation why Mr. Granata was entitled to a raise at the time of his promotion but not

22  Ms. Klayman, particularly given that Defendant admitted in February 2016 that Ms. Klayman's ▆▆▆▆

23  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Ex. 60, MORRISON-12760. In light of the absence

24  of any legitimate, non-discriminatory reason for the disparate treatment, and Defendant's own admis-

25  sion that Ms. Klayman was under-compensated, Defendant fails to establish as a matter of law that

26  discrimination played "no role" in its actions. *Mihalik*, 715 F.3d at 110 n.8.

27  _____

28  262583 (S.D.N.Y. Mar. 13, 2001) and *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 897 (10th Cir. 1994) is thus misplaced: both cases dealt with members of plaintiff's protected class who were consid- ered and promoted *at the same time* that the plaintiff was passed over for promotion.

The disparate treatment continued when, after announcing her pregnancy in 2017, attorneys at MoFo began to exclude Ms. Klayman from matters and events and effectively demoted her while she was on maternity leave. Partner Spencer Klein and then-associate Dario de Martino cut Ms. Klayman out of the Investing in Blockchain event that she had initiated and planned, including by omitting her from event materials and communications, and rescheduling the event for a date near when she was due to give birth. Ex. 10, DOES13375. Thereafter, in July 2017, while Ms. Klayman was on maternity leave, Mr. de Martino appointed himself Co-Chair of the Blockchain + Smart Contracts Group, of which Ms. Klayman had been the sole Chair. Ex. 44, MORRISON-9103. Neither Mr. de Martino nor anyone else at the Firm consulted with or notified her about the title change before it occurred. Ex. 3, Klayman I Tr. 41:3–42:11.[7] When Ms. Klayman expressed her concerns to Mr. Wojciechowski, he cautioned her that objecting would make her seem like a ████████████ *Id.*[8]

Notably, MoFo argues that Ms. Klayman's objections to being demoted to Co-Chair "demonstrates a lack of the collegiality partnership requires." Dkt. 151 at 24. This, in and of itself, is a gendered critique: there is no evidence that Mr. de Martino was likewise accused of a "lack of collegiality" or that this incident hindered his partnership prospects—████████████████████████████ ██████████████████████████████████████ ██████████████████████████ Ex. 47, MORRISON-9754. Meanwhile, Ms. Klayman was lauded for her collegiality while at MoFo. Ex. 18, MORRISON-174 at

---

[7] Defendant's assertions that the Firm contemplated having Co-Chairs prior to Plaintiff's leave are of no moment. MoFo cites an email exchange in which Tessa Schwartz noted that Ms. Klayman "seems capable" to hold the title of Chair on her own and asked whether a *partner* should be added as a "co-head" of the group. Ex. 36, MORRISON-7527. Further, Mr. Wojciechowski's declaration, which states his understanding that Plaintiff and Mr. de Martino were co-founders and co-chairs (Dkt. 156-23, Wojciechowski Decl. ¶ 4), cannot be credited over contradictory evidence: Mr. Wojciechowski was copied on a September 2016 email exchange in which ████████████████████████████ ████████████ Ex. 72, MORRISON-42998. ████████████████████████████ ████████████████████████████████████████████████████████████████

[8] This term in itself is gendered. *See, e.g., Passananti v. Cook Cty.*, 689 F.3d 655, 665–66 (7th Cir. 2012) ("A raft of case law . . . establishes that the use of sexually degrading, gender-specific epithets, such as . . . 'bitch' . . . has been consistently held to constitute harassment based upon sex.") (collecting cases); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 85 (2d Cir. 2010) (references to a woman as "bitch[y]" "have obvious gender connotations"); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) ("Calling a female colleague a 'bitch' is firmly rooted in gender. It is humiliating and degrading based on sex.").

-175 ("Evaluators find her to be . . . a tireless and loyal co-worker who always finds a way to be helpful, including when personal sacrifice is required. Her commitment to the firm, practice area, colleagues and clients is unparalleled"); Ex. 17, MORRISON-123 at -126 ("Josh is commended unanimously for her commitment, teamwork, leadership, and overall dedication to the Firm.").

