1  RACHEL S. BRASS, SBN 219301
     rbrass@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   555 Mission Street, Suite 3000
3    San Francisco, CA 94105-0921
     Telephone: 415.393.8200
4    Facsimile: 415.393.8306

5  MICHELE L. MARYOTT, SBN 191993
     mmaryott@gibsondunn.com
6  LAUREN M. BLAS, SBN 296823
     lblas@gibsondunn.com
7  RONALD GOMEZ, SBN 295274
     rgomez@gibsondunn.com
8  GIBSON, DUNN & CRUTCHER LLP
   3161 Michelson Drive
9  Irvine, CA 92612-4412
   Telephone: 949.451.3800
10 Facsimile: 949.451.4220

11 AMANDA C. MACHIN (admitted *pro hac vice*)
     amachin@gibsondunn.com
12 GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Avenue, N.W.
13 Washington, DC 20036-5306
   Telephone: 202.955.8500
14 Facsimile: 202.467.0539

15 Attorneys for Defendant
   MORRISON & FOERSTER LLP
16

17                    UNITED STATES DISTRICT COURT
18                   NORTHERN DISTRICT OF CALIFORNIA
19                         SAN FRANCISCO DIVISION

20 SHERRY A. WILLIAM and JOSHUA         CASE NO. 3:18-cv-02542-JSC
   ASHLEY KLAYMAN,
21                                      **DEFENDANT MORRISON & FOERSTER
             Plaintiffs,                LLP'S REPLY IN SUPPORT OF MOTION
22                                      FOR SUMMARY JUDGMENT AGAINST
      v.                                PLAINTIFF JOSHUA ASHLEY KLAYMAN**
23
   MORRISON & FOERSTER LLP,             **Hearing:**
24                                      Date:   Thursday, December 10, 2020
             Defendant.                 Time:   9:00 a.m.
25                                      Place:  Courtroom E, 15th Floor
                                        Magistrate Judge Jacqueline Scott Corley
26

Gibson, Dunn & Crutcher LLP

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF
JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................ 1

II. STATEMENT OF RELEVANT FACTS & ISSUES TO BE DECIDED ......................... 1

III. ARGUMENT ..................................................................................................................... 1

    A.    Summary Judgment Should Be Granted on Ms. Klayman's FMLA Claim ................. 1

        1.    The Record Confirms Ms. Klayman Was Not Pressured to Work on Leave ............ 1

        2.    Ms. Klayman's Leave Did Not Influence Her Partnership Prospects ............... 3

    B.    Summary Judgment Should Be Granted on Ms. Klayman's Discrimination Claims .......... 5

        1.    Ms. Klayman Cannot Establish a Prima Facie Case of Discrimination ............ 5

        2.    Ms. Klayman Establishes No Genuine Issue of Fact Regarding Pretext .......... 8

        3.    Ms. Klayman Cannot Show She Was Treated "Less Well" Than Her Peers ............ 11

    C.    Ms. Klayman Fails to Raise a Genuine Dispute of Fact on Pay ................................ 12

    D.    The Undisputed Record Shows that Morrison Did Not Retaliate Against Ms. Klayman .......... 13

    E.    No Dispute of Fact Exists with Respect to Punitive Damages ................................. 15

IV. CONCLUSION ................................................................................................................. 15

Gibson, Dunn & Crutcher LLP

i

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arnold v. Newsome*,
  2005 WL 994454 (N.D. Ill. Mar. 25, 2005) ................................................................................6

*Bowden v. Potter*,
  308 F. Supp. 2d 1108 (N.D. Cal. 2004) .....................................................................................6

*Cooper v. United Air Lines, Inc.*,
  82 F. Supp. 3d 1084 (N.D. Cal. 2015) ...............................................................................2, 13

*EEOC v. Boeing Co.*,
  577 F.3d 1044 (9th Cir. 2009) ...................................................................................................5

*Gaub v. Prof. Hosp. Supply*,
  845 F. Supp. 2d 1118 (D. Idaho 2012) ....................................................................................13

*Grosz v. Boeing Co.*,
  455 F. Supp. 2d 1033 (C.D. Cal. 2006) .....................................................................................6

*Harper v. Lugbauer*,
  2014 WL 1266305 (N.D. Cal. Mar. 21, 2014), *aff'd*,
  709 F. App'x 849 (9th Cir. 2017) ..............................................................................................5

*Kolstad v. Am. Dental Ass'n*,
  527 U.S. 526 (1999) .................................................................................................................15

*Lam v. Univ. of Hawai'i*,
  40 F.3d 1551 (9th Cir. 1994) ...................................................................................................11

*Miller v. Int'l Bus. Machines Corp.*,
  2007 WL 1148996 (N.D. Cal. Apr. 18, 2007) ..........................................................................2

*Moran v. Selig*,
  447 F.3d 748 (9th Cir. 2006) .....................................................................................................6

*Olson v. U.S.*,
  No. 19-35389 (9th Cir. Oct. 27, 2020) .....................................................................................4

*Peoples v. Cty. of Contra Costa*,
  2008 WL 2225671 (N.D. Cal. May 28, 2008) .......................................................................11

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993) ...................................................................................................................5

*Stanley v. Univ. of S. Cal.*,
  178 F.3d 1069 (9th Cir. 1999) ..........................................................................................12, 13

ii

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF
JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Terrell v. Contra Costa Cty.*,
   232 F. App'x 626 (9th Cir. Apr. 16, 2007) ................................................................................3

*Texas Dept. of Cmty. Affairs v. Burdine*,
   450 U.S. 248 (1981) ............................................................................................................6, 12

*Vasquez v. Cty. of L.A.*,
   349 F.3d 634 (9th Cir. 2003) ....................................................................................................6

