1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                         NORTHERN DISTRICT OF CALIFORNIA

9

10    SHERRY A. WILLIAM, et al.,                  Case No.  18-cv-02542-JSC

11                  Plaintiffs,              **ORDER RE: DEFENDANT'S**
                                             **MOTIONS FOR SUMMARY**
12          v.                               **JUDGMENT**

13    MORRISON & FOERSTER LLP,                Re: Dkt. Nos. 150, 151

14                  Defendant.

15

16          Attorneys Sherry William and Joshua Klayman sue their former employer, Morrison &

17    Foerster LLP ("MoFo"), for gender, pregnancy, and maternity leave discrimination in violation of

18    state and federal law.  Both women, who worked as associates in MoFo's Financial Department in

19    Los Angeles and New York, respectively, allege that after they returned from maternity leave they

20    encountered a variety of adverse actions including the denial of advancement opportunities.

21    MoFo's motions for summary judgment are now pending before the Court.[1]  (Dkt. No. 150, 151.)

22    Having considered the parties' briefs and having had the benefit of oral argument on January 28,

23    2021, the Court GRANTS IN PART and DENIES IN PART the motions for summary judgment.

24    Disputes of material fact preclude summary judgment on many, but not all, of Plaintiffs' claims.

25          //

26          //

27    ────────────────────

28    [1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
      636(c). (Dkt. Nos. 5, 20 & 66.)

United States District Court
Northern District of California

<div style="text-align:left; writing-mode:vertical-rl">United States District Court
Northern District of California</div>

**BACKGROUND**

### A.  Factual Overview[2]

Ms. Klayman, a 2006 Temple Law School graduate, joined MoFo in July 2013 as a Senior Associate in the Financial Transactions Group within the Finance Department in the firm's New York Office.  At the time she was hired, she was nine months pregnant.  Shortly after she started, she took a four-month maternity leave.  In July 2014, Ms. Klayman was promoted to Of Counsel. In 2015, Ms. Klayman took a second maternity leave.  The following year Ms. Klayman help found and chaired the firm's Blockchain/Smart Contracts Taskforce.  MoFo deferred Ms. Klayman's consideration for partnership that year.  In 2017, Ms. Klayman took a third maternity leave.  Ms. Klayman's consideration for partnership was again deferred in 2017.  At the beginning of 2018, Ms. Klayman made a complaint to human resources.  In June 2018, Ms. Klayman resigned.

In 2015, two years after Ms. Klayman joined MoFo's Finance Department, Ms. William, a 2010 Harvard Law School graduate, joined MoFo's Los Angeles office as an associate in the Project Finance & Development practice group.  Ms. William took maternity leave from June 2017 through December 2017.  Following her return from maternity leave, the only two partners in Ms. William's practice group in Los Angeles stopped assigning her work.  Ms. William's subsequent reviews focused heavily on her lack of billable hours, and in December 2019 MoFo terminated her employment.

### B.  Procedural Background

Plaintiffs Jane Does 1, 2, and 3 filed this action on April 30, 2018 alleging discrimination claims under state and federal law on behalf of themselves and a putative class of similarly situated female attorneys at Morrison & Foerster. (Dkt. No. 1.[3]) The Complaint was accompanied by a motion to proceed anonymously using pseudonyms.  (Dkt. No. 2.)  In January 2019, Plaintiffs filed a First Amended Complaint ("FAC") adding three additional plaintiffs: Jane Does 4, 5, and

---

[2] The facts discussed here are undisputed and provided to frame Plaintiffs' claims.  The disputed and undisputed facts will be discussed in more detail below.

[3] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

6. (Dkt. No. 39.)  The FAC was also accompanied by a motion to proceed anonymously using pseudonyms. (Dkt. No. 40.) MoFo filed its answer to the FAC and a motion for judgment on the pleadings the same day. (Dkt. Nos. 43, 46.) After the motion for judgment on the pleadings was fully briefed, Plaintiffs filed a Second Amended Complaint ("SAC") adding Plaintiff Jane Doe 7, also accompanied by a motion to proceed anonymously using a pseudonym. (Dkt. Nos. 53, 55.) The Court thereafter granted in part and denied in part the motion for judgment on the pleadings. (Dkt. No. 83.)

Following a mediation in September 2019, the parties reached a settlement of Jane Does 2, 3, 4, 5, and 7's claims.  (Dkt. No. 110 at ¶ 12; Dkt. No. 113.)   On December 10, 2019, Jane Does 1 and 6 withdrew their motion to proceed under pseudonyms.  (Dkt. No. 114.)  On February 20, 2020, Ms. William and Ms. Klayman filed the now operative Fourth Amended Complaint which pleads claims for: (1) pregnancy and maternity (sex plus) discrimination in violation of Title VII; (2) violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.; (3) pregnancy and maternity (sex plus) discrimination in violation of California's Fair Employment and Housing Act ("FEHA") (William only); (4) violation of the California Family Rights Act, Cal. Gov't Code § 12945.2 (William only); (5) retaliation in violation of Title VII (William only); (6) retaliation in violation of FEHA (William only); (7) wrongful discharge in violation of public policy (William only); (8) violation of California's Unfair Competition Law, Cal. Bus & Prof. Code § 17200 et seq. (William only); (9) pregnancy, maternity, and caregiver discrimination in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, et seq. (Klayman only); (10) retaliation in violation of Title VII (Klayman only); (11) retaliation in violation of NYCHRL (Klayman only); (12) violation of the Equal Pay Act, 29 U.S.C. § 216(b) (Klayman only); and (13) violation of the New York Equal Pay Act, N.Y. Lab. Law § 194 (Klayman only).  (Dkt. No. 132.)

MoFo has separately moved for summary judgment on Ms. William and Ms. Klayman's claims.  (Dkt. Nos. 150, 151.)

//

//

**DISCUSSION**

**I.  SHERRY WILLIAM**

    **A.  Gender and Maternity Discrimination Under Title VII and FEHA (Claims 1 & 3)**

        The elements of a Title VII discrimination claim are that the plaintiff: (1) belongs to a protected class, (2) performed her job satisfactorily, (3) suffered an adverse employment action, and (4) the employer treated her differently because of her membership in the protected class. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (internal citation omitted); *see also Guz v. Bechtel Nat'l Inc.*, 24 Cal.4th 317, 354 (2000) (discrimination claims under the FEHA are analyzed under the same framework as Title VII claims). The fourth element—that the plaintiff was subjected to adverse employment action because of her membership in a protected class—can be satisfied either through direct evidence of discrimination, such as a supervisor's derogatory comment about her race or gender, *see, e.g., E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1050 (9th Cir. 2009), or through circumstantial evidence, which may include evidence that similarly situated individuals outside the plaintiff's protected class were treated more favorably or that other circumstances surrounding the at-issue employment action give rise to an inference of discrimination, *see Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105-06 (9th Cir. 2008).

        There is no dispute that Ms. William belongs to a protected class or that she suffered an adverse action (reclassification, denial of work, and eventual termination).  MoFo insists, however, that she has not demonstrated that she was qualified or that she was treated differently than similarly situated individuals.  Ms. William contends that these are disputed issues of fact that preclude summary judgment.  The Court agrees.

        As to whether Ms. William is qualified, drawing all inferences in her favor, a reasonable trier of fact could find that she was qualified in light of her 2016 Annual Evaluation which concluded she was "performing at the level expected."  (Dkt. No. 157-4.)  While Jeff Chester, one of the partners in Ms. William's group noted that she "is still coming up the learning curve," he was also very complimentary noting that "she is always available and willing to jump in with a great attitude."  (*Id.* at 2, 4.)  Likewise, Elizabeth Sluder, the other partner in Ms. William's group,

1    noted that she "quickly understood the assignments and her work product was always timely and

2    never required any revision." (*Id*. at 3.)  Ms. Sluder also noted that "Sherry has not been provided

3    an opportunity to see an energy/project finance deal through, from beginning to end (through no

4    fault of her own)" and was therefore "slightly trailing behind" on her legal knowledge.  (*Id*.)