Because each of Defendant's proffered reasons for demoting Ms. Klayman is belied by the record, Defendant once again fails to establish as a matter of law that discrimination played "no role" in its actions. *Mihalik*, 715 F.3d at 110 n.8.

**III.    Genuine Factual Disputes Exist as to Ms. Klayman's Retaliation Claim**

Defendant also fails to show that it is entitled to summary judgment with respect to Ms. Klayman's retaliation claim. To set forth a prima facie case, a plaintiff must show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the two. *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006). In the retaliation context, an adverse action is one that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted); *see also Mihalik*, 715 F.3d at 112 (under NYCHRL, a plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct "reasonably likely to deter a person from engaging in such action.").

MoFo does not dispute that Ms. Klayman engaged in protected activity. It argues only that the conduct she suffered following her complaints was merely "petty workplace angling" that was not motivated by retaliatory animus. Dkt. 151 at 30–31. But viewing the record in the light most favorable to Ms. Klayman raises a plausible inference that, as a result of her complaints, she was subjected to excessive scrutiny and hostility significant enough to drive her from the Firm. *See, e.g.*, *Schmidt v. Shasta Cty. Marshal's Office*, No. 2:14-cv-02471, 2017 WL 4038356, at *4 (E.D. Cal. Sept. 13, 2017) ("[Plaintiff] has provided evidence that she was placed under increased scrutiny with an aim to 'get' her. . . . [E]vidence of increased scrutiny coupled with evidence of an intent to remove the employee in question is sufficient to survive summary judgment[.]"); *Gaub v. Prof. Hosp. Supply, Inc.*, 845 F. Supp. 2d 1118, 1135 (D. Id. 2012) ("Subjecting an employee to greater scrutiny might also dissuade a reasonable worker from filing a complaint under the *Burlington* standard.").

Ms. Klayman first met with Chief HR Officer Jason McCord on January 23, 2018 to complain of gender and pregnancy discrimination. Ex. 63, MORRISON-13702; Ex. 7, McCord Tr. 112:3–113:5. That same day, Mr. McCord reached out to Ms. Herman, ███████████████████████████ ███████████. Ex. 7, McCord Tr. 115:25–116:14. ███████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████ Ex. 40, MORRISON-8222. The timing and nature of this email suggests that Ms. Herman and Mr. McCord sought from the outset to discredit Ms. Klayman and tarnish her character rather than conduct an impartial investigation of her discrimination complaint.

The coordinated effort to mar Ms. Klayman's reputation only escalated over the following months, as an increasing number of partners began emailing each other, Mr. McCord, and Ms. Herman to disparage Ms. Klayman behind her back. On February 9, 2018, Mr. Wojciechowski texted Ms. Klayman ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████ Ex. 13, DOES35896. On March 8, 2018, after Ms. Klayman inadvertently missed a call while overseas on a business trip with her infant in tow (Ex. 12, DOES23817), a partner emailed Mr. Wojciechowski and Finance Department Co-Head Gary Lee, "It will be very hard to convince me to ever promote her or introduce her to another client." Ex. 53, MORRISON-11318. Mr. Lee then forwarded this email to Mr. McCord, as well as partners Tessa Schwartz, Nicholas Spiliotes, and Jennifer Marines. *Id.* In the days following, partners Brad Wine and Alex Kaufman emailed the same individuals to berate Ms. Klayman for leaving the overseas business trip early to accept an award at the United Nations, even though she had cleared it with them beforehand. Ex. 46, MORRISON-9151. ████████████████████████████████████████████████████████████████████████ ██████████████████████████████ *Id.*; Ex. 45, MORRISON-9115; Ex. 54, MORRISON-11458. The record shows that they were well aware of HR's investigation of Ms. Klayman's discrimination complaint. Ex. 66, MORRISON-14573; Ex. 6, Herman Tr. 209:3–21. ████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

1   ███████████ Ex. 6, Herman Tr. 204:5–206:13. ██████████████████████

2   ████████████████████████████████████████████████████████████████

3   ███████████ Ex. 66, MORRISON-14573; Ex. 6, Herman Tr. 212:9–213:22. █████

4   ████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████. Ex. 6, Herman Tr. 216:16–217:2; 146:12–147:11.