*Villiarimo v. Aloha Island Air*,
   281 F.3d 1054 (9th Cir. 2002) ............................................................................................6, 15

*Williams-Windom v. Potter*,
   2007 WL 9724366 (C.D. Cal. Apr. 23, 2007) ..........................................................................6

*Winkler v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*,
   930 F.2d 1364 (9th Cir. 1991) ................................................................................................12

**Statutes**

29 U.S.C. § 206(d)(1) ....................................................................................................................12

Gibson, Dunn & Crutcher LLP

iii
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF
JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

# I. INTRODUCTION

Ms. Klayman's account of her experience at Morrison has some superficial appeal. But at summary judgment, a plaintiff needs more than an appealing story: she needs admissible evidence, and enough of it to prove that she deserves a trial. Ms. Klayman falls well short of that threshold. She offers no evidence to refute certain inescapable facts, like her own voluntary choice to work while on leave, or her egregious lapses in judgment in 2018 that stoked the ire of her colleagues. She improperly shifts the burden to Morrison on her discrimination and Equal Pay Act claims because she has no evidence of similarly situated comparators. And where she does purport to offer evidence, much of it is hearsay, mischaracterization, speculation, or the kind of self-righteous say-so that is insufficient to create a dispute of material fact. Summary judgment should accordingly be granted to Morrison.

# II. STATEMENT OF RELEVANT FACTS & ISSUES TO BE DECIDED

The relevant facts are stated in Morrison's opening motion. Ms. Klayman's recitation of the facts involves numerous material mischaracterizations of the evidence as well as reliance on inadmissible evidence, including hearsay interrogatory responses, which Morrison has addressed below. The issues to be decided are the same as in Morrison's summary judgment motion.[1]

# III. ARGUMENT

## A. Summary Judgment Should Be Granted on Ms. Klayman's FMLA Claim

The clear weight of admissible evidence establishes that Ms. Klayman voluntarily worked on her leaves—in fact, insisted on doing so—and that taking leave played no role as to her partnership prospects. Summary judgment should be granted to Morrison on this claim.

### 1. The Record Confirms Ms. Klayman Was Not Pressured to Work on Leave

Ms. Klayman's own emails show that there is simply no credible claim that she was "pressured" to work while on leave. She does not deny writing in 2015 that "no one from Morrison was pressuring [her] to work" and she did so because she felt "driven to reach out to the office." Brass Decl. Ex. 36. Rather, she admits she did so because she was "hoping" it would improve her partnership prospects.

---

[1] Ms. Klayman denies claiming "discrimination under a disparate impact theory" (Opp. 25 n.10), but her complaint says otherwise. 4AC ¶ 144 (alleging "Plaintiffs have been disparately impacted . . . as a result of MoFo's wrongful conduct …."). She never withdrew this theory, nor rebutted Morrison's arguments, compelling summary judgment on this claim, as well as her other abandoned theories—lost work opportunities, hostile work environment, and being pressured to take reduced hours. MSJ 15–18.

Gibson, Dunn & Crutcher LLP

1

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

Opp. 2. There is nothing different in 2017; in Ms. Klayman's words, she was "hard at work trying to build the Blockchain and ICO practice," and that "[f]or [her], it is a pleasure and a passion (like another baby), so [she] enjoy[s] staying involved and want[s] to do so." Brass Decl. Ex. 61. Even when Morrison partners told her to stop, she did not, an act of free choice, not coercion. MSJ 8–10.

Ms. Klayman admits that she "did some work voluntarily," but now claims it was "in the belief that it was her only viable path to partnership" and says, although she never complained about it at the time, that she was "pressured" by her mentor and staunchest advocate, Mark Wojciechowski, to "do ever more." Opp. 6. None of the evidence she cites actually supports this position. Her claim that "Susan McCormac stated that there is no excuse for any Firm attorney to be unavailable, even when out on leave" (*id.*), is supported only by her own interrogatory responses, which are inadmissible hearsay. *Miller v. Int'l Bus. Machines Corp.*, 2007 WL 1148996, at *2 (N.D. Cal. Apr. 18, 2007). Her claim that "a partner sent her a work-related email the very first day of her 2017 leave" ignores that the same email says, "███████████," and was sent by a partner who repeatedly encouraged Ms. Klayman not to work on leave. Marcuse Decl. Ex. 69; Brass Decl. Ex. 57. Nor can she complain about receiving an email on the first day of that leave when it is undisputed that she did not tell the Firm she had her baby for eight weeks (Lamb Decl. ¶¶ 5, 8; Brass Dec. Exs. 67, 73; McCord Decl. ¶ 19), and told colleagues she planned to take a "working" leave. *E.g.*, Brass Decl. Exs. 55, 138, Klayman Tr. 34:16-35:15 ("everyone knew that I would be still available"); Exs. 56, 57, 60, 62.

As for the supposed "pressure" from Mr. Wojciechowski, Ms. Klayman admitted that she worked during her second leave "hoping that her sacrifices and commitment would improve her chances of being elevated to the partnership." Opp. 2. She cites no evidence that anyone told her to do so, and the evidence is to the contrary. *See Cooper v. United Air Lines, Inc.*, 82 F. Supp. 3d 1084, 1104 (N.D. Cal. 2015) (Corley, M.J.) (no "dispute of material fact without any evidence that actually creates a dispute"); MSJ 9 (discussing Firm expectations and norms about not working on leaves). The notion that two emails with "???" spaced months apart (one in July and one in October) signaled an expectation that she "respond promptly" or "pressur[ed] her" is simply untenable. Indeed, in a more complete version of Marcuse Exhibit 70, Mr. Wojciechowski emailed her asking if she wanted to work on a project, saying "██████████████████████████████████████████████████