5    Other reviewers called her "an excellent team player" and a "born leader." (*Id*. at 4.)

6          MoFo has not identified evidence that compels a finding that Ms. William's performance

7    was deficient *before* she took maternity leave.  To the extent that MoFo identifies Mr. Chester's

8    vague testimony that he believed he lowered Ms. William's billing rate for matters on which he

9    was the billing partner, Mr. Chester's testimony was that he did this "shortly after she started with

10   us."  That record supports an inference that any concerns regarding this issue would have been

11   reflected in her 2016 Evaluation which was delivered nearly 18 months after she started.  (Dkt.

12   No. 159-50, Chester Depo. At 114:3-18.)  But Mr. Chester's comments in her 2016 Evaluation

13   noted no such concerns.  (Dkt. No. 157-4.)  Likewise, as to Ms. Sluder's declaration attesting to

14   specific issues with Ms. William's performance in late 2016 and early 2017, only one of these

15   issues is documented in Ms. William's 2017 Annual Evaluation.  (Dkt. No. 157-5 at 3

16   ("Elizabeth…noting that one client called to complain about her tone" while also noting that "this

17   particular client is extremely difficult.").)   Further, Mr. Chester and Ms. Sluder "had slightly

18   differing views" in October 2017 regarding whether to advance or reclassify Ms. William.  (Dkt.

19   No. 188-51 at 5.)  Mr. Chester believed she should progress and "ha[d] made substantial

20   progress." (*Id*. at 3.)  Further, Ms. Sluder reported that she told Ms. William that the

21   reclassification decision "means that she didn't have the hours to advance as opposed to it being a

22   quality of work distinction."  (Dkt. No. 171-52 at 3.)  Given this evidence, a reasonable trier of

23   fact could conclude that Ms. William was qualified and not credit MoFo's argument that her

24   performance was deficient before her leave. *See Peterson v. Hewlett-Packard Co*., 358 F.3d 599,

25   603 (9th Cir. 2004) (holding "[t]he amount of evidence that [plaintiff] must produce [regarding

26   qualification] is very little") (internal quotation marks and citation omitted).

27         Turning to the question of whether Ms. William has shown that there were similarly

28   situated individual(s) who were not members of her protected class (women who took maternity

5

leave) and who were treated more favorably, a reasonable trier of fact could find that the associate Ms. William identifies as a comparator was similarly situated.  While MoFo insists that he is not comparable, drawing all inferences in Ms. William's favor, a reasonable jury could conclude otherwise given that he was in the ████████████, he was class of ██, and he received the same feedback regarding performing below expectations for an associate of his seniority, but he was not reclassified.  (*Compare* Dkt. No. 157-5 *with* Dkt. No. 178-3.)  MoFo's argument that comparators must have the same supervisor is incorrect.  *See Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (holding that it was "[i]t was error for the district court to impose a strict 'same supervisor' requirement," and stating that "whether two employees are similarly situated is ordinarily a question of fact").  Instead, the comparators "need to be similar 'in all material respects.'"  *Id*.  Further, the argument improperly asks the Court to draw inferences in its favor.  Likewise, MoFo's focus on another female associate within the same group who took leave the same year as Ms. William but was not reclassified is misplaced. "[F]avorable treatment of other members of the protected class does not necessarily defeat plaintiff's claims at trial, and moreover, does not entitle defendant to summary judgment." *Peoples v. Cty. of Contra Costa*, No. C 07-00051 MHP, 2008 WL 2225671, at *8 (N.D. Cal. May 28, 2008) (citing *Lam v. University of Hawaii*, 40 F.3d 1551, 1561–1562 (9th Cir. 1994)). The issue is not whether all women who take maternity leave are treated adversely; it is whether Ms. William was treated adversely because she took maternity leave.

Drawing all inferences in Ms. William's favor, she has established a prime facie case of gender/maternity leave discrimination. The burden thus shifts to MoFo "to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003).  MoFo has offered evidence of a non-discriminatory reason for her reclassification (that she lacked the necessary skill, had poor performance, and failed to contribute to the firm), for her low work assignments (lack of experience, low work available in the group), and her termination (not billing enough hours, not improving or getting more experience). At the third step of *McDonnell Douglas*, if the employer articulates a legitimate reason for its action, the plaintiff "may defeat summary judgment by offering direct or

circumstantial evidence that a discriminatory reason more likely motivated the employer, or that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Anthoine v. N. Cent. Ctys. Consortium*, 605 F.3d 740, 753 (9th Cir. 2010) (analyzing a claim under Section 1983 but using the *McDonnell Douglas* framework) (internal quotation marks and citation omitted).

Ms. William has offered both direct and circumstantial evidence that her maternity leave was the basis for the decision to reclassify her.  The same evidence discussed above that could support a finding that Ms. William was qualified could also support a finding that MoFo's arguments to the contrary were pretextual.  Ms. William has also offered direct evidence of discrimination from which a reasonable trier of fact could conclude that she was reclassified as a result of her maternity leave.  In October 2017, when Mr. Chester and Ms. Sluder were deciding whether to progress Ms. William or reclassify her, Mr. Chester stated "she was somewhat behind when she started with us.  Although she's made a lot of progress, she was still a little behind and *now with her extended absence*, we feel she probably merits a hold." (Dkt. No. 188-51 at 5 (emphasis added).)

With respect to the adverse actions of the denial of work and subsequent termination, a reasonable trier of fact could also find that Ms. William was frozen out of work as a result of her leave. In 2016, Ms. William billed 2,035 hours.  (Dkt. No. 157-4 at 2).  In 2017, she billed 671 hours.  (Dkt. No. 157-5 at 2.)  In 2018, she billed half that: 387 hours.  (Dkt. No. 157-6 at 2.)   In 2019, she billed 766 hours.  (Dkt. No. 157-7 at 2.)   There is a genuine dispute of fact as to whether Ms. William's low billable hours in 2018 and 2019 were the result of less work being assigned to her because she took maternity leave.

First, it is undisputed that Ms. Sluder did not give Ms. William any substantive work after she returned from maternity leave. (Dkt. No. 174-4, Sluder Depo. at 213:7-12 (testifying that the only work she assigned Ms. William after the 2017 review was to review a client transfer of files); Dkt. No. 157-6 at 7 (reflecting no work from Ms. Sluder).[4])  Second, while Mr. Chester

United States District Court
Northern District of California

---

[4] To the extent that Ms. Sluder now attempts to contradict this evidence though her declaration attesting that in May 2018, she staffed Ms. William on a deal at a client's request, this presents a

recognized going into Ms. William's 2017 review that "she will need to bill at least 2,000 collectible billable hours" and that he "believe[d] she is able to achieve this," he too stopped giving her work and she only billed 42 hours for him in 2018. (Dkt. No. 188-51 at 3; Dkt. No. 157-6 at 7.)  Third, in the years prior (2016 and 2017), the vast majority of Ms. William's work came from Mr. Chester and Ms. Sluder.  (Dkt. No. 157-4 (2016: 592 hours for Chester and 303 for Sluder); Dkt. No. 157-5 (2017: 473 hours for Chester and 563 hours for Sluder).)  While MoFo argues that the lack of work is attributable at least in part to Ms. William's group being slow in 2018, Ms. Sluder testified that she staffed every associate on matters that year except Ms. William. (Dkt. No. 174-4, Sluder Depo. at 213:14-17; 219:18-220:1.)  Fourth, there is a factual dispute about Ms. William's efforts to obtain other work.  It is undisputed that Ms. William reached out to at least 11 different partners for additional work. (Dkt. No. 174-1, William Depo. Vol 1 at 276:3-13.)  MoFo maintains that is too few, but that is a question for the jury.  Finally, Ms. William testified that both Mr. Chester and Ms. Sluder made negative comments and/or demonstrated animus to mothers.  According to Ms. William, Ms. Sluder accused Ms. William of concealing that she was a parent when she was hired and said "parents haven't really worked out with the group." (*Id.* at 134:3-21.)  In addition, Mr. Chester told Ms. William that another woman had left the firm and practice group because she became a mommy, and he scheduled an important call when he knew Ms. William had to take her daughter to a doctor's appointment. (*Id.* at 163:16-167:17.)