6   ████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████

8   ███████████████████████████████████████████ Ex. 38, MORRISON-7546.

9   ██████████████████████████████████████████████████████████ *Id.*

10  After Ms. Klayman's complaint, she had become a burden to be managed in a concerted effort by

11  multiple MoFo partners.

12      Even while the Firm sought to "manage" Ms. Klayman following her complaint to HR, paper-

13  ing her record with undeservedly harsh criticism, it also failed to meaningfully address her complaint

14  of discrimination. For example, ████████████████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████. 52,

17  MORRISON-11240. ████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████

19  ██████████████████████████████ *Id.* ████████████████████████████

20  ████████████████████████████████████████████████████████████████

21  ███████████████████████████ Ex. 14, DOES36089. ██████████████████████

22  ████████████████████████████████████████████████████████████████

23  ███████████████ (Ex. 7, McCord Tr. 196:23–197:18), ████████████████████

24  ██████████████████████████████ A jury could thus find that his selective concern for confiden-

25  tiality lacks credibility. Even when Mr. McCord did conduct interviews, those interviews appeared to

26  seek ways to discredit Ms. Klayman. Ex. 41, MORRISON-8248 ████████████████

27  ████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████

1   ████████████████████████████████████████████████

2   ████████████████████████   And even though Mr. McCord drafted talking points in May 2018

3   to deliver to Ms. Klayman and Mr. de Martino, he never delivered them. Ex. 47, MORRISON-9754;

4   Ex. 7, McCord Tr. 186:24–187:6.

5        When her good faith discrimination complaint resulted in unwarranted scrutiny and harsh crit-

6   icism, Ms. Klayman reasonably concluded she had no choice but to resign. *See Jordan v. Clark*, 847

7   F.2d 1368, 1377 n.10 (9th Cir. 1988) (constructive discharge occurs when, "looking at the totality of

8   the circumstances, a reasonable person in [the employee's] position would have felt that he was forced

9   to quit because of intolerable and discriminatory working conditions") (citation omitted). Indeed, mul-

10  tiple partners openly suggested that she should just leave the Firm. Ex. 3, Klayman I Tr. 215:2–218:1.

11  This attitude bore out in their behavior and in a misinformation campaign designed to make the Firm's

12  wishes into a self-fulfilling prophecy. On March 29, 2018, ████████████████████████

13  ██████████   Ms. Klayman felt compelled to dispel the rumor that she would be leaving the Firm. Ex.

14  16, DOES36626; Ex. 27, MORRISON-3842. On April 20, 2018, she reported to Mr. McCord a rumor

15  communicated to her that MoFo "d[id] not expect [her] to be around very long." Ex. 26, MORRISON-

16  3831. Understanding this rumor to mean that the Firm was devising a way to push her out, she therefore

17  began the process of forming her own firm and consulting business, because "I needed to have myself

18  situated . . . I could be fired at any moment[.]" Ex. 3, Klayman I Tr. 220:6–222:10. By June 2018,

19  seeing no meaningful redress for the discrimination, Ms. Klayman felt she was out of options. Ex. 15,

20  DOES36202 ("I don't want to have to give notice on Friday, for the record. I resent being in a position

21  where those people have made me feel like I need to run away.").

22       Considering the evidence of excessive scrutiny, a sham HR investigation, and a whisper cam-

23  paign designed to force Ms. Klayman's exit, there are sufficient facts to support an inference that

24  MoFo's actions were retaliatory. It strains credulity that the Firm's heightened scrutiny of Ms. Klayman

25  beginning in 2018 was simply coincidental, considering she had never before received such harsh crit-

26  icism in her four and a half years at the Firm, and many, if not all, these individuals were aware of her

27  protected activity. *See Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505–06 (9th Cir. 1989) (pretext

28  may be inferred from the timing of an adverse action, awareness of protected activity by individuals

involved in adverse action, and the employee's job performance before the action). A jury could find that MoFo's actions were causally linked to Ms. Klayman's protected activity and reasonably likely to deter an employee from engaging in such activity. *Freitag*, 468 F.3d at 541; *Mihalik*, 715 F.3d at 112; *see also Williams*, 872 N.Y.S.2d at 34 (jury is "generally best suited to evaluate the impact of retaliatory conduct"). Summary judgment should therefore be denied as to Ms. Klayman's retaliation claim.