Gibson, Dunn & Crutcher LLP

2
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

█████████████████████████████████████████████████████████," to which Ms. Klayman said, "████████████████████." Maryott Decl. Ex. 3, MORRISON-20867.[2]

Nor does Mr. Wojciechowski's comment that, in his view, the firm's management were "cold blooded economic animals" suggest pressure on Ms. Klayman. A review of the email chain shows that Ms. Klayman forwarded information about a "very exciting ICO" to at least eighteen attorneys, and in response, Mr. Wojciechowski reiterated the firm's consistent message that Ms. Klayman needed to generate *billable work* to make partner: "[a]ctually bringing in the work and/or billing time is the absolute primary distinguishing factor for making partner and getting compensated." Marcuse Decl. Ex. 68. Critically, he wasn't suggesting that she do this work *while on leave*; to the contrary, he wrote he was "happy to back [her] up while [she was] on leave." *Id.*; *see also* Brass Decl. Ex. 149, Woj. Tr. 267:2-6 ("Q: Did you believe that in order for Ms. Klayman to successfully make partner she needed to be doing this during her leave? A: Absolutely not."). This guidance does not support an inference that Ms. Klayman's "potential for advancement depended on working through leave." Opp. 6.

As none of Ms. Klayman's evidence creates a genuine dispute of fact about coercion into working on leave, nor that she was harmed, summary judgment should be granted. MSJ 9–10 (citing cases).

### 2. Ms. Klayman's Leave Did Not Influence Her Partnership Prospects

Ms. Klayman advances the alternate theory that Morrison "interfered with her leave by using it as a negative factor in its decision to deny her partnership." Opp. 7. Assuming arguendo that deciding not to put someone up for promotion constitutes an adverse employment action, summary judgment is still warranted because there is no dispute that Ms. Klayman's decision to take a leave in 2015 and 2017 was <u>not</u> a "negative factor" in Morrison's decision not to promote her in 2016 or 2017.[3]

The undisputed evidence shows that there was no compelling case for adding an equity Financial Transactions partner in 2016; indeed, no one in the entire Finance Department was put up for

---

[2] The Court may consider evidence submitted on reply where, as here, the reply addresses the same set of facts as the opposition but provides the full context for the other side's selective recitation of the facts. *See Terrell v. Contra Costa Cty.*, 232 F. App'x 626, 629 n.2 (9th Cir. Apr. 16, 2007).

[3] Contrary to Ms. Klayman's suggestion, Morrison briefed the "negative factor" argument in its motion, including arguing that claims based on the 2015 leave were time-barred (*see, e.g.*, MSJ 8 & n.2) and that, because the firm hired her knowing she was going to take a leave, and promoted her after she returned, it could not have been biased against her (*id.* at 14). Morrison also moved for summary judgment on the entire FMLA claim, not just the interference theory. *See id.* at 2, 7-10.

Gibson, Dunn & Crutcher LLP

3
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

partner that year. *See* MSJ 3–4 (citing Brass Decl. Exs. 149, 145, 142, 32); p. 8, *infra* (rebutting pretext argument). Given that Ms. Klayman—like everyone in her department—had no chance of promotion in 2016, even drawing all the inferences in her favor, it cannot be said that Mr. Spiliotes's "just back in the office" comment shows that her 2015 leave factored in the decision not to promote her. Ms. Klayman also ignores that (a) she had only been at Morrison for three years at that point (eight months of which she had been on leave) (*e.g.*, McCord Decl. Ex. A), and (b) Mr. Spiliotes was invested in her success and wanted to help her get the exposure and experience needed for a successful run at partnership. Brass Decl. Ex. 145, Spiliotes Tr. 74:2-24, 116:12-25, 146:21-147:11.[4]

Ms. Klayman's argument that her 2017 leave played a role in the decision not to promote her that year is even more attenuated. Rather, while she was on leave Mr. Spiliotes made clear to her that he and the other partners in the group "were prepared to support her in the next round" (i.e., 2018), and her own internal notes reflect that feedback and encouragement. Brass Decl. Ex. 145, Spiliotes Tr. 188:10-189:17; Ex. 69 (Ms. Klayman writing, "Nick feels confident that I will be in the running."). That same year, he also undertook—indisputably at Ms. Klayman's express request (Brass Decl. Ex. 145, Spiliotes Tr. 145:2-9, 145:15-22, 151:9-20; Ex. 58; Maryott Decl. Ex. 8, Herman Tr. 139:23-141:24)—to interview dozens of partners to gather feedback on her partnership candidacy to position her for success. Brass Decl. Ex. 134, Ex. 145, Spiliotes Tr. 178:12-181:1; *see* pp. 9–10, *infra*.

The supposed comment from Ms. Herman that some people thought she had been "'acting like a martyr' by mentioning that her baby was on her lap during conference calls" does not create a dispute of fact. Opp. 8. Ms. Klayman had multiple conversations about why she hadn't been put up for consideration in 2017 and what she needed to do in 2018, and comments about her supposed "martyr[dom]" were never mentioned, including in Ms. Klayman's own notes of those conversations. Brass Decl. Exs. 68, 69; Maryott Decl. Ex. 4, MORRISON-11439 (Lee notes re Klayman, including "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 9, MORRISON-7491 (Marines notes re conversation with Ms. Klayman regarding "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮

---

[4] Any claim regarding Ms. Klayman's 2015 leave is time-barred. MSJ 8. And Mr. Spiliotes's statement and "other evidence" (Opp. 8 n.7) are insufficient to show willful conduct. *See Olson v. U.S.*, No. 19-35389, slip op. at 10-11 (9th Cir. Oct. 27, 2020) (two-year statute of limitations on FMLA claim in absence of willfulness).