Ms. William has thus demonstrated a triable issue of fact as to whether she was reclassified and frozen out of work as a result of her maternity leave.[5]  MoFo's motion for summary judgment on her discrimination claims is denied.

**B.  Retaliation Under Title VII and FEHA (Claims 5 and 6)**

Title VII makes it unlawful for an employer to retaliate against an employee because the employee has taken action to enforce rights protected under Title VII.  *See Miller v. Fairchild*

---

dispute of fact for the jury to resolve.  (Dkt. No. 156-31 at ¶ 19.)  And in any event, by Ms. Sluder's own account "the deal died very quickly" and there "ultimately were not many corporate documents for Ms. William to review before it ended."  (*Id.*)
[5] Ms. William's termination flows from the lack of work.

*Indus., Inc*., 797 F.2d 727, 730 (9th Cir. 1986). To prove a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) she was subsequently subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the employer's action. *See Dawson v. Entek Int'l,* 630 F.3d 928, 936 (9th Cir. 2011) (internal citation omitted); *see also Guz v. Bechtel National, Inc*., 24 Cal.4th 317, 354 (2000) (same standard for FEHA claims). "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson*, 630 F.3d at 936 (internal citation omitted). If a plaintiff establishes a prima facie case of unlawful retaliation, then the burden shifts to the defendant to offer evidence "that the challenged action was taken for legitimate, non-discriminatory reasons." *Id*. (citation omitted). If the defendant provides a legitimate explanation, the burden of production shifts back to plaintiff to show that the defendant's explanation is pretextual. *Id*. (citation omitted).

Ms. William's retaliation claim is twofold: (1) that she was denied work in retaliation for filing this lawsuit which led to her termination, and (2) that she was terminated for continuing to pursue this case.  MoFo insists that Ms. William's retaliation claim fails because she has failed to show a causal connection between the lawsuit and her lack of work and/or termination.  As with her discrimination claim, MoFo insists that the lack of work and termination were the result of her poor performance rather than in retaliation for filing or pursuing this lawsuit.

The challenge with the first part of Ms. William's retaliation's theory—that she was denied work in retaliation for filing the lawsuit—is that it relies on much of the same evidence as for her discrimination claim, but the protected activity which she contends caused the adverse action is different: taking maternity leave for her discrimination claim and filing the lawsuit for her retaliation claim.  Given the temporal proximity between the two events—returning from leave and the filing of the suit—the evidence could support either.  But the evidence cannot support *both*; that is, Ms. William's theories on the two claims cannot be reconciled.

To satisfy her initial prima facie burden, Ms. William must identify evidence sufficient to support a finding of a causal connection between the denial of work and the filing of the lawsuit.

United States District Court
Northern District of California

1    Ms. William has not identified any evidence that suggests the minimal work she did receive from

2    Mr. Chester in 2018 predated the filing of the lawsuit and therefore that he stopped assigning her

3    work after she filed her lawsuit.  Nor has she identified evidence that she received work from other

4    partners before the April lawsuit filing, but not after. And, of course, she argues that Ms. Sluder

5    ceased assigning her work before her lawsuit.  While "causation can be inferred from timing alone

6    where an adverse employment action follows on the heels of protected activity," Ms. William has

7    not offered sufficient evidence of temporal proximity from which a reasonable trier of fact could

8    draw such an inference. *Davis v. Team Elec. Co*., 520 F.3d 1080, 1094 (9th Cir. 2008). At oral

9    argument, Ms. William argued that there is an "asymmetry of information" on this issue.  (Dkt.

10   No. 210 at 16:10.)  But at summary judgment the plaintiff must come forward with *evidence*

11   establishing a prima facie case of retaliation.  *See Surrell v. California Water Service Co*., 518

12   F.3d 1097, 1108 (9th Cir. 2008).  Ms. William has not done so with respect to the failure to assign

13   her work.

14          Ms. William has also failed to identify evidence which supports an inference that she was

15   terminated in December 2019 in retaliation for continuing with the lawsuit after the other plaintiffs

16   settled their claims.  (Dkt. No. 173-3 at 23:4-19.)  Ms. William's billable hours had been declining

17   since 2017 and she had been warned in her 2018 review that "[f]ailure to demonstrate significant

18   and sustained improvement in her billable and total hours contributions could result in

19   termination."  (Dkt. No. 157-6 at 4.)   Although Ms. William's billable hours were higher in 2019,

20   they were still only 40% of the minimum expectation.  (Dkt. No. 157-7.)  Thus, while Ms. William

21   has shown a disputed issue of fact as to whether her termination was caused by her alleged

22   inability to get work for purposes of her discrimination claim, she has not identified evidence

23   sufficient to support a finding that the reason given for her termination—her very low billable

24   hours—was a pretext for retaliation for her deciding in November 2019 to continue with her

25   lawsuit. *See Slattery v. Swiss Reinsurance America Corp*., 248 F.3d 87, 95 (2d Cir. 2001)

26   ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began

27   well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does

28   not arise.")

1    Accordingly, MoFo's motion for summary judgment on Ms. William's retaliation claims is

2    granted.

3        **C.  FMLA and CFRA (Claims 2 and 4)**

4        To prevail on a FMLA interference claim, an employee must establish that "(1) [s]he was

5    eligible for the FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [s]he was

6    entitled to leave under the FMLA, (4) [s]he provided sufficient notice of [her] intent to take leave,

7    and (5) [her] employer denied him FMLA benefits to which he was entitled." *Sanders v. City of*

8    *Newport*, 657 F.3d 772, 778 (9th Cir. 2011) (internal quotation marks omitted).

9        Under the FMLA, it unlawful for an employer to "interfere with, restrain, or deny the

10   exercise of or the attempt to exercise, any right provided" by the Act. *Bachelder v. Am. W.*

11   *Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (quoting 29 U.S.C. § 2615(a)(1)); *see also*

12   *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) ("This court has

13   previously concluded that identical standards apply to the FMLA and to the CFRA.... We will

14   therefore refer to all [claims] as arising under the FMLA.").  In particular, FMLA's "prohibition

15   encompasses an employer's consideration of an employee's use of FMLA-covered leave in

16   making adverse employment decisions." *Bachelder*, 259 F.3d at 1122.  If an employer considers a

17   FMLA leave as "a negative factor" in an adverse action, then it violates FMLA.  *Id.* at 1131.

18   Under the negative factor analysis, the question is not whether the employer had additional

19   reasons for the adverse action, but whether the taking of the "FMLA-protected leave was used as a

20   negative factor in her discharge." *Id*. "[T]here is no room for a *McDonnell Douglas* type of

21   pretext analysis when evaluating an interference claim under this statute." *Id*.  (internal quotation

22   marks omitted).

23       There is no dispute that Ms. William took FMLA leave and suffered an adverse action

24   (reclassification) upon return.  The same disputes of fact which preclude summary judgment on

25   Ms. William's discrimination claims likewise preclude summary judgment on her interference

26   claim. (*See e.g.,* Dkt. No. 188-51 at 5 ("Although she's made a lot of progress, she was still a little

27   behind and now with her extended absence, we feel she probably merits a hold."); Dkt. No. 174-3,

28   Chester Depo.135:15-16 (testifying that her maternity leave "was a contributing factor").)  As with

United States District Court
Northern District of California

11

her discrimination claims, the close temporal proximity supports causation. *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th Cir. 2003) ("[T]he proximity in time between the leave and her termination also provides supporting evidence of a connection between the two events."). Drawing all inferences in Ms. William's favor a reasonable trier of fact could conclude that her FMLA leave was a negative factor in her reclassification.

**D. Wrongful Termination in Violation of Public Policy (Claim 5)**

MoFo argues in a footnote that Ms. William's wrongful termination claim fails because "she is without a viable discrimination claim." (Dkt. No. 200-2 at 25, n. 3.) Because the Court denies summary judgment on the discrimination claims, this claim survives as well.

**E. Unfair Competition (Claim 8)**

MoFo also argues that Ms. Willaim's unfair competition claim fails because her FEHA and CFRA claims fail. (*Id.* at 31.) Because both those claims survive, this claim necessarily does as well.