## IV.    Genuine Factual Disputes Exist as to Ms. Klayman's Unequal Pay Claims

MoFo next argues that it is entitled to summary judgment on Plaintiff's unequal pay claims, errantly citing Title VII standards for pay discrimination. Dkt. 151 at 25–27. As a threshold matter, Ms. Klayman brings her claims under the Equal Pay Act ("EPA") and the N.Y. Equal Pay Law (*see* Dkt. 132, 4AC, at 42–44), and Defendant thus fails to provide relevant legal authority supporting dismissal of those claims. A prima facie case under the EPA entails a simple showing that employees of the opposite sex were paid different wages for "substantially equal" work.[9] *Stanley v. Univ. of So. Cal.*, 178 F.3d 1069, 1073–74 (9th Cir. 1999). The EPA thus "creates a type of strict liability; no intent to discriminate need be shown." *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986) (citation omitted). Because Ms. Klayman has established a prima facie case, and because Defendant fails to incontrovertibly prove an affirmative defense, summary judgment must be denied.

### A.    Ms. Klayman Performed Substantially Equal Work to Her Male Comparators

In considering whether a plaintiff's job is "substantially equal" to those performed by members of the opposite sex, courts compare the jobs in question, not individuals who hold the jobs. *Stanley*, 178 F.3d at 1074; *Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 914 (9th Cir. 1983) ("The statute explicitly applies to jobs that require equal skills, and not to employees that possess equal skills."). Courts also examine whether the jobs have a "common core of tasks." *Stanley*, 178 F.3d at 1074.

MoFo argues that attorneys that did not hold the Of Counsel title or who were in the Tax and Corporate Departments are not valid comparators, without providing any facts demonstrating that these attorneys did not share a "common core of tasks" with Ms. Klayman. Nor does the Firm provide legal support for its arguments: "it is actual job performance requirements, rather than job classifications or

---

[9] Claims brought under the N.Y. Equal Pay Law are analyzed using the same standards of a federal EPA claim. *See Talwar v. Staten Island Univ. Hosp.*, 610 Fed. App'x 28, 30 n.2 (2d Cir. 2015).

titles, that is determinative." *EEOC v. Maricopa Cty. Cmty. Coll. Dist.*, 736 F.2d 510, 513 (9th Cir. 1984) (citation omitted); *see also* 29 C.F.R. § 1620.13(e); *Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F. Supp. 985, 990 (D.N.J. 1996) (genuine issue of material fact whether woman associate whose work was primarily transactional performed substantially equal work to men who were commercial litigators).

During the relevant time period, senior associates and counsel in the Corporate, Finance, and Tax Departments were subject to the same annual evaluation standards and procedures. Ex. 30, MOR-RISON-4783. The Firm also recognized that Ms. Klayman's skills transcended any one group or department, noting in her 2017 review, "[T]he NY Finance and Projects partners find Josh to be a finance lawyer with a wealth of experience not just in banking and finance but other related areas, such as corporate, equity investments and capital markets activities. . . . She is comfortable applying her knowledge and experience to new deal types and situations, allowing her to work across different client types, matters and industries." Ex. 17, MORRISON-123. Moreover, work at the Firm can involve multiple departments and practice groups, and the department in which an attorney resides can be ███ ████████████████████████ Ex. 5, White Tr. 204:1–15; Ex. 33, MORRISON-7361 ████ ████████████████████████████████████████████████████████████████ ; Ex. 8, Spiliotes Tr. 23:12–25 (████████████████████████████████████████████████ ████████████████████████████████████ ). Defendant fails to demonstrate an absence of dispute as to the degree of skill, effort, and responsibility required by the jobs performed by Ms. Klayman and her comparators, nor has Defendant identified any undisputed facts indicating that she and her comparators worked under different conditions.