Gibson, Dunn & Crutcher LLP

4

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"). Thus, even if Ms. Herman did relay that comment—and the only evidence about it is double-hearsay, inadmissible for the truth of the matter—there can be no dispute that it played no role in the decision not to put Ms. Klayman forward for partnership consideration. *See Harper v. Lugbauer*, 2014 WL 1266305, at *14 (N.D. Cal. Mar. 21, 2014), *aff'd*, 709 F. App'x 849 (9th Cir. 2017) (hearsay inadmissible and insufficient to defeat summary judgment). This supposed evidence does not save Ms. Klayman's FMLA claim from summary judgment.

### B. Summary Judgment Should Be Granted on Ms. Klayman's Discrimination Claims

Ms. Klayman's opposition confirms that she cannot establish even a prima facie case of discrimination, much less offer "specific and substantial" evidence that even one of Morrison's reasons for not promoting her was pretextual *and* suggestive of a discriminatory animus. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514 (1993); *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009).

#### 1. Ms. Klayman Cannot Establish a Prima Facie Case of Discrimination

Morrison's explanation for why Ms. Klayman was not put up for partnership in 2016 and 2017 has been consistent from the start: in 2016, her practice group was having a down year, and no one in her department was put up (MSJ 3–4, 14); in 2017, she still hadn't established the "chorus of support" or transformed her hundreds (and hundreds) of hours of blockchain speaking and writing into billable work. Moreover, concerns remained about her judgment and communications. *Id.* at 4–6, 14.

Ms. Klayman nonetheless contends that (1) the Firm "explicitly linked the denial of partnership to her maternity leave," and (2) she received "sterling reviews," and recognition for "partner-level work." Opp. 8–9. Her first argument hinges entirely on the evidence discussed above, and fails to create a genuine issue of fact for the same reasons. Her second argument fails to establish a genuine issue of fact because Morrison always made clear that although all partnership candidates must demonstrate a high level of performance to be recommended for *consideration* for partnership (which Ms. Klayman was, twice), there are other factors that matter in deciding how far one advances in that process. MSJ 11–12 (citing McCord Decl. Ex. E (listing standards for admission to partnership, including, in addition to various performance-based criteria, "ability to attract or develop clients and satisfy existing clients" and "mature professional judgment"); *see also* Brass Decl. Exs. 140, 143, 145. Ms. Klayman presents no contrary evidence, including her own notes—which she does not contend are

Gibson, Dunn & Crutcher LLP

5

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

inaccurate or incomplete. *See* pp. 3–5, *supra*; Brass Decl. Ex. 69; Ex. 68 (Spiliotes notes of meeting).[5]

Next, Ms. Klayman erroneously places the burden on Morrison to explain why her proposed comparators were dissimilar to her. Opp. 9. But it is *Ms. Klayman's* burden to put forward proper comparators. *Grosz v. Boeing Co.*, 455 F. Supp. 2d 1033, 1040 (C.D. Cal. 2006) (citing *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)); *see also Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."). She has not done so. For example, she contends that Mr. Ruff's job "entailed advising clients with respect to financial technology and transactions, developing business, and engaging in pro bono service." Opp. 9. She makes similarly broad contentions about Mr. Granata, Mr. Silva and Mr. de Martino. *Id*. at 10. At that level of generality, Ms. Klayman could be considered substantially similar to all 150+ attorneys in the Finance and Corporate Departments, as well as attorneys in fields as diverse as tax, intellectual property and antitrust. Brass Decl. Ex. 142, Lee Tr. 64:21-24. That ignores the requirement that the comparators display *similar conduct* (*Vasquez v. Cty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003)) and be similar in "all material respects" (*Grosz*, 455 F. Supp. 2d at 1040). Moreover, courts have emphasized that attorneys should be "directly comparable" in "performance, qualification, experience, and education." *Arnold v. Newsome*, 2005 WL 994454, at *10 (N.D. Ill. Mar. 25, 2005); *Williams-Windom v. Potter*, 2007 WL 9724366, at *3 (C.D. Cal. Apr. 23, 2007) (same). Ms. Klayman does not engage with these authorities and those she cites are not on point. *E.g.*, *Bowden v. Potter*, 308 F. Supp. 2d 1108, 1116 (N.D. Cal. 2004) (making uncontroversial point that comparators need not be identically situated).

The only comparators Ms. Klayman even attempts to engage with are Mr. Ruff, Mr. Avram, and Ms. Sluder. As noted, Mr. Ruff's conduct and performance differed from Ms. Klayman's in numerous "material respects," including his book of business (███████████████) and his unique focus on laws and regulations relating to electronic payments, which were "important and strategic areas for the firm," that "can generate substantial fees on an ongoing basis." A.E. White Decl.

---

[5] Citing her own testimony, Ms. Klayman claims she was "informed [by Jill Feldman] that the promotion to [Of Counsel] was a 'placeholder' for partnership." Opp. 2. This is inadmissible hearsay that cannot create a dispute of material fact as to her qualifications. *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1061 (9th Cir. 2002).

Gibson, Dunn & Crutcher LLP

6

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

Ex. I at MORRISON-11628. Ms. Klayman did not specialize in this area, MSJ 12 (citing Brass Dec. Exs. 145, 149), and offers no evidence of comparable collectable billings. Given that blockchain was "new and generally unproven," the Firm believed it had "to have a broader case" for partnership than Ms. Klayman's blockchain work alone. Brass Decl. Ex. 145, Spiliotes Tr. 169:15-172:9; *see also* Dopsch Decl. ¶ 4; Marcuse Decl. Ex. 31 at MORRISON-7166 (partner noting that blockchain "is still in its early phase and it is hard to predict how fast and in what fields significant revenue[] generating use cases will evolve"); *id*. at -7172 (partner commenting "whether there is enough legal work [in blockchain] is uncertain"); *id*. at -7173 (question with blockchain is "how you monetize it for lawyers"). That aligns with Mr. Wojciechowski's advice that "[a]ctually bringing in the work and/or billing time is the absolute primary distinguishing factor for making partner and getting compensated." Marcuse Decl. Ex. 68. There is no question Mr. Ruff is not similar in "all material respects."