**F. Punitive Damages**

Title VII provides for punitive damages when a defendant engages in a discriminatory practice "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The standard for determining whether evidence is sufficient to present a claim for punitive damages to a jury is set forth in *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999). In *Kolstad*, the Supreme Court held that an employer may be liable for punitive damages where it "discriminate[s] in the face of a perceived risk that its actions will violate federal law." *Id.* at 536. Under this analysis, "in general, intentional discrimination is enough to establish punitive damages liability," even in the absence of egregious conduct. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000). The *Kolstad* Court also identified "three areas in which the factfinder could find intentional discrimination but the defendant would nonetheless not be liable for punitive damages."

> First, if the theory of discrimination advanced by the plaintiff was sufficiently novel or poorly recognized, the employer could reasonably believe that its action was legal even though discriminatory. Second, the employer could believe it had a valid [bona fide occupational qualification] defense to its discriminatory

12

1

2

3

4

> conduct. Third, in some (presumably rare) situations, the employer could actually be unaware of Title VII's prohibition against discrimination. Common to all of these exceptions is that they occur when the employer is aware of the specific discriminatory conduct at issue, but nonetheless reasonably believes that conduct is lawful. Under such circumstances, an employer may not be liable for punitive damages.

*Id*. at 515 (citing *Kolstad*, 527 U.S. at 536–37).

5

6

7

8

9

10

11

12

13

14

15

16

17

MoFo insists that Ms. William is not entitled to punitive damages because Mr. Chester and Ms. Sluder had good reasons for not giving her work.  This argument is essentially a reprise of its argument that summary judgment should be granted in its favor on Ms. William's discrimination and retaliation claims—arguments which the Court has rejected at least with respect to her discrimination claims. "[I]t is hard to imagine a case where a discrimination claim survives summary judgment but a punitive damages claim does not." *Davis v. Zurich American Ins. Co.*, No. 3:19-CV-04397-WHO, 2021 WL 369538, at *13 (N.D. Cal. Feb. 3, 2021) (finding that "[h]iding the reason or inventing pretextual reasons [for an adverse action] is action in conscious disregard of [plaintiff's] rights."). "Evidence that the decision-maker committed a discriminatory employment decision and then attempted to cover it up using a pretext is sufficient to defeat summary judgment on the punitive damages issue." [6] *Veloz v. Sears, Roebuck & Co.*, No. 16-05982 SVW GJS, 2017 WL 5151313, at *14 (C.D. Cal. May 23, 2017).

18

Accordingly, MoFo's motion for summary judgment as to Ms. William's request for punitive damages is denied.

19

\*\*\*

20

21

For the reasons explained above, MoFo's motion for summary judgment on Ms. William's claims is granted as to her retaliation claims but denied in all other respects.

22

**II.      JOSHUA KLAYMAN**

23

**A.  Gender and Maternity Discrimination Under Title VII (Claim 1)**

24

As discussed *supra*, the elements of a Title VII discrimination claim are that the plaintiff:

25

(1) belongs to a protected class, (2) performed her job satisfactorily, (3) suffered an adverse

26

27

28

---

[6] The Court declines to consider MoFo's argument raised for the first time on reply that Ms. William has not identified a managing agent. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1   employment action, and (4) the employer treated her differently because of her membership in the

2   protected class. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006)

3   (internal citation omitted).  Ms. Klayman's Title VII discrimination theory is that she was denied

4   partnership in 2016 and 2017 because of her multiple maternity leaves.  There is no dispute that

5   she belongs to a protected class or that the denial of partnership constitutes an adverse action.  As

6   with Ms. William, MoFo insists that Ms. Klayman was not qualified and that she has failed to

7   identify appropriate comparators.

8            First, MoFo maintains that she was not qualified because partners had concerns regarding

9   her judgment, she had not made a clear business case, and she didn't have enough partner support.

10   However, Ms. Klayman's 2016 and 2017 annual evaluations raise a triable issue of fact as to her

11   qualifications.  In 2016, she billed 1,642 hours (and 1,420 nonbillable hours) and she was praised

12   for "demonstrat[ing] expert drafting skills, expressing complex legal information clearly and

13   concisely"; having a "high level of substantive legal knowledge in her practice area"; "excellent

14   problem-solving skills, creativity, and attention to detail"; "a 'go to' lawyer in the Firm"; and her

15   "extensive non-billable contributions to the firm."  (Dkt. No. 172-19 at 2, 3.)   Likewise, in 2017

16   (during part of which she was out on leave), she billed 1,017 hours (plus 607 non-billable hours)

17   and she was "praise[d for her] writing drafting and written communication skills"; she has a

18   "wealth of experience"; "brings nuance and depth to her analysis and judgment"; "shows an

19   excellent level of independence and judgment"; "has greatly impressed a number of people with

20   her passion and leadership of the Firm's blockchain initiative"; and "evaluators gave high praise

21   for Josh's 'sophisticated and natural' marketing and business development abilities."  (Dkt. No.

22   172-18 at 2-5; *see also* Dkt. No. 180-21 (partner feedback); Dkt. No. 181-6 (same); Dkt. No. 181-

23   11 (same).)  Given these reviews, a reasonable trier of fact could find that she was qualified for

24   partnership in 2016 and 2017.

25            Second, as to whether Ms. Klayman has offered evidence of similarly situated

26   comparators, MoFo insists that none of her proposed comparators are similar in "all material

27   respects."  For 2016, Ms. Klayman identifies as a comparator Dario Avrum who joined MoFo as a

28   lateral partner in 2016.  MoFo argues that he is dissimilar to Ms. Klayman because he was already

14

a partner elsewhere and he was part of a lateral package deal.  While these facts suggest bases for differentiating between Ms. Klayman and Mr. Avram, they do not demonstrate as a matter of law that they are not similarly situated.  Ms. Klayman has likewise raised a question of fact regarding whether Sean Ruff is an appropriate comparator for 2017.  Mr. Ruff was also of counsel in the Finance Department and he was advanced to the Partnership Review Committee in 2017 and made partner in 2018.  (Dkt. No. 181-24.)  While MoFo identifies his high annual billings and his "unique focus on laws and regulations relating to electronic payments" as reasons why he is not similarly situated (Dkt. No. 200-9 at 10:24), a reasonable jury could find Ms. Klayman's blockchain experience demonstrates that she has comparable unique skills and that other factors (such as her consistently high billables) are comparable to his high annual billings.  *See Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1157 (9th Cir. 2010) (internal citations omitted) ("employee's roles need not be identical; they must only be similar in all material respects."). "Whether two employees are similarly situated is ordinarily a question of fact." *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007).

Drawing all inferences in Ms. Klayman's favor, she has met her minimal burden of demonstrating a prima facie claim of discrimination. *See Aragon v. Republic Silver State Disposal Inc*., 292 F.3d 654, 659 (9th Cir. 2002), as amended (July 18, 2002) ("[t]he requisite degree of proof necessary to establish a prima facie case for Title VII ... on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.") (internal citation and quotation marks omitted).

MoFo has also met its burden of showing a legitimate non-discriminatory reason for its failure to promote Ms. Klayman to partner: (1) there was a lack of business in Ms. Klayman's group in 2016, (2) she had shifted her focus to blockchain instead of other billable work so she lacked a clear business case, and (3) some partners were worried about her communication style. The burden thus shifts to Ms. Klayman to identify evidence that creates a genuine dispute as to whether MoFo's reasons are pretextual.

First, as to the 2016 promotion denial, it is undisputed that revenues in Ms. Klayman's practice group were down by "a staggeringly large" 21.9 percent that year.  (Dkt. No. 159-44, Lee

1   Depo. at 156:20-25.)  As a result, the Finance Department did not put any attorneys forward for

2   partnership that year. (*Id.* at 175:11-13.)  Ms. Klayman insists that this explanation is pretextual

3   because (1) the firm hired Dario Avram as a lateral partner that year, and (2) Mr. Wojciechowski,

4   who supported her for partner in 2016, "deliberately chose not to attribute the decision to pass her

5   up for partner in 2016 to the Firm's financial performance."  (Dkt. No. 180-3 at 16:3-4.)  Ms.