B. <u>Ms. Klayman Was Paid Less than Her Male Comparators</u>

Even assuming *arguendo* that the only appropriate comparators for Ms. Klayman were other Finance Of Counsel, there are still actionable disparities. From 2016 to 2018, Ms. Klayman earned a rate that was approximately $14,000–$75,000 less per year than various male Of Counsel who graduated law school within three years of her. Marcuse Decl. ¶¶ 78–99; *see Hein*, 718 F.2d at 916 (EPA plaintiff must show that she "is receiving lower wages than the average of wages paid to all employees

of the opposite sex performing substantially equal work and similarly situated with respect to any other factors, such as seniority, that affect the wage scale"). Moreover, even though her base compensation was "trued-up" to reflect the billable hours she worked in excess of her 80% schedule, her bonuses were still prorated based on her reduced hours schedule and leave. Ex. 34, MORRISON-7494.

Defendant asserts that Plaintiff ignores that some men made less than her and some women made more. Dkt. 151 at 26. This does not defeat the claim. Ms. Klayman made less than many comparators as well as a composite of similarly-situated men. Marcuse Decl. ¶¶ 78–99. This is sufficient to state a claim. *Stanley*, 178 F.3d at 1073–74. Defendant fails to identify any individual whom it believes is a more appropriate comparator who was paid less than she was, and the pay of other women who were Of Counsel is simply irrelevant to whether Ms. Klayman can establish a prima facie case.

C. Defendant Fails to Prove that it Has an Undisputed Affirmative Defense

Once a plaintiff establishes a prima facie case under the EPA, the burden shifts to the defendant to show the pay disparity is justified under one of the EPA's four affirmative defenses. *See Hein*, 718 F.2d at 913. Under the EPA, a pay disparity passes muster only if it is made pursuant to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex." *Id.* Defendant vaguely gestures to all four defenses but fails to provide evidence to satisfy its burden. *See Cooper v. United Air Lines, Inc.*, 82 F. Supp. 3d 1084, 1095 (N.D. Cal. 2015) (for an EPA affirmative defense, defendant must produce evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial).

MoFo rejects Dario Avram, Alfredo Silva, Dario de Martino, Enrico Granata, ███████ and ████████ based on their titles (with respect to the former three individuals) or the department in which they were located (with respect to the latter three). Dkt. 151 at 26–27. As explained above, however, "it is actual job performance requirements, rather than job classifications or titles," that dictate whether an individual is a valid comparator. *Maricopa Cty.*, 736 F.2d at 513. Defendant thus fails to prove an affirmative defense with respect to these six men.

MoFo next argues that Jeff Kayes, Marc-Alain Galeazzi, ███████, ███████, and ████████ each had "more experience and in-demand specialties, as did Sean Ruff, ███████, ██, and ████████, who also had significant personal books of business." Dkt. 151 at 27. MoFo also

asserts that ███████████████ was in a "higher-demand practice." *Id.* The only evidence cited

for the above assertions is the declaration of Nicholas Spiliotes, who simply states, *without providing*

*any support*, that certain groups were "in higher demand" or were "growing rapidly" or were "highly

sought-after," and that the higher salaries were therefore justified by "the market rate." *See* Dkt. 156-

21, Spiliotes Decl. ¶¶ 3–11. Such vague and conclusory assertions cannot suffice to meet Defendant's

burden of establishing its entitlement to judgment as a matter of law. *See Cooper*, 82 F. Supp. 3d at

1098 ("A defendant cannot escape liability merely by articulating a legitimate non-discriminatory rea-

son… rather, [it] must prove that the pay differential was based on a factor other than sex.") (citation

omitted). What's more, the implication that Plaintiff's group was not in high demand is at the very least

disputed, given that she was pressured to work during her maternity leaves to keep up with demand,

*see supra* Part I.A, and her group even had to ███████████. Ex. 32, MORRISON-7357 ████████

████████████████████████████████████████████████████████

██████████████████████████)