As for Mr. Avram, Ms. Klayman offers *no evidence* that he was similar in all "material respects," and the record shows that he wasn't. He was already a private equity partner at another major firm and joined Morrison *as a partner*, signifying that he satisfied, among other things, the necessary business case. Marcuse Decl. Ex. 50 (lateral materials). As Mr. Wojciechowski testified, "███████████████████████████████████████████," and therefore it ███████████████████████████████████████. Brass Decl. Ex. 149, Woj. Tr. 237:22-240:15. Ms. Klayman's focus was entirely different, not a well-established source of revenue, and she had not been made partner by another firm before coming to Morrison. *Id*. at 239:12-240:15. Mr. Avram was materially dissimilar to Ms. Klayman, and she offers no real argument otherwise.

With respect to Ms. Sluder, all Ms. Klayman offers is the fact that she, purportedly like Ms. Sluder, "had also worked on multiple energy matters." Opp. 10. Ms. Klayman makes no effort to show that "energy matters" and "renewable energy matters" require the same skill, and has no answer to the more important point, which is that Ms. Sluder's practice areas—which included both renewable energy and Project Finance—were central firm priorities, which ████████████████████████. MSJ 13 (citing A.E. White Decl. Ex. F at MORRISON-10931-50; Ex. 142, Lee Tr. 64:21-69:24). Blockchain, by contrast, was not recognized as a Firm priority, as noted above.

Gibson, Dunn & Crutcher LLP

7
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

In short, to prove that she experienced leave-based promotion discrimination, Ms. Klayman must show that similarly situated people were promoted, while she wasn't. Because promotion at Morrison turns on a range of factors, from performance, to business case, to area of specialty, Ms. Klayman needed to identify people who were similar to her in *all those respects* for the comparison to yield useful insight. Because she has not done so, summary judgment should be granted.

### 2. Ms. Klayman Establishes No Genuine Issue of Fact Regarding Pretext

This Court need not analyze pretext since Ms. Klayman raises no genuine issue of fact on her prima facie case. But had she, summary judgment would still be appropriate because the record shows that at least one—if not all—of Morrison's reasons for not promoting her were not discriminatory.

*First*, Ms. Klayman quibbles with Morrison's explanation that the Firm's financial performance could not support promoting a new equity partner in 2016, citing the hiring of Dario Avram and Mr. Wojciechowski's desire to push her candidacy notwithstanding the financial issues. Opp. 10. As noted, Mr. Avram was already a private equity partner [REDACTED] The Firm's decision not to put up Ms. Klayman given her focus on blockchain is not comparable and does not suggest pretext. *See* p. 7, *supra*. As for Mr. Wojciechowski, his views were admittedly his own and not shared by others. E.g., Brass Decl. Ex. 149, Woj. Tr. 237:3-21. Although Mr. Wojciechowski was intent on pushing Ms. Klayman's candidacy for partner no matter what the circumstances (*e.g.*, Maryott Decl, Ex. 7, Woj Tr. 163:11-165:7 [REDACTED]); Marcuse Decl. Ex. 35); it hardly shows Morrison's decisionmakers were giving "inconsistent" rationales. *See* pp. 3–4, *supra*; *see also* Brass Decl. Ex. 142, Lee Tr. 152:14-153:7, 158:2-21.

*Second*, Ms. Klayman argues that the Firm's concerns about the viability of her blockchain practice are pretextual because it supposedly "actively encouraged" her to "transition[] her focus from traditional finance work to blockchain." Opp. 11. There is no doubt that Ms. Klayman received praise and encouragement for marketing herself and the blockchain practice, but the Firm clearly told her, on multiple occasions, that she *also* needed to continue her traditional finance work if she wanted to become an equity partner. This was documented contemporaneously, including by Ms. Klayman herself, so it is not a "post hoc justification." Marcuse Decl. Ex. 18 (2016 review, noting she should "seek out

opportunities to work on complex financing matters, both with partners in and outside of the Finance & Projects Group"); Brass Decl. Ex. 145, Spiliotes Tr. 140:12-141:25 (2016 feedback); Marcuse Decl. Ex. 31 at MORRISON-7172 (partner commenting in August 2017 that she "would want to be sure that [Ms. Klayman] has enough substantive work to keep her busy if Block Chain doesn't support her"); *see also* Brass Decl. Ex. 68 (Spiliotes 2017 feedback); Ex. 69 (Klayman notes re feedback). Ms. Klayman cites no contrary evidence, nor any telling her that blockchain was a speedy path to partnership.