6   Klayman, however, has not offered any evidence that the decision to hire a lateral partner is

7   equivalent to the decision to put forward an internal candidate for equity partnership, and MoFo

8   has offered evidence that it is not and that MoFo brought Mr. Avram on in 2016 because "a major

9   high level strategic initiative of the firm was to create a private equity practice in the firm."  (Dkt.

10  No. 159-51, Wojciechowski Depo. at 238:3-12.)

11          Nor is Ms. Klayman's description of Mr. Wojciechowski's statement a fair reading of what

12  he said.  Mr. Wojciechowski stated that he "kn[e]w that our firm's current financial performance

13  has something to do with" why she was not advanced for partnership, but he was hesitant to say

14  that to her.  (Dkt. No. 181-10 at 3.) This statement does not support an inference that he did not

15  say something to her about the firm's financial situation playing a role in the firm's decision

16  because it was not true; instead, the only reasonable inference from that statement is that he did

17  not want to share that information with her, not that it was not true. Accordingly, Ms. Klayman

18  has failed to raise a triable dispute of fact as to MoFo's non-discriminatory reason for not putting

19  her forward for partnership in 2016.

20          The Court thus turns to the denial of partnership in 2017.  Ms. Klayman contends that

21  MoFo's reasons for failing to promote her to partner in 2017 are pretextual because (1) it

22  encouraged her to transition from traditional finance to blockchain, (2) there is insufficient

23  evidence of issues with her communication style, (3) the suggestion she needed a chorus of

24  support is undermined by MoFo's failure to contact most of the people she listed; and (4) the

25  uncertain blockchain future.  The Court agrees that Ms. Klayman has raised disputes of fact which

26  preclude summary judgment on this question.

27          First, there is ample evidence that Ms. Klayman's blockchain work was both encouraged

28  and praised by many partners.  For example, in her 2016 review she was "commended" and

16

United States District Court
Northern District of California

1    encouraged to "maintain her very extensive non-billable contributions, both in pro bono work…

2    and thought leadership in areas such as the blockchain/smartcontracts task force" (Dkt. No. 172-19

3    at 3-4.)  In her 2017 review, she was similarly commended for her blockchain work.  (Dkt. No.

4    172-18.)  One reviewer said her work on behalf of the firm's blockchain practice was "nothing

5    short of extraordinary."  (*Id.* at 5.)  Another said she's been essential to this work and had "worked

6    tirelessly to identify new opportunities."  (*Id.*; *see also* Dkt. No. 181-6; Dkt. No. 180-21.)  While

7    some of these reviewers recognized that blockchain had an uncertain future, others noted that her

8    work "has ensured that MoFo is well positioned to take a leadership role in this fast-developing

9    area of technology."  (Dkt. No. 180-21 at 4; *id.* at 5 ("mapping a path to ensure MoFo's success in

10   the blockchain space.").)

11           Second, while a few reviewers commented on her lengthy and frequent emails, the

12   majority praised her communication skills, both formal and informal.  (*See, e.g.*, Dkt. No. 180-21

13   at 3-4; Dkt. No. 181-6 at 5-8.)

14           Third, if partner candidates require a "chorus of people" advocating for them, (Dkt. No.

15   159-47, Spiliotes Depo. at 43:14), the record does not adequately explain why MoFo did not

16   contact so many of the people Ms. Klayman identified as references in support of her 2017 partner

17   bid.  (*Compare* Dkt. No. 181-4 (Ms. Klayman's list of substantive finance references (not

18   blockchain)) *with* Dkt. No. 195-11 (the list of those MoFo contacted).)  MoFo argues that it was

19   because she gave them so many names.  However, a reasonable juror could find this explanation

20   inconsistent with its argument that she needed a chorus of support.

21           Accordingly, drawing all reasonable inferences in Ms. Klayman's favor, a reasonable jury

22   could find that her focus on blockchain work, communication skills issues, and need for a

23   "chorus" of support were a pretext for discrimination.  MoFo's motion for summary judgment on

24   Ms. Klayman's Title VII discrimination claim is therefore denied to the extent that it is predicated

25   on denial of promotion in 2017, but granted as to her denial of promotion in 2016.

26       **B.  Gender and Maternity Leave Discrimination Under NYCHRL (Claim 9)**

27           In contrast to a Title VII claim, for a NYCHRL discrimination claim, "the plaintiff need

28   only show that her employer treated her less well, at least in part for a discriminatory reason. The

17

1  employer may present evidence of its legitimate, non-discriminatory motives to show the conduct

2  was not caused by discrimination, but it is entitled to summary judgment on this basis only if the

3  record establishes as a matter of law that 'discrimination play [ed] *no* role' in its actions." *Mihalik*

4  *v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n. 8 (2d Cir. 2013) (quoting

5  *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 872 N.Y.S.2d 27, 38, 40 n. 27 (1st Dep't 2009))

6  (emphasis in original).

7      Ms. Klayman's opposition to MoFo's motion for summary judgment on her NYCHRL

8  claim frames the claim as based on her non-promotion to partner as discussed above with respect

9  to her Title VII claim and on the following: (1) that she was treated less favorably when she was

10  denied a raise at the time of her 2014 of counsel promotion, and (2) she was excluded from events

11  after announcing her pregnancy in 2017.  (Dkt. No. 180-3 at 20-21.)  To the extent that the claim

12  is predicated on the non-promotion theory, summary judgment is denied with respect to the denial

13  of promotion in 2017 but granted as to her denial of promotion in 2016 for the same reasons as set

14  forth with respect to the Title VII claim.  The Court thus turns to the other bases for the claim.

15      First, there is no dispute that MoFo adjusted Ms. Klayman's salary in January 2015 (after

16  her promotion July 2014).  (Dkt. No. 156-45 at 11.)  MoFo contends that the raise was instituted

17  later because of counsel salary adjustments are performed at the beginning of the year, so while

18  she received the promotion mid-year, the salary bump did not take effect until January of the

19  following year.  Ms. Klayman's reliance on Mr. Granata having received his promotion at the

20  same time he was promoted to of counsel is unpersuasive because his promotion took place on

21  January 1, 2015. (Dkt. No.  156-20, Klein Decl. at ¶ 3.)  Ms. Klayman has thus failed to identify

22  evidence sufficient to support a finding that she was treated "less well" with respect to her raise

23  "because of a discriminatory intent." *Mihalik*, 715 F.3d at 110.  To put it another way, the record

24  establishes as a matter of law that discrimination played no role in her of counsel raise taking

25  place in January 2015 rather than upon her promotion six months earlier.

26      Second, Ms. Klayman argues that after she announced her pregnancy in 2017, partner

27  Spencer Klein and then-associate Dario de Martino excluded her from the Investing in Blockchain

28  event she had initiated including by scheduling it for when she was going to give birth.  In support

United States District Court
Northern District of California

of this argument she identifies an email she sent in December 2017 to Janet Herman, MoFo's Director of Attorney Development & Women's Initiatives. (Dkt. No. 180-14.)  While the email indicates that the event at-issue was rescheduled for the same time Ms. Klayman was to be induced, it does not support a reasonable inference that she was excluded from the conference because of her leave.  Ms. Klayman states in the email that "[t]he entire Blockchain group and I also were excluded from the planning and invitation process." (*Id*. at 3.)  The email describes the back-and-forth between herself and Mr. de Martino as "going on for a long time" referring to exchanges that began before she took maternity leave.  (*Id*. at 2.)  Thus, this evidence does not support an inference that she was excluded from the conference because of her pregnancy/maternity leave as opposed to political posturing about the blockchain group.  Next, Ms. Klayman emphasizes that while she was out on leave her title was changed from Chair of the Blockchain + Smart Contracts Task Force to Co-Chair of the Task Force.  However, MoFo offers evidence that it contemplated a co-chair title change in September 2016—well before she went out on leave.  Ms. Klayman has not identified evidence from which a reasonable jury could infer a connection between her maternity leave and the title change.

Accordingly, MoFo's motion for summary judgment on Ms. Klayman's NYCHRL claim is granted except to the extent that it is based on whether she was treated less well with respect to promotion to partner in 2017.