Perhaps most notably, ████████ was an Of Counsel in Plaintiff's practice group, had two

fewer years of experience, and was paid ███████████ more in base compensation than Plaintiff

was throughout his tenure at MoFo. Ex. 48, MORRISON-10141; Ex. 1, Def. Resp. to RFAs 55, 63, 64,

and 65. The Firm avers that ████████████████████████████ and negotiated

pay that reflected his value in a competitive hiring marketplace" (Dkt. 151 at 27), and that his salary

was based "upon competing offers and market demand for his services." Dkt. 156-23, Wojciechowski

Decl. at ¶ 6. But this language mirrors the "market forces" rationale that the Supreme Court and the

Ninth Circuit have rejected as an affirmative defense under the EPA. *Corning Glass Works v. Brennan*,

417 U.S. 188, 204–05 (1974) (rejecting the value assigned by the market to men's and women's work

as a "factor other than sex"); *Rizo v. Yovino*, 950 F.3d 1217, 1228 (9th Cir. 2020) (rejecting prior pay

as an EPA affirmative defense because it "is not a factor related to the work an employee is currently

performing, nor is it probative of whether sex played any role in establishing an employee's pay"). And

even if MoFo's proffered reasons could be construed as legitimate, its assertions are too conclusory to

establish an affirmative defense. *See Cooper*, 82 F. Supp. 3d at 1095. MoFo must prove "not simply

that [its] proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact*

explain the wage disparity." *Rizo*, 950 F.3d at 1222 (citation omitted). It is unclear how ██████

██████████████████ and the bargaining process justified his pay, when Ms. Klayman had ten years

of experience and had repeatedly fought to negotiate her salary, which the Firm admitted was ███

████████████████████ Ex. 42, MORRISON-8897; Ex. 59, MORRISON-12755; Ex. 60, MOR-

RISON-12760 at -12761.

Finally, however a third-party characterized Ms. Klayman's pay (Dkt. 151 at 27) is irrelevant:

even if true, she states an EPA claim if her male counterparts were paid still more. The EPA demands

that like be treated as like, regardless of gender; there is no glass ceiling for wages. Defendant's motion

for summary judgment on the unequal pay claims must therefore be denied.

## V.      Ms. Klayman Is Entitled to Seek Punitive Damages

Title VII provides for punitive damages when a defendant acts "with malice or with reckless

indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1);

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534–35 (1999). "'[I]n general, intentional discrimination

is enough to establish punitive damages liability,' but egregious conduct is not required." *EEOC v.*

*Abercrombie & Fitch Stores, Inc.*, 966 F. Supp. 2d 949, 969 (N.D. Cal. 2013) (quoting *Passantino v.*

*Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000)). The NYCHRL adopts

an even lower threshold: "plaintiff is entitled to punitive damages where [defendant's] actions amount

to willful or wanton negligence, or recklessness, or where there is a conscious disregard of the rights

of others or conduct so reckless as to amount to such disregard." *Chauca v. Abraham*, 30 N.Y.3d 325,

329 (2017). Based on the evidence set forth above, triable issues exist with respect to Defendant's

liability for punitive damages. As a leading BigLaw firm, MoFo is plainly familiar with anti-discrimi-

nation and retaliation laws yet chose to penalize Ms. Klayman for taking leave and levying complaints.

## CONCLUSION

The record, viewed in the light most favorable to Ms. Klayman, reveals genuine issues of dis-

puted fact as to each of her claims.[10] Accordingly, because a jury could weigh the evidence and decide

in her favor, this Court should deny Defendant's motion for summary judgment in its entirety.

---

[10] Ms. Klayman does not allege discrimination under a disparate impact theory.

Dated: November 9, 2020

/s/ Deborah K. Marcuse
Deborah K. Marcuse

[*Continued from Caption Page*]

Danielle Fuschetti (CA Bar No. 294065)
dfuschetti@sanfordheisler.com
**SANFORD HEISLER SHARP, LLP**
111 Sutter Street, Suite 975
San Francisco, CA 94104
Telephone: (415) 795-2020
Facsimile: (415) 795-2021

*Attorneys for Plaintiffs*