*Third*, Ms. Klayman attempts to minimize the Firm's concerns about her "judgment, skills, and communication style," claiming that the only evidence cited is the declaration of Peter Dopsch and that "only Spencer Klein, out of the dozens of others they spoke to, suggested that she needed to improve her communications." Opp. 12. These contentions significantly mischaracterize the record evidence. For example, her 2015 performance review ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Brass Decl. Ex. 7; *see also id.* Ex. 26 (2014 review addressing same). In 2016, Gary Lee commented that "others don't agree on [Ms. Klayman's] work quality." *Id.* Ex. 50. Mr. Dopsch expressed similar concerns. Dopsch Decl. ¶ 2; *see also* MSJ 3. Ms. Klayman's 2017 performance reviews also contained ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Marcuse Decl. Ex. 23 at MORRISON-2296-97. Others commented during the 2017 feedback solicitation that she "needs to have more opportunity to develop into first chair" and "should not be up now because needs time to develop further." Marcuse Decl. Ex. 31 at MORRISON-7166, -7169. Mr. Wojciechowski also testified that he had "always pointed . . . out" that "she really struggled to separate what was material from what was not" and had had "years of conversation with Ms. Klayman" about how she was "not focusing on what really matters." Brass Decl. Ex. 149, Woj. Tr. 267:8-17, 267:23-268:21. Ms. Klayman herself identified her communication style and judgment as areas to work on in the coming year (Brass Decl. Ex. 69)—an odd choice if she felt they were completely unjustified and "cherry picked."

She also claims that the "chorus of support" Mr. Spiliotes spoke about was pretextual because not everyone she identified was contacted and because such a chorus was "not required of other candi-

Gibson, Dunn & Crutcher LLP

dates." Opp. 13. But Ms. Klayman ignores at least two critical facts relating to Mr. Spiliotes's feedback solicitation. First, the record is undisputed that in both 2016 and 2017, *she* was the one who asked for feedback. Brass Decl. Ex. 51 ("I'm preparing feedback for Josh Klayman at her request"); Ex. 145, Spiliotes Tr. 116:12-25; Maryott Decl. Ex. 8, Herman Tr. 139:23-141:24 (referring to "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"). Second, and evidencing the judgment concerns described above, rather than identify the people she had worked with most closely, she provided more than 60 names. Maryott Decl. Ex. 2, MORRISON-5898 (list of partners contacted). She can hardly complain of a "level of investigation not imposed on male candidates" when she specifically asked for it, nor can she complain that the right people weren't contacted when she failed to distill the list to those people. Brass Decl. Ex. 145, Spiliotes Tr. 180:23-181:1.

*Fourth*, Ms. Klayman suggests that Morrison's business case justification was pretextual, citing comments in an undated draft of the practice group business plan praising her efforts. Opp. 13; Marcuse Decl. ¶ 33. But again, Ms. Klayman conflates her support for her efforts to generate billable revenue with having actually done so in order to support a case for equity partnership. *See* pp. 8–9, *supra*. Ms. Klayman has never contended—including in her opposition—that she was able to monetize her practice. Notably, when she went to practice on her own, she generated only $150,000 in revenue, and she still has not become an equity partner. Brass Decl. Ex. 147, Klayman Tr. 474:22-475:25, 412:12-19; Katz-Hickman Decl. Ex. A. The fact that Mr. de Martino was promoted at the end of 2018 is not evidence of pretext, either, as (a) Ms. Klayman was on track to be put up at the end of 2018 had she not experienced significant performance issues and quit (Brass Decl. Ex. 68), and (b) Mr. de Martino had an active M&A practice, separate from his blockchain work, that generated more than $1.5 million in revenue in 2018. Klein Decl. ¶ 5; Brass Decl. Ex. 143, Peck Tr. 163:21-165:5; MSJ 13.[6] That he succeeded following the same advice Ms. Klayman received (but chose to ignore) shows that the advice was sincere and is not evidence of discrimination.

*Fifth* and finally, Ms. Klayman cites Mr. Spiliotes's "just back in the office" email and argues

---

[6] To the extent Ms. Klayman argues that the statement that no client was demanding that she make partner was pretextual because a client contacted the Firm saying he was "amazed she wasn't a partner already" (Opp. 13), she ignores the uncontradicted record evidence: That she told Ms. Herman that "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Maryott Decl. Ex. 8, Herman Tr. 234:21-23.

10
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

Gibson, Dunn & Crutcher LLP

that because it "specifically invoked" Ms. Klayman's leaves, the jury ought to be allowed to decide what he meant. Opp. 14. As noted, even drawing all inferences in her favor, she cannot prove it caused her not to be put up for partnership in 2016 when *no one* from the Finance Department was put up. *See* pp. 3–4, *supra*. The email is more than a year removed from the 2017 partnership process, and it is implausible to infer discrimination from it given everything else Mr. Spiliotes did to help Ms. Klayman (and other female candidates).[7] *See* MSJ 15.

### 3. Ms. Klayman Cannot Show She Was Treated "Less Well" Than Her Peers

Ms. Klayman claims she was treated "less well" in a more than "trivial, insubstantial, or petty" way because she was "denied a raise at the time of her promotion to Of Counsel," and because she was supposedly excluded from blockchain events and "demoted" to Co-Chair of the Blockchain + Smart Contracts Task Force. Opp. 15–16. She fails to create a dispute of material fact on these points.

***First***, the record shows that Ms. Klayman was promoted to Of Counsel in July 2014, ▮▮▮▮▮ McCord Decl. Ex. A at MORRISON-12743-44. She was not given a raise at the time because ▮▮▮▮▮ Opp. 15; Maryott Decl. Ex. 1, MORRISON-11334; Brass Decl. Ex. 95 ("the OC comp is done early in the year"); McCord Decl. Ex. A at 12718-19. Mr. Granata's promotion, by contrast, did not become effective until January 1, 2015. Klein Decl. ¶ 3. Morrison's legitimate and unrebutted reason for the timing of the pay increase dooms this aspect of her claim.