### C.  FMLA Leave (Claim 2)

As discussed *supra*, under the FMLA, it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. *Bachelder v. Am. W. Airlines, Inc*., 259 F.3d 1112, 1122 (9th Cir. 2001) (quoting 29 U.S.C. § 2615(a)(1)).  Ms. Klayman's FMLA claim is twofold: (1) MoFo interfered with her leave because she was asked to work while on maternity leave, and (2) she was denied promotion because of her maternity leaves.

First, it is undisputed that Ms. Klayman worked during her maternity leaves.  The question is whether she did so of her own volition or because she was pressured to do so by MoFo, and in particular, her mentor partner Mr. Wojciechowski.  In support of the latter position, Ms. Klayman

19

identifies a June 2017 email thread wherein Ms. Klayman while on leave had been emailing with

Mr. de Martino among others about a new project/client.  (Dkt. No. 182-9.)  Mr. Wojciechowski

responded to one of Ms. Klayman's group emails with the comment: "Who is doing the

corporate/finance work on the matter?  I hope it's you."  (*Id*. at 3.)  Ms. Klayman responded that

she and Mr. de Martino had both offered to help and she reiterated that she would "offer to help."

(*Id*.)  In response Mr. Wojciechowski wrote:

> This is the sort of work you need to capture. I wouldn't be surprised if your friend has already done it. I'm happy to back you up while your on leave, but as I said our new management are cold-blooded economic animals. Actually bringing in the work and/or billing time is the absolute primary distinguishing factor for making partner and getting compensated.

(*Id*.)  This exchange prompted a very long email from Ms. Klayman regarding all the work she

was doing noting that she was "currently at about 150% for my billable hours," to which Mr.

Wojciechowski responded:

> Josh - I don't want to go back and forth with you on this. I know you're communicating with a lot of people and sending out a lot of emails but at the end of the day the focus is going to be on your collections and billable hours.
>
> Please, no need to go back and forth. I understand what you're doing, I commend it and I trust you understand what I'm saying.

(*Id*. at 2-3.)

Ms. Klayman also identifies an email from Mr. Wojciechowski a month later where he

forwarded her an email and asked: "[i]s this something you could handle?" (Dkt. No. 182-11 at 2.)

When Ms. Klayman did not respond he sent her a "???" email three hours later.  (*Id*.)  She then

responded stating "I'm happy to work on it" but she had calls scheduled and was "alone here with

my baby, so it may take me a bit longer than usual, depending on how she is."  (*Id*.)  Mr.

Wojciechowski responded:

> So just let me know.  Can you take it on or not?  If not, no worries.  I'm only asking you because you've told me you want to keep active while on leave.  If you've already taken on enough and/or your thinking has changed it's 100% OK.  Just let me know.

(Dkt. No. 195-14 at 2.)  Ms. Klayman responded "I'm happy to help…Yes, I'd still like to remain

active.  I was just letting you know my constraints today."  (*Id.*)

FMLA interference claims generally arise where the employer is the party making the

contact with the employee on leave, and even then courts hold that "[f]ielding occasional calls

20

about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights." *Reilly v. Revlon, Inc*., 620 F.Supp.2d 524, 537 (S.D.N.Y. 2009); *see also O'Donnell v. Passport Health Commc'ns, Inc*., 561 F. App'x 212, 218 (3d Cir. 2014) ("there is no right in the FMLA to be 'left alone,' and be completely absolved of responding to the employer's discrete inquiries"); *Simmons v. Indian Rivers Mental Health Ctr*., No. 7:08-CV-1035-SLB, 2015 WL 13725503, at *2 (N.D. Ala. Mar. 31, 2015) (collecting cases discussing whether some contact constitutes interference). The evidence of contact here is certainly more than minimal; however, the evidence also suggests that Ms. Klayman was initiating the contact as often, if not more than, another MoFo attorney. (Dkt. No. 182-9 at 2-3 (listing all the work she has been doing).) While the record supports a finding that Ms. Klayman felt pressure to work, there is a genuine dispute as to whether the pressure arose from MoFo interfering with her leave rather than her own desire to stay relevant during her leave and obtain partner as quickly as possible. Resolving the question of interference thus comes down to a question of credibility that cannot be resolved on summary judgment. *See Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).

Second, Ms. Klayman contends that her 2015 and 2017 maternity leaves were "negative factors" used to deny her partnership in 2016 and 2017. Ms. Klayman's FMLA 2016 denial of promotion claim fails for the same reason as her 2016 denial of promotion discrimination claim. While Ms. Klayman identifies partner Nicholas Spiliotes' comment that is made sense to wait and not put her up for partner in 2016 because "she is just back in the office," Ms. Klayman does not dispute that the Finance Department did not put anyone up for partner in 2016 because of low revenues. (Dkt. No. 172-38.) Mr. Spiliotes' comment is insufficient to create a dispute of fact in light of this undisputed evidence.

With respect to the 2017 promotion, Ms. Klayman emphasizes that when she sought feedback from Ms. Herman the MoFo Attorney Development Director regarding why Ms. Klayman's 2017 partner bid was unsuccessful, Ms. Herman told her that "multiple people" had accused Ms. Klayman of "acting like a martyr" by mentioning that a baby was on her lap during conference calls while on leave. (Dkt. No. 180-7, Klayman Depo. Vol. 1 at 316:7-10.) MoFo's

21

speculation that Ms. Klayman's story is not credible is a jury argument.  And MoFo's hearsay

objection is overruled because Ms. Herman was speaking as the Attorney Development Director

and as such her statement qualifies as the statement of a party opponent.  *See* Fed. R. Evid.

801(d)(2)(A).  Ms. Herman's statement creates a dispute of fact regarding whether Ms. Klayman's

maternity leave(s) was a negative factor with respect to the 2017 partnership denial.

Accordingly, MoFo's motion for summary judgment on Ms. Klayman's FMLA claim is

granted as to whether her maternity leave was a negative factor in the decision not to advance her

for partnership in 2016 but denied in all other respects.

**D.  Retaliation Under Title VII and NYCHRL (Claims 10 and 11)**

As discussed *supra*, Title VII makes it unlawful for an employer to retaliate against an

employee because the employee has taken action to enforce rights protected under Title VII.  *See*

*Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 730 (9th Cir. 1986).  "Retaliatory discharge claims

follow the *McDonnell Douglas* burden-shifting framework." *See Dawson v. Entek Int'l,* 630 F.3d

928, 936 (9th Cir. 2011). To prove a prima facie case of retaliation, a plaintiff must show: (1) that

she engaged in a protected activity; (2) she was subsequently subjected to an adverse employment

action; and (3) a causal link exists between the protected activity and the employer's action.  *Id.*;

*see also Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 394 (S.D.N.Y. 2019)

("Plaintiff's NYCHRL retaliation claims are similarly governed by *McDonnell Douglas*' burden-

shifting framework").

Ms. Klayman contends that after she complained to Human Resources (HR) in January

2018 regarding ongoing issues she was having with Dario de Martino and Spencer Klein, MoFo

took several adverse actions which led to her constructive discharge in January 2018.  While there

is no dispute that Ms. Klayman's complaint to HR constitutes a protected activity for purposes of

her retaliation claims, the parties dispute whether the alleged adverse actions—subjecting her to

harsh scrutiny, a sham HR investigation, and a whisper campaign which led to Ms. Klayman's

constructive discharge—were causally connected to her HR complaint.[7]  "The causal link can be

---

[7] The contours of Ms. Klayman's retaliation claims are a bit nebulous.  From her opposition brief,
it is unclear whether she contends that each of these acts was an adverse action or whether the

United States District Court
Northern District of California

1    inferred from circumstantial evidence such as the employer's knowledge of the protected activities

2    and the proximity in time between the protected activity and the adverse action." *Dawson*, 630

3    F.3d at 936.

4         First, as to the unwanted scrutiny, Ms. Klayman insists that there was a coordinated effort

5    to mar her reputation following her HR complaint.  She identifies emails between partners, Ms.