***Second***, Morrison discussed, at length, why Ms. Klayman's claims of exclusion from events rest on unfounded speculation. MSJ 16–17. She cites no evidence contradicting Morrison's account. As for the change from "Chair" to "Co-Chair," she again fails to cite any evidence showing that the change was a *result* of her leaves. Opp. 16. The record evidence shows that the Firm contemplated having co-chairs in 2016, before Ms. Klayman's leave (Brass Decl. Ex. 50), and that Mr. Klein and

---

[7] Ms. Klayman's cited cases have nothing to do with pretext. *See Peoples v. Cty. of Contra Costa*, 2008 WL 2225671, at *8 (N.D. Cal. May 28, 2008) (favorable treatment of member of protected class did not defeat *prima facie* case); *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1561 (9th Cir. 1994) (analyzing favorable treatment of member of protected class outside the context of pretext).

*(Cont'd on next page)*

Gibson, Dunn & Crutcher LLP

11

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

Mr. Wojciechowski aligned on the title change (*id.*, Ex. 65, Woj. Decl. ¶ 4).[8] Moreover, she cites no evidence suggesting the title change had any professional consequences for her. Although HR recognized that Mr. de Martino "should not have put himself as the co-chair of the group without first speaking to [her]" (Brass Decl. Ex. 135), any sharp elbows by then-associate Mr. de Martino do not create a genuine dispute of fact as to whether the firm treated *Ms. Klayman* "less well."[9]

### C.   Ms. Klayman Fails to Raise a Genuine Dispute of Fact on Pay

Here, Ms. Klayman again improperly shifts the burden of proof to Morrison and fails to identify a triable issue of fact with respect to her prima facie case or Morrison's defenses. Opp. 21–25.

As with the disparate treatment claim, it is *Ms. Klayman's* burden to prove that her work was substantially equal to valid comparators, yet she fails to adduce any affirmative *evidence*, and instead summarily asserts that she "made less than many comparators as well as a composite of similarly situated men" and to cherry pick examples that support her view. Opp. 23; *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1074 (9th Cir. 1999) ("To make out a prima facie case, the plaintiff bears the burden of showing that the jobs being compared are 'substantially equal.'"); *Burdine*, 450 U.S. at 253; *compare* Spiliotes Decl. ¶¶ 3-11 (discussing roles of ▇▇▇▇▇▇, Galeazzi and Ruff); Woj. Decl. ¶ 6 (discussing role of ▇▇▇). This does not suffice to create a dispute of fact.

Additionally, Ms. Klayman completely mischaracterizes Morrison's affirmative defense, which is simply that of counsel pay is negotiated and is necessarily highly individualized to account for the wide spectrum in of counsel experience, roles, and responsibilities. It thus constitutes a "differential based on any other factor other than sex." MSJ 19, 21 (citing Brass Decl. Ex. 140, 30(b)(6) Tr. 39:25-40:11, 59:1-6); 29 U.S.C. § 206(d)(1). That is shown not only through written policies and 30(b)(6) testimony, but also in the discussion of the proposed comparators themselves, which proves that these individuals had highly varied backgrounds, experience, and practices, and client bases, all of which

---

[8] Ms. Klayman argues Mr. Wojciechowski's declaration should not be credited because he *was copied* on an email referring to Ms. Klayman as "Chair" (Marcuse Decl. Ex. 72) but that email pre-dated the September 12, 2016 emails about whether to have one chair or two, and is of no moment (*id.*, Ex. 36). Nor are double hearsay statements in Mr. McCord's handwritten notes entitled to more weight than Mr. Wojciechowski's declaration. *Winkler v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 930 F.2d 1364, 1367 (9th Cir. 1991).

[9] Even if Mr. Wojciechowski told Ms. Klayman that complaining would make her seem like a "bitchy woman," the comment evidently did not deter her, as complain she did. Brass Decl. Ex. 102.

12

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

Gibson, Dunn & Crutcher LLP

were reflected in their compensation. MSJ 19–21; Spiliotes Decl. ¶¶ 3-11. Morrison provided sworn declarations from the Firm's leaders articulating this, which Ms. Klayman criticizes, but does not actually challenge with any contrary evidence. The uncontradicted evidence therefore supports Morrison's argument that (a) Ms. Klayman has not established she was paid less than any comparable male of counsel for the same work, and (b) that to the extent there was a disparity, it is attributable to a discretionary, individualized compensation policy for of counsel attorneys. Summary judgment should therefore be granted on the equal pay claims. *E.g.*, *Cooper*, 82 F. Supp. 3d at 1101 (Corley, M.J.) (granting summary judgment where defendant had a "legitimate business reason for the pay disparities"); *Stanley*, 178 F.3d at 1075 (granting summary judgment where pay disparity justified by "markedly disparate levels of experience and qualifications," as "superior experience, education, and ability may justify pay disparities if distinctions based on these criteria are not gender based").

**D.     The Undisputed Record Shows that Morrison Did Not Retaliate Against Ms. Klayman**

Ms. Klayman seeks a trial on the ground that she experienced "excessive scrutiny and hostility significant enough to drive her from the Firm," that Morrison conducted a "sham investigation" of her complaints, and subjected her to a "whisper campaign." Opp. 17, 20. These atmospherics do not change that what she complains of is being held responsible for her own egregious judgment errors.