6    Herman, and Jason McCord (her HR contact).  However, these emails are about multiple issues

7    that arose during this time period regarding Ms. Klayman's performance.  For example, in March

8    2018, a partner was upset because Ms. Klayman missed a call with a client and then took four

9    days to respond to the partner's email following up.  (Dkt. No. 172-13.)  That partner raised the

10   issue with other partners, and in doing so, stated "[i]t will be very hard to convince me to ever

11   promote her or introduce her to another client."  (Dkt. No. 172-54.)  At the same time, two other

12   partners complained that Ms. Klayman had left early from a business trip to Israel to receive an

13   award, and as a result, missed four meetings.  (Dkt. No. 172-47.)  In addition, she failed to respond

14   to emails from one of the partners asking her to prepare marketing materials for one of the missed

15   meetings.  (*Id*.)  The partners, Brad Wine and Alex Kaufman, were frustrated by what they

16   perceived as her lack of commitment and her lack of responsiveness.  (*Id*.)  Mr. Wine and Mr.

17   Kaufman raised their concerns with several partners including Ms. Herman.  Ms. Klayman

18   emphasizes that Ms. Herman's notes regarding her meeting with Mr. Wine and Mr. Kaufman

19   indicate that they were aware of the HR investigation.  (Dkt. No. 180-10, Herman Depo. at 209:3-

20   16.)  While the fact that they were aware of her HR complaint could support an causal connection

21   between her protected activity and the alleged adverse action, it does not support such an inference

22   _____

23   constructive discharge is the adverse action. In any event, MoFo does not argue that she has not
     established an adequate adverse action for purposes of her retaliation claims.  Given the Ninth
24   Circuit's broad view of adverse actions and that a constructive discharge at a minimum would
     constitute an adverse action, the Court does not address this issue here, and instead, assumes for
25   purposes of this Order that Ms. Klayman has established an adverse action. *See Ray v.
     Henderson*, 217 F.3d 1234, 1240–41 (9th Cir. 2000) ("We have found that a wide array of
26   disadvantageous changes in the workplace constitute adverse employment actions including
     '[t]ransfers of job duties and undeserved performance ratings.'") (internal citation and quotation
27   marks omitted); *Ford v. Alfaro*, 785 F.2d 835, 841 (9th Cir. 1986) (noting that constructive
     discharge is an adverse action under Title VII).

28

1    here where the evidence shows that there was an independent basis for the scrutiny—her

2    performance issues.

3              Next, Ms. Klayman emphasizes that Ms. Herman elevated Mr. Kaufman's concerns to Mr.

4    Spiliotes and argues that Ms. Herman "also spoke to Mr. Spiliotes regarding Ms. Klayman's

5    discrimination complaint." (Dkt. No. 180-3 at 24:4-5 (citing Herman Depo. at 216:16-217:2;

6    146:12-147:11).) But the cited portions of Ms. Herman's testimony do not indicate that she spoke

7    to Mr. Spiliotes regarding Ms. Klayman's HR complaint during the call regarding Mr. Kaufman's

8    concerns; to the contrary, Ms. Herman testified that she could not recall when she discussed this

9    with Mr. Spiliotes. (Dkt. No. 180-10, Herman Depo. at 146:12-147:11). Ms. Herman's testimony

10   does not support an inference that partners at the firm were out to mar Ms. Klayman's reputation,

11   but rather, that Ms. Herman as the Attorney Development Director was managing complaints she

12   received from partners by relaying them up the chain to Mr. Spiliotes who was the Co-Chair of the

13   Finance Department at the time. (Dkt. No. 156-22, Spiliotes Decl. at ¶ 2.)

14             Ms. Klayman's reliance on a forward of an email between herself and partner Suz Mac

15   Cormac is likewise unavailing. In the email, Ms. Klayman asked for advice about how to succeed

16   as a woman at MoFo, which Ms. Mac Cormac forwarded to others including Mr. Spiliotes who

17   commented that he was glad to see Ms. Mac Cormac's involvement and thanked the other partners

18   for "taking on the Josh management." (Dkt. No. 172-39.) Ms. Klayman argues that this email

19   shows she was viewed as a "burden." This email, however, as with the ones discussed above,

20   does not plausibly support an inference that the partners at MoFo were out to mar her reputation

21   following her HR complaint. *See Schmidt v. Shasta Cty. Marshal's Office*, No. 14-02471 MCE-

22   CMK, 2017 WL 4038356, at *4 (E.D. Cal. Sept. 13, 2017) ("evidence of increased scrutiny

23   coupled with *evidence of an intent to remove the employee* in question is sufficient to survive

24   summary judgment") (emphasis added).

25             Second, as to the sham investigation, Ms. Klayman has not raised a dispute of material fact

26   regarding whether Mr. McCord failed to meaningfully investigate her HR complaint. Ms.

27   Klayman does not dispute that she told Mr. McCord that she did not want him to speak with

28   anyone—she wanted the investigation kept confidential. (Dkt. No. 180-11, McCord Depo. at

196:23-197:18; Dkt. No. 159-46, McCord Depo. at 150:22-151:5.)   In late April, Mr. McCord decided that he was going to move forward with the investigation and talk to people about her allegations at which point he advised Ms. Klayman that he needed to talk to Mr. Klein and Mr. de Martino.  (Dkt. No. 159-46, McCord Depo. at 177:3-18.)  While Ms. Klayman attempts to discredit Mr. McCord's explanation for why he did not move forward with the investigation by identifying other emails regarding Ms. Klayman on which he was included during this period, as discussed above these emails were regarding her performance issues.  For example, after Ms. Klayman complained that she did not want Mr. Klein included in a new client meeting, her email regarding this was forwarded to Mr. Kaufman—one of the partners on the Israel trip 10 days earlier—who stated that he had been speaking to Mr. McCord "extensively" and that Mr. McCord had agreed they should take a collaborative approach regarding Ms. Klayman's request. (Dkt. No. 181-22.)  Similarly, although Ms. Klayman faults Mr. McCord for not delivering the talking points he prepared to her and Mr. de Martino in May 2018 regarding his plan to bring in a mediator to address the breakdown in their relationship, she does not dispute Mr. McCord's explanation that he did not do so because she resigned from the firm.  (Dkt. No. 159-38 (talking points dated 5/21/18); Dkt. No. 159-46, McCord Depo. at 186:24-187:6 (testifying that he did not deliver the talking points because she resigned); Dkt. No. 180-18 (noting that Ms. Klayman resigned June 11, 2018).)  This evidence does not plausibly support an inference that Mr. McCord conducted a sham investigation into her complaints.

Finally, Ms. Klayman argues that this all culminated in a whisper campaign designed to push her out of the firm.  Ms. Klayman testified that "multiple partners said to me, 'why don't you just leave?'" although when pressed at deposition for specifics, she testified that two of these were statements that she *was* leaving—not that she *should* leave.  (Dkt. No. 180-7, Klayman Depo. at 215-218:1.)  She also testified that Ms. Herman told her—before she filed her HR complaint—that what women do in situations like this is that "they talk with their feet."  (*Id.* at 215:21-216:25.)  Ms. Klayman appears to have heeded this advice and was interviewing with another law firm in January 2018—at or around the same time she filed her complaint with HR.  (Dkt. No. 158-36.)

"[C]onstructive discharge occurs when the working conditions deteriorate, as a result of

United States District Court
Northern District of California

1    discrimination, to the point that they become sufficiently extraordinary and egregious to overcome

2    the normal motivation of a competent, diligent, and reasonable employee to remain on the job to

3    earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo*, 229 F.3d 917,

4    930 (9th Cir. 2000) (internal citation and quotation marks omitted).  While the evidence

5    demonstrates that Ms. Klayman was the subject of considerable attention by MoFo partners in the

6    Spring of 2018, she has neither identified evidence that could support a finding of "conditions so

7    intolerable and discriminatory as to justify resigning" nor evidence of a sufficient causal

8    connection between the conditions she identified and her HR complaint.  *Watson*, 823 F.2d at 361.

9    This is especially true where, as here, she was already considering leaving before the alleged

10   conduct occurred.  Taking the evidence in the light most favorable to Ms. Klayman, a reasonable

11   trier of fact could not find that she was driven from the workplace because of her gender/maternity

12   leave.  Accordingly, MoFo's motion for summary judgment on Ms. Klayman's retaliation claim is

13   granted.