*First*, Ms. Klayman pivots from her prior theory that Mr. Klein and Mr. de Martino were making her life intolerable to a theory that she was subjected to unwarranted "scrutiny" by other partners. The record shows that scrutiny was entirely warranted. Ms. Klayman repeatedly attempts to downplay the extent of her errors in judgment and lack of professionalism by, for example, recasting the fact that she completely missed a conference call with a client that had been set to accommodate her schedule, and failed to respond for 24 hours, as "inadvertently miss[ing] a call." Opp. 18; *see also* MSJ 23–24; Brass Decl. Exs. 89, 91, 92, 147, Klayman Tr. 417:16-419:24. But for a senior lawyer, missing a specially set call with an important firm client is akin to no-showing for a hearing—it is not an "inadvertent" excusable error. *Compare Gaub v. Prof. Hosp. Supply*, 845 F. Supp. 2d 1118, 1135 (D. Idaho 2012) (finding that errors that drew excessive scrutiny were only "minor transgressions"). Nor was it isolated. In addition to her erratic and unprofessional conduct on the trip to Israel, even partners who supported her and were actively trying to mentor her found her increasingly unengaged, unresponsive,

Gibson, Dunn & Crutcher LLP

13
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

and difficult to work with, and were surprised by her behavior. Brass Decl. Ex. 149, Woj. Tr. 267:10-17, 268:10-21; Ex. 142, Lee Tr. 250:20-254:20; Dopsch Decl. ¶ 3; *see also* Ex. 89 (partner describing an "unfortunate turn of events" with Ms. Klayman). And there is an obvious explanation: Ms. Klayman had become preoccupied with showing that the Blockchain + Smart Contracts Task Force was "hers," and lost sight of lawyering and professionalism basics. MSJ 4, 24. That her colleagues became justifiably frustrated is not evidence of retaliation or a "coordinated effort to mar [her] reputation." Opp. 18. Ms. Klayman offers no real evidence to the contrary, other than to claim retaliation because she "had never before received such harsh criticism." *Id*. at 20. But that simply proves Morrison's point: she had performed well before, but she had turned her attention away from client service and toward the spotlight, and her resulting implosion was concerning. She also claims that "many, if not all," partners "were aware of her protected activity," but, with two exceptions, offers no evidence of this. The record shows otherwise. Brass Decl. Ex. 96; Klein Decl. ¶ 13; de Martino Decl. ¶ 3.

***Second***, to the extent Ms. Klayman argues Morrison "failed to meaningfully address her complaint of discrimination" (Opp. 19), she fails to account for the undisputed fact that she asked Mr. McCord not to speak to any witnesses until at least March 2018. Brass Decl. Ex. 96. She claims that Mr. McCord was nevertheless "emailing a large number of partners" (Opp. 19), but cites no affirmative outreach by Mr. McCord to anyone about her. In any event, the emails Mr. McCord was receiving had nothing to do with Ms. Klayman's underlying complaint of discrimination, which was focused on being separated from Mr. Klein and Mr. de Martino. MSJ 23–25. The Firm was under no obligation to do that in the absence of evidence of wrongdoing by them. And Mr. McCord did ultimately investigate Ms. Klayman's claims and prepared findings, but she quit before they could speak. *Id*. at 24 (citing Brass Decl. Exs. 135, 144, 147). Ms. Klayman's accusation that Mr. McCord and Ms. Herman "sought from the outset to discredit" her by sharing only negative information fares no better, as it either relies on inadmissible and irrelevant hearsay or else is directly contradicted by the record, as Mr. McCord testified that he *spoke* to Ms. Herman (i.e., that he received more "background" from her than a single critical email, as Ms. Klayman suggests, *see* Marcuse Decl. Ex. 7, McCord Tr. 115:25-116:14), and the remainder of the evidence shows that he did his best to investigate Ms. Klayman's claims under the restrictions she imposed. MSJ 23–25. There is no basis to find a "sham" investigation.

Gibson, Dunn & Crutcher LLP

14

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

***Third***, Ms. Klayman's references to a "whisper campaign" fail to establish a genuine issue of fact as to whether a reasonable person in her position would be compelled to resign her employment. Ms. Klayman wanted to make partner at Morrison in 2018 and was told that it was important for her to get exposure to an array of partners who could attest to her abilities. Brass Decl. Exs. 68, 69. Moreover, she was provided with coaches and mentors, including Mr. Lee and Ms. Marines, to position her for success. MSJ 5 (citing Brass Decl. Exs. 88, 90, 142, 145). Against this backdrop, it is little wonder that partners would be emailing each other with concerns about her increasingly unprofessional behavior. Still, no one told her she was going to be fired, and she cites no evidence other than her own testimony for the proposition that "multiple partners openly suggested she should just leave the firm." Opp. 20. As for the supposed "misinformation campaign," she does not cite a single example of anyone actually spreading misinformation about her and her "evidence" amounts to her own testimony about vague and unattributed "rumors." *Id*.; *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1061 (9th Cir. 2002) (court "has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony"). Finally, it is uncontroverted that Ms. Klayman was seeking partnership opportunities at other firms as early as February 2018—before any of the alleged whispers started, and making the "rumors" she alleges founded in truth. Brass Decl. Ex. 86. Summary judgment should therefore be granted to Morrison on this claim.

E.  **No Dispute of Fact Exists with Respect to Punitive Damages**

Ms. Klayman's assertion that "triable issues exist with respect to Defendant's liability for punitive damages" and that Morrison "chose to penalize [her] for taking leave and levying complaints" (Opp. 25) does not give rise to a dispute of fact since Ms. Klayman ignores the governing legal standard. For the reasons given above, there is no evidence—much less clear and convincing evidence—of malice or reckless indifference, and Ms. Klayman does not even attempt to identify anyone who could be considered a "managing agent" for purposes of imputing liability. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534, 539-40 (1999). Summary judgment should accordingly be granted on punitive damages.

## IV.  CONCLUSION

The Court should grant summary judgment to Morrison on all of Ms. Klayman's claims.

Gibson, Dunn & Crutcher LLP

15

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC

Dated: November 24, 2020

                                          GIBSON, DUNN & CRUTCHER LLP

                                          By:  */s/ Rachel S. Brass*
                                                              Rachel S. Brass

                                          Attorneys for Defendant
                                          MORRISON & FOERSTER LLP

Gibson, Dunn & Crutcher LLP

16

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSHUA ASHLEY KLAYMAN – CASE NO. 3:18-CV-02542-JSC