14           **E.  The Equal Pay Act and New York Equal Pay Act (Claims 12, 13)**

15           Under the Equal Pay Act, the plaintiff bears the burden to establish a prima facie case of

16   wage discrimination. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974); *see also*

17   *Talwar v. Staten Island Univ. Hosp*., 610 F. App'x 28, 31 n.2 (2d Cir. 2015) ("An equal pay claim

18   under New York Labor Law § 194 'is analyzed under the same standards applicable to the federal

19   Equal Pay Act.'").  "The prima facie case is limited to a comparison of the jobs in question, and

20   does not involve a comparison of the individuals who hold the jobs. To make out a prima facie

21   case, the plaintiff bears the burden of showing that the jobs being compared are substantially

22   equal." *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1074 (9th Cir. 1999) (internal citation

23   and quotation marks omitted). If the plaintiff establishes a prima facie case, the burden shifts to the

24   defendant to show that the wage differential is justified by one of the Equal Pay Act's four

25   exceptions. *Id*. at 196.

26           Ms. Klayman contends that as of counsel she was paid less than her male counterparts who

27   worked as senior associates and of counsel in the Corporate, Finance, and Tax departments.  (Dkt.

28   No. 180-4, Marcuse Decl. at ¶¶ 79-99 (identifying comparators); Dkt. No. 156-22, Spiliotes Decl,

at ¶¶ 2-3 (providing additional details regarding the comparators).)  MoFo insists that she has not

made out a prima facie case under the Equal Pay Act or its New York equivalent because she has

not offered evidence that her work was substantially equal to valid comparators.  However, "[t]o

be substantially equal, the jobs need not be identical, but must require similar skills, effort and

responsibility performed under similar conditions; it is actual job performance requirements, rather

than job classifications or titles, that is determinative." *E.E.O.C. v. Maricopa Cty. Cmty. Coll.*

*Dist.*, 736 F.2d 510, 513 (9th Cir. 1984) (internal citation and quotation marks omitted). Given that

MoFo does not dispute that senior associates and of counsel in the Corporate, Finance, and Tax

Departments are evaluated and held to the same standards and procedures, Ms. Klayman has at

least raised a dispute of fact as to whether the comparators she identifies do perform substantially

the same work.  (Dkt. No. 181-5.)  *See Stanley*, 178 F.3d at 1074 ("the question is whether,

viewing the evidence in the light most favorable to Stanley, and resolving all inferences in her

favor, a genuine issue of material fact exists regarding the substantial equality of the jobs.").

Indeed, the rationales MoFo offers for distinguishing Ms. Klayman's comparators are that they

"had more experience," worked in "in-demand specialties," or had "significant person books of

business"; all of which go to its justification for paying them more, i.e., MoFo's affirmative

defense—not to whether the work they performed in their senior counsel or of counsel positions

was substantially the same.  (Dkt. No. 200-4 at 27.)

      In any event, at a minimum, Ms. Klayman has established a dispute of fact regarding

whether ███████████ had a substantially similar job and thus is a proper comparator.  Mr. ███████

was of counsel in Ms. Klayman's practice group, graduated from law school ██ years after she

did, and was paid between $10,000-$35,000 more in base compensation throughout his tenure at

MoFo. (Dkt. No. 181-18 (Mr. ████████ 2017 Evaluation indicating his class year and position);

*Compare* Dkt. No. 180-5, RFA responses 55, 63, 64, and 65 (indicating Mr. ███████ base salary

from 2016-2018) *with* Dkt. No. 180-4 at ¶¶ 79, 87, 94 (listing Ms. Klayman's base salary from

2016-2018).)  *See Hein v. Oregon Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983).  MoFo's

argument that Mr. █████ is not a proper comparator because he joined MoFo as a lateral associate

from another firm where he had developed a "highly specialized and valuable expertise" is an

1    argument that it can make to the jury, but it is not an argument that demonstrates as a matter of

2    law substantial differences in their work.  (Dkt. No. 156-24, Wojciechowski Decl. at ¶ 6.)

3          Once a plaintiff has established a prima facie case under the EPA, the burden shifts to the

4    employer to prove that the differential in wages is justified under one of the Equal Pay Act's four

5    exceptions.  *See Corning Glass Works*, 417 U.S. at 196.  The four exceptions, which operate as

6    affirmative defenses are: "where such payment is made pursuant to (i) a seniority system; (ii) a

7    merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a

8    differential based on any other factor other than sex ...."  *Rizo v. Yovino*, 950 F.3d 1217, 1222 (9th

9    Cir.), cert. denied, 141 S. Ct. 189 (2020) (quoting 29 U.S.C. § 206(d)(1).)

10         MoFo contends that it has established the affirmative defense of a differential other than

11   sex.  It contends that "of counsel pay is negotiated and is necessarily highly individualized to

12   account for the wide spectrum in of counsel experience, roles, and responsibilities."  (Dkt. No.

13   200-9 at 16.)   "To counter a prima facie case, an employer must prove not simply that the

14   employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in*

15   *fact* explain the wage disparity."  *Rizo*, 950 F.3d at 1222 (emphasis in original).  MoFo's

16   conclusory argument that everyone is different and the range of salaries accounts for these

17   differences is insufficient to make this showing.  Just as the Ninth Circuit rejected the use of prior

18   pay as a basis for salary in *Rizo*, MoFo's use of such an amorphous standard which lacks an

19   objective basis "is not probative of whether sex played any role in establishing an [Plaintiff's]

20   pay."  *Rizo*, 950 F.3d at 1228 ("We acknowledge that prior pay could be viewed as a proxy for

21   job-related factors such as education, skills, or experience related to an employee's prior job, and

22   that prior pay can be a function of factors related to an employee's prior job. But prior pay itself is

23   not a factor related to the work an employee is currently performing, nor is it probative of whether

24   sex played any role in establishing an employee's pay.").

25         In *Stanley*, the Ninth Circuit held that "markedly different levels of experience and

26   qualifications" could satisfy a defendant's burden to demonstrate that a factor "other than sex"

27   explained the pay differential.  *Stanley*, 178 F.3d at 1075 (finding that the "plaintiff's fourteen

28   years less experience than [her comparator as well as the facts that s]he never coached an Olympic

United States District Court
Northern District of California

28

United States District Court
Northern District of California

team. She had no marketing or promotional experience other than that she gained as a coach. She had never published a book about basketball" demonstrated "markedly different levels of experience and qualifications").  The differences in experience between Ms. Klayman and her comparators do not rise to the level in *Stanley* and drawing all inferences in her favor, a reasonable jury could find that her "leadership" in the blockchain field was just as distinguishing as her male colleagues' "in-demand specialties."

Accordingly, because MoFo has not met its burden of establishing an affirmative defense to Ms. Klayman's Equal Pay Claim as a matter of law, its motion for summary judgment on the Equal Pay Act claim under New York and federal law is denied.

### F.  Punitive Damages

MoFo's motion for summary judgment on Ms. Klayman's punitive damages claim is based on the same arguments as its motion for summary judgment on Ms. William's punitive damages claim.  It is thus denied for the same reasons.

### CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART MoFo's motions for summary judgment.  The motions are granted as to:

- Ms. William's claims for Retaliation Under Title VII and FEHA (Claims 5 and 6),
- Ms. Klayman's claims for (1) Gender and Maternity Leave Discrimination Under Title VII to the extent that it is based on denial of promotion 2016 (Claim 1); (2) discrimination under FMLA to the extent that it is based on denial of promotion 2016 (Claim 2); (3) Gender and Pregnancy Discrimination under NYCHRL except to the extent that it is based on denial of promotion in 2017 (Claim 9); and (4) Retaliation Under Title VII and NYCHRL (Claims 10 and 11).

The motions are denied in all other respects.

The Court resets the trial for August 16, 2021 with a pretrial conference August 4, 2021 at 2:00 p.m.  The parties shall meet and confer regarding an expert discovery schedule and file a stipulation or competing proposals by April 5, 2021.

//

29

1    This Order disposes of Docket Nos. 150 and 151.

2    **IT IS SO ORDERED.**

3    Dated: March 8, 2021

4

5                                                    _____

6                                                    JACQUELINE SCOTT CORLEY
                                                     United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